EXHIBIT

16

Transcript of the Testimony of

# Robert Gerholdt

December 5, 2023

## Raymond Thompson v. Joshua Cockrell, et al

## Field Reporting Services
**314-461-2122**
**fieldreporting328@gmail.com**

## 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RAYMOND THOMPSON,                )
                                 )
            Plaintiff,           )
                                 )
    v.                           )    Case No. 4:23-CV-133-SRW
                                 )
JOSHUA COCKRELL, et al.,         )
                                 )
            Defendants.          )

DEPOSITION OF ROBERT GERHOLDT

On behalf of Plaintiff

December 5, 2023

CERTIFIED TRANSCRIPT

## 2

INDEX OF EXAMINATION

WITNESS:  ROBERT GERHOLDT
                                                    Page
Examination by Mr. Gelfand  .....................    5
Examination by Ms. Robertson ....................  112
Further Examination by Mr. Gelfand ..............  120
Further Examination by Ms. Robertson ............  123

        E X H I B I T S
Plaintiff's Deposition Exhibit 2 ................   62
Plaintiff's Deposition Exhibit 3 ................   58
Plaintiff's Deposition Exhibit 4 ................   68
Plaintiff's Deposition Exhibit 5 ................   77
Plaintiff's Deposition Exhibit 6 ................   91
Plaintiff's Deposition Exhibit 7 ................   55
Plaintiff's Deposition Exhibit 11 ...............   99
Plaintiff's Deposition Exhibit 12 ...............   44
Plaintiff's Deposition Exhibit 13 ...............   97
Plaintiff's Deposition Exhibit 14 ...............  105
Plaintiff's Deposition Exhibit 15 ...............   70
Defendants' Deposition Exhibit A ................  114
Defendants' Deposition Exhibit B ................  115

        (Exhibits retained by counsel.)

## 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RAYMOND THOMPSON,                )
                                 )
            Plaintiff,           )
                                 )
    v.                           )    Case No. 4:23-CV-133-SRW
                                 )
JOSHUA COCKRELL, et al.,         )
                                 )
            Defendants.          )

        DEPOSITION OF ROBERT GERHOLDT, produced, sworn,
and examined on the 5th day of December, 2023, between
8:00 a.m. and 6:00 p.m. of that day before Brenda L.
Schmelz, Certified Verbatim Reporter-Master, Missouri CCR
1267, a Certified Court Reporter within and for the State
of Missouri, in the above-styled certain cause now pending
before the United States District Court, Eastern District
of Missouri, Eastern Division, on behalf of the Plaintiff.

## 4

APPEARANCES

On behalf of Plaintiff:

Justin K. Gelfand, Esq.
Margulis Gelfand, LLC
7700 Bonhomme, Suite 750
St. Louis, MO  63105
314.390.0234
justin@margulisgelfand.com

On behalf of Defendant:
Catherine Robertson, Esq.
Reichardt Noce & Young
12444 Powerscourt Dr., Suite 160
St. Louis, MO  63131
314.789.1199
cmr@reichardtnoce.com

Robert Gerholdt  -  December 5, 2023

2 (Pages 5 to 8)

5

1           ROBERT GERHOLDT,
2 of lawful age, being first duly sworn to tell the truth,
3 the whole truth, and nothing but the truth, deposes and
4 says on behalf of Plaintiff, as follows:
5
6              EXAMINATION
7 BY MR. GELFAND:
8     Q.  Good afternoon.
9     **A.  Good afternoon.**
10     Q.  Could you please state and spell your name for
11 the benefit of the court reporter, please, sir?
12     **A.  Robert Gerholdt.  My last name is spelled**
13 **G-E-R-H-O-L-D-T.**
14     Q.  And what is your title?
15     **A.  Police officer.**
16     Q.  Okay.  Would you prefer that I refer to you as
17 Officer Gerholdt over this deposition?
18     **A.  No, that's fine.  You can call me Robert, big**
19 **ugly tall guy with glasses.  You can call me whatever you**
20 **want to.**
21     Q.  Careful what you offer.
22     **A.  It's happened before, sir.  Trust me.**
23     Q.  How are you currently employed?
24     **A.  I'm employed by the City of Manchester.**
25     Q.  And how long have you been a police officer with

6

1 the City of Manchester?
2     **A.  Just over a year and a half.**
3     Q.  We'll get a little more into your background in
4 a second, but before we do, I assume given your
5 employment, you've given depositions before?
6     **A.  Yes, sir, I have.**
7     Q.  Approximately how many times?
8     **A.  That I can remember, three.**
9     Q.  Has that always been in connection with your
10 work, in other words, criminal cases where you've been
11 deposed?
12     **A.  It's always been in connection with cases that I**
13 **was involved in, yes.**
14     Q.  Okay.  I'm going to go over a couple of ground
15 rules quickly, but it sounds like you're pretty familiar
16 with the process.
17     **A.  Please.**
18     Q.  Over the course of this deposition, I'm going to
19 ask you some questions.  Your own attorney may ask you
20 some questions as well.  No matter who's asking you the
21 question, I'm going to ask that you please only answer
22 questions if you understand the question.  Fair enough?
23     **A.  Yes, sir.  I would hope so.**
24     Q.  If you don't understand the question, you know,
25 please just ask me to rephrase it or ask your own attorney

7

1 to rephrase it.  I promise you, you won't offend either of
2 us.  We'd rather you understand the question and get it
3 right.  Fair enough?
4     **A.  Yes, sir.**
5     Q.  Similarly, if you do answer a question, I would
6 assume that you did understand it.  Fair enough?
7     **A.  Absolutely.**
8     Q.  Finally, over the course of this deposition, as
9 you see, the court reporter is taking a transcript.  I'll
10 certainly do my best in this way too, but if we can do our
11 best to make sure that we don't talk over one another,
12 that will make the court reporter not kill us, which will
13 be better for all of us today.  Fair enough?
14     **A.  Yes.  I would like to leave here in one piece,**
15 **yes.**
16     Q.  Okay.  You testified that you've been a police
17 officer with the City of Manchester for approximately
18 one and a half years; is that correct?
19     **A.  Correct, just a little over one and a half**
20 **years, yeah.  It will be two years in April.**
21     Q.  Generally speaking, what are your duties and
22 responsibilities as a police officer in the City of
23 Manchester?
24     **A.  As a police officer, I am responsible for**
25 **traffic control.  I am responsible for responding to**

8

1 different calls for service, for general keeping the
2 peace, restoring or maintaining order in the City.
3     Q.  Do you have any supervisory responsibilities?
4     **A.  I do not.**
5     Q.  What is your academic background?
6     **A.  My academic background is -- how far would you**
7 **like me go back, sir?**
8     Q.  Past high school.
9     **A.  Past -- oh, past high school.  I have an**
10 **associate's degree in Criminal Justice from Southern New**
11 **Hampshire University.**
12     Q.  And when did you receive that?
13     **A.  I did that just within the last year.**
14     Q.  Okay.  Any other post high school education,
15 formal education?
16     **A.  I did go to a corrections, a course, the Arizona**
17 **Institute of Business and Technology in Mesa, Arizona, but**
18 **that -- that was 35 years ago.**
19     Q.  Okay.
20     **A.  Many moons.**
21     Q.  Did you receive a degree in that?
22     **A.  I received a diploma and that was basically not**
23 **a college credited type thing.  It was when I was going to**
24 **go into corrections, and basically it was just a yes, you**
25 **passed, Merry Christmas.**

Robert Gerholdt  -  December 5, 2023

9

1    Q.  Other than your current employment, do you have
2  any previous law enforcement experience?
3    **A.  I do.**
4    Q.  Where?
5    **A.  City of Hazelwood.**
6    Q.  How long did you work for the City of Hazelwood?
7    **A.  Approximately eighteen and a half years.**
8    Q.  As a police officer?
9    **A.  Sixteen of that was as a police officer and then**
10  **two and a half was as a detective.**
11    Q.  Why did you leave the City of Hazelwood?
12    **A.  Better pay.  My insurance actually was $1570 a**
13  **month.  That was putting a pretty big financial strain on**
14  **my family.  The general atmosphere of the City of**
15  **Hazelwood was -- in all honesty, it was just -- it was**
16  **affecting my marriage, affecting my family and my wife**
17  **pretty much told me to get out of law enforcement or go**
18  **somewhere else.  So that's when I chose to come to**
19  **Manchester.  Thank God they hired me.**
20    Q.  Did you go straight from Hazelwood Police
21  Department to Manchester Police Department?
22    **A.  Yes, it was a matter of one day.  I actually**
23  **quit the City of Hazelwood on April 16th, which was a**
24  **Saturday, and I took Sunday off.  And Monday, the 18th, I**
25  **started at Manchester.**

10

1    Q.  When you left Hazelwood, were you a detective?
2    **A.  I was not.  I was back on the road.**
3    Q.  Was there anything that happened at Hazelwood
4  that caused you to go from detective to police officer?
5    **A.  No, sir.  The program that I was in was a**
6  **two-year rotating detective position.  It wasn't a**
7  **permanent spot.  I actually got six months, a little bit**
8  **more, before they put me back on the road.**
9    Q.  With the exception of Hazelwood and Manchester,
10  have you worked in any other law enforcement capacity?
11    **A.  No, sir.**
12    Q.  Have you ever been the subject of any discipline
13  actions in connection with your law enforcement
14  experience?
15    **A.  No.**
16    Q.  Have you ever been the party to any lawsuit -- a
17  party to any lawsuit with the exception of, obviously, the
18  one that gets us all together today?
19    **A.  No, sir.**
20    Q.  So just to be clear, you've never sued or been
21  sued?
22    **A.  Me personally, no.**
23    Q.  Now, as a police officer with as many years of
24  experience as you have --
25    **A.  Yes, sir.**

11

1    Q.  -- would you agree with me that it's important
2  to be thorough in your police work?
3    **A.  Yes, sir.**
4    Q.  To be fair?
5    **A.  Yes, sir.**
6    Q.  To keep an open mind?
7    **A.  Yes.**
8    Q.  To follow all leads?
9    **A.  Yes.**
10    Q.  To not rush to judgment until you have all the
11  relevant evidence?
12    **A.  Yes.**
13    Q.  And to be honest and accurate in any police
14  reports, affidavits, other documents that you prepare in
15  connection with your work?
16    **A.  That is correct.**
17    Q.  Now, as a police officer with the City of
18  Manchester, would you agree with me that you have a number
19  of investigative tools at your disposal?
20        MS. ROBERTSON:  Objection, vague.
21    **A.  Can you be more specific?**
22    Q.  (By Mr. Gelfand)  Sure.  If it is appropriate
23  in the context of any particular investigation, you have
24  the ability to apply for, and if granted by a judge,
25  execute search warrants; correct?

12

1    **A.  Correct.**
2    Q.  You have the ability to conduct voluntary
3  witness interviews with anybody willing to talk to you in
4  connection with a matter; correct?
5    **A.  Yes.**
6    Q.  You have the ability to issue subpoenas if you
7  need to get documents from third parties or companies;
8  correct?
9    **A.  I do not have the ability to issue subpoenas,**
10  **no.**
11    Q.  Do you have the ability to request subpoenas?
12    **A.  I do have the ability to request them, yes.**
13    Q.  And have you done that before in connection with
14  cases?
15    **A.  Yes.**
16    Q.  You have access to forensics and crime labs that
17  can do things like DNA, fingerprints, the whole nine
18  yards; correct?
19    **A.  St. Louis County, yes, sir.**
20    Q.  Okay.  And would you agree with me that it's
21  only fair to all parties involved in a matter to use all
22  available resources to make sure that you've investigated
23  any situation fairly and thoroughly?
24        MS. ROBERTSON:  Objection, calls for
25  speculation.  You can answer if you know.

Robert Gerholdt  -  December 5, 2023

---

**13**

1     A.  I think that question is only based on the
2  circumstance because not all circumstances are the same.
3     Q.  (By Mr. Gelfand):  What are circumstances that
4  you have confronted in your police work with the City of
5  Manchester Police Department where you have concluded that
6  you should not use all available resources?
7        MS. ROBERTSON:  Objection, calls for
8     speculation.  Object to form.  Vague.
9     A.  I don't understand the question, sir.
10    Q.  (By Mr. Gelfand):  Are there any instances where
11  you've investigated a matter and decided purposefully not
12  to use law enforcement that you just testified about?
13       MS. ROBERTSON:  Same objection.  You can
14    answer if you know.
15    A.  I don't know.
16    Q.  (By Mr. Gelfand):  Did you personally draft any
17  police reports or affidavits in connection with this
18  particular matter?
19    A.  A police report, yes, sir.
20    Q.  And just broadly speaking -- we'll get into the
21  details of the police report -- would you agree with me
22  that it's important to be accurate and complete when you
23  draft police reports?
24    A.  Yes, sir.
25    Q.  Did you do that in this case?

---

**14**

1     A.  Yes, sir.
2     Q.  Did you take great care to make sure that what
3  you said was completely accurate?
4     A.  Yes, sir.
5     Q.  Now, what is your understanding of the purpose
6  of a Manchester Police Department police report?
7        MS. ROBERTSON:  Objection, vague.
8     A.  The purpose of a police report is to tell a
9  story, for a lack of better words, what happened, who I
10  contacted, where I went, what I did, what other people
11  did, what other people said.  That is the purpose of a
12  police report.
13    Q.  (By Mr. Gelfand):  Would you agree with me that
14  one of the purposes of a police report is to memorialize
15  what happened?
16       MS. ROBERTSON:  Objection, calls for
17    speculation, vague.
18    A.  I don't understand what you mean by memorialize.
19    Q.  (By Mr. Gelfand):  To write down what happens,
20  so that there is some sort of written record?
21    A.  Yes.
22    Q.  And is it fair to say, based on your training
23  and experience as a law enforcement officer, that other
24  law enforcement often rely on police reports?
25       MS. ROBERTSON:  Objection, vague, calls for

---

**15**

1     speculation.
2     A.  In my experience as a police officer, I would
3  say that there has been times when my police report
4  directly coincides with -- with another department's case
5  or something they have going on.  So in that I would say,
6  yes.
7     Q.  (By Mr. Gelfand):  Do you provide police reports
8  to prosecutors?
9     A.  Yes, sir.
10    Q.  Why?
11       MS. ROBERTSON:  Objection, vague, calls for
12    speculation, relevance.  You can answer.
13    A.  I'm sorry, can you repeat the question, sir?
14    Q.  (By Mr. Gelfand):  Yeah.  Why do you provide
15  police reports to prosecutors?
16    A.  If they ask for it, whether it be for warrant
17  application purposes or prosecutors using a police report
18  in reference to another agency's police report.
19    Q.  I want to direct your attention, Officer, to the
20  night of October 22 of 2022.  Do you recall that evening?
21    A.  Yes.
22    Q.  Were you on duty?
23    A.  I was.
24    Q.  And specifically, were you on duty acting in the
25  capacity of a police officer with the City of Manchester

---

**16**

1  Police Department?
2     A.  Yes, sir.
3     Q.  Did you come into contact with an individual
4  named Amara Elmore?
5     A.  Yes, sir.
6     Q.  Prior to that evening, to the best of your
7  knowledge, had you ever met Ms. Elmore?
8     A.  No.
9     Q.  Prior to that evening, to the best of your
10  knowledge, had you ever spoken with Ms. Elmore?
11    A.  No, sir.
12    Q.  As far as you know, is it fair to say that's the
13  first time you ever met this woman?
14    A.  I think that's fair, yes, sir.
15    Q.  Did you also come into contact with a -- an
16  individual named Steven Mackenzie?
17    A.  Yes, sir.
18    Q.  Similarly, had you ever met or spoken with
19  Mr. Mackenzie prior to that evening?
20    A.  No, sir.
21    Q.  Where did you -- well, first of all, when you
22  came into contact with Ms. Elmore and Mr. Mackenzie, were
23  they together?
24    A.  They were together.
25    Q.  Where did you come into contact with them first?

---

Robert Gerholdt - December 5, 2023

---

17

1    A.  At 1209 Cottagemill.  Specifically, they were in
2 the street out in front of the residence.
3    Q.  Okay.  And just to be clear, so that we can
4 speed through some of this --
5    A.  Absolutely.
6    Q.  -- that is a residential address owned by a
7 Jeremiah -- I'm sorry, owned by Raymond Thompson; correct?
8    A.  That is correct, sir.
9    Q.  Okay.  I'm going to refer to that as
10 Mr. Thompson's house.  Fair enough?
11    A.  Yes, sir, absolutely.
12    Q.  When you -- prior to arriving at the scene, why
13 did you respond to that address?
14    A.  Dispatch had sent me there in reference to a
15 recover a failed to return vehicle.  That's the way it
16 came out.
17    Q.  Did you then respond to that call, so to speak,
18 by traveling in your police car to that residence?
19    A.  Yes.  I was dispatched as initially an assist
20 car.  Officer Cockrell was dispatched.  It was his sector
21 that night, but I got there first.
22    Q.  Who is Officer Cockrell?
23    A.  Officer Joshua Cockrell was the assist officer.
24    Q.  Was there any significance to what transpired
25 with the fact that you got there first?

---

18

1    A.  No, sir.  I just -- luck of the draw.  Got there
2 first.
3    Q.  Did it still remain Officer Cockrell's call or
4 was it yours?
5    A.  No, sir.  It was -- I took the call since I got
6 there first, and I was already talking to Ms. Elmore and
7 Mr. Mackenzie prior to Officer Cockrell being there.
8    Q.  When you traveled to the residence, did you
9 travel there with lights and sirens?
10    A.  No, sir.
11    Q.  Lights or sirens?
12    A.  Lights or sirens?  No, sir.
13    Q.  When you arrived at the residence, you testified
14 that Ms. Elmore and Mr. Mackenzie were standing in the
15 street?
16    A.  Yes, sir.
17    Q.  What did you do?
18    A.  I got out and I contacted them.
19    Q.  What, if anything, did you say?
20    A.  I don't remember exactly what I said to them, so
21 I can't -- I can't tell you.
22    Q.  Approximately what time of day was this on
23 October 22 of 2022?
24    A.  It was just a little after 11:00 p.m. or 2300
25 hours, 2316 specifically in the police report.

---

19

1    Q.  Okay.  So approximately 11:15 p.m.?
2    A.  Yes, sir.
3    Q.  How long were you on-scene before you initially
4 left?
5    A.  I cannot -- I can't say exactly how long I was
6 there.
7    Q.  Approximately how long were you on-scene?
8    A.  Twenty, 25 minutes.
9    Q.  When you approached Ms. Elmore and
10 Mr. Mackenzie, what, if anything, did they say to you,
11 other than --
12    A.  I remember that they were all smiles.  They were
13 saying, Hi, how you doing.  I -- like I said, I don't
14 remember exactly what I said to them, but normally when I
15 meet people I say hello, how are you, what's going on?
16 But I can't -- I can't testify to that because I don't
17 remember.  Just --
18    Q.  Do you remember anything they said to you?
19    A.  Oh, I remember a lot.  Yeah.  But I'm just
20 saying, what I said to them.
21    Q.  Fair enough.
22    A.  Okay.  That's just -- normally, that's what I
23 would say to people, just to kind of break the ice, but I
24 can't specifically say what I said to them, but as far as
25 what they said to me, yes, sir, I do remember.

---

20

1    Q.  What did each of them say to you?
2    A.  So Ms. Elmore was the one that did most of the
3 talking.  She stated that her father, Nathan Rench, had
4 loaned a 2003 Harley-Davidson trike to a friend of -- or a
5 then friend.  Apparently, they weren't friends anymore.  A
6 then friend of his named Raymond Thompson.  She said that
7 she was told by Nathan Rench that after the bike had been
8 loaned for a couple of weeks, Raymond Thompson moved --
9 moved out of Owensville and did not return the bike.  She
10 said that Nathan Rench asked her and Mackenzie, both, if
11 they would recover the bike for him.
12    Q.  Prior to arriving at Mr. Thompson's house that
13 evening, had you ever spoken with Nathan Rench?
14    A.  No, sir.
15    Q.  To the best of your knowledge, had you ever met
16 Nathan Rench?
17    A.  No idea who he was.
18    Q.  This was just a random name out of the blue;
19 correct?
20    A.  Yes, sir.
21    Q.  So what did you do next?
22    A.  She continued her story.  After she told me
23 that, she said that Nathan Rench showed her a picture of a
24 title that had his information on it.  She took a picture
25 of that title and then she showed that to me.  She showed

---

21

1   me a title that -- a picture of a title on a phone that
2   had a name, a VIN number and the year, make and model of
3   the bike.
4       Q.  Let's back up for a second.
5       A.  Absolutely.
6       Q.  Is everything you just testified about a
7   conversation that you had prior to, as I understand it,
8   knocking on the door of Mr. Thompson's house?
9       A.  Yes, sir, it is.
10      Q.  With respect to what she showed you, if I
11  understand your testimony correctly, it was a phone, her
12  phone, depicting what was a picture of a picture of a
13  title?
14      A.  Yes, sir.
15      Q.  Or I should say a purported title.
16      A.  I'm sorry?
17      Q.  I should say a purported title.
18      A.  A purported title.  I don't know what the word
19  purported means, but --
20      Q.  Supposed.
21      A.  Yes, sir.
22      Q.  In other words, you now understand that wasn't
23  the real title; right?
24      A.  I'm sorry, sir?
25      Q.  You now understand that wasn't a real title;

22

1   correct?
2           MS. ROBERTSON:  Objection -- objection,
3       calls for speculation, calls for a legal
4       conclusion.  You can answer if you know.
5       A.  At the time, no, I did not know that.
6       Q.  (By Mr. Gelfand):  I'm asking you now.
7       A.  Now, sir?
8       Q.  Yes.
9       A.  As we stand here today?
10      Q.  Yes.  So that's what I mean by a purported
11  title.
12      A.  Okay.
13      Q.  At the time that she showed you the picture of
14  the picture on the phone, did she show you any other
15  documents?
16      A.  No, sir.
17      Q.  Or any other pictures to be precise?
18      A.  She showed a picture of the motorcycle.
19      Q.  What did you do after she showed you this
20  picture of a picture?
21      A.  She continued her statement.  Said that they
22  were in the area and they found Mr. Thompson's address on
23  CaseNet and they came to the address that evening.  They
24  said that they or -- I'm sorry, she said that they did not
25  see the bike in the driveway.  So the gate was open, so

23

1   they looked in the backyard.  They saw the bike in the
2   back and then they called the police.
3       Q.  Was there anybody present that evening who
4   claimed to be Nathan Rench?
5       A.  No, sir.
6       Q.  Did you do anything that evening to investigate
7   the relationship, if any, between Ms. Elmore and
8   Mr. Rench?
9       A.  For the -- for the entire time that it was
10  there, is that what you're asking?
11      Q.  Yes.
12      A.  Yes.  However, Ms. Elmore stated that the reason
13  why Nathan Rench wasn't there was because he had been in a
14  recent motorcycle accident and had a stroke and he had to
15  get around on a motorized scooter.  That's why he wasn't
16  there.
17      Q.  Did you know at the time whether anything she
18  was telling you was true or untrue?
19      A.  I had no reason to believe I was being lied to.
20      Q.  In fairness, you also had no reason to believe
21  you weren't being lied to; correct?
22      A.  Yes, sir.
23      Q.  Did you do anything to investigate the actual
24  relationship that evening between Ms. Elmore and Mr.
25  Rench?

24

1       A.  We're skipping ahead a little bit, after --
2       Q.  Let's -- let's do this, because that's fair.
3       A.  Okay.
4       Q.  And I don't want to confuse --
5       A.  Right, you're -- you're skipping --
6       Q.  -- the record.
7       A.  -- way ahead.
8       Q.  My understanding, which is -- let's get our
9   bearings for a second.
10      A.  Sure.
11      Q.  My understanding is that you responded to
12  Mr. Thompson's house that evening multiple nights --
13  multiple times; correct?
14      A.  That is correct.
15      Q.  Okay.  What you've previous -- what you've been
16  testifying about so far is the first response; correct?
17      A.  The first response, yes, sir.
18      Q.  Let's stay on that right now --
19      A.  Yes, sir.
20      Q.  -- until we expressly get to the next.
21      A.  Okay.  Absolutely.
22      Q.  During that first response, did you do anything
23  at all to investigate how Ms. Elmore and Mr. Rench were
24  actually related, if at all?
25      A.  No, sir.

Robert Gerholdt  -  December 5, 2023

25

1    Q.  During that first response at the time at
2  Mr. Thompson's house, did you do anything at all to
3  investigate how, if at all, Mr. Mackenzie and Mr. Rench
4  were actually related?
5    **A.  No, sir, I had no reason.**
6    Q.  So after they showed you these documents and
7  told you that they believed the bike was in the back, what
8  did you do?
9    **A.  At that point, I went and I knocked on the door,**
10  **on the front door of Mr. Thompson's residence several**
11  **times.  Knocked on the door, rang the doorbell to try to**
12  **get -- contact somebody at the house.**
13    Q.  Did you do anything to determine who lived in
14  that house?
15    **A.  Yes, sir.**
16    Q.  What did you do?
17    **A.  As I was coming back down, Mr. Mackenzie was**
18  **like, there's the bike right there.  You can see it back**
19  **behind the fence, the open fence.  As I was walking**
20  **towards the driveway, there was a vehicle parked in the**
21  **driveway.  I ran the plate on the vehicle and it came back**
22  **to Raymond Thompson.**
23    Q.  Prior to that evening, had you ever had any
24  interactions with Mr. Thompson that you recall?
25    **A.  No, sir.**

26

1    Q.  Prior to that evening, had you ever been to his
2  residence for any reason?
3    **A.  Specifically, no.  I have driven by it probably**
4  **hundreds of times, but specifically for a call, no.**
5    Q.  When you say "driven by it," you just mean
6  because it's in Manchester and you --
7    **A.  General patrol.**
8    Q.  Patrol, not because there was anything at the
9  house?
10    **A.  No, sir.**
11    Q.  Now, when you knocked on the door multiple
12  times, did you quickly conclude that nobody was home?
13    **A.  Quickly?  Not quickly.**
14    Q.  Did you conclude that nobody was home?
15    **A.  I concluded that nobody was home, yes, sir.**
16    Q.  What led you to conclude that nobody was home?
17    **A.  Nobody answered the door.**
18    Q.  Simple enough; right?
19    **A.  What's that?**
20    Q.  Simple enough; right?
21    **A.  Yes, sir.**
22    Q.  Did you pick up the phone and try to call
23  Mr. Thompson?
24    **A.  I did not.**
25    Q.  You testified that you then walked down from the

27

1  front door?
2    **A.  Correct.**
3    Q.  And around to the driveway; is that correct?
4    **A.  That is correct, sir.**
5    Q.  What did you do at that point?
6    **A.  As I previously stated, there was a vehicle**
7  **parked in the driveway.  I ran the plate on the vehicle**
8  **and it came back to Mr. Thompson.**
9    Q.  Was the only significance of that from a law
10  enforcement perspective that it corroborated that this was
11  Mr. Thompson's house?
12    **A.  I don't understand the question.**
13    Q.  Why -- why did you run the plate to the vehicle?
14    **A.  To see who it came back to and that would**
15  **conclude that it -- it was Mr. Thompson's residence.**
16    Q.  And that was the only point, right, to figure
17  out who lived there?
18    **A.  Yes, sir.**
19    Q.  Then what did you do?
20    **A.  After that, I did look in the backyard -- or I'm**
21  **sorry, I looked in the back behind the fence and, I saw**
22  **that the motorcycle sitting back there that resembled the**
23  **picture that they showed me.**
24    Q.  Let's back up for a second.  Do you readily
25  admit that you walked past the privacy fence into the

28

1  backyard of the house?
2    MS. ROBERTSON:  Objection, mischaracterizes
3  his testimony.
4    MR. GELFAND:  I'm asking him a question.
5  It wasn't mischaracterizing anything.
6    **A.  At the point that we're at right now, that**
7  **answer is no, because I had not yet gone into the**
8  **backyard.**
9    Q.  (By Mr. Gelfand):  Okay.  At any point that
10  evening in this first time that you responded to the house
11  --
12    **A.  Yes, sir.**
13    Q.  -- did you enter Mr. Thompson's backyard?
14    **A.  Yes, sir.**
15    Q.  Did all four of you enter Mr. Thompson's
16  backyard?
17    **A.  At the same time?**
18    Q.  Or simultaneously?
19    **A.  No, not simultaneously, no.**
20    Q.  Tell me what happened.  What was the order of
21  people that entered the backyard?
22    **A.  Myself and Officer Cockrell went back first.**
23  **And then Amara Elmore and Steven Mackenzie came back after**
24  **that.**
25    Q.  Was there a time where you and Officer Cockrell

29

1  were in the backyard and asked Ms. Elmore and Mr.
2  Mackenzie to wait?
3      **A.  I did tell them to wait.**
4      Q.  Why?
5      **A.  Because I didn't know what was going on.  I**
6  **didn't know anything about Mr. Thompson.  I didn't want**
7  **them just willy-nilly coming back into a backyard, getting**
8  **hurt, slipping, falling or anything else that might cause**
9  **any other issues.**
10      Q.  And during that time, before Ms. Elmore and Mr.
11  Mackenzie came into the backyard, Officer Cockrell was
12  with you in the backyard?
13      **A.  Yes, sir.**
14      Q.  Approximately how long were you and Officer
15  Cockrell in the backyard before Ms. Elmore and Mr.
16  Mackenzie were cleared by you to come to the backyard?
17      **A.  I don't know the answer to that.**
18      Q.  Are we talking seconds, minutes, days or --
19      **A.  We're not talking days.  We're not talking**
20  **hours.  So I would say minutes.**
21      Q.  Okay.  When you and Officer Cockrell entered the
22  backyard at that time -- I'm just trying to show what
23  happened here.
24      **A.  Mm-hm.**
25      Q.  What were each of you doing?

30

1      **A.  When we entered the backyard?**
2      Q.  Yes.
3      **A.  I do not know what Officer Cockrell was doing.**
4  **My attention was on what was going on.  His was to back me**
5  **up, so I don't -- I can't tell you what he does.  I can't**
6  **testify to that.**
7      Q.  What did you do?
8      **A.  I walked straight to the motorcycle.  I located**
9  **the VIN number on the right front fork assembly.  I ran**
10  **the VIN.  First of all, I verified it through the picture**
11  **that they showed me.  And then I ran the VIN through our**
12  **computer dispatch.**
13      Q.  So just to understand what you're saying, I
14  understand you didn't watch specifically what Officer
15  Cockrell was doing?
16      **A.  Correct.**
17      Q.  But when you went into the backyard before
18  clearing Ms. Elmore and Mr. Mackenzie to come into the
19  backyard, you were going in the backyard to try to find
20  the motorcycle?
21      **A.  That's correct.  Well, not to try and find it,**
22  **no.  I knew exactly where it was because I could see it.**
23      Q.  Okay.  And then you walked up to what you
24  believed was the motorcycle; correct?
25      **A.  Yes, sir.  Yes, sir.**

31

1      Q.  And you searched for the VIN; correct?
2      **A.  Correct.**
3      Q.  Where was the VIN?
4      **A.  Right front fork assembly.**
5      Q.  And you testified that the VIN matched, so to
6  speak, the VIN that was on the picture of a picture that
7  Ms. Elmore showed you; correct?
8      **A.  Yes, sir.**
9      Q.  Is there anything else you did in the backyard
10  before clearing Ms. Elmore and Mr. Mackenzie to come into
11  the backyard?
12      **A.  So the answer to that question is, yes.**
13  **However, I think it should be noted that I at no point --**
14  **when I ran the VIN and it came back to Nathan Rench,**
15  **that -- which is what I did next, Amara Elmore and Steven**
16  **Mackenzie walked back in there.  I didn't say, okay, guys,**
17  **come on back.  I didn't say anything like that.  They just**
18  **walked back into the backyard, and I did not stop them at**
19  **that point.**
20      Q.  Okay.  What else did you do in the backyard
21  then?
22      **A.  Nothing.  As far as -- I mean, as far as the**
23  **motorcycle is concerned, I didn't go anywhere else.  I**
24  **didn't touch anything else.  I never put my hands on the**
25  **motorcycle at any point.  I simply looked at it and ran**

32

1  **the information.  Once it came back to it, Steven**
2  **Mackenzie came, had a key in his hand.  At that point, he**
3  **started the motorcycle and took it.**
4      Q.  So we're going to get into that in a second.
5      **A.  Absolutely.**
6      Q.  And I can show it to you if you want, but my
7  understanding is there's a reference in a police report
8  that you prepared whereby you claim to attempt to --
9      **A.  Oh.**
10      Q.  -- make statements to I believe it was an open
11  window --
12      **A.  An open window.**
13      Q.  -- of the house.
14      **A.  An open window, yes.**
15      Q.  Can you tell me what happened there?
16      **A.  Absolutely.  So there was -- in the rear of the**
17  **residence there is -- it's two-story because there was an**
18  **upper window that was open and I -- once again I yelled my**
19  **name, Manchester Police Department, nobody answered again.**
20  **I -- yes.**
21      Q.  And where were you standing when you yelled into
22  that window?
23      **A.  Next to the motorcycle.**
24      Q.  You testified a minute ago that Mr. Mackenzie
25  had a key in his hand?

Robert Gerholdt  -  December 5, 2023

---

33

1    A.  Yes, sir.
2    Q.  What did the key look like?
3    A.  I do not remember.
4    Q.  What then did he do?
5    A.  I was standing on the right side of the
6  motorcycle.  The motorcycle was facing west.  He came up
7  on the left side of the motorcycle, had the key in his
8  right hand, just like this (indicating).  He went around
9  to the rear of the bike and then the bike started, very
10  loudly I might say.
11    Q.  Did he represent to you that this was a key to
12  the motorcycle?
13    A.  I don't remember.
14    Q.  Was that the inference?
15    A.  Well, if he had the key in his hand, that would
16  be the inference.  If he --
17    Q.  He's not going into the house; right?
18    A.  Right, but he never once said this is the key
19  to -- to my recollection, that this is the key to the
20  motorcycle.  He had the key in his hand.
21    Q.  Did you watch him use the key to start the
22  motorcycle?
23    A.  I did not.
24    Q.  Then what happened?
25    A.  The motorcycle started, rattled windows within

---

34

1  about an eight-block radius, and then he drove the
2  motorcycle out of the gate.  Amara Elmore followed him and
3  she got into her vehicle and they drove away.
4    Q.  When you initially responded to this call, did
5  you utilize a dash cam?
6    A.  Yes, sir.
7    Q.  What is a dash cam?
8    A.  So the dash cam is a -- it's a camera that's
9  mounted -- every department's different.  The City of
10  Manchester, it looks like a little cross, sits right above
11  the center of the vehicle or the center of the interior of
12  the vehicle, has a computer or a monitor, a little --
13  probably about a 5-inch monitor that sits right above the
14  passenger seat.  And yes, I did use it.
15    Q.  When you were on scene, were you wearing what we
16  commonly call a body cam or a body camera?
17    A.  Yes, sir.
18    Q.  Are you familiar with what a body cam is?
19    A.  I would hope so, sir.
20    Q.  I would hope so, too.  What is a body cam?
21    A.  Pardon me?
22    Q.  What is a body cam?
23    A.  A body camera -- once again, each department is
24  different.  The City of Hazelwood's about the size of a
25  small book.  These are about the size of a little tiny

---

35

1  half pack of cigarettes.  Basically, it's a mobile camera
2  that will capture audio and video of an incident.
3    Q.  Do police officers at the Manchester Police
4  Department during this time period have control over
5  whether the body cam is recording at any given time?
6    A.  Yes, sir.
7    Q.  And is that as simple as basically pushing a
8  button?
9    A.  It is.
10    Q.  When a body cam is recording, and I'm just
11  asking about the Manchester Police body cam --
12    A.  Sure.
13    Q.  -- that you were wearing that night.  When a
14  body cam is recording, is there any indicia on the body
15  cam to show that it's on and that it's recording?
16    A.  Yes, sir.  I would like to go back to one thing
17  real quick.  There are instances where the body cam is
18  activated automatically.  So when the body cam and the car
19  camera are paired together, whenever you turn on, let's
20  say, your lights, your emergency lights, both the body
21  camera and the car camera are automatically activated.
22  Another instance would be if you're driving faster than
23  75 miles an hour, the body camera and the car camera
24  automatically activate and the only way to deactivate them
25  is to physically turn them off.

---

36

1    So to answer your question, yes, there is a
2  green status light, which shows the camera power is on.
3  There is also a very very small, very small, even for my
4  eyes, LED screen.  It's not even a LED, it just like a
5  digital readout up top that shows the power status, the
6  number of calls or the number of recordings that are
7  currently being recorded on it and a -- I think a serial
8  number.
9    Q.  And what, if any, significance is there to a red
10  light when it's enabled?
11    A.  When the red light is enabled, that means that
12  the recording is active, which is the same case for the
13  car camera.  Whenever the body cam is in current record
14  mode, there's also a red light that shows up on the
15  button.
16    Q.  When you responded to this particular scene and
17  enabled the dash cam and the body cam, was that one of the
18  automatic instances or was that manual?
19    A.  That was a manual thing, sir.  And it should
20  also be noted that the car camera and the body camera work
21  opposite of each other.  So as I said before, when you
22  turn on the lights, that the dash cam and then it
23  activates the body camera.  By the same token, if I
24  respond to a scene and I push the record button on my body
25  camera, that activates the car camera.  So they're both

---

**37**

1 paired together.
2    Q.  So in this particular instance, both the body
3 camera and the car camera, the dash camera were recording?
4    A.  Yes, sir.  When I exited my vehicle -- actually
5 before I exited my vehicle, I hit the button, it started
6 recording.  Normally, during the day -- if you watch my
7 recordings, I have to go like this (demonstrating) to make
8 sure the red light's on because the sun's shining and --
9 and you can't see, but if it's dark, I can look down and
10 see the red light.
11    Q.  And you saw the red light in this instance?
12    A.  Yes, sir.
13    Q.  And is it fair to say you didn't turn it off;
14 right?
15    A.  No, sir.
16    Q.  Is that what it's called?
17    A.  No, sir.
18    Q.  So the dash camera --
19    A.  No, wait, it is fair.  I'm sorry.
20    Q.  It is fair to say that?
21    A.  It is fair to say that I did not turn it off.
22 That is correct.
23    Q.  I appreciate that clarification.  Sometimes we
24 have records that --
25    A.  That's all good, man.  Don't worry about it.

**38**

1    Q.  I appreciate that.  So bottom line, though, when
2 we just cut to the chase --
3    A.  Are we making her mad yet?
4    Q.  If we cut to the chase, throughout the entirety
5 of all of your interactions with Ms. Elmore, Mr. Mackenzie
6 walking up to the front door, the backyard, that was all
7 recorded on body cam and dash cam with the caveat that
8 some of it may not have been visible from the dash cam?
9    A.  Correct.  So the body cam would have picked up
10 100 percent of everything I did.  The dash cam would have
11 picked up my initial contact with Elmore and Mackenzie and
12 then would have shown a really pretty picture of the back
13 of their vehicle for the rest of the time.
14    Q.  Does the dash cam record audio?
15    A.  The dash cam does record audio, but noted that
16 the dash cam only records the audio from inside the
17 vehicle.
18    Q.  Okay.
19    A.  It does not record outside.  That would be cool
20 if it did.
21    Q.  Have you ever recommended that to your --
22    A.  You know, I'm not really sure I want to go to
23 that planet yet, but I'm sure that -- that in some cases,
24 it does.
25    Q.  When you entered -- let's back up for a second.

**39**

1    A.  Absolutely.
2    Q.  I think there's some concern, if I understood
3 your testimony earlier correctly, with whether we
4 characterize the part of Mr. Thompson's property as a
5 backyard or as anything else.  I'm going to call it the
6 backyard, but let's just get our terms straight for a
7 second.  There is part of Mr. Thompson's private
8 property that you entered that was enclosed by a privacy
9 fence; correct?
10    A.  Yes, sir.
11    Q.  And that part had concrete or asphalt; in other
12 words, not grass; correct?
13    A.  Correct.
14    Q.  And that is the part where you testified the
15 motorcycle that Mr. Mackenzie and Ms. Elmore ultimately
16 left with was initially parked; correct?
17    A.  If you're -- if I understand you correctly,
18 which I'm hoping I do, you're saying that -- the question
19 you're asking me is that the motorcycle was parked behind
20 that privacy fence?
21    Q.  Yes.
22    A.  Yes.
23    Q.  Okay.  I'm going to call that the backyard for
24 purposes of this deposition with the understanding that if
25 you guys want to call it something else over the course of

**40**

1 this litigation, feel free to.
2    A.  Backyard is fine.  I'm sure she'll appreciate
3 that, too.
4    Q.  Great.  When you entered the backyard, you had
5 to actually cross a privacy fence; correct?  There was a
6 gate?
7    A.  A threshold.
8    Q.  Yes.  And you crossed that threshold onto
9 Mr. Thompson's private property; correct?
10    A.  Yes, sir.
11    Q.  At that time, did you have a search warrant?
12    A.  No, sir.
13    Q.  At that time, had you ever even attempted to
14 apply for a search warrant?
15    A.  No, sir.
16    Q.  Is it fair to say that at that time you did not
17 believe you had probable cause to obtain a search warrant?
18    A.  To obtain a search warrant?
19    Q.  Yes.
20       MS. ROBERTSON:  Objection, misconstrues the
21 testimony and evidence in this matter, assumes
22 facts not in evidence, calls for a legal
23 conclusion, calls for speculation.  You can
24 answer if you know.
25    A.  I don't know.

Robert Gerholdt - December 5, 2023

41

1    Q.  (By Mr. Gelfand):  Were you conducting a
2  criminal investigation?
3    **A.  No, sir.**
4    Q.  So just to focus on the facts for a second,
5  notwithstanding your counsel's objections, you didn't have
6  a search warrant; correct?
7    **A.  No, sir.**
8    Q.  You had never even attempted to obtain a search
9  warrant permitting you to enter the backyard; correct?
10    **A.  Yes, that is correct.**
11    Q.  And your purpose in entering the backyard as you
12  previously testified to was to locate and look at the VIN
13  number on the motorcycle; correct?
14    **A.  Correct.**
15    Q.  Did you believe there were exigent
16  circumstances?
17    **A.  Can you define exigent circumstances for me?**
18    Q.  Do you know what exigent circumstances are?
19    **A.  I do.  But as far as in this case, which is**
20  **different from all other cases, what I had was I was there**
21  **to keep the peace and restore order.  I had what**
22  **Ms. Elmore had told me.  I had a picture of the VIN.  I**
23  **had a picture of the motorcycle.  I had tried to contact**
24  **somebody at the residence, so yes.**
25    Q.  Let's back up for a second.

42

1    **A.  Okay.**
2    Q.  Did you believe when you entered the backyard
3  that anyone -- that a human being was in the backyard in
4  need of assistance?
5    **A.  No.**
6    Q.  For example, a hurt person saying help?
7    **A.  I -- no, that would have complicated things.**
8  **No.**
9    Q.  You testified that you were not conducting a
10  criminal investigation; correct?
11    **A.  Correct.**
12    Q.  So you weren't worrying about, you know, drugs
13  being flushed down the toilet, for example, those kinds of
14  things; correct?
15    **A.  No, sir, I wasn't, but --**
16    Q.  You used the phrase you were there to keep the
17  peace and restore order; is that correct?
18    **A.  Yes.**
19    Q.  Who was threatening the peace?
20       MS. ROBERTSON:  Objection, mischaracterizes
21  the testimony and evidence, assumes facts not in
22  evidence, calls for --
23    Q.  (By Mr. Gelfand):  You can answer --
24       MS. ROBERTSON:  -- calls for speculation.
25  You can answer if you know.

43

1    **A.  I don't know.**
2    Q.  (By Mr. Gelfand):  Did you have Mr. Thompson's
3  consent to enter the backyard?
4    **A.  Mr. Thompson was not there.**
5    Q.  So no?
6    **A.  Or nobody was there.  So I could not obtain his**
7  **consent.**
8    Q.  Okay.  So the bottom line is, you would agree
9  you did not have Mr. Thompson's consent; correct?
10    **A.  I would agree, yes.**
11    Q.  Okay.  I want to show you -- do you recall
12  responding to written interrogatories in connection with
13  this case?
14    **A.  Those are very big words, sir.  Can you be a**
15  **little bit more --**
16    Q.  Sure.  That's fair.  I don't know why we use
17  some words that we use as lawyers.  Do you recall that we
18  asked you a bunch of questions in writing, and I'm sure
19  with the benefit of your counsel you provided written
20  responses to those questions?
21    **A.  Yes, sir.  That's -- thank you, I understand**
22  **that.**
23    Q.  Okay.  I have no idea why we don't just call
24  them questions, but that's neither here nor there.  I am
25  going to show you what I'm going to mark as Exhibit 12 if

44

1  I can, please.
2       (Plaintiff's Deposition Exhibit No. 12
3       was marked for identification.)
4    Q.  (By Mr. Gelfand):  Do you recognize what --
5  first of all, do you have Exhibit 12 in front of you?
6    **A.  I have it in front of me, yes.**
7    Q.  Okay.  And do you recognize Exhibit 12 as the
8  written responses to questions that we asked you?
9    **A.  Correct.  Yes, sorry.**
10    Q.  And did you respond to these under oath?
11    **A.  Under oath?**
12       MS. ROBERTSON:  Do you remember signing a
13  verification?
14    **A.  Yes.**
15    Q.  (By Mr. Gelfand):  Okay.
16    **A.  Thank you.  I'm sorry.**
17    Q.  Not a trick question.  You're good.  In your
18  written interrogatories, I'm going to direct your
19  attention -- I'm going to jump around a little bit, but
20  I'm going to direct your attention to Interrogatory 17 on
21  page 9.
22    **A.  Way in the back.  Can I fold this?**
23    Q.  Yeah.  Do you see 17?
24    **A.  Yes, sir.**
25    Q.  It says, Defendant states this was not a

45

1  criminal investigation but a standby to keep the peace.
2      **A.  Correct.**
3      Q.  What did you mean by that?
4      **A.  Basically, I responded to a call that there was**
5  **no criminal intent.  There was nothing to lead me to**
6  **believe that there was going to be a criminal**
7  **investigation.  That's why I treated it as a -- as a**
8  **simple keep the peace call.  I had people there that were**
9  **upset for some reason that their father's motorcycle**
10 **hadn't been returned.  They were upset about it, and I was**
11 **there to keep the peace and do what I could to bring**
12 **resolution to it.**
13     Q.  If we direct your attention to Interrogatory
14 Number 15 -- let's back up for a second.
15     **A.  Okay.**
16     Q.  Would you agree with me that Mr. Thompson did
17 nothing to threaten the peace, so to speak?
18     **A.  Absolutely.  He wasn't there, so he couldn't.**
19     Q.  Now, if we go to Number 15 on page 8.
20     **A.  Okay.**
21     Q.  Do you see where we asked you number C, if you
22 did enter Plaintiff's property without a warrant, on what
23 legal authority, if any, did you rely to enter Plaintiff's
24 property?
25     **A.  I do see that.**

46

1      Q.  And do you see where your answer is, quote,
2  Pursuant to the community caretaker exception to the
3  warrant requirement, in order to keep the peace during a
4  self-help repossession, end quote.  Did I read that
5  correctly?
6      **A.  You did.**
7      Q.  And is that a true statement?
8      **A.  It is.**
9      Q.  So is it your testimony here today that the
10 reason you entered the backyard and did what you did with
11 respect to the motorcycle, the Harley-Davidson 2003 trike
12 that's at issue in this case, was pursuant to the
13 community caretaker exception to the warrant requirement?
14     **A.  To keep --**
15         MS. ROBERTSON:  Hold on.  Objection, calls
16     for a legal conclusion and then also just
17     reassert the objection stated in the
18     interrogatory answer.  You can answer if you
19     know.
20     **A.  Can you ask me the question again, sir?  I'm**
21 **sorry.**
22     Q.  (By Mr. Gelfand):  Yeah.  If -- I'm basically
23 just asking what you wrote down here, but --
24     **A.  No, no, no, please.  No, go ahead.**
25     Q.  Sure.  Is the answer to the question on what

47

1  legal authority, if any, did you rely to enter Plaintiff's
2  property what you wrote here, which is the community
3  caretaker exception to the warrant requirement?
4          MS. ROBERTSON:  Same objection, calls for a
5      legal conclusion.  I know I stated it before.
6      **A.  Yes.**
7      Q.  (By Mr. Gelfand):  And that was the answer you
8  gave in Interrogatory Number 15 here on page 8; correct?
9      **A.  Yes, sir.**
10     Q.  And that is what you're testifying to today;
11 correct?
12     **A.  That is what I'm testifying to, yes, sir.**
13     Q.  Okay.  We may come back to these
14 interrogatories, but you can put that aside if you'd like?
15     **A.  Okay.  Do you want it back or --**
16     Q.  If you could -- now, you testified generally
17 about dash cam and body cam footage that was created on
18 October 22 of 2022 and, if it went past midnight, on
19 October 23 of 2022; correct?
20     **A.  Yes, sir.**
21     Q.  Based on your training and experience with the
22 Manchester Police Department, what happens to that footage
23 when you record it?
24         MS. ROBERTSON:  Objection, calls for
25     speculation.  He's not the custodian of the

48

1      footage.  You can answer if you know.
2      **A.  May I answer that question with a question?**
3      Q.  (By Mr. Gelfand):  Sure.
4      **A.  With respect, are you asking me what happens to**
5  **it once I'm done with it or what are you asking?**
6      Q.  No, I'm just saying as a general matter --
7      **A.  Oh.**
8      Q.  -- when you record -- if you responded to a call
9  today.
10     **A.  Okay.**
11     Q.  And you enabled or it was automatically
12 enabled to your dash cam and body cam devices.
13     **A.  Mm-hm.**
14     Q.  And that was in connection with -- I don't know,
15 an assault you were investigating?
16     **A.  Okay.  Just some -- some traffic stop.**
17     Q.  Correct.  Fair enough.  What I'm trying to
18 figure out is based -- if you know, based on your training
19 and experience, what happens to the recording that is
20 recorded?  So does it get saved somewhere?  Does it --
21         MS. ROBERTSON:  Can I just make a running
22     objection because I want you to be able to
23     answer these questions for discovery purposes,
24     but I'd like a running objection that he's not
25     the custodian, calls for speculation, but go

Robert Gerholdt  -  December 5, 2023

---

49

1  ahead.
2      A.  Okay.  It might help you or it might help this
3  if I explain to you the entire process of the body
4  cameras.
5      Q.  (By Mr. Gelfand):  Sure.
6      A.  Before the beginning of my shift, which is at
7  5:45 a.m, the body cameras are stored in docking stations.
8  There's 32 body cameras and four docking stations, A, B, C
9  and D.  Before my shift starts, I will go -- I'll find my
10  name.  There's, like, a -- an iPad that sits next to them.
11  You find your name, you push on your name and then you
12  push the little arrow, enter arrow, and from there the
13  iPad magically gives you a number, a body cam number,
14  let's say in this case A1.  Okay.  That is my body camera
15  for the day.  You wait for a second, it syncs.  My name
16  will show up on the body camera.  At that point, you take
17  it out, you put it on, you go about your business.  Do
18  whatever you do throughout the day, traffic stops, calls
19  for service, whatever.
20      At the end of the day, you take that body camera
21  back and you put it back in the docking station.  Now, it
22  doesn't matter which dock you put it into because they're
23  all interconnected, and to be frankly honest with you, I
24  mean, there's probably a lot o guys out there that don't
25  remember which one they picked it up from in the first

---

50

1  place.  So you put it back in the docking station, and
2  then from there, the video's downloaded into a server.
3  And that is as much as I know about it.
4      Q.  Have there ever been instances where you in a
5  case you were investigating needed to obtain copies of the
6  body camera or dash cam footage?
7      A.  Yes, sir.
8      Q.  Let's stick on body cam for a second.
9      A.  Okay.
10      Q.  That's what you're testifying about.
11      A.  Mm-hm.
12      Q.  How do you do that?
13      A.  There is a program that we can go, it's the
14  WatchGuard program, where you can log in.  Once the body
15  cam video is downloaded, which is a tossup sometimes
16  between whether it takes five minutes to download or
17  whether it takes five hours to download.  However, once
18  that is all done, you can go back in through the
19  WatchGuard program and view the video.
20      Q.  And have there been instances where you needed
21  to make a copy of the video, for example, for a prosecutor
22  for discovery?
23      A.  Me personally, no.
24      Q.  Do you know how you could accomplish that task
25  if you wanted to?

---

51

1      A.  You can copy it directly from the WatchGuard.
2  You can -- there is a -- tab where you can select it and
3  download it.
4      Q.  Do you only have access to your body cam videos
5  or do you have access to other officer's body cam videos
6  when you log into that program?
7      A.  Me personally, I believe that I only have access
8  to mine.  I know that supervisors and command staff
9  have -- have access to all of them and, of course, IT has
10  access to all of them.
11      Q.  Do you know how long they are stored on the
12  system?
13      MS. ROBERTSON:  Objection, calls for
14  speculation.  Same running objection so.
15      A.  Different calls are classified differently, and
16  they are stored for different timeframes.  And for that, I
17  do not know.
18      Q.  (By Mr. Gelfand):  Do you know whether there are
19  any policies at the Manchester Police Department that were
20  in effect between October of 2022 and today that address
21  that issue?  In other words, how long body cam or dash cam
22  video should be maintained?
23      A.  I do not know.
24      Q.  Have you ever received training in any of those
25  policies, if they exist?

---

52

1      A.  The -- as far as --
2      Q.  Data retention policies?
3      A.  I don't remember.
4      Q.  Have you ever, in connection with any of your
5  cases, reviewed body cam or dash cam footage from more
6  than three weeks earlier than the date you were reviewing
7  it?
8      A.  No.
9      Q.  What is, if you know -- you testified about how
10  this mechanically works --
11      A.  Correct.
12      Q.  -- with respect to the body cams.
13      A.  Mm-hm.
14      Q.  How does it work with respect to dash cams?
15      A.  So the dash cameras are kind of a different
16  animal.  They work over Wi-Fi.  Basically, when you pull
17  up to the station, you get in that Wi-Fi zone where the
18  material from the dash cam is transferred over to the
19  server, and that happens automatically.
20      Q.  In other words, to speak in simple language,
21  when you drive your police vehicle back to the station, it
22  automatically downloads?
23      A.  Yes, when -- well, that is in a perfect world,
24  but yes, sir.
25      Q.  Meaning, if the Wi-Fi is working?

---

53

1    **A.  That's correct.**
2    Q.  Does the Wi-Fi generally work?
3    **A.  Yes.  The Wi-Fi generally works, yes, sir.**
4    Q.  Okay.  How do you, as an officer, review dash
5    cam footage if you want to?
6    **A.  We have the ability to watch our in-car dash cam**
7    **footage directly from the little tiny too small monitor**
8    **that is in the vehicle.**
9    Q.  After the fact, if you want to get dash cam
10   footage, for example, for a prosecutor for discovery, how
11   do you get it?
12   **A.  I've never done that, so I don't know.**
13   Q.  Is there a program that you're aware of or
14   somewhere on the servers at the police station that you
15   can log into to see dash cam videos?
16   **A.  WatchGuard.**
17   Q.  So it has dash cam and body cam?
18   **A.  Yes, sir.**
19   Q.  Do you know, similar to what I asked you before,
20   whether there's any policies and procedures speaking to
21   how long dash cam footage should be maintained by the
22   police department?
23   **A.  There is policies, but if you're asking me if I**
24   **know them, I don't.  I don't know the wording.  I don't**
25   **know how long each individual recording is saved.**

54

1    Q.  Is it your understanding that there is some time
2    period after which body cam footage and dash cam footage
3    is automatically deleted by the system?
4    **A.  Officially, I do not know that.  I can -- I**
5    **don't want to speculate because I can only tell you what**
6    **I've heard, but what I know is no.**
7    Q.  What have you heard?
8    **A.  A year or six months or 30 days depending, but**
9    **once again, I can't verify that because I haven't seen it**
10   **and I don't know that for myself.**
11   Q.  Who have you heard that from?
12   **A.  Just other officers, in general.**
13   Q.  After this incident that is the subject of this
14   litigation involving Mr. Thompson's Harley-Davidson, did
15   you ever review any of your body cam footage that you
16   recorded that evening?
17   **A.  I did not.**
18   Q.  Did you ever review any of your dash cam footage
19   that you recorded that evening?
20   **A.  I had no reason to.  I did not.**
21   Q.  Did anyone ever ask you to preserve your body
22   cam footage from that evening?
23   **A.  No, sir.**
24   Q.  Did anyone ever ask you to preserve your dash
25   cam footage from that evening?

55

1    **A.  No, sir.**
2    Q.  I am going to show you what I have marked as
3    Exhibit 7.  Have you ever seen -- and take a minute to
4    look at it, have you ever seen Exhibit 7?
5    **A.  No, sir, I have not.**
6    Q.  If you can look at the second page, please.
7    **A.  Sure.  No, sir, I have not seen this.**
8    Q.  Is it your testimony that to this day you've
9    never actually seen Exhibit 7?
10   **A.  Yes, sir.**
11   Q.  So as I hand it to you during this deposition,
12   it's the first time you've ever seen this document?
13   **A.  Yes, sir, it is.**
14   Q.  Including the attachment, i.e, the formal letter
15   dated November 14th, 2022?
16   **A.  Yes, sir.**
17   Q.  If you look at Exhibit 7 right now, do you see
18   that it is an e-mail, subject line preservation letter
19   dated November 14 of 2022?
20       MS. ROBERTSON:  Just a running objection,
21   object to foundation.  You can answer if you
22   know.
23   **A.  I -- I see that, what you're saying, sir.**
24       **(Plaintiff's Deposition Exhibit No. 7 was**
25       **identified for the record.)**

56

1    Q.  (By Mr. Gelfand):  I'm just asking if you see it
2    on the document?
3    **A.  Yes.**
4    Q.  Yes?
5    **A.  Right there.**
6    Q.  And do you see that this e-mail at least on the
7    face of the document was sent to Mr. Rost and Ms. Seele?
8        MS. ROBERTSON:  Same objection.
9    **A.  I don't know who that is.**
10   Q.  (By Mr. Gelfand):  Have you ever interacted with
11   the city attorneys at Manchester?
12   **A.  Before this point or before this case, no.**
13   Q.  Okay.  There is an e-mail address here
14   police@manchestermo.gov.  Do you recognize that e-mail
15   address?
16   **A.  I do not.**
17   Q.  Did you drive a police vehicle to this
18   deposition today?
19   **A.  To this -- to this deposition, yes, sir, I did.**
20   Q.  On the back of your police vehicle does it say
21   ManchesterMo.gov?
22   **A.  It's embarrassing, but I don't know.  I would**
23   **have to go look.**
24   Q.  Okay.  Do you recognize what the domain name
25   ManchesterMo.gov is?

Robert Gerholdt - December 5, 2023

57

1    A. Yes.
2    Q. Okay. What is it?
3    A. That is the e-mail domain.
4    Q. Do you have any knowledge of who, if anyone,
5  accesses e-mails sent to the account
6  police@manchestermo.gov?
7    A. I do not, sir.
8    Q. Now, in your interrogatories, Exhibit 12, you
9  reference, and I'll direct your attention to it, two
10  general order numbers on page 6 in response to
11  Interrogatory No. 11.
12    A. We're on -- which one are we on, sir, Number 11
13  or Number --
14    Q. Eleven.
15    A. Okay.
16    Q. Do you see where your answer says, See general
17  order numbers 441 and 456?
18    A. I do.
19    Q. What is general order number 441?
20    A. General order 441 deals with maintaining the
21  peace during self-help repossessions and towing vehicles,
22  personal property disputes.
23    Q. And what is 456?
24    A. 456, I don't know.
25    Q. Okay.

58

1    A. I would have to look at it.
2    Q. I'm not trying to trick you.
3    A. No, I get it.
4    Q. Does that help you?
5    A. Thank you.
6    Q. Do you know what 456 is?
7    A. Now I do.
8    Q. What is it?
9    A. Property lockouts and vehicle towing.
10    Q. Okay.
11    A. That hurt, just a little bit.
12    Q. Let's -- let's start simple with 456. I'm going
13  to show you what I've marked as Exhibit 3.
14        (Plaintiff's Deposition Exhibit No. 3 was
15        identified for the record.)
16    Q. (By Mr. Gelfand): Was anything you were doing a
17  property lockout?
18    A. No, sir.
19    Q. Or a vehicle lockout?
20    A. No, sir.
21    Q. What is a vehicle lockout?
22    A. A vehicle lockout happens quite a bit actually.
23  It's where somebody has either locked their keys in a
24  vehicle, doesn't have access to it and they need us to
25  respond and open the vehicle.

59

1    Q. That had nothing to do with what you're doing
2  here; right?
3    A. No, sir.
4    Q. Was this vehicle, meaning the Harley-Davidson
5  2003 towed?
6    A. No, sir.
7    Q. If we look at page 2 of Exhibit 3, order number
8  456, do you see where it says policy?
9    A. Yes, sir.
10    Q. It says, An officer may remove or cause to be
11  removed any vehicle from a street, highway, public or
12  private property to the nearest garage or other place of
13  safety or to a garage designated or maintained by the City
14  of Manchester under any of the below described
15  circumstances, after it is determined that there is no
16  other way to safely remove the vehicle. Did I read that
17  correctly?
18    A. Yes, sir. Very good.
19    Q. Is that what you did here?
20    A. No, the vehicle was not towed.
21    Q. If we look at page 4, do you see the police
22  department tow procedures?
23    A. Yes, sir.
24    Q. Can we agree that you did not complete an MPD
25  Form 003, a DOR Form 4569 and an MPD Form 038 or any of

60

1  those forms for that matter, in connection with this
2  matter?
3    A. In connection with this matter, no, sir.
4    Q. Meaning that is accurate?
5    A. That is accurate, sir.
6    Q. Fair to say that -- and let me be clear, I'm not
7  critical of you putting it in your interrogatories
8  response, but is it fair to say that order number 456 has
9  really nothing to do with this case, because there was not
10  a towed vehicle or a property lockout?
11    A. No, that would be incorrect.
12    Q. Okay. How does 456 factor into this case?
13    A. If you look at 456-07, repossessed vehicles, it
14  would explain that -- well --
15    Q. Let's talk about that. Do you see 456.07
16  indicating that an officer is to generate a towed vehicle
17  report on the ITIRMS, whatever that is?
18    A. That's our reporting system, sir.
19    Q. Okay. Do you see that?
20    A. I do see that.
21    Q. Did you do that here?
22    A. I did not. Okay. So --
23    Q. Is the reason you didn't do that was because
24  this was not a vehicle repossession?
25    A. That's right, sir. That's what I get for

61

1  **thinking; it hurts sometimes.**
2      Q.  Fair to say that 456 has nothing to do with any
3  of this?
4      **A.  Yes, sir, that would be fair.**
5      Q.  Okay.  Now, let's look at 441.
6      **A.  Do you want this back?**
7      Q.  You can just keep it and make a pile.
8      **A.  Okay.  I'm sorry.**
9      Q.  Because the court reporter is ultimately going
10  to keep possession of it.  Keep possession.  No pressure.
11  Do you have Exhibit 441 in front of you?
12      **A.  I do not.**
13      Q.  I'm going to show you Exhibit 2.
14      **A.  After this, can we take a break for a second?**
15      Q.  We can take a break right now.
16      **A.  Just for thirty seconds.**
17          MR. GELFAND:  Let's take a -- we've been
18  going.
19          MS. ROBERTSON:  Yeah, let's --
20          MR. GELFAND:  The one -- one thing I
21  haven't told you which I always forget to tell
22  you and don't intend to is, we're not in any
23  race.  If you want to take a break at any
24  point --
25          THE WITNESS:  Okay.

62

1          MR. GELFAND:  Like now, when there's no
2  real meaningful question pending.
3          (Off the record.)
4      Q.  (By Mr. Gelfand):  Officer, you understand that
5  after the recess you're still testifying under oath?
6      **A.  Yes, sir.**
7      Q.  Okay.  Do you still have Exhibit 2, I believe,
8  in front of you?
9      **A.  Yes, sir.  Exhibit 2.**
10      Q.  Yes.  Okay.  And is that general order number
11  No. 441?
12      **A.  It is, sir.**
13          **(Plaintiff's Deposition Exhibit No. 2 was**
14          **identified for the record.)**
15      Q.  (By Mr. Gelfand):  It says, The purpose of this
16  general order is to establish procedures to follow when
17  property interests are in dispute or this department is
18  notified of vehicle repossessions.  Correct?
19      **A.  That is correct, sir.**
20      Q.  And it says, The policy -- the officer should
21  not attempt to take personal property away from one party
22  and give it to another.  Correct?
23      **A.  It does say that, sir.**
24      Q.  When we look at procedure, do you see 441.02?
25      **A.  Yes, sir.**

63

1      Q.  Tell me if I'm reading this correctly.  When
2  property is in dispute, the officer should advise and
3  permit the courts to determine their respective rights to
4  the property.  The officer should advise the party in
5  possession of the property not to dispose of it until the
6  courts have resolved the matter.  Did I read that
7  correctly?
8      **A.  You did read that correctly.**
9      Q.  And then finally, it says, If one party has a
10  court order which appears to give that party the right to
11  possession of the property, that order should be enforced
12  only by the official specifically directed to do so in the
13  order.  Officers are advised to beware of court orders of
14  a suspicious nature.  Did I read that correctly?
15      **A.  You did read the correctly, sir.**
16      Q.  In a nutshell, this is basically saying courts
17  get to make the decision in property disputes not police
18  officers; correct?
19          MS. ROBERTSON:  Object to form, calls for a
20  legal conclusion, calls for speculation.
21      Q.  (By Mr. Gelfand):  Did I not just read that?
22      **A.  You did just read that, sir, but I would**
23  **disagree.  With -- with the respect that this general**
24  **order deals with official vehicle repossessions where if**
25  **you look at section C, an officer gets dispatched to take**

64

1  **the report.  An officer arrives at the scene.  They meet**
2  **with the repossession agent, and they obtain a full**
3  **description of the vehicle being repossessed and the name**
4  **of the company performing that.  You run the vehicle VIN**
5  **and license plate at the DOR registration and obtain a**
6  **printout of the results.  Have the repossession entered**
7  **into the appropriate computer databases, REJIS, MULES,**
8  **NCIC and obtain a printout of the computer entry.**
9          **This section is -- deals with official vehicle**
10  **repossessions, basically a repossession company.  Let's**
11  **say --**
12      Q.  And I don't think we're disagreeing with each
13  other.  This -- what happened here on October 22 of 2022
14  at Mr. Thompson's house was not an official vehicle
15  repossession with a repossession company; correct?
16      **A.  Yes, sir, that is correct.**
17      Q.  Okay.  And is it fair to say that this order,
18  number 441, addresses that circumstance, the official
19  vehicle repossession by a repossession company that was
20  not applicable here?
21      **A.  It is applicable here because there in section**
22  **C, numbers 1, 2 and 3 were things that I did before the**
23  **vehicle was taken.**
24      Q.  Well, let's talk about that.  Did you identify
25  the name of the company performing the vehicle

Robert Gerholdt  -  December 5, 2023

65

1  repossession?
2  **A. No, sir. So if you read section 1, I was**
3  **dispatched to take a report.**
4  Q. No, I understand, but I just went --
5  **A. Okay.**
6  Q. -- to number 2 because --
7  **A. Okay.**
8  Q. -- I knew you were dispatched.
9  **A. The repossession agent, I guess in this case was**
10 **Ms. Elmore.**
11 Q. Well, let's talk about that.
12 **A. Okay.**
13 Q. Based on what?
14 **A. No, she was -- she was the reporting party**
15 **that -- that said that --**
16 Q. So come on, you weren't actually considering her
17 to be a repossession --
18 **A. No, sir.**
19 Q. -- agent --
20 **A. I was not.**
21 Q. Okay.
22 **A. But this -- if -- if we say that this 441 in**
23 **general had nothing to do with what happened that night,**
24 **there are a couple of things that I did do that were --**
25 **that are on this. One, you know, it's number three, I ran**

66

1  **the vehicle VIN and license plate for the DOR**
2  **registration. I did not do the -- do -- print out the**
3  **results, but I did run the VIN.**
4  Q. Okay.
5  **A. So --**
6  Q. And you didn't do the ITI system; correct?
7  **A. No, sir, I did not.**
8  Q. Okay. So, notwithstanding the clarification, I
9  think I understand what you're saying.
10 **A. Okay. Okay.**
11 Q. The bottom line is, you're not claiming that Ms.
12 Elmore was the repo company; right?
13 **A. No, sir, I am not.**
14 Q. Like the show Repo Man or whatever it's called?
15 **A. I've seen that, that's actually pretty cool.**
16 Q. It is pretty cool, but it has nothing to do with
17 what happened that night; correct?
18 **A. That is correct.**
19 Q. Okay. Now, if we jump -- if we go back to that
20 night for a second, when you arrived at Mr. Thompson's
21 house, Mr. Thompson was in possession of the
22 Harley-Davidson insofar as it was parked in his gated
23 backyard; correct?
24     MS. ROBERTSON: Objection, calls for
25     speculation, calls for a legal conclusion. You

67

1  can answer if you know.
2  **A. I don't understand the question, sir.**
3  Q. (By Mr. Gelfand): When you arrived at the
4  house, the Harley-Davidson was parked in Mr. Thompson's
5  gated backyard; correct?
6  **A. Correct.**
7  Q. Fenced backyard. And so in that capacity, he
8  was in possession of it, no different than if my car is in
9  my garage and I am in possession of it, even if I'm not
10 home; correct?
11 **A. Correct.**
12 Q. Okay. Now, when you left Mr. Thompson's house
13 in this first call, so to speak, Mr. Mackenzie and Ms.
14 Elmore were in possession of Mr. Thompson's
15 Harley-Davidson motorcycle; correct?
16 **A. That is correct.**
17 Q. I am going to show you Exhibit 4. Can you tell
18 me if you recognize Exhibit 4?
19 **A. I do.**
20 Q. What is Exhibit 4?
21 **A. It's the police report.**
22 Q. And is this a police report that you personally
23 prepared in connection with the incident that is the
24 subject of this lawsuit?
25 **A. The initial, yes.**

68

1     **(Plaintiff's Deposition Exhibit No. 4 was**
2     **identified for the record.)**
3  Q. (By Mr. Gelfand): And just be clear so that
4  we're clear for the record, this references the Thompson
5  residence, the address you responded to and the date and
6  time of dispatch, at least approximately; correct?
7  **A. Correct.**
8  Q. Okay. Officer Cockrell was there with you;
9  correct?
10 **A. He was.**
11 Q. Were there any other officers in this initial
12 call that were physically present with you?
13 **A. In the initial call, no.**
14 Q. Why is Officer Cockrell's name not mentioned as
15 an officer in this police report anywhere?
16 **A. That's a good question, sir. I don't know.**
17 Q. If we look at -- you see these numbers on the
18 bottom, we call them Bates numbers.
19 **A. I have no idea what that is.**
20 Q. No, I'm saying these are numbers -- we can go
21 off the record for a second.
22     (Off the record.)
23 Q. (By Mr. Gelfand): Do you see MPD 0002?
24 **A. I do.**
25 Q. I'm sorry, if you'll go to the next page 0003,

69

1  you describe a 2003 Harley-Davidson trike with a VIN
2  number of 1HD1GDV353K323459; correct?
3    **A. Yes, sir.**
4    Q. Black in color; correct?
5    **A. Yes, sir.**
6    Q. And you would agree with me that that is the
7  Harley-Davidson that is at issue in this lawsuit?
8    **A. I would agree with you, sir.**
9    Q. Okay. Do you know anything about Harleys?
10   **A. I do not.**
11   Q. Are you a motorcycle enthusiast?
12   **A. I have -- I would love to be, but unfortunately,**
13 **my better half won't allow me.**
14   Q. Have you ever ridden a Harley?
15   **A. I wish. Once again, no, I have not, sir.**
16   Q. Do you know anything about the nature of this
17 particular Harley, for example, whether it was a
18 collector's edition, whether it was rare, whether it's
19 custom in any way?
20   **A. I do not.**
21   Q. You said in your police report on page MPD 0003,
22 Mackenzie then started the vehicle with the key and was
23 able to get it out through the open gate and around the
24 Jeep. Did I read that correctly?
25   **A. Yes.**

70

1    Q. Are you aware that this particular Harley
2  doesn't actually have a key?
3      MS. ROBERTSON: Objection, calls for
4  speculation. You can answer if you know.
5    **A. No.**
6    Q. (By Mr. Gelfand): I'm going to show you
7  Exhibit 15. Did you, when you were on-scene at
8  Mr. Thompson's house with the Harley, ever see what's
9  depicted in Exhibit 15, which is that it starts with a
10 toggle switch instead of a key?
11      (Plaintiff's Deposition Exhibit No. 15
12      was identified for the record.)
13      MS. ROBERTSON: Objection, calls for
14 speculation. Object to foundation. Object to
15 form.
16   **A. No, sir. I do not recognize that. I never saw**
17 **it.**
18   Q. (By Mr. Gelfand): As a police officer, would
19 you agree with me that if someone claims this is my key to
20 my car, one way of determining whether that is true is to
21 see if the key actually fits into the key slot?
22   **A. That would be one way, yes, sir.**
23   Q. Did you do anything at all to confirm whether
24 the key that Mr. Mackenzie showed you had anything to do
25 with the Harley?

71

1    **A. No, sir.**
2    Q. The next sentence says, Elmore and Mackenzie
3  were then allowed to leave. Did I read that correctly?
4    **A. You did read that correctly.**
5    Q. What did you mean when you say, Elmore and
6  Mackenzie were then allowed to leave?
7    **A. That meaning once the vehicle was started they**
8  **left.**
9    Q. And to be clear, they left with the
10 understanding that you and Officer Cockrell were okay with
11 them leaving with the bike?
12   **A. Yes, sir.**
13   Q. After they left, what, if anything, did you do
14 at the property in this first response?
15   **A. After they left?**
16   Q. Yes.
17   **A. I returned to my vehicle, and I went back in**
18 **service.**
19   Q. Was there a time later that evening -- let's
20 back up for a second.
21      Before we -- before you left and before they
22 left with the vehicle, did you physically touch the
23 motorcycle at anytime?
24   **A. No, sir.**
25   Q. Did Officer Cockrell physically touch the

72

1  motorcycle at any time?
2    **A. I can't say because I don't -- once again, I --**
3  **I was concentrating on what I was doing, not what he was**
4  **doing, so I can't tell you that.**
5    Q. During the pendency of the entire call, were you
6  and Officer Cockrell both working in your capacity as law
7  enforcement officers at all times?
8    **A. Yes, sir.**
9    Q. Were you wearing police uniforms at all times?
10   **A. Yes, sir.**
11   Q. Were you wearing badges at all times?
12   **A. No, I was not wearing the badge.**
13   Q. Did you have a badge?
14   **A. I did have a badge, yes, sir.**
15   Q. To the best of your knowledge, did Officer
16 Cockrell have a badge?
17   **A. Yes, sir.**
18   Q. Did you both have police issued firearms?
19   **A. We did, sir.**
20   Q. And did you both respond to the call in police
21 vehicles?
22   **A. Yes, we did, sir.**
23   Q. Can we agree that when you and Officer Cockrell
24 allowed Ms. Elmore and Mr. Mackenzie to leave with
25 Mr. Thompson's motorcycle, the Harley-Davidson at issue in

Robert Gerholdt  -  December 5, 2023

73

1 this case, no court had ever said that they had the right
2 to that bike?
3       MS. ROBERTSON:  Objection, calls for
4 speculation.  Object to form.
5    **A.  Your statement that -- that we allowed them to**
6 **leave with Mr. Thompson's motorcycle, at the time I had no**
7 **reason to believe it was Mr. Thompson's motorcycle.**
8    Q.  (By Mr. Gelfand):  No reason?
9    **A.  Beyond the legal running the VIN number, the**
10 **title that they showed me at that time at that moment I**
11 **had no reason to believe that it was Mr. Thompson's**
12 **motorcycle.**
13    Q.  Was the fact that it was parked in
14 Mr. Thompson's private backyard a reason to believe that
15 it was his motorcycle?
16    **A.  No.**
17    Q.  Did you have any reason to believe that there
18 was a court determination that it was anybody's motorcycle
19 other than Mr. Thompson's?
20    **A.  That's --**
21       MS. ROBERTSON:  Object to the form, calls
22 for speculation.  You can answer.
23    **A.  Sorry.  Aside from the title that they showed me**
24 **and running the VIN over the -- over the air, no.  There**
25 **was no other court documents.**

74

1    Q.  (By Mr. Gelfand):  I'm asking you a simple
2 question.
3    **A.  Sure.**
4    Q.  There are some instances where courts have
5 decided a property dispute.  You're familiar with that;
6 correct?
7       MS. ROBERTSON:  Objection, calls for
8 speculation.
9    **A.  I can't be specific about that.  I -- I have**
10 **heard that, yes.**
11    Q.  Do you understand, based on your training and
12 experience --
13    **A.  Yes.**
14    Q.  -- that sometimes people may fight over whose
15 property it is --
16    **A.  And they go to court, yes, sir.**
17    Q.  And they go to court; correct?
18    **A.  Correct.**
19    Q.  And then the court issues an order; correct?
20    **A.  Correct.**
21    Q.  And in those instances, sometimes officers may
22 truly just keep the peace to make sure that the court
23 determined rightful owner gets possession of the property;
24 correct?
25       MS. ROBERTSON:  Object to form.  Object

75

1 to -- speculation.  It assumes facts not in
2 evidence, mischaracterizes the evidence.  You
3 can answer if you know it.
4    **A.  I don't know.**
5    Q.  (By Mr. Gelfand):  Sitting here today, are you
6 aware that what Ms. Elmore and Mr. Mackenzie told you
7 wasn't true?
8       MS. ROBERTSON:  Objection, calls for
9 speculation, calls for a legal conclusion.  You
10 can answer if you know.
11    **A.  Sitting here today, am I aware that what they**
12 **told me was not true?**
13    Q.  Yes.
14    **A.  Yes, sir, I am aware.**
15    Q.  When you let them leave with the motorcycle that
16 night, Mr. Mackenzie and Ms. Elmore to be specific, at
17 that time had you ever spoken with Mr. Thompson?
18       MS. ROBERTSON:  Object to form.
19    **A.  No, sir.**
20    Q.  (By Mr. Gelfand):  At that time, had you ever
21 given Mr. Thompson the ability to provide his perspective
22 on who owned the motorcycle?
23       MS. ROBERTSON:  Object to form, assumes
24 facts not in evidence.
25    **A.  No.**

76

1    Q.  (By Mr. Gelfand):  How much time passed from the
2 moment you knocked on Mr. Thompson's door to the moment
3 Mr. Mackenzie and Ms. Elmore left with the motorcycle?
4    **A.  No clue.  I have no idea.**
5    Q.  Less than half an hour?
6    **A.  Considering the entirety of the call lasted 25**
7 **to 30 minutes, I think it's safe to say that it was less**
8 **than half an hour.**
9    Q.  Less than 20 minutes?
10    **A.  I don't know, sir.  I'm not going to guess.**
11    Q.  Did you do anything at all during that time
12 period to investigate with the Department of Revenue the
13 history of the title with respect to the motorcycle?
14    **A.  I had no reason to at that time, sir.**
15    Q.  In other words, no?
16    **A.  In other words, no, that's correct.  I'm sorry.**
17 **I'm not trying to be vague.**
18    Q.  Did you believe that at that time you could just
19 make an on-site assessment that Mr. Mackenzie and Ms.
20 Elmore were the owners of the motorcycle without needing
21 to go to a court?
22    **A.  Can you define on-site assessment?**
23    Q.  You made a decision at the time on the site --
24 on the scene?
25    **A.  Correct.**

77

1    Q.  Now, I'm going to briefly show you Exhibit 5.
2    **A.  Do you want this back?**
3    Q.  No.
4    **A.  Do you want me to just put it over here?**
5    Q.  Sure. Thank you. Exhibit 5 I will represent to
6  you was not in your interrogatories. Do you recognize
7  Exhibit 5?
8    **A.  It's general order 425.**
9       **(Plaintiff's Deposition Exhibit No. 5 was**
10      **identified for the record.)**
11   Q.  (By Mr. Gelfand): Have you seen this before?
12   **A.  I have seen it before, but I would have to read**
13 **it to be able to testify to it.**
14   Q.  Does general order -- first of all, let's back
15 up for a second.
16   **A.  Okay.**
17   Q.  Based on your training and experience, what is a
18 general order?
19   **A.  A general order is a mandate set forth by the**
20 **City of Manchester that officers must follow in all**
21 **different number of cases.**
22   Q.  And are these distributed to officers on or
23 about the date that they're implemented?
24   **A.  They are.**
25   Q.  So by way of example, the back of Exhibit No. 5

78

1  says, Distribution all department personnel. That would
2  include people like you, Officer Cockrell, et cetera;
3  correct?
4    **A.  That would, yes, sir.**
5    Q.  Each of these order numbers that we have looked
6  at were in effect on the date that you want to
7  Mr. Thompson's house; correct?
8    **A.  In -- in effect, meaning they were valid**
9  **operational directives?**
10   Q.  Yes.
11   **A.  Yes, okay. Yes, sir.**
12   Q.  In other words, they had been -- they pre-date
13 the call?
14   **A.  Okay. I'm thinking too much. Yes, sir, you're**
15 **correct.**
16   Q.  No, that's fine. That's a fair clarification.
17 Order number 425 refers to search warrants and warrantless
18 searches; correct?
19   **A.  It does.**
20   Q.  And we can agree because you've testified to it
21 that this call did not involve the execution of a search
22 warrant; correct?
23   **A.  Yes, sir.**
24   Q.  And similarly, I think you'll agree, if we look
25 at page 5, Bates number MPD 000131. Do you see that?

79

1    **A.  Yes, sir.**
2    Q.  There's a list of warrantless searches that are
3  most often encountered and authorized for various things
4  that law enforcement might confront in certain criminal
5  investigations; correct?
6    **A.  I do see that, yes, sir.**
7    Q.  Okay. You'd agree with me none of that was the
8  basis of your entry into Mr. Thompson's backyard; correct?
9       MS. ROBERTSON:  Objection, calls for
10 speculation, calls for a legal conclusion,
11 misconstrues the facts in evidence in this case
12 and assumes facts not in evidence. You can
13 answer if you know.
14   **A.  I would disagree with you.**
15   Q.  (By Mr. Gelfand): Were you conducting a
16 criminal investigation?
17   **A.  No, sir.**
18   Q.  Okay. So tell me which 425.06 A 1 through 7 --
19   **A.  So --**
20   Q.  -- exception --
21   **A.  I'm sorry.**
22   Q.  -- applied.
23      MS. ROBERTSON:  Objection. He just told
24 you he wasn't conducting a criminal
25 investigation.

80

1       MR. GELFAND:  I agree, but then he just
2  told me that he disagreed with my premise.
3    **A.  But a warrantless search is -- not only has to**
4  **do with a criminal investigation. It can be -- it can be**
5  **a keep the peace as --**
6    Q.  (By Mr. Gelfand): You're talking about what
7  you're calling the community caretaker exception?
8    **A.  Yes, sir.**
9    Q.  Okay. If you -- read this carefully because I'm
10 not trying to trick you.
11   **A.  Oh, okay.**
12   Q.  This doesn't mention -- let's back up.
13      Did your warrantless search involve a valid
14 arrest?
15   **A.  No, sir.**
16      MS. ROBERTSON:  Hold on. I have an --
17      THE WITNESS:  Oh.
18      MS. ROBERTSON:  -- objection. Object to --
19 object to form, calls for a legal conclusion and
20 if -- I guess I don't want to continue
21 interrupting you, so I'll just ask for a running
22 objection if you're going to --
23      MR. GELFAND:  For 1 through 7, that's fine.
24      MS. ROBERTSON:  Okay. Yeah. Just I'm
25 going to object to -- object to form as to the

81

1 characterization and speculation and legal
2 conclusion.
3      MR. GELFAND:  That's fine.
4      Q.  (By Mr. Gelfand):  So just to backup, so we have
5 a clean record.  Did the warrantless search involve a
6 valid arrest?
7      **A.  No.**
8      Q.  Did it involve a plain view search?
9      **A.  Yes.**
10      Q.  What is your understanding of a plain view
11 search?
12      **A.  The motorcycle was in plain view.**
13      Q.  Where was it parked?
14      **A.  In the rear of the residence.**
15      Q.  Was it in plain view at a place that you
16 believed you were legally entitled to stand?
17      **A.  Yes, sir.**
18      Q.  Did you believe you were legally entitled to
19 stand in Mr. Thompson's gated backyard?
20      **A.  Yes.**
21      MS. ROBERTSON:  Objection.
22      Q.  (By Mr. Gelfand):  Why?
23      MS. ROBERTSON:  Objection, calls for a
24 legal conclusion.
25      Q.  (By Mr. Gelfand):  Why?

82

1      **A.  Sorry about that.  I'm sorry.**
2      Q.  Why?
3      **A.  Why -- repeat the question, please.**
4      Q.  Why did you believe you could stand in
5 Mr. Thompson's gated backyard without a warrant?
6      **A.  Because I was conducting keeping the peace.  I**
7 **was there to check the VIN on the vehicle to verify the**
8 **information.  That was it.**
9      Q.  Well, let's back up.  We'll get to that in a
10 second.
11      **A.  Okay.**
12      Q.  I think we can knock out the rest of these
13 pretty quickly.
14      **A.  Okay.**
15      Q.  Did your warrantless search involve an
16 automobile search?
17      **A.  No, sir.**
18      Q.  Did your warrantless search involve a search
19 under emergency conditions where public safety was
20 endangered?
21      **A.  No.**
22      Q.  Did your warrantless search involve a search
23 made after a valid consent had been obtained from
24 Mr. Thompson?
25      **A.  No.**

83

1      Q.  Did your warrantless search involve a frisk of
2 any individual based on a reasonable suspicion that the
3 subject was armed and reasonable articulable reasons to
4 fear safety?
5      **A.  No.**
6      Q.  Did the warrantless search involve an inventory
7 search of a seized vehicle and property?
8      **A.  No.**
9      Q.  Is it your understanding that you can enter a
10 gated yard of someone's residence?
11      MS. ROBERTSON:  Objection, calls for
12 speculation.
13      **A.  I don't know.**
14      Q.  (By Mr. Gelfand):  Come on.  If you're driving
15 down the street --
16      **A.  Mm-hm.**
17      Q.  -- and no other facts.
18      **A.  Okay.**
19      Q.  And there's a gated backyard with a privacy
20 fence like this one --
21      **A.  Mm-hm.**
22      Q.  -- but the gate happens to be open if that's the
23 case.  Can you just enter in it and search it as a cop?
24      MS. ROBERTSON:  Object to form, calls for
25 speculation.

84

1      Q.  (By Mr. Gelfand):  You can answer.
2      **A.  I have to have a reason.  I can't just be**
3 **driving down the road, not contacting anybody, not seeing**
4 **anything out of the ordinary, not talking to anybody, not**
5 **getting any kind of story from anybody.**
6      **Now, I would say that depending on the time of**
7 **the day, let's say that your scenario was 1:00 in the**
8 **morning, 2:00 in the morning, 3:00 in the morning and that**
9 **was an area that was a high crime area known for vehicle**
10 **break-ins, known for burglaries or other crimes, and I see**
11 **an open gate or an open front door to something to that**
12 **effect, then yes, I would stop and yes, I would make sure**
13 **everything is okay before I closed the door and went on.**
14      Q.  Prior to the bike leaving Mr. Thompson's private
15 property, what, if anything, did you do to investigate the
16 veracity, the truth of Ms. Elmore's and Mr. Mackenzie's
17 story?
18      **A.  That's another big word, veracity.**
19      Q.  Truth.
20      **A.  I had no reason to believe that they were lying**
21 **to me.  I had no red flags.  They told me their story.**
22 **They showed me a picture of the title.  The vehicle was in**
23 **the backyard.  I saw it based on the picture that they**
24 **showed me.  That is why I entered the backyard.**
25      Q.  So that wasn't exactly responsive to what I was

Robert Gerholdt  -  December 5, 2023

---

85

1  asking.
2      **A.  Okay.  I'm sorry.**
3      Q.  What, if anything -- I think your answer is
4  nothing, but tell me if I'm wrong.  What, if anything, did
5  you do to investigate the veracity of Ms. Elmore's and
6  Mr. Mackenzie's story?
7          MS. ROBERTSON:  Objection, asked and
8      answered, mischaracterizes his testimony.  He
9      answered your question.  You can answer it again
10     if you want.
11     **A.  No, I'll stick with what I said.**
12     Q.  (By Mr. Gelfand):  Well, I'm going to ask it a
13  different way --
14     **A.  Okay.**
15     Q.  -- because you -- you told me that you had no
16  reason to doubt their story, but that's a different --
17  that's not responsive to what you did to investigate it.
18  You understand the difference?
19     **A.  So the word I'm getting hung up on is
20  "veracity."**
21     Q.  Okay.  Let me -- that's fair.  Let me replace it
22  with "truth."  What, if anything, did you do to
23  investigate prior to them leaving, whether Ms. Elmore and
24  Mr. Mackenzie were telling the truth to you?
25     **A.  After hearing their story, once again, after**

---

86

1  seeing the documents that they showed me, after running
2  **the VIN on the motorcycle which came back to Nathan Rench,**
3  **that is what I did.  That's the steps that I took.**
4          **And then I also at that point, before they left**
5  **with the motorcycle, I contacted my supervisor.  I ran it**
6  **by him as to what he thought and then I made the decision**
7  **based on that.**
8      Q.  Who is your supervisor?
9      **A.  Sergeant Evan Waters.**
10     Q.  How did you contact your supervisor?
11     **A.  By telephone.**
12     Q.  What did you tell Mr. Waters?
13     **A.  I explained to Sergeant Waters the -- what I**
14  **had, who I was out with.  I explained to him briefly what**
15  **they had said.  I explained to them what I did as far as**
16  **running the VIN on the motorcycle.  It came back to him.**
17  **I also explained to him that Mr. Mackenzie had a key,**
18  **which he claimed was to the motorcycle.  At that point,**
19  **Sergeant Waters said yes, I could release the bike.**
20     Q.  Was there anything else that you said to
21  Sergeant Waters?
22     **A.  I would have to reference my report for that.**
23     Q.  Was your discussion with Sergeant Waters
24  recorded police channels?
25     **A.  It would have been on my body camera, yes, sir.**

---

87

1      Q.  Was it also on your -- I hate to use this
2  phrase, but walkie-talkie or your radio?
3      **A.  Oh, my mic, no.**
4      Q.  Why not?
5      **A.  Because I called him on the telephone.**
6      Q.  Your mic, your police issued radio, is recorded
7  by dispatch; correct?
8      **A.  I'm sorry?**
9      Q.  It's recorded by dispatch; correct?
10     **A.  It is.**
11     Q.  And you were aware at that time that it was
12  recorded by dispatch; correct?
13     **A.  Yes, sir.**
14     Q.  Were you also aware at that time that your
15  personal cell phone would not be recorded by dispatch?
16     **A.  That's not the way that I thought of it, but you**
17  **are correct.**
18     Q.  What, if anything, specifically did Sergeant
19  Waters tell you?
20     **A.  The gist of that conversation was me basically**
21  **telling him everything that happened and once explained it**
22  **to him, he said that the bike could be released.**
23          **However, let's -- let's take it for what it is,**
24  **Sergeant Waters was not on the scene.  I was on the scene.**
25  **Okay.  I was the one that made the final decision.  Okay.**

---

88

1  **I was the one that let Mackenzie and Elmore take the bike,**
2  **not Sergeant Waters.**
3      Q.  Okay.  Prior to you letting Mr. Mackenzie and
4  Ms. Elmore take the bike, had you reviewed any financial
5  documents reflecting ownership of the bike?  Checks?
6      **A.  Thank you.  No, sir.**
7      Q.  Had you spoken to Mr. Thompson?
8      **A.  No, sir.**
9      Q.  Had you obtained any documents from any third
10  parties, any companies, any things like that?
11     **A.  No, sir.  Are we done with this?**
12     Q.  Yes.  Did you look on CaseNet?
13     **A.  I did not.**
14     Q.  Did you contact the Department of Revenue?
15     **A.  As far as running through -- the VIN through**
16  **REJIS, that is the extent, so I would say no.**
17     Q.  Okay.  Later that -- so, first of all, did you
18  testify as best as you can recall to everything that
19  happened that first time that you were at the house?
20     **A.  Yes, sir, I did.**
21     Q.  Later that night, technically the following
22  morning, did you return to Mr. Thompson's house?
23     **A.  I did.**
24     Q.  Approximately how much time had passed between
25  the time you left and the time you returned?

---

89

1    **A.  Three hours and two minutes.**
2    Q.  So do you know the exact time you returned?
3    **A.  0218.**
4    Q.  2:18 a.m.?  Why did to return to the house at
5    2:18 in the morning?
6    **A.  Mr. Thompson had called and wanted to report his**
7    **bike stolen.**
8    Q.  And when you say he called, did he call -- as
9    far as you understood it, 911 dispatch?
10   **A.  I do not know if he called 911, but he did**
11   **contact dispatch.  That's how.  He didn't call me or call**
12   **the Manchester Police Department, I do not believe.**
13   Q.  He called for police assistance in some form?
14   **A.  Correct, yes, sir.**
15   Q.  Did you personally respond to his residence?
16   **A.  I did.**
17   Q.  And this was the same shift; correct?
18   **A.  It was.**
19   Q.  So everything I asked you about you responding
20   in your police car with your police uniform, badge, gun,
21   et cetera, that all applies here, too; correct?
22   **A.  It does.**
23   Q.  Okay.  Who else responded to the house?
24   **A.  Sergeant Waters and Officer Cockrell.**
25   Q.  Prior to responding to the house, did you and

90

1    Officer Cockrell speak about this?
2    **A.  Can you be more specific in that, sir?**
3    Q.  Sure.  You and Officer Cockrell a couple hours
4    earlier had this shared experience with Ms. Elmore and
5    Mr. Mackenzie; correct?
6    **A.  Yes, sir.**
7    Q.  You're then getting notice, at least preliminary
8    notice, that Mr. Thompson is saying they stole my
9    motorcycle or my motorcycle's gone.  Did you guys have any
10   conversation with each other?
11   **A.  No, sir, we did not.  We do not ride together.**
12   **Our sectors are hell and gone from each other, so between**
13   **the time that we left the scene and then the time that we**
14   **arrived on the scene, no.**
15   Q.  Did you speak with Sergeant Waters in the
16   interim?
17   **A.  In the interim, in between?**
18   Q.  Yes.
19   **A.  No.**
20   Q.  Okay.  When -- who showed up first at the house?
21   You?
22   **A.  I did.  Yes, sir.  I'm sorry.**
23   Q.  That's okay.  When you showed up at the house,
24   what happened?
25   **A.  Mr. Thompson was on his front steps and he**

91

1    **wanted to report that his bike was stolen.  He had all of**
2    **the documents.  He had a title, bill of sale.  He had**
3    **copies of checks and everything else for the motorcycle.**
4    Q.  Did he give them to you?
5    **A.  He did.  He did not -- correctly, he showed them**
6    **to me.  I was able to look at them, but as far as actually**
7    **getting copies of them, he kept them and brought copies to**
8    **the station at a later time.**
9    Q.  Okay.  I'm going to show you Exhibit 6.  Do you
10   have Exhibit 6 in front of you?
11   **A.  Yes, sir.**
12   Q.  If you look at the first two pages, which is
13   front and back with the first page.
14   **A.  Mm-hm.**
15   Q.  Is that the title that Mr. Thompson showed you
16   that evening?
17   **A.  It is a copy of the title, yes, sir.**
18   **(Plaintiff's Deposition Exhibit No. 6 was**
19   **identified for the record.)**
20   Q.  (By Mr. Gelfand)  And if we look at the second
21   page of the title, meaning the back page of the title,
22   does it appear to contain signatures of Nathan Rench and
23   Ray Thompson?
24   **A.  Yes, sir.**
25   Q.  Reflecting that Ray Thompson purchased the bike

92

1    from Nathan Rench in March of 2020?
2    **A.  Yes.**
3    Q.  And that same month, March of 2020, that a Mr.
4    Kee's lien was released?
5    **A.  Jimmy Kee, yes, sir.**
6    Q.  And if we look at -- it might just be easier to
7    look at my copy.
8    **A.  I gotta position my long ass legs.  I'm sorry.**
9    Q.  Do you see a check from Mr. Thompson to Mr. Kee
10   reflecting payment of that lien?
11   **A.  The 2175?**
12   Q.  Yes.
13   **A.  Yes, sir.**
14   Q.  And did Mr. Thompson provide that to you?
15   **A.  He did.**
16   Q.  And on the last page do you see a check, a
17   canceled check, meaning a cleared check --
18   **A.  Mm-hm.**
19   Q.  -- reflecting payment from Mr. Thompson to
20   Mr. Rench in March of 2020?
21   **A.  I -- I do, yes, sir.**
22   Q.  With the memo line 2003 HD Trike?
23   **A.  Yes, sir.**
24   Q.  Do you see handwriting at the bottom of this
25   page?

93

1      A.  (No verbal response.)
2      Q.  Proof of payment, buyer paid seller check?
3      A.  I do.
4      Q.  Do you recognize that handwriting?
5      A.  I don't.
6      Q.  What was your reaction when Mr. Thompson --
7   let's back up.  Is it fair to say that when Mr. Thompson
8   showed all of this to you, it was clear that he owned the
9   bike?
10         MS. ROBERTSON:  Objection, calls for legal
11   conclusion, calls for speculation.  You can
12   answer if you know.
13      A.  It was clear that there was more to the case
14   than meets the eye that Amara Elmore and Mackenzie had
15   told me.
16      Q.  (By Mr. Gelfand)  What was your reaction?
17      A.  I was shocked, surprised.
18      Q.  What did you do?
19      A.  At that point, when he showed me the documents,
20   I stepped back.  I called Amara Elmore on the telephone.
21   I told her the facts and circumstances that Mr. Thompson
22   had told me and I said bring the bike back.
23         At that point, Ms. Elmore said that she had
24   already delivered the bike to Mr. Rench and she didn't
25   know where he was or where the bike was, but she would try

94

1   to call me back.
2      A.  A minute or so after hanging up with her, Mr.
3   Rench called me.  He admitted what he did, said that he
4   did it on purpose to get the bike.  He also said that
5   since Mr. Thompson hadn't registered the bike in 30 days
6   that it was automatically his again.  And he was gonna do
7   whatever it took to keep the bike and not bring it back.
8      Q.  At that moment, did you wish that you had not
9   let Ms. Elmore and Mr. Mackenzie take the bike?
10         MS. ROBERTSON:  Objection, relevance.
11   Answer if you know.
12      A.  If you're asking me if I second-guessed myself
13   at that point, no.
14      Q.  I am going to show you a couple of pictures.  Do
15   you have Exhibit 8 in front of you?
16      A.  Yes.
17         (Plaintiff's Deposition Exhibit No. 8 was
18         identified for the record.)
19      Q.  (By Mr. Gelfand)  I will represent to you
20   that's a Google Maps image from a different date, June of
21   2023 according to Google.
22      A.  Okay.
23      Q.  Do you recognize that house?  I'm not trying to
24   trick you.  Is that Mr. Thompson's house?
25      A.  Yeah.  I'm just trying to make sure that -- that

95

1   it is.
2      Q.  Is that Mr. Thompson's house?
3      A.  Yes.
4      Q.  Okay.  Just to be clear, that's the house that
5   you responded to?
6      A.  Yes.
7      Q.  Okay.
8      A.  Sorry.
9      Q.  No problem.
10      A.  I'm not trying to --
11      Q.  On this picture, Exhibit 8, do you see a black
12   Jeep?
13      A.  I do see a black Jeep.
14      Q.  Was that the Jeep that you ran the plates for
15   and determined it was Mr. Thompson's?
16      A.  I don't remember.
17      Q.  Okay.  I'm showing you Exhibit 9.  Can you tell
18   me, I know it cuts off your head, but who is in Exhibit 9?
19      A.  I think that's a safe bet to say that is me,
20   sir.
21         (Plaintiff's Deposition Exhibit No. 9 was
22         identified for the record.)
23      Q.  (By Mr. Gelfand)  Okay.  Do you recognize your
24   police vest that says your name and DSN number?
25      A.  I do.  It's different now, but --

96

1      Q.  Was this the vest that you were wearing on the
2   night that you responded to Mr. Thompson's house?
3      A.  Yes, it's the only vest I have.  Outer vest,
4   specifically.
5      Q.  You testified earlier, and I understand there's
6   no dispute about this, that your body camera was on.
7   Would you agree with me that these lights reflect that
8   your body camera was on?
9      A.  Yes.  The green power light is on.  The red
10   record light is on.
11      Q.  And this depicts a walkie-talkie -- I'm sure
12   there's a better name for it and a mic?
13      A.  Yes, sir.
14      Q.  That is what is recorded by dispatch when you
15   use it?
16      A.  You mean, when we speak --
17      Q.  Yes.
18      A.  -- on the radio?
19      Q.  Correct.
20      A.  Yes.
21      Q.  I am going to show you what I'm going to mark as
22   Exhibit --
23         MR. GELFAND:  What are we on, 13?
24         THE COURT REPORTER:  Thirteen.
25         THE WITNESS:  Are we done with this one,

Robert Gerholdt  -  December 5, 2023

97

1    sir?
2         MR. GELFAND: Yes.
3         THE WITNESS: Okay. I'm sorry. I'm just
4    trying to keep them all --
5         MR. GELFAND: Totally fine.
6         This is identical to the one we used
7    yesterday but with those initials.
8         MS. ROBERTSON: Okay.
9    Q.   (By Mr. Gelfand) Can you tell me if you
10   recognize what is depicted in Exhibit 13?
11   **A.   I would say that's Mr. Rench's rear driveway**
12   **area.**
13   Q.   Mr. Thompson's?
14   **A.   Mr. Thompson's, I'm sorry. Yes, sir.**
15        **(Plaintiff's Deposition Exhibit No. 13**
16   **was identified for the record.)**
17   Q.   (By Mr. Gelfand) Okay. Was that where you
18   entered to locate and look at the VIN number of the
19   Harley-Davidson as you testified?
20   **A.   Yes, sir, in this area.**
21   Q.   Would you agree with me that there's a large
22   privacy fence surrounding the yard?
23   **A.   Yes, sir, I would. A tall privacy fence, 6**
24   **foot, I believe.**
25   Q.   And that was there that night, too; correct?

98

1    **A.   Yes, sir.**
2    Q.   I'm going to ask you to the best of your recall,
3    can you initial just with your initials, and draw a circle
4    around where the bike was? If it's on that photo?
5    **A.   Do you want me to circle it and initial it?**
6    Q.   Yeah.
7    **A.   Yes?**
8    Q.   Yes.
9    **A.   I don't want to ruin evidence.**
10   Q.   You're not.
11   **A.   Of course. I'm sorry.**
12   Q.   There, you're fine.
13   **A.   (Complies.) Oh, so it's not just my pen.**
14   Q.   Okay. And -- thank you.
15   **A.   You're welcome.**
16   Q.   So the circle represents where the bike was.
17   Where were you standing, right next to it?
18   **A.   Right there.**
19   Q.   Okay. That's depicted with a vertical line next
20   to the circle?
21   **A.   That's -- yes.**
22   Q.   Okay. Where was Officer Cockrell?
23   **A.   I do not remember where he was standing.**
24   Q.   Okay. I'll take that back from you.
25   **A.   Sure.**

99

1    Q.   I'm going to show you Exhibit 11. Do you see
2    Exhibit 11 in front of you?
3    **A.   Yes, sir, I do.**
4    Q.   I will represent to you that Exhibit 11 is taken
5    from the angle looking into where the yard is with the
6    gate?
7    **A.   Mm-hm.**
8    Q.   Is that correct?
9    **A.   If you're saying that it's angled looking back,**
10   **yes, sir.**
11        **(Plaintiff's Deposition Exhibit No. 11**
12   **was identified for the record.)**
13   Q.   (By Mr. Gelfand) In other words, if I'm parked
14   on the street facing the house, that's the same vantage
15   point that's depicted in that photo?
16   **A.   It would be if you were west of the house, yes,**
17   **sir.**
18   Q.   Okay. And just so we understand, was this
19   driveway what you entered to get into the backyard?
20   **A.   Yes, sir.**
21   Q.   And this fence that's depicted in here, this
22   gate, that's the threshold that you used the word to pass;
23   correct?
24   **A.   Yes, sir.**
25   Q.   When you went back to the house the second time,

100

1    other than providing you documents, what, if anything, did
2    Mr. Thompson tell you?
3    **A.   Mr. Thompson told me that he had purchased the**
4    **motorcycle from Mr. Rench two years ago, that he had paid**
5    **$5000 for it. He also mentioned that he had paid off the**
6    **lien from Jimmy Kee. He told me that the reason why he**
7    **had not registered it yet was because Mr. Thompson -- or**
8    **no, not Mr. Thompson, I'm sorry. Mr. Rench had applied**
9    **for a duplicate title after he had sold the motorcycle,**
10   **and he was in a dispute with the Department of Revenue and**
11   **Mr. Rench to try to get it rectified.**
12   Q.   How did you respond?
13   **A.   I took and wrote down the information.**
14   Q.   Is it fair to say, based on what he communicated
15   to you, that when Mr. Thompson called the police that
16   night to report his bike missing, until officers told him,
17   he had no clue the police were a part of this?
18        MS. ROBERTSON: Object to form.
19   **A.   I don't know. I can't answer that.**
20   Q.   (By Mr. Gelfand) Can you think of a single way
21   he would know that police were involved in this?
22   **A.   I can't.**
23   Q.   Did he seem surprised from what you observed
24   when you informed him that you were actually there with
25   Ms. Elmore and Mr. Mackenzie?

Robert Gerholdt - December 5, 2023

101

1    **A. Can you rephrase the question, sir?**
2    Q. When -- let's back up.
3    **A. Okay.**
4    Q. Would you agree with me that when people report
5    a vehicle stolen, they generally don't expect that the
6    police had any involvement in it; right?
7    **A. If you're speaking generally, I would say, yes,**
8    **you're correct.**
9    Q. And was it your understanding that Mr. Thompson,
10   until you showed up that second time, got home, saw his
11   bike was missing and called the police?
12   **A. Yes, sir.**
13   Q. When you informed him, as you testified a few
14   minutes ago, to the conversation you had when you arrived
15   that second time about what had transpired with respect to
16   you, Officer Cockrell and Ms. Elmore and Mr. Mackenzie,
17   did he seem surprised?
18   **A. Surprised, no.**
19   Q. How would you describe --
20   **A. Upset, very.**
21   Q. Why do you say that?
22   **A. He had every right to be upset that his bike was**
23   **gone, but I don't remember him being really surprised. I**
24   **know that he was upset.**
25   Q. What, if anything, did he say to you about

102

1    entering his backyard?
2    **A. I don't remember.**
3    Q. Just to be clear what, if anything, did he say
4    to other officers that were present about police entering
5    his backyard?
6    **A. I can't speak to what he told other officers**
7    **because --**
8    Q. That you heard?
9    **A. I don't remember.**
10   Q. At any time, did you tell him anything along the
11   lines of we're the police, we can go anywhere?
12   **A. Me?**
13   Q. Yes.
14   **A. No, sir.**
15   Q. At any time, did you hear Officer Cockrell tell
16   him something along the lines of we're the police, we can
17   go anywhere?
18   **A. I do not remember that, no.**
19   Q. At any time, did you hear Sergeant Waters tell
20   him anything along the lines of we're the police, we can
21   go anywhere?
22   **A. No, sir.**
23   Q. Then what happened?
24   **A. After receiving the call from Mr. Rench, I**
25   **immediately notified dispatch, I gave them the VIN number**

103

1    **of the motorcycle and I also gave them Mr. Rench's**
2    **information. The motorcycle was placed out stolen and**
3    **Mr. Rench was placed on wanted for stealing.**
4    Q. And then did you leave Mr. Thompson's residence?
5    **A. If anything transpired between that time and me**
6    **leaving, I don't remember.**
7    Q. Is there anything that we haven't talked about
8    with respect to the second time that you recall happening
9    at Mr. Thompson's residence?
10   **A. There was not.**
11        MS. ROBERTSON: Objection, vague. You can
12   answer.
13   Q. (By Mr. Gelfand): Do you recall any
14   conversations we haven't talked about?
15   **A. No, sir.**
16   Q. Do you recall any police activities that we
17   haven't talked about?
18   **A. No, sir.**
19   Q. At any time, did you interact with
20   Mr. Thompson's brother, Jeremiah Thompson?
21   **A. At any time during that call?**
22   Q. Yes.
23   **A. No.**
24   Q. At any time, did you observe any other law
25   enforcement on-site interact with Jeremiah Thompson?

104

1    **A. I can't answer that, because my focus was on**
2    **Mr. Thompson and getting the information and getting it**
3    **out. What Officer Cockrell and Sergeant Waters were**
4    **doing, I can't testify to that because I don't know.**
5    Q. Is it fair to say that, as you said,
6    Mr. Thompson was rightly upset, but he was fully
7    cooperative with law enforcement; correct?
8    **A. He was cooperative, yes.**
9    Q. And on his own volition he provided you copies
10   of the title and the checks and everything we talked
11   about; correct?
12   **A. Big word, "volition"?**
13   Q. Sorry. He chose to give that to you, you didn't
14   ask him for it; correct?
15   **A. I did ask him for it, and as I stated before, he**
16   **had every right to make copies of it -- he didn't want to**
17   **give it to me for fear that it would disappear.**
18   Q. Let me back up, I mean, did he show it to you?
19   **A. Did he --**
20   Q. Did he show it to you on his own or did you ask
21   him for it?
22   **A. He did show it to me on his own.**
23   Q. Okay. I think you just answered my question.
24   Who is James Yim?
25   **A. James Yim is a detective with the Department of**

Field Reporting Services
314-461-2122

105

1 **Revenue Special Investigations Unit.**
2    Q.   I am going to show you what I am marking as
3 Exhibit 6. I'm sorry. I'm not marking this as Exhibit 6.
4       THE COURT REPORTER:   Fourteen.
5       MR. GELFAND:   Exhibit 14. Thank you.
6    Q.   (By Mr. Gelfand):   Do you have recognize
7 Exhibit 14?
8    **A.   (No verbal response.)**
9    Q.   Let me be clear, why don't we start with the
10 back because it's an e-mail chain. Start with the first
11 chronologically.
12   **A.   Start with this one here?**
13   Q.   Yes. Do you see an e-mail from you?
14   **A.   Yes.**
15   Q.   Is that your e-mail address?
16   **A.   Yes, it is.**
17   Q.   At ManchesterMo.gov?
18   **A.   Yes. On the back of the police car again.**
19   Q.   To James Yim and Jason Dowdell?
20   **A.   Yes.**
21       **(Plaintiff's Deposition Exhibit No. 14**
22       **was identified for the record.)**
23   Q.   (By Mr. Gelfand):   Who is Jason Dowdell?
24   **A.   Jason Dowdell is or was, I should say, the**
25 **detective on the case at the time.**

106

1    Q.   With Manchester Police?
2    **A.   With Manchester Police, yes, sir.**
3    Q.   And in your e-mail, you ask the Department of
4 Revenue individual, Mr. Yim, Can you please give me
5 everything related to the VIN on this paperwork? I'm
6 working a case with possible title fraud and would like to
7 know everything there is regarding this VIN. Thank you,
8 sir, and have a great day, with like a hundred exclamation
9 points.
10   **A.   Several, yes, sir.**
11   Q.   Okay. You said, P.S. Detective Dowdell says Hi.
12 PO Rob Gerholdt. And your Gerholdt -- I'm sorry, and your
13 5375 DSN; is that correct?
14   **A.   That is correct.**
15   Q.   So this was October 27, 2022, so this was about
16 five days later; correct?
17   **A.   Yes, sir.**
18   Q.   Or maybe four days, whatever it is. But a
19 couple days later, correct?
20   **A.   Count on my finger, yes, sir.**
21   Q.   At this point are you conducting an
22 investigation?
23   **A.   At this point, yes, sir, I am.**
24   Q.   And in particular, you're conducting an
25 investigation into whether Ms. Elmore, Mr. Mackenzie

107

1 and/or Mr. Rench committed any crimes?
2    **A.   Yes, sir.**
3    Q.   At this point, are you doing anything or did you
4 do anything to preserve your body cam and dash cam
5 footage?
6    **A.   No, sir.**
7    Q.   Why not?
8    **A.   I had no reason to.**
9    Q.   Even though you're investigating people that are
10 allegedly -- well, possibly committing a crime on your
11 footage that you have video footage of?
12   **A.   Right. I did not.**
13   Q.   Special Agent Yim responds about a day later
14 with the information that he has; correct?
15   **A.   On October 28, yes, sir.**
16   Q.   And then on October 28, there's some
17 correspondence between Detective Dowdell and Mr. Yim;
18 correct?
19   **A.   Yes, sir. We done with this?**
20   Q.   Yes.
21   **A.   Okay.**
22   Q.   Now, do you know, based on your subsequent
23 investi -- well, let's back up.
24       After you left Mr. Thompson's house that night,
25 were there any other times that you responded to

108

1 Mr. Thompson's house?
2    **A.   There was one.**
3    Q.   When was that?
4    **A.   That was February -- it was in February when the**
5 **bike had been recovered.**
6    Q.   Okay. So let's back up. February of 2023?
7    **A.   Yes, sir.**
8    Q.   So is it fair to say that from October 22nd of
9 2022 to February of 2023, Mr. Thompson did not have use of
10 his Harley-Davidson?
11       MS. ROBERTSON:   Objection, calls for
12 speculation. You can answer if you know.
13   **A.   I don't know.**
14   Q.   (By Mr. Gelfand):   Let's back up for a second.
15 I don't know if you've ever seen this. Have you ever seen
16 any Triple L towing slips?
17   **A.   I have not, sir. That was not part of my**
18 **investigation.**
19   Q.   Is it your understanding that the bike was
20 returned to Mr. Thompson somewhere around -- without
21 holding anyone to the exact date, February 16 of 2023?
22   **A.   Again, when -- from the time that the bike was**
23 **actually impounded by Owensville PD to the time that**
24 **Mr. Thompson actually took repossession of the bike, I**
25 **don't know.**

Robert Gerholdt  -  December 5, 2023

---

109

1    Q.  Do you know when Owensville PD took possession
2  of the bike?
3    A.  In February, that day when Mr. Thomp -- or I'm
4  sorry, when Mr. Rench was pulled over riding the
5  motorcycle and he was arrested for driving while revoked,
6  and the bike was impounded because it was still stolen.
7  Even though we had arrested Mr. Rench prior, I'd left the
8  bike out stolen.  It was impounded at that point, and then
9  when they sent the hit confirmation to Manchester, that is
10  when I responded to Mr. Thompson's house and was going to
11  tell him that the bike had been recovered and where it was
12  at.
13    Q.  And did you, in fact, do that?
14    A.  I did.
15    Q.  On what day?
16    A.  I don't remember the day.  I'd have to refer to
17  my report.
18    Q.  Do you remember approximately?
19    A.  It was in February.
20    Q.  Okay.  The middle of the month?
21    A.  I don't know, sir.
22    Q.  Okay.  Is it in the report that I gave you as
23  Exhibit 4?
24    A.  It is in the report.  May I access it?
25    Q.  Yeah, please.

---

110

1    A.  Somewhere under all -- there it is.  12/12/2023
2  at 2030 hours, that's when I was notified by Ballwin
3  dispatch that the motorcycle had been recovered.
4    Q.  2/12 or 12/12?
5    A.  2/12.
6    Q.  Okay.  Would you agree with me that correlates
7  with the tow slip?
8    A.  It does, sir.
9    Q.  Okay.  So bottom-line, October 22, 2023, to
10  February 12, 2023, represents the date range between the
11  date the bike was taken from Mr. Thompson's backyard and
12  the date that it was taken into the possession by
13  Owensville --
14    A.  Owensville.
15    Q.  Owensville PD?
16    A.  Yes, sir.
17    Q.  Okay.  And at some time after that, Mr. Thompson
18  had to go pick it up from Owensville and eventually did;
19  correct?
20        MS. ROBERTSON:  Objection, calls for
21  speculation.
22    Q.  (By Mr. Gelfand)  Do you know?
23    A.  After telling Mr. Thompson that the bike had
24  been recovered, I do not -- I don't have anything to do
25  with the investigation after that.  That would have been

---

111

1  Detective Dowdell who orchestrated that.  I do know that
2  there were title issues that had to be worked out, but as
3  far as him and when he actually went to -- to -- and got
4  the bike back in his possession, I don't know.
5    Q.  When you let Ms. Elmore and Mr. Mackenzie leave
6  with Mr. Thompson's 2003 Harley-Davidson, did you consider
7  your investigation complete?
8        MS. ROBERTSON:  Object to form.
9    A.  Again, I wasn't conducting an investigation, but
10  I considered the call complete.
11    Q.  I'm going to go off the record for a minute.
12        (Off the record.)
13    Q.  (By Mr. Gelfand)  Back on the record after a
14  recess.  With the exception of anything that you've
15  discussed with any attorney representing you in this
16  matter, what, if anything, did you do to prepare for
17  today's deposition?
18    A.  To prepare for today's deposition, I read over
19  the police report as many times as I could.  I also looked
20  at the directives, read over them.  That's it.
21    Q.  Did you speak with anyone other than your
22  attorneys about the subject matter of your deposition?
23    A.  About the subject, no, because I had no idea
24  what this deposition subject matter was going to be.
25    Q.  Well, the policy?

---

112

1    A.  Uh-huh.  Specifically, no.  Meaning what it was
2  about, I -- I didn't have to.
3    Q.  Have you spoken with Officer Cockrell about his
4  deposition?
5    A.  No, I haven't.  I have not seen him since his
6  deposition.  His was yesterday; correct?
7    Q.  Yes.  Have you spoken with Officer Cockrell
8  about what transpired that night?
9    A.  Any time in the last year?
10    Q.  Yes.
11    A.  I would say that while the case was active and
12  going on while we were investigating the second half of
13  it, what was going on afterwords, he wouldn't -- he would
14  have been aware of it, but specifically asking him and
15  speaking to him about what happened that night, no.
16    Q.  At this time, I have no further questions.
17        MS. ROBERTSON:  I have a few questions.
18                EXAMINATION
19  BY MS. ROBERTSON:
20    Q.  Officer Gerholdt, Mr. Gelfand asked you
21  regarding some things you did on October 22 of 2023 at
22  1209 Cottagemill, and some of those that had to do with
23  this was running the VIN of a vehicle or possibly a Jeep
24  in the driveway.  Do you recall being asked about that?
25    A.  Yes, ma'am.

---

113

1    Q.  And you mentioned that you -- you contacted
2  dispatch so you run the VIN.  Did you -- do you recall that?
3    **A.  On the motorcycle?**
4    Q.  No, on the -- I'm sorry.  Did -- with respect to
5  the vehicle in the driveway, not the motorcycle, what did
6  you do with respect to that vehicle?
7    **A.  I ran the rear license plate on the vehicle.**
8    Q.  Okay.  And when you're running the plate on a
9  vehicle through dispatch, do you know what -- what they're
10 doing?
11   **A.  So the REJIS computer system interacts with the**
12 **Department of Revenue regarding license plates, driver's**
13 **licenses, criminal history and everything else.  It's all**
14 **tied in together.**
15   Q.  Okay.  And I think Mr. Gelfand -- you know what,
16 I'm going to -- I'm going to ask you that in a minute.
17 Sorry.
18       With respect to -- to running the plate on the
19 vehicle in the driveway, did you do anything between
20 running that plate and -- and walking into the backyard?
21   **A.  I did.  After I ran the plate, I took a few**
22 **steps out into the grassy area where I could see into the**
23 **backyard and that's where I saw the motorcycle.**
24   Q.  Okay.  I'm going to mark this as a Defendant's
25 Exhibit A.

114

1       MS. ROBERTSON:  I apologize.  I didn't make
2  copies, so --
3       MR. GELFAND:  That's fine.
4       MS. ROBERTSON:  I didn't anticipate --
5       THE WITNESS:  Do I need to write anything
6  on this?
7       MS. ROBERTSON:  Not yet.
8       THE WITNESS:  Okay.
9    Q.  (By Ms. Robertson):  Officer Gerholdt, do you
10 have Defendants' Exhibit A in front of you?
11   **A.  I do.**
12   Q.  Okay.  And do you recognize what's depicted in
13 Defendants' Exhibit A?
14   **A.  I do.**
15   Q.  Okay.  It's -- it's a photograph; correct?
16   **A.  Correct.**
17   Q.  What's depicted?
18   **A.  This is a view from the rear area inside the**
19 **fence -- the enclosed fenced area looking out into the**
20 **street.**
21       **(Defendants' Deposition Exhibit A was**
22       **identified for the record.)**
23   Q.  (By Mr. Gelfand):  Okay.  And I'm going to mark
24 this as Defendants' Exhibit B.  And, Officer Gerholdt,
25 Defendants' B is a photograph; correct?

115

1    **A.  It is.**
2    Q.  Do you recognize what's depicted in Exhibit B?
3    **A.  This is looking south on the driveway of 1209**
4  **Cottagemill.**
5       **(Defendants' Deposition Exhibit B was**
6       **identified for the record.)**
7    Q.  (By Ms. Robertson):  Do either Exhibit A or
8  Exhibit B show what you did after or show where you --
9  where you -- where you walked after you ran the plate?
10   **A.  Both of them do.**
11   Q.  Okay.  And can you describe for me where you
12 walked after you ran the plate on the Jeep or vehicle that
13 was in the driveway?
14   **A.  I walked west into the grass, towards the tree,**
15 **and from that point I could look back into the driveway**
16 **and see the motorcycle.**
17   Q.  Okay.  Do you recall where you were -- strike
18 that.
19       You walked into the grass?
20   **A.  I did.**
21   Q.  Okay.  And that's not in the backyard, that's in
22 the front of the house; correct?
23   **A.  That is correct.**
24   Q.  And from that vantage point, were you able to
25 see the motorcycle?

116

1    **A.  I was.**
2    Q.  And when you arrived at Mr. Thompson's
3  residence, was the gate open?
4    **A.  The gate was open, yes.**
5    Q.  Do you know who opened the gate?
6    **A.  I do not.**
7    Q.  Did you open the gate?
8    **A.  No.**
9    Q.  After observing the motorcycle from the grass,
10 what did you do next?
11   **A.  After observing the motorcycle from the grass,**
12 **that's when I entered the rear yard to check the**
13 **motorcycle.**
14   Q.  Mr. Gelfand later asked you about steps you may
15 have taken to investigate and he asked you something to
16 the effect of you did not investigate with DOR.  Do you
17 recall being asked that?
18   **A.  I do.**
19   Q.  Okay.  When you -- when you walked into the
20 backyard, you observed the VIN on the motorcycle, I
21 believe you said on the right fork; is that right?
22   **A.  Yes.**
23   Q.  And then you -- did you radio that vehicle
24 identification number through dispatch?
25   **A.  I did.**

117

1    Q.  And what does that do?
2    A.  That initiates a search through the Department
3  of Revenue records for the VIN as to current ownership or
4  if it's lost or stolen or any other information on it.
5    Q.  Did dispatch then contact you with the result?
6    A.  They did.
7    Q.  What was the result?
8    A.  The result that the VIN came back to Nathan
9  Rench.
10    Q.  The VIN did not come back to Raymond Thompson;
11  is that correct?
12    A.  That is correct.
13    Q.  And what did that indicate to you?
14    A.  That indicated that it belonged to Mr. Rench.
15    Q.  And that Raymond Thompson was not the owner of
16  the motorcycle; correct?
17    A.  Correct.
18        MR. GELFAND:  Object to the form.
19    Q.  (By Ms. Robertson):  Then Mr. Gelfand later
20  asked you about what you did to investigate the veracity
21  of Ms. Elmore or Mr. Mackenzie.  So in your training and
22  experience as a law enforcement officer, can you tell me
23  what you do to assess credibility?
24    A.  Assessing credibility starts with the first
25  contact with the person.  How they talk to you, how they

118

1  look at you, the statements that they make, all lends to
2  credibility.  The -- the fact that they had a picture of
3  the bike, the fact that they had a picture of the title,
4  all goes towards credibility.  That's why it didn't throw
5  up any red flags.
6    Q.  When -- in your training and experience as a law
7  enforcement officer, how can you tell someone's lying to
8  you?
9    A.  Well, unfortunately in this case, I was lied to,
10  but for the most part they don't look at you in the eye.
11  They don't have proper documents.  They -- their stories
12  are all over the place.  They'll say one thing one second,
13  then say another thing another second.  They won't be able
14  to support any of their claims.
15    Q.  Did Ms. Elmore do any of those things in this
16  case?
17    A.  She did not.
18    Q.  You testified earlier that you saw no -- no red
19  flags.  What did you mean by that?
20    A.  What I mean by a red flag it's just what we just
21  discussed, basically how the story is that they tell, what
22  documents they have, are they -- are they kind of looking
23  like they're hiding something, are they stammering, are
24  they not looking me in the eye, that kind of thing.
25    Q.  Okay.  On October 22 and October 23, the first

119

1  time you responded to Mr. Thompson's residence, was anyone
2  present other than yourself, Officer Cockrell, Amara
3  Elmore or Steven Mackenzie to the best of your knowledge?
4    A.  To the best of my knowledge, no, there was
5  nobody else there.
6    Q.  Did you speak with Jeremiah Thompson on
7  October 22 of 2022?  That would have been your first time
8  to the residence.
9    A.  I did not.
10    Q.  Did you speak with Raymond Thompson at that
11  time?
12    A.  During my first visit to that house?
13    Q.  During your first visit.
14    A.  No, I did not.
15    Q.  Okay.  During your subsequent visit, was
16  Jeremiah Thompson present, to the best of your knowledge?
17    A.  I did not know who Jeremiah Thompson was at that
18  point.  He was not present as far as I know.
19    Q.  Okay.  Is Raymond -- other than law enforcement
20  officers during your subsequent visit, is -- is Raymond
21  Thompson the only individual you spoke with?
22    A.  When I responded back for the stolen vehicle
23  report, yes, Raymond Thompson was the only one I spoke
24  with that night.
25    Q.  Did you observe anyone else other than law

120

1  enforcement officers and Raymond Thompson that evening?
2    A.  I did not.  My -- my direction was -- or my
3  attention was drawn to Mr. Thompson.
4        MS. ROBERTSON:  Something funny?  Is
5  something funny, Mr. Gelfand?
6        MR. GELFAND:  Is something funny?
7        MS. ROBERTSON:  Is something funny?  You
8  just had a smirk on your face.  I wasn't sure if
9  I could help you with anything.
10        MR. GELFAND:  There is no smirk on my face.
11  You can continue asking questions.
12        MS. ROBERTSON:  I don't have anything
13  further.
14        MR. GELFAND:  I have a couple of follow-up
15  questions, Officer Gerholdt.
16            FURTHER EXAMINATION
17  BY MR. GELFAND:
18    Q.  Let me direct your attention to Defense Exhibits
19  A and B.  You testified that you were standing on a grassy
20  area essentially looking into Mr. Thompson's backyard
21  before you entered the backyard.  Is that correct?
22    A.  That is correct.
23    Q.  Is it fair to say that when you were standing
24  there on that grassy area you did not see any contraband
25  in Mr. Thompson's backyard?

Robert Gerholdt  -  December 5, 2023

121

1     A.  Define contraband.
2     Q.  Do you know what contraband is?
3     A.  I do, but I want to know your definition of it.
4     Q.  Drugs, guns, any --
5     A.  Knives, nuclear bombs, that kind of stuff?
6     Q.  Sure.
7     A.  No.
8     Q.  Bottom line is you didn't see any contraband
9  from where you were standing; correct?
10     A.  Again yes, no.  No, you're correct.
11     Q.  Okay.  Now, have you ever conducted what you
12  have considered -- well, have you ever seized drugs or
13  weapons from a vehicle?
14     A.  In my career?
15     Q.  Yes.
16     A.  Yes, sir.
17     Q.  Have you ever done so pursuant to what's called
18  the "plain view doctrine"?
19     A.  Yes, sir.
20     Q.  When you've seized those drugs or weapons from a
21  vehicle under the plain view doctrine, do you seize them
22  as evidence and keep them in a law enforcement evidence
23  locker or do you give it to a random person?
24        MS. ROBERTSON:  Object -- object to form,
25     calls for a legal conclusion, vague, calls for

122

1  speculation, argumentative.
2     Q.  (By Mr. Gelfand):  You can answer my question.
3     A.  If you're asking me if they are secured in an
4  evidence locker, then yes, sir.
5     Q.  Yes.  In other words, when you seize contraband
6  as a law enforcement officer, law enforcement takes
7  possession of the contraband and keeps it as evidence so
8  that it can be used in court; correct?
9     A.  That is correct.
10     Q.  You were asked by your attorney about whether as
11  a law enforcement officer you sometimes have to assess
12  credibility on the job.  Did I understand that correctly?
13     A.  Yes, you did.
14     Q.  Okay.  When assessing -- and you mentioned in
15  response to your attorney's questions certain things that
16  you sometimes use to assess credibility; correct?
17     A.  Correct.
18     Q.  Are inconsistencies with two people's stories of
19  the same event indicative that somebody is lying?
20     A.  No.
21     Q.  Why not?
22     A.  Because two people might perceive the same event
23  two separate ways.
24     Q.  Can it be indicative that somebody is lying?
25     A.  Can it be?  Yes.

123

1     Q.  In other words, if somebody says, we showed up
2  together and the other person says we showed up at the
3  bank apart, that could be suspicious; correct?
4        MS. ROBERTSON:  Object to form, calls for
5     speculation, vague.
6     A.  It could be.
7     Q.  (By Mr. Gelfand):  When determining whether
8  somebody is telling the truth about what happened, would a
9  video of what transpired help to determine that?
10        MS. ROBERTSON:  Same objection.
11     A.  Yes, sir.
12        MR. GELFAND:  Thank you.  I have no further
13     questions.
14        MS. ROBERTSON:  I -- I have just -- just a
15     couple.  Do you -- can we go off the record for
16     a second?
17        (Off the record.)
18           FURTHER EXAMINATION
19  BY MS. ROBERTSON:
20     Q.  Officer Gerholdt, in addition to Defendants'
21  Exhibit A and B, which you have in front of you, I'm going
22  to hand you Plaintiff's Exhibit Number 13.  In Defendants'
23  Exhibit A and B, do you see a driveway?
24     A.  Yes.
25     Q.  And does -- that driveway extends from the

124

1  vantage point we're looking at into a public street; is
2  that right?
3     A.  Yes.
4     Q.  Is there a sidewalk depicted in Exhibit B?
5     A.  There is -- yes.
6     Q.  And in Plaintiff's Exhibit 13, do you see
7  pavement in that photograph?
8     A.  Yes.
9     Q.  Is that the same pavement that extends from the
10  driveway depicted in Exhibits -- Defendants' Exhibit A and
11  B?
12     A.  Yes.
13     Q.  And, in fact, in Exhibit 13, do you see a
14  vehicle parked in the corner?
15     A.  Yes.
16     Q.  And in the upper left-hand corner of Exhibit 13
17  is that the gate, the threshold, you were asked about that
18  you walked through?
19     A.  Yes.
20     Q.  Okay.  Is that the same threshold that's
21  depicted in Defendants' Exhibit A?
22     A.  Yes.
23     Q.  And in Defendants' Exhibit A, is the gate open?
24     A.  Yes.
25     Q.  In Plaintiff's Exhibit 13, is the gate closed?

125

1     **A.  I can't tell because the sun is shining on the**
2  **picture.**
3     Q.  Okay.  Well --
4     **A.  Is the gate closed, no.  No, it's not.  You can**
5  **see it right there.**
6     Q.  May I see it?  Okay.  Is it partially closed?
7     **A.  It is partially closed, yes.**
8     Q.  Okay.  Thank you.  No further questions?
9        MR. GELFAND:  No further questions.  Do you
10  want to read and review?
11       MS. ROBERTSON:  Yeah, we're going to --
12  we're going to read and sign.
13          (Thereupon, the deposition of Robert
14    Gerholdt concluded at 3:58 p.m.)
15          (SIGNATURE WAS NOT WAIVED.)
16
17
18
19
20
21
22
23
24
25

126

1  STATE OF        )
2  COUNTY OF         )
3
4
5       I, Robert Gerholdt, do hereby affirm that I have
6  read the foregoing deposition and agree that said
7  deposition is a true and correct representation of my
8  testimony in this matter, with any changes I have made on
9  the correction page.
10
11
       _____
12              Robert Gerholdt
13
14  Subscribed to before me this _____ day of
15  _____, 2023.
16
17
       _____
18             (Notary Public)
19  RAYMOND THOMPSON v.
    JOSHUA COCKRELL, et al.
20
21  Held:  December 5, 2023
22  Brenda L. Schmelz, CVR-Master, Mo. CCR 1267
23
24
25

127

1              ERRATA SHEET
2  RE:  RAYMOND THOMPSON vs. JOSHUA COCKRELL, et al.
   WITNESS:  ROBERT GERHOLDT
3  PG/LN NO.  CORRECTION       REASON FOR CHANGE
4  _____|_____|_____
5  _____|_____|_____
6  _____|_____|_____
7  _____|_____|_____
8  _____|_____|_____
9  _____|_____|_____
10 _____|_____|_____
11 _____|_____|_____
12 _____|_____|_____
13 _____|_____|_____
14 _____|_____|_____
15 _____|_____|_____
16 _____|_____|_____
17 _____|_____|_____
18     I certify that I have read my deposition in the
   above case and I request that no changes be made.
19
20     I certify that I have read my deposition in the
   above case and I request that the above changes be made.
21
22         SIGNATURE OF DEPONENT:
23         _____
24         DATED: _____
25

128

1
2            CERTIFICATE OF REPORTER
3
4       I, Brenda L. Schmelz, Certified Verbatim
5  Reporter-Master, CCR No. 1267, a Certified Court Reporter
6  within and for the State of Missouri, do hereby certify
7  that the foregoing witness, Robert Gerholdt, was duly
8  sworn on the date indicated and that the foregoing is a
9  true and accurate transcription of my notes and is a true
10  record of the testimony given by the foregoing witness.
11       I further certify that I am not employed by or
12  related to any party to this action by blood or marriage
13  and that I am in no way interested in the outcome of this
14  matter.
15       IN WITNESS WHEREOF, I have hereunto set my hand
16  this 15th day of December, 2023.
17
18         __/s/ Brenda L. Schmelz_____
           Brenda L. Schmelz, CVR-M, CCR
19         Certified Court Reporter within
           and for the State of Missouri
20
21
22
23
24
25

Robert Gerholdt - December 5, 2023

## A

**a.m** 3:11 49:7 89:4
**A1** 49:14
**ability** 11:24 12:2 12:6,9,11,12 53:6 75:21
**able** 48:22 69:23 77:13 91:6 115:24 118:13
**above-styled** 3:14
**absolutely** 7:7 17:5,11 21:5 24:21 32:5,16 39:1 45:18
**academic** 8:5,6
**access** 12:16 51:4 51:5,7,9,10 58:24 109:24
**accesses** 57:5
**accident** 23:14
**accomplish** 50:24
**account** 57:5
**accurate** 11:13 13:22 14:3 60:4 60:5 128:9
**acting** 15:24
**action** 128:12
**actions** 10:13
**activate** 35:24
**activated** 35:18 35:21
**activates** 36:23 36:25
**active** 36:12 112:11
**activities** 103:16
**actual** 23:23
**addition** 123:20
**address** 17:6,13 22:22,23 51:20 56:13,15 68:5 105:15
**addresses** 64:18
**admit** 27:25
**admitted** 94:3

**advise** 63:2,4
**advised** 63:13
**affidavits** 11:14 13:17
**affirm** 126:5
**afternoon** 5:8,9
**afterwords** 112:13
**age** 5:2
**agency's** 15:18
**agent** 64:2 65:9 65:19 107:13
**ago** 8:18 32:24 100:4 101:14
**agree** 11:1,18 12:20 13:21 14:13 43:8,10 45:16 59:24 69:6,8 70:19 72:23 78:20,24 79:7 80:1 96:7 97:21 101:4 110:6 126:6
**ahead** 24:1,7 46:24 49:1
**air** 73:24
**al** 1:8 3:6 126:19 127:2
**allegedly** 107:10
**allow** 69:13
**allowed** 71:3,6 72:24 73:5
**Amara** 16:4 28:23 31:15 34:2 93:14,20 119:2
**and/or** 107:1
**angle** 99:5
**angled** 99:9
**animal** 52:16
**answer** 6:21 7:5 12:25 13:14 15:12 22:4 28:7 29:17 31:12 36:1 40:24 42:23,25 46:1

46:18,18,25 47:7 48:1,2,23 55:21 57:16 67:1 70:4 73:22 75:3,10 79:13 84:1 85:3,9 93:12 94:11 100:19 103:12 104:1 108:12 122:2
**answered** 26:17 32:19 85:8,9 104:23
**anticipate** 114:4
**anybody** 12:3 23:3 84:3,4,5
**anybody's** 73:18
**anymore** 20:5
**anytime** 71:23
**apart** 123:3
**apologize** 114:1
**Apparently** 20:5
**appear** 91:22
**APPEARANC...** 4:2
**appears** 63:10
**applicable** 64:20 64:21
**application** 15:17
**applied** 79:22 100:8
**applies** 89:21
**apply** 11:24 40:14
**appreciate** 37:23 38:1 40:2
**approached** 19:9
**appropriate** 11:22 64:7
**approximately** 6:7 7:17 9:7 18:22 19:1,7 29:14 68:6 88:24 109:18
**April** 7:20 9:23
**area** 22:22 84:9,9

97:12,20 113:22 114:18,19 120:20,24
**argumentative** 122:1
**Arizona** 8:16,17
**armed** 83:3
**arrest** 80:14 81:6
**arrested** 109:5,7
**arrived** 18:13 66:20 67:3 90:14 101:14 116:2
**arrives** 64:1
**arriving** 17:12 20:12
**arrow** 49:12,12
**articulable** 83:3
**aside** 47:14 73:23
**asked** 20:10 29:1 43:18 44:8 45:21 53:19 85:7 89:19 112:20,24 116:14,15,17 117:20 122:10 124:17
**asking** 6:20 22:6 23:10 28:4 35:11 39:19 46:23 48:4,5 53:23 56:1 74:1 85:1 94:12 112:14 120:11 122:3
**asphalt** 39:11
**ass** 92:8
**assault** 48:15
**assembly** 30:9 31:4
**assess** 117:23 122:11,16
**assessing** 117:24 122:14
**assessment** 76:19 76:22

**assist** 17:19,23
**assistance** 42:4 89:13
**associate's** 8:10
**assume** 6:4 7:6
**assumes** 40:21 42:21 75:1,23 79:12
**atmosphere** 9:14
**attachment** 55:14
**attempt** 32:8 62:21
**attempted** 40:13 41:8
**attention** 15:19 30:4 44:19,20 45:13 57:9 120:3,18
**attorney** 6:19,25 111:15 122:10
**attorney's** 122:15
**attorneys** 56:11 111:22
**audio** 35:2 38:14 38:15,16
**authority** 45:23 47:1
**authorized** 79:3
**automatic** 36:18
**automatically** 35:18,21,24 48:11 52:19,22 54:3 94:6
**automobile** 82:16
**available** 12:22 13:6
**aware** 53:13 70:1 75:6,11,14 87:11,14 112:14

## B

**B** 2:10,23 49:8 114:24,25 115:2 115:5,8 120:19 123:21,23 124:4 124:11

Robert Gerholdt  -  December 5, 2023

**back** 8:7 10:2,8
21:4 23:2 25:7
25:17,18,21
27:8,14,21,22
27:24 28:22,23
29:7 30:4 31:14
31:16,17,18
32:1 35:16
38:12,25 41:25
44:22 45:14
47:13,15 49:21
49:21 50:1,18
52:21 56:20
61:6 66:19
71:17,20 77:2
77:14,25 80:12
82:9 86:2,16
91:13,21 93:7
93:20,22 94:1,7
98:24 99:9,25
101:2 104:18
105:10,18
107:23 108:6,14
111:4,13 115:15
117:8,10 119:22
**background** 6:3
8:5,6
**backup** 81:4
**backyard** 23:1
27:20 28:1,8,13
28:16,21 29:1,7
29:11,12,15,16
29:22 30:1,17
30:19,19 31:9
31:11,18,20
38:6 39:5,6,23
40:2,4 41:9,11
42:2,3 43:3
46:10 66:23
67:5,7 73:14
79:8 81:19 82:5
83:19 84:23,24
99:19 102:1,5
110:11 113:20
113:23 115:21
116:20 120:20

120:21,25
**badge** 72:12,13
72:14,16 89:20
**badges** 72:11
**Ballwin** 110:2
**bank** 123:3
**based** 13:1 14:22
47:21 48:18,18
65:13 74:11
77:17 83:2
84:23 86:7
100:14 107:22
**basically** 8:22,24
35:1,7 45:4
46:22 52:16
63:16 64:10
87:20 118:21
**basis** 79:8
**Bates** 68:18 78:25
**bearings** 24:9
**beginning** 49:6
**behalf** 1:13 3:16
4:3,9 5:4
**believe** 23:19,20
32:10 40:17
41:15 42:2 45:6
51:7 62:7 73:7
73:11,14,17
76:18 81:18
82:4 84:20
89:12 97:24
116:21
**believed** 25:7
30:24 81:16
**belonged** 117:14
**benefit** 5:11
43:19
**best** 7:10,11 16:6
16:9 20:15
72:15 88:18
98:2 119:3,4,16
**bet** 95:19
**better** 7:13 9:12
14:9 69:13
96:12
**beware** 63:13

**Beyond** 73:9
**big** 5:18 9:13
43:14 84:18
104:12
**bike** 20:7,9,11
21:3 22:25 23:1
25:7,18 33:9,9
71:11 73:2
84:14 86:19
87:22 88:1,4,5
89:7 91:1,25
93:9,22,24,25
94:4,5,7,9 98:4
98:16 100:16
101:11,22 108:5
108:19,22,24
109:2,6,8,11
110:11,23 111:4
118:3
**bill** 91:2
**bit** 10:7 24:1
43:15 44:19
58:11,22
**black** 69:4 95:11
95:13
**blood** 128:12
**blue** 20:18
**body** 34:16,16,18
34:20,22,23
35:5,10,11,14
35:14,17,18,20
35:23 36:13,17
36:20,23,24
37:2 38:7,9
47:17 48:12
49:3,7,8,13,14
49:16,20 50:6,8
50:14 51:4,5,21
52:5,12 53:17
54:2,15,21
86:25 96:6,8
107:4
**bombs** 121:5
**Bonhomme** 4:5
**book** 34:25
**bottom** 38:1 43:8

66:11 68:18
92:24 121:8
**bottom-line**
110:9
**break** 19:23
61:14,15,23
**break-ins** 84:10
**Brenda** 3:11
126:22 128:4,18
128:18
**briefly** 77:1 86:14
**bring** 45:11 93:22
94:7
**broadly** 13:20
**brother** 103:20
**brought** 91:7
**bunch** 43:18
**burglaries** 84:10
**business** 8:17
49:17
**button** 35:8
36:15,24 37:5
**buyer** 93:2

─────────────

**C**

**C** 45:21 49:8
63:25 64:22
**call** 5:18,19 17:17
18:3,5 26:4,22
34:4,16 39:5,23
39:25 43:23
45:4,8 48:8
67:13 68:12,13
68:18 72:5,20
76:6 78:13,21
89:8,11,11 94:1
102:24 103:21
111:10
**called** 23:2 37:16
66:14 87:5 89:6
89:8,10,13
93:20 94:3
100:15 101:11
121:17
**calling** 80:7
**calls** 8:1 12:24

13:7 14:16,25
15:11 22:3,3
36:6 40:22,23
42:22,24 46:15
47:4,24 48:25
49:18 51:13,15
63:19,20 66:24
66:25 70:3,13
73:3,21 74:7
75:8,9 79:9,10
80:19 81:23
83:11,24 93:10
93:11 108:11
110:20 121:25
121:25 123:4
**cam** 34:5,7,8,16
34:18,20,22
35:5,10,11,14
35:15,17,18
36:13,17,17,22
38:7,7,8,9,10,14
38:15,16,17,17
47:17 48:12,12
49:13 50:6,8,15
51:4,5,21,21
52:5,5,18 53:5,6
53:9,15,17,17
53:21 54:2,2,15
54:18,22,25
107:4,4
**camera** 34:8,16
34:23 35:1,19
35:21,21,23,23
36:2,13,20,20
36:23,25,25
37:3,3,3,18
49:14,16,20
50:6 86:25 96:6
96:8
**cameras** 49:4,7,8
52:15
**cams** 52:12,14
**canceled** 92:17
**capacity** 10:10
15:25 67:7 72:6
**capture** 35:2

Field Reporting Services
314-461-2122

Robert Gerholdt  -  December 5, 2023

**car** 17:18,20
  35:18,21,23
  36:13,20,25
  37:3 67:8 70:20
  89:20 105:18
**care** 14:2
**career** 121:14
**Careful** 5:21
**carefully** 80:9
**caretaker** 46:2,13
  47:3 80:7
**case** 1:7 3:5 13:25
  15:4 36:12
  41:19 43:13
  46:12 49:14
  50:5 56:12 60:9
  60:12 65:9 73:1
  79:11 83:23
  93:13 105:25
  106:6 112:11
  118:9,16 127:18
  127:20
**CaseNet** 22:23
  88:12
**cases** 6:10,12
  12:14 38:23
  41:20 52:5
  77:21
**Catherine** 4:10
**cause** 3:14 29:8
  40:17 59:10
**caused** 10:4
**caveat** 38:7
**CCR** 3:12 126:22
  128:5,18
**cell** 87:15
**center** 34:11,11
**certain** 3:14 79:4
  122:15
**certainly** 7:10
**CERTIFICATE**
  128:2
**Certified** 1:19
  3:12,13 128:4,5
  128:19
**certify** 127:18,20

  128:6,11
**cetera** 78:2 89:21
**chain** 105:10
**CHANGE** 127:3
**changes** 126:8
  127:18,20
**channels** 86:24
**characterization**
  81:1
**characterize** 39:4
**chase** 38:2,4
**check** 82:7 92:9
  92:16,17,17
  93:2 116:12
**checks** 88:5 91:3
  104:10
**chose** 9:18 104:13
**Christmas** 8:25
**chronologically**
  105:11
**cigarettes** 35:1
**circle** 98:3,5,16
  98:20
**circumstance**
  13:2 64:18
**circumstances**
  13:2,3 41:16,17
  41:18 59:15
  93:21
**city** 5:24 6:1 7:17
  7:22 8:2 9:5,6
  9:11,14,23
  11:17 13:4
  15:25 34:9,24
  56:11 59:13
  77:20
**claim** 32:8
**claimed** 23:4
  86:18
**claiming** 66:11
**claims** 70:19
  118:14
**clarification**
  37:23 66:8
  78:16
**classified** 51:15

**clean** 81:5
**clear** 10:20 17:3
  60:6 68:3,4
  71:9 93:8,13
  95:4 102:3
  105:9
**cleared** 29:16
  92:17
**clearing** 30:18
  31:10
**closed** 84:13
  124:25 125:4,6
  125:7
**clue** 76:4 100:17
**cmr@reichard...**
  4:12
**Cockrell** 1:8 3:6
  17:20,22,23
  18:7 28:22,25
  29:11,15,21
  30:3,15 68:8
  71:10,25 72:6
  72:16,23 78:2
  89:24 90:1,3
  98:22 101:16
  102:15 104:3
  112:3,7 119:2
  126:19 127:2
**Cockrell's** 18:3
  68:14
**coincides** 15:4
**collector's** 69:18
**college** 8:23
**color** 69:4
**come** 9:18 16:3
  16:15,25 29:16
  30:18 31:10,17
  47:13 65:16
  83:14 117:10
**coming** 25:17
  29:7
**command** 51:8
**committed** 107:1
**committing**
  107:10
**commonly** 34:16

**communicated**
  100:14
**community** 46:2
  46:13 47:2 80:7
**companies** 12:7
  88:10
**company** 64:4,10
  64:15,19,25
  66:12
**complete** 13:22
  59:24 111:7,10
**completely** 14:3
**complicated** 42:7
**Complies** 98:13
**computer** 30:12
  34:12 64:7,8
  113:11
**concentrating**
  72:3
**concern** 39:2
**concerned** 31:23
**conclude** 26:12
  26:14,16 27:15
**concluded** 13:5
  26:15 125:14
**conclusion** 22:4
  40:23 46:16
  47:5 63:20
  66:25 75:9
  79:10 80:19
  81:2,24 93:11
  121:25
**concrete** 39:11
**conditions** 82:19
**conduct** 12:2
**conducted**
  121:11
**conducting** 41:1
  42:9 79:15,24
  82:6 106:21,24
  111:9
**confirm** 70:23
**confirmation**
  109:9
**confront** 79:4
**confronted** 13:4

**confuse** 24:4
**connection** 6:9,12
  10:13 11:15
  12:4,13 13:17
  43:12 48:14
  52:4 60:1,3
  67:23
**consent** 43:3,7,9
  82:23
**consider** 111:6
**considered**
  111:10 121:12
**considering**
  65:16 76:6
**contact** 16:3,15
  16:22,25 25:12
  38:11 41:23
  86:10 88:14
  89:11 117:5,25
**contacted** 14:10
  18:18 86:5
  113:1
**contacting** 84:3
**contain** 91:22
**context** 11:23
**continue** 80:20
  120:11
**continued** 20:22
  22:21
**contraband**
  120:24 121:1,2
  121:8 122:5,7
**control** 7:25 35:4
**conversation**
  21:7 87:20
  90:10 101:14
**conversations**
  103:14
**cool** 38:19 66:15
  66:16
**cooperative**
  104:7,8
**cop** 83:23
**copies** 50:5 91:3
  91:7,7 104:9,16
  114:2

Robert Gerholdt  -  December 5, 2023

**copy** 50:21 51:1
91:17 92:7
**corner** 124:14,16
**correct** 7:18,19
11:16,25 12:1,4
12:8,18 17:7,8
20:19 22:1
23:21 24:13,14
24:16 27:2,3,4
30:16,21,24
31:1,2,7 37:22
38:9 39:9,12,13
39:16 40:5,9
41:6,9,10,13,14
42:10,11,14,17
43:9 44:9 45:2
47:8,11,19
48:17 52:11
53:1 62:18,19
62:22 63:18
64:15,16 66:6
66:17,18,23
67:5,6,10,11,15
67:16 68:6,7,9
69:2,4 74:6,17
74:18,19,20,24
76:16,25 78:3,7
78:15,18,22
79:5,8 87:7,9,12
87:17 89:14,17
89:21 90:5
96:19 97:25
99:8,23 101:8
104:7,11,14
106:13,14,16,19
107:14,18
110:19 112:6
114:15,16,25
115:22,23
117:11,12,16,17
120:21,22 121:9
121:10 122:8,9
122:16,17 123:3
126:7
**correction** 126:9
127:3

**corrections** 8:16
8:24
**correctly** 21:11
39:3,17 46:5
59:17 63:1,7,8
63:14,15 69:24
71:3,4 91:5
122:12
**correlates** 110:6
**correspondence**
107:17
**corroborated**
27:10
**Cottagemill** 17:1
112:22 115:4
**counsel** 2:25
43:19
**counsel's** 41:5
**Count** 106:20
**County** 12:19
126:2
**couple** 6:14 20:8
65:24 90:3
94:14 106:19
120:14 123:15
**course** 6:18 7:8
8:16 39:25 51:9
98:11
**court** 1:2 3:1,13
3:15 5:11 7:9
7:12 61:9 63:10
63:13 73:1,18
73:25 74:16,17
74:19,22 76:21
96:24 105:4
122:8 128:5,19
**courts** 63:3,6,16
74:4
**created** 47:17
**credibility** 117:23
117:24 118:2,4
122:12,16
**credited** 8:23
**crime** 12:16 84:9
107:10
**crimes** 84:10

107:1
**criminal** 6:10
8:10 41:2 42:10
45:1,5,6 79:4,16
79:24 80:4
113:13
**critical** 60:7
**cross** 34:10 40:5
**crossed** 40:8
**current** 9:1 36:13
117:3
**currently** 5:23
36:7
**custodian** 47:25
48:25
**custom** 69:19
**cut** 38:2,4
**cuts** 95:18
**CVR-M** 128:18
**CVR-Master**
126:22

---

**D**

**D** 49:9
**dark** 37:9
**dash** 34:5,7,8
36:17,22 37:3
37:18 38:7,8,10
38:14,15,16
47:17 48:12
50:6 51:21 52:5
52:14,15,18
53:4,6,9,15,17
53:21 54:2,18
54:24 107:4
**Data** 52:2
**databases** 64:7
**date** 52:6 68:5
77:23 78:6
94:20 108:21
110:10,11,12
128:8
**dated** 55:15,19
127:24
**day** 3:10,11 9:22
18:22 37:6

49:15,18,20
55:8 84:7 106:8
107:13 109:3,15
109:16 126:14
128:16
**days** 29:18,19
54:8 94:5
106:16,18,19
**deactivate** 35:24
**deals** 57:20 63:24
64:9
**December** 1:16
3:10 126:21
128:16
**decided** 13:11
74:5
**decision** 63:17
76:23 86:6
87:25
**Defendant** 4:9
44:25
**Defendant's**
113:24
**Defendants** 1:9
3:7
**Defendants'** 2:22
2:23 114:10,13
114:21,24,25
115:5 123:20,22
124:10,21,23
**Defense** 120:18
**define** 41:17
76:22 121:1
**definition** 121:3
**degree** 8:10,21
**deleted** 54:3
**delivered** 93:24
**demonstrating**
37:7
**department** 9:21
9:21 13:5 14:6
16:1 32:19
34:23 35:4
47:22 51:19
53:22 59:22
62:17 76:12

78:1 88:14
89:12 100:10
104:25 106:3
113:12 117:2
**department's**
15:4 34:9
**depending** 54:8
84:6
**depicted** 70:9
97:10 98:19
99:15,21 114:12
114:17 115:2
124:4,10,21
**depicting** 21:12
**depicts** 96:11
**DEPONENT**
127:22
**deposed** 6:11
**deposes** 5:3
**deposition** 1:12
2:11,12,13,14
2:15,16,17,18
2:19,20,21,22
2:23 3:9 5:17
6:18 7:8 39:24
44:2 55:11,24
56:18,19 58:14
62:13 68:1
70:11 77:9
91:18 94:17
95:21 97:15
99:11 105:21
111:17,18,22,24
112:4,6 114:21
115:5 125:13
126:6,7 127:18
127:20
**depositions** 6:5
**describe** 69:1
101:19 115:11
**described** 59:14
**description** 64:3
**designated** 59:13
**details** 13:21
**detective** 9:10
10:1,4,6 104:25

Robert Gerholdt - December 5, 2023

105:25 106:11
107:17 111:1
**determination**
73:18
**determine** 25:13
63:3 123:9
**determined** 59:15
74:23 95:15
**determining**
70:20 123:7
**devices** 48:12
**difference** 85:18
**different** 8:1 34:9
34:24 41:20
51:15,16 52:15
67:8 77:21
85:13,16 94:20
95:25
**differently** 51:15
**digital** 36:5
**diploma** 8:22
**direct** 15:19
44:18,20 45:13
57:9 120:18
**directed** 63:12
**direction** 120:2
**directives** 78:9
111:20
**directly** 15:4 51:1
53:7
**disagree** 63:23
79:14
**disagreed** 80:2
**disagreeing** 64:12
**disappear** 104:17
**discipline** 10:12
**discovery** 48:23
50:22 53:10
**discussed** 111:15
118:21
**discussion** 86:23
**dispatch** 17:14
30:12 68:6 87:7
87:9,12,15 89:9
89:11 96:14
102:25 110:3

113:2,9 116:24
117:5
**dispatched** 17:19
17:20 63:25
65:3,8
**disposal** 11:19
**dispose** 63:5
**dispute** 62:17
63:2 74:5 96:6
100:10
**disputes** 57:22
63:17
**distributed** 77:22
**Distribution** 78:1
**District** 1:2,3 3:1
3:1,15,15
**Division** 1:3 3:2
3:16
**DNA** 12:17
**dock** 49:22
**docking** 49:7,8
49:21 50:1
**doctrine** 121:18
121:21
**document** 55:12
56:2,7
**documents** 11:14
12:7 22:15 25:6
73:25 86:1 88:5
88:9 91:2 93:19
100:1 118:11,22
**doing** 19:13
29:25 30:3,15
58:16 59:1 72:3
72:4 104:4
107:3 113:10
**domain** 56:24
57:3
**door** 21:8 25:9,10
25:11 26:11,17
27:1 38:6 76:2
84:11,13
**doorbell** 25:11
**DOR** 59:25 64:5
66:1 116:16
**doubt** 85:16

**Dowdell** 105:19
105:23,24
106:11 107:17
111:1
**download** 50:16
50:17 51:3
**downloaded** 50:2
50:15
**downloads** 52:22
**Dr** 4:11
**draft** 13:16,23
**draw** 18:1 98:3
**drawn** 120:3
**drive** 52:21 56:17
**driven** 26:3,5
**driver's** 113:12
**driveway** 22:25
25:20,21 27:3,7
97:11 99:19
112:24 113:5,19
115:3,13,15
123:23,25
124:10
**driving** 35:22
83:14 84:3
109:5
**drove** 34:1,3
**drugs** 42:12
121:4,12,20
**DSN** 95:24
106:13
**duly** 5:2 128:7
**duplicate** 100:9
**duties** 7:21
**duty** 15:22,24

**E**

**E** 2:10
**e-mail** 55:18 56:6
56:13,14 57:3
105:10,13,15
106:3
**e-mails** 57:5
**earlier** 39:3 52:6
90:4 96:5
118:18

**easier** 92:6
**Eastern** 1:3,3 3:1
3:2,15,16
**edition** 69:18
**education** 8:14
8:15
**effect** 51:20 78:6
78:8 84:12
116:16
**eight-block** 34:1
**eighteen** 9:7
**either** 7:1 58:23
115:7
**Eleven** 57:14
**Elmore** 16:4,7,10
16:22 18:6,14
19:9 20:2 23:7
23:12,24 24:23
28:23 29:1,10
29:15 30:18
31:7,10,15 34:2
38:5,11 39:15
41:22 65:10
66:12 67:14
71:2,5 72:24
75:6,16 76:3,20
85:23 88:1,4
90:4 93:14,20
93:23 94:9
100:25 101:16
106:25 111:5
117:21 118:15
119:3
**Elmore's** 84:16
85:5
**embarrassing**
56:22
**emergency** 35:20
82:19
**employed** 5:23,24
128:11
**employment** 6:5
9:1
**enabled** 36:10,11
36:17 48:11,12
**enclosed** 39:8

114:19
**encountered** 79:3
**endangered**
82:20
**enforced** 63:11
**enforcement** 9:2
9:17 10:10,13
13:12 14:23,24
27:10 72:7 79:4
103:25 104:7
117:22 118:7
119:19 120:1
121:22 122:6,6
122:11
**enter** 28:13,15
41:9 43:3 45:22
45:23 47:1
49:12 83:9,23
**entered** 28:21
29:21 30:1
38:25 39:8 40:4
42:2 46:10 64:6
84:24 97:18
99:19 116:12
120:21
**entering** 41:11
102:1,4
**enthusiast** 69:11
**entire** 23:9 49:3
72:5
**entirety** 38:4 76:6
**entitled** 81:16,18
**entry** 64:8 79:8
**ERRATA** 127:1
**Esq** 4,4,10
**essentially** 120:20
**establish** 62:16
**et** 1:8 3:6 78:2
89:21 126:19
127:2
**Evan** 86:9
**evening** 15:20
16:6,9,19 20:13
22:23 23:3,6,24
24:12 25:23
26:1 28:10

54:16,19,22,25
71:19 91:16
120:1
**event** 122:19,22
**eventually** 110:18
**evidence** 11:11
40:21,22 42:21
42:22 75:2,2,24
79:11,12 98:9
121:22,22 122:4
122:7
**exact** 89:2 108:21
**exactly** 18:20
19:5,14 30:22
84:25
**Examination** 2:1
2:5,6,7,8 5:6
112:18 120:16
123:18
**examined** 3:10
**example** 42:6,13
50:21 53:10
69:17 77:25
**exception** 10:9,17
46:2,13 47:3
79:20 80:7
111:14
**exclamation**
106:8
**execute** 11:25
**execution** 78:21
**Exhibit** 2:11,12
2:13,14,15,16
2:17,18,19,20
2:21,22,23
43:25 44:2,5,7
55:3,4,9,17,24
57:8 58:13,14
59:7 61:11,13
62:7,9,13 67:17
67:18,20 68:1
70:7,9,11 77:1,5
77:7,9,25 91:9
91:10,18 94:15
94:17 95:11,17
95:18,21 96:22

97:10,15 99:1,2
99:4,11 105:3,3
105:5,7,21
109:23 113:25
114:10,13,21,24
115:2,5,7,8
123:21,22,23
124:4,6,10,13
124:16,21,23,25
**Exhibits** 2:25
120:18 124:10
**exigent** 41:15,17
41:18
**exist** 51:25
**exited** 37:4,5
**expect** 101:5
**experience** 9:2
10:14,24 14:23
15:2 47:21
48:19 74:12
77:17 90:4
117:22 118:6
**explain** 49:3
60:14
**explained** 86:13
86:14,15,17
87:21
**expressly** 24:20
**extends** 123:25
124:9
**extent** 88:16
**eye** 93:14 118:10
118:24
**eyes** 36:4

**F**

**face** 56:7 120:8
120:10
**facing** 33:6 99:14
**fact** 17:25 53:9
73:13 109:13
118:2,3 124:13
**factor** 60:12
**facts** 40:22 41:4
42:21 75:1,24
79:11,12 83:17

93:21
**failed** 17:15
**fair** 6:22 7:3,6,13
11:4 12:21
14:22 16:12,14
17:10 19:21
24:2 37:13,19
37:20,21 40:16
43:16 48:17
60:6,8 61:2,4
64:17 78:16
85:21 93:7
100:14 104:5
108:8 120:23
**fairly** 12:23
**fairness** 23:20
**falling** 29:8
**familiar** 6:15
34:18 74:5
**family** 9:14,16
far 8:6 16:12
19:24 24:16
31:22,22 41:19
52:1 86:15
88:15 89:9 91:6
111:3 119:18
**faster** 35:22
**father** 20:3
**father's** 45:9
**fear** 83:4 104:17
**February** 108:4,4
108:6,9,21
109:3,19 110:10
**feel** 40:1
**fence** 25:19,19
27:21,25 39:9
39:20 40:5
83:20 97:22,23
99:21 114:19
**fenced** 67:7
114:19
**fight** 74:14
**figure** 27:16
48:18
**final** 87:25
**finally** 7:8 63:9

**financial** 9:13
88:4
**find** 30:19,21
49:9,11
**fine** 5:18 40:2
78:16 80:23
81:3 97:5 98:12
114:3
**finger** 106:20
**fingerprints**
12:17
**firearms** 72:18
**first** 5:2 16:13,21
16:25 17:21,25
18:2,6 24:16,17
24:22 25:1
28:10,22 30:10
44:5 49:25
55:12 67:13
71:14 77:14
88:17,19 90:20
91:12,13 105:10
117:24 118:25
119:7,12,13
**fits** 70:21
**five** 50:16,17
106:16
**flag** 118:20
**flags** 84:21 118:5
118:19
**flushed** 42:13
**focus** 41:4 104:1
**fold** 44:22
**follow** 11:8 62:16
77:20
**follow-up** 120:14
**followed** 34:2
**following** 88:21
**follows** 5:4
**foot** 97:24
**footage** 47:17,22
48:1 50:6 52:5
53:5,7,10,21
54:2,2,15,18,22
54:25 107:5,11
107:11

**foregoing** 126:6
128:7,8,10
**forensics** 12:16
**forget** 61:21
**fork** 30:9 31:4
116:21
**form** 13:8 59:25
59:25,25 63:19
70:15 73:4,21
74:25 75:18,23
80:19,25 83:24
89:13 100:18
111:8 117:18
121:24 123:4
**formal** 8:15 55:14
**forms** 60:1
**forth** 77:19
**found** 22:22
**foundation** 55:21
70:14
**four** 28:15 49:8
106:18
**Fourteen** 105:4
**frankly** 49:23
**fraud** 106:6
**free** 40:1
**friend** 20:4,5,6
**friends** 20:5
**frisk** 83:1
**front** 17:2 25:10
27:1 30:9 31:4
38:6 44:5,6
61:11 62:8
84:11 90:25
91:10,13 94:15
99:2 114:10
115:22 123:21
**full** 64:2
**fully** 104:6
**funny** 120:4,5,6,7
**further** 2:7,8
112:16 120:13
120:16 123:12
123:18 125:8,9
128:11

Robert Gerholdt  -  December 5, 2023

**G**

G-E-R-H-O-L-...
5:13
**garage** 59:12,13
67:9
**gate** 22:25 34:2
40:6 69:23
83:22 84:11
99:6,22 116:3,4
116:5,7 124:17
124:23,25 125:4
**gated** 66:22 67:5
81:19 82:5
83:10,19
**Gelfand** 2:5,7 4:4
4:5 5:7 11:22
13:3,10,16
14:13,19 15:7
15:14 22:6 28:4
28:9 41:1 42:23
43:2 44:4,15
46:22 47:7 48:3
49:5 51:18 56:1
56:10 58:16
61:17,20 62:1,4
62:15 63:21
67:3 68:3,23
70:6,18 73:8
74:1 75:5,20
76:1 77:11
79:15 80:1,6,23
81:3,4,22,25
83:14 84:1
85:12 91:20
93:16 94:19
95:23 96:23
97:2,5,9,17
99:13 100:20
103:13 105:5,6
105:23 108:14
110:22 111:13
112:20 113:15
114:3,23 116:14
117:18,19 120:5
120:6,10,14,17
122:2 123:7,12

125:9
**general** 8:1 9:14
26:7 48:6 54:12
57:10,16,19,20
62:10,16 63:23
65:23 77:8,14
77:18,19
**generally** 7:21
47:16 53:2,3
101:5,7
**generate** 60:16
**Gerholdt** 1:12
2:3 3:9 5:1,12
5:17 106:12,12
112:20 114:9,24
120:15 123:20
125:14 126:5,12
127:2 128:7
**getting** 29:7 84:5
85:19 90:7 91:7
104:2,2
**gist** 87:20
**give** 62:22 63:10
91:4 104:13,17
106:4 121:23
**given** 6:4,5 35:5
75:21 128:10
**gives** 49:13
**glasses** 5:19
**go** 6:14 8:7,16,24
9:17,20 10:4
31:23 35:16
37:7 38:22
45:19 46:24
48:25 49:9,17
50:13,18 56:23
66:19 68:20,25
74:16,17 76:21
102:11,17,21
110:18 111:11
123:15
**God** 9:19
**goes** 118:4
**going** 6:14,18,21
8:23 15:5 17:9
19:15 29:5 30:4

30:19 32:4
33:17 39:5,23
43:25,25 44:18
44:19,20 45:6
55:2 58:12 61:9
61:13,18 67:17
70:6 76:10 77:1
80:22,25 85:12
91:9 94:14
96:21,21 98:2
99:1 105:2
109:10 111:11
111:24 112:12
112:13 113:16
113:16,24
114:23 123:21
125:11,12
**gonna** 94:6
**good** 5:8,9 37:25
44:17 59:18
68:16
**Google** 94:20,21
**gotta** 92:8
**granted** 11:24
**grass** 39:12
115:14,19 116:9
116:11
**grassy** 113:22
120:19,24
**great** 14:2 40:4
106:8
**green** 36:2 96:9
**ground** 6:14
**guess** 65:9 76:10
80:20
**gun** 89:20
**guns** 121:4
**guy** 5:19
**guys** 31:16 39:25
49:24 90:9

**H**

**H** 2:10
**half** 6:2 7:18,19
9:7,10 35:1
69:13 76:5,8

112:12
**Hampshire** 8:11
**hand** 32:2,25
33:8,15,20
55:11 123:22
128:15
**hands** 31:24
**handwriting**
92:24 93:4
**hanging** 94:2
**happened** 5:22
10:3 14:9,15
28:20 29:23
32:15 33:24
64:13 65:23
66:17 87:21
88:19 90:24
102:23 112:15
123:8
**happening** 103:8
**happens** 14:19
47:22 48:4,19
52:19 58:22
83:22
**Harley** 69:14,17
70:1,8,25
**Harley-Davidson**
20:4 46:11
54:14 59:4
66:22 67:4,15
69:1,7 72:25
97:19 108:10
111:6
**Harleys** 69:9
**hate** 87:1
**Hazelwood** 9:5,6
9:11,15,20,23
10:1,3,9
**Hazelwood's**
34:24
**HD** 92:22
**head** 95:18
**hear** 102:15,19
**heard** 54:6,7,11
74:10 102:8
**hearing** 85:25

**Held** 126:21
**hell** 90:12
**hello** 19:15
**help** 42:6 49:2,2
58:4 120:9
123:9
**hereunto** 128:15
**Hi** 19:13 106:11
**hiding** 118:23
**high** 8:8,9,14
84:9
**highway** 59:11
**hired** 9:19
**history** 76:13
113:13
**hit** 37:5 109:9
**Hold** 46:15 80:16
**holding** 108:21
**home** 26:12,14,15
26:16 67:10
101:10
**honest** 11:13
49:23
**honesty** 9:15
**hope** 6:23 34:19
34:20
**hoping** 39:18
**hour** 35:23 76:5,8
**hours** 18:25
29:20 50:17
89:1 90:3 110:2
**house** 17:10
20:12 21:8
24:12 25:2,12
25:14 26:9
27:11 28:1,10
32:13 33:17
64:14 66:21
67:4,12 70:8
78:7 88:19,22
89:4,23,25
90:20,23 94:23
94:24 95:2,4
96:2 99:14,16
99:25 107:24
108:1 109:10

Robert Gerholdt  -  December 5, 2023

115:22 119:12
**human** 42:3
**hundred** 106:8
**hundreds** 26:4
**hung** 85:19
**hurt** 29:8 42:6
58:11
**hurts** 61:1

**I**

**i.e** 55:14
**ice** 19:23
**idea** 20:17 43:23
68:19 76:4
111:23
**identical** 97:6
**identification**
44:3 116:24
**identified** 55:25
58:15 62:14
68:2 70:12
77:10 91:19
94:18 95:22
97:16 99:12
105:22 114:22
115:6
**identify** 64:24
**image** 94:20
**immediately**
102:25
**implemented**
77:23
**important** 11:1
13:22
**impounded**
108:23 109:6,8
**in-car** 53:6
**incident** 35:2
54:13 67:23
**include** 78:2
**Including** 55:14
**inconsistencies**
122:18
**incorrect** 60:11
**INDEX** 2:1
**indicate** 117:13

**indicated** 117:14
128:8
**indicating** 33:8
60:16
**indicative** 122:19
122:24
**indicia** 35:14
**individual** 16:3
16:16 53:25
83:2 106:4
119:21
**inference** 33:14
33:16
**information**
20:24 32:1 82:8
100:13 103:2
104:2 107:14
117:4
**informed** 100:24
101:13
**initial** 38:11
67:25 68:11,13
98:3,5
**initially** 17:19
19:3 34:4 39:16
**initials** 97:7 98:3
**initiates** 117:2
**inside** 38:16
114:18
**insofar** 66:22
**instance** 35:22
37:2,11
**instances** 13:10
35:17 36:18
50:4,20 74:4,21
**Institute** 8:17
**insurance** 9:12
**intend** 61:22
**intent** 45:5
**interact** 103:19
103:25
**interacted** 56:10
**interactions**
25:24 38:5
**interacts** 113:11
**interconnected**

49:23
**interested** 128:13
**interests** 62:17
**interim** 90:16,17
**interior** 34:11
**interrogatories**
43:12 44:18
47:14 57:8 60:7
77:6
**interrogatory**
44:20 45:13
46:18 47:8
57:11
**interrupting**
80:21
**interviews** 12:3
**inventory** 83:6
**investi** 107:23
**investigate** 23:6
23:23 24:23
25:3 76:12
84:15 85:5,17
85:23 116:15,16
117:20
**investigated**
12:22 13:11
**investigating**
48:15 50:5
107:9 112:12
**investigation**
11:23 41:2
42:10 45:1,7
79:16,25 80:4
106:22,25
108:18 110:25
111:7,9
**investigations**
79:5 105:1
**investigative**
11:19
**involve** 78:21
80:13 81:5,8
82:15,18,22
83:1,6
**involved** 6:13
12:21 100:21

**involvement**
101:6
**involving** 54:14
**iPad** 49:10,13
**issue** 12:6,9 46:12
51:21 69:7
72:25
**issued** 72:18 87:6
**issues** 29:9 74:19
111:2
**ITI** 66:6
**ITIRMS** 60:17

**J**

**James** 104:24,25
105:19
**Jason** 105:19,23
105:24
**Jeep** 69:24 95:12
95:13,14 112:23
115:12
**Jeremiah** 17:7
103:20,25 119:6
119:16,17
**Jimmy** 92:5
100:6
**job** 122:12
**Joshua** 1:8 3:6
17:23 126:19
127:2
**judge** 11:24
**judgment** 11:10
**jump** 44:19 66:19
**June** 94:20
**Justice** 8:10
**Justin** 4:4
**justin@margul...**
4:7

**K**

**K** 4:4
**Kee** 92:5,9 100:6
**Kee's** 92:4
**keep** 11:6 41:21
42:16 45:1,8,11
46:3,14 61:7,10

61:10 74:22
80:5 94:7 97:4
121:22
**keeping** 8:1 82:6
**keeps** 122:7
**kept** 91:7
**key** 32:2,25 33:2
33:7,11,15,18
33:19,20,21
69:22 70:2,10
70:19,21,21,24
86:17
**keys** 58:23
**kill** 7:12
**kind** 19:23 52:15
84:5 118:22,24
121:5
**kinds** 42:13
**knew** 30:22 65:8
**Knives** 121:5
**knock** 82:12
**knocked** 25:9,11
26:11 76:2
**knocking** 21:8
**know** 6:24 12:25
13:14,15 16:12
21:18 22:4,5
23:17 29:5,6,17
30:3 38:22
40:24,25 41:18
42:12,25 43:1
43:16 46:19
47:5 48:1,14,18
50:3,24 51:8,11
51:17,18,23
52:9 53:12,19
53:24,24,25
54:4,6,10 55:22
56:9,22 57:24
58:6 65:25 67:1
68:16 69:9,16
70:4 75:3,4,10
76:10 79:13
83:13 89:2,10
93:12,25 94:11
95:18 100:19,21

Field Reporting Services
314-461-2122

Robert Gerholdt  -  December 5, 2023

101:24 104:4
106:7 107:22
108:12,13,15,25
109:1,21 110:22
111:1,4 113:9
113:15 116:5
119:17,18 121:2
121:3
**knowledge** 16:7
16:10 20:15
57:4 72:15
119:3,4,16
**known** 84:9,10

## L

**L** 3:11 108:16
126:22 128:4,18
128:18
**labs** 12:16
**lack** 14:9
**language** 52:20
**large** 97:21
**lasted** 76:6
**law** 9:2,17 10:10
10:13 13:12
14:23,24 27:9
72:6 79:4
103:24 104:7
117:22 118:6
119:19,25
121:22 122:6,6
122:11
**lawful** 5:2
**lawsuit** 10:16,17
67:24 69:7
**lawyers** 43:17
**lead** 45:5
**leads** 11:8
**leave** 7:14 9:11
71:3,6 72:24
73:6 75:15
103:4 111:5
**leaving** 71:11
84:14 85:23
103:6
**led** 26:16 36:4,4

**left** 10:1 19:4
33:7 39:16
67:12 71:8,9,13
71:15,21,22
76:3 86:4 88:25
90:13 107:24
109:7
**left-hand** 124:16
**legal** 22:3 40:22
45:23 46:16
47:1,5 63:20
66:25 73:9 75:9
79:10 80:19
81:1,24 93:10
121:25
**legally** 81:16,18
**legs** 92:8
**lends** 118:1
**let's** 21:4 24:2,2,8
24:18 27:24
35:19 38:25
39:6 41:25
45:14 49:14
50:8 58:12,12
60:15 61:5,17
61:19 64:10,24
65:11 71:19
77:14 80:12
82:9 84:7 87:23
87:23 93:7
101:2 107:23
108:6,14
**letter** 55:14,18
**letting** 88:3
**license** 64:5 66:1
113:7,12
**licenses** 113:13
**lied** 23:19,21
118:9
**lien** 92:4,10 100:6
**light** 36:2,10,11
36:14 37:10,11
96:9,10
**light's** 37:8
**lights** 18:9,11,12
35:20,20 36:22

96:7
**line** 38:1 43:8
55:18 66:11
92:22 98:19
121:8
**lines** 102:11,16
102:20
**list** 79:2
**litigation** 40:1
54:14
**little** 6:3 7:19
10:7 18:24 24:1
34:10,12,25
43:15 44:19
49:12 53:7
58:11
**lived** 25:13 27:17
**LLC** 4:5
**loaned** 20:4,8
**locate** 41:12
97:18
**located** 30:8
**locked** 58:23
**locker** 121:23
122:4
**lockout** 58:17,19
58:21,22 60:10
**lockouts** 58:9
**log** 50:14 51:6
53:15
**long** 5:25 9:6
19:3,5,7 29:14
51:11,21 53:21
53:25 92:8
**look** 27:20 33:2
37:9 41:12 55:4
55:6,17 56:23
58:1 59:7,21
60:13 61:5
62:24 63:25
68:17 78:24
88:12 91:6,12
91:20 92:6,7
97:18 115:15
118:1,10
**looked** 23:1 27:21

31:25 78:5
111:19
**looking** 99:5,9
114:19 115:3
118:22,24
120:20 124:1
**looks** 34:10
**lost** 117:4
**lot** 19:19 49:24
**loudly** 33:10
**Louis** 4:6,11
12:19
**love** 69:12
**luck** 18:1
**lying** 84:20 118:7
122:19,24

## M

**ma'am** 112:25
**Mackenzie** 16:16
16:19,22 18:7
18:14 19:10
20:10 25:3,17
28:23 29:2,11
29:16 30:18
31:10,16 32:2
32:24 38:5,11
39:15 67:13
69:22 70:24
71:2,6 72:24
75:6,16 76:3,19
85:24 86:17
88:1,3 90:5
93:14 94:9
100:25 101:16
106:25 111:5
117:21 119:3
**Mackenzie's**
84:16 85:6
**mad** 38:3
**magically** 49:13
**maintained** 51:22
53:21 59:13
**maintaining** 8:2
57:20
**making** 38:3

**man** 37:25 66:14
**Manchester** 5:24
6:1 7:17,23
9:19,21,25 10:9
11:18 13:5 14:6
15:25 26:6
32:19 34:10
35:3,11 47:22
51:19 56:11
59:14 77:20
89:12 106:1,2
109:9
**ManchesterMo...**
56:21,25 105:17
**mandate** 77:19
**manual** 36:18,19
**Maps** 94:20
**March** 92:1,3,20
**Margulis** 4:5
**mark** 43:25 96:21
113:24 114:23
**marked** 44:3 55:2
58:13
**marking** 105:2,3
**marriage** 9:16
128:12
**matched** 31:5
**material** 52:18
**matter** 6:20 9:22
12:4,21 13:11
13:18 40:21
48:6 49:22 60:1
60:2,3 63:6
111:16,22,24
126:8 128:14
**mean** 14:18 22:10
26:5 31:22 45:3
49:24 71:5
96:16 104:18
118:19,20
**meaning** 52:25
59:4 60:4 71:7
78:8 91:21
92:17 112:1
**meaningful** 62:2
**means** 21:19

36:11
**mechanically**
  52:10
**meet** 19:15 64:1
**meets** 93:14
**memo** 92:22
**memorialize**
  14:14,18
**mention** 80:12
**mentioned** 68:14
  100:5 113:1
  122:14
**Merry** 8:25
**Mesa** 8:17
**met** 16:7,13,18
  20:15
**mic** 87:3,6 96:12
**middle** 109:20
**midnight** 47:18
**miles** 35:23
**mind** 11:6
**mine** 51:18
**minute** 32:24
  55:3 94:2
  111:11 113:16
**minutes** 19:8
  29:18,20 50:16
  76:7,9 89:1
  101:14
**mischaracterizes**
  28:2 42:20 75:2
  85:8
**mischaracterizi...**
  28:5
**misconstrues**
  40:20 79:11
**missing** 100:16
  101:11
**Missouri** 1:3 3:1
  3:12,14,16
  128:6,19
**Mm-hm** 29:24
  48:13 50:11
  52:13 83:16,21
  91:14 92:18
  99:7

**Mo** 4:6,11 126:22
**mobile** 35:1
**mode** 36:14
**model** 21:2
**moment** 73:10
  76:2,2 94:8
**Monday** 9:24
**monitor** 34:12,13
  53:7
**month** 9:13 92:3
  109:20
**months** 10:7 54:8
**moons** 8:20
**morning** 84:8,8,8
  88:22 89:5
**motorcycle** 22:18
  23:14 27:22
  30:8,20,24
  31:23,25 32:3
  32:33 33:6,6,7
  33:12,20,22,25
  34:2 39:15,19
  41:13,23 45:9
  46:11 67:15
  69:11 71:23
  72:1,25 73:6,7
  73:12,15,18
  75:15,22 76:3
  76:13,20 81:12
  86:2,5,16,18
  90:9 91:3 100:4
  100:9 103:1,2
  109:5 110:3
  113:3,5,23
  115:16,25 116:9
  116:11,13,20
  117:16
**motorcycle's** 90:9
**motorized** 23:15
**mounted** 34:9
**moved** 20:8,9
**MPD** 59:24,25
  68:23 69:21
  78:25
**MULES** 64:7
**multiple** 24:12,13

26:11

**N**
**name** 5:10,12
  20:18 21:2
  32:19 49:10,11
  49:11,15 56:24
  64:3,25 68:14
  95:24 96:12
**named** 16:4,16
  20:6
**Nathan** 20:3,7,10
  20:13,16,23
  23:4,13 31:14
  86:2 91:22 92:1
  117:8
**nature** 63:14
  69:16
**NCIC** 64:8
**nearest** 59:12
**need** 12:7 42:4
  58:24 114:5
**needed** 50:5,20
**needing** 76:20
**neither** 43:24
**never** 10:20
  31:24 33:18
  41:8 53:12 55:9
  70:16
**New** 8:10
**night** 15:20 17:21
  35:13 65:23
  66:17,20 75:16
  88:21 96:2
  97:25 100:16
  107:24 112:8,15
  119:24
**nights** 24:12
**nine** 12:17
**Noce** 4:10
**normally** 19:14
  19:22 37:6
**Notary** 126:17
**noted** 31:13
  36:20 38:15
**notes** 128:9

**notice** 90:7,8
**notified** 62:18
  102:25 110:2
**notwithstanding**
  41:5 66:8
**November** 55:15
  55:19
**nuclear** 121:5
**number** 11:18
  21:2 30:9 36:6
  36:6,8 41:13
  45:14,19,21
  47:8 49:13,13
  57:12,13,19
  59:7 60:8 62:10
  64:18 65:6,25
  69:2 73:9 77:21
  78:17,25 95:24
  97:18 102:25
  116:24 123:22
**numbers** 57:10
  57:17 64:22
  68:17,18,20
  78:5
**nutshell** 63:16

**O**
**o** 49:24
**oath** 44:10,11
  62:5
**object** 13:8 55:21
  63:19 70:14,14
  73:4,21 74:25
  74:25 75:18,23
  80:18,19,25,25
  83:24 100:18
  111:8 117:18
  121:24,24 123:4
**objection** 11:20
  12:24 13:7,13
  14:7,16,25
  15:11 22:2,2
  28:2 40:20
  42:20 46:15,17
  47:4,24 48:22
  48:24 51:13,14

55:20 56:8
  66:24 70:3,13
  73:3 74:7 75:8
  79:9,23 80:18
  80:22 81:21,23
  83:11 85:7
  93:10 94:10
  103:11 108:11
  110:20 123:10
**objections** 41:5
**observe** 103:24
  119:25
**observed** 100:23
  116:20
**observing** 116:9
  116:11
**obtain** 40:17,18
  41:8 43:6 50:5
  64:2,5,8
**obtained** 82:23
  88:9
**obviously** 10:17
**October** 15:20
  18:23 47:18,19
  51:20 64:13
  106:15 107:15
  107:16 108:8
  110:9 112:21
  118:25,25 119:7
**offend** 7:1
**offer** 5:21
**officer** 5:15,17,25
  7:17,22,24 9:8,9
  10:4,23 11:17
  14:23 15:2,19
  15:25 17:20,22
  17:23,23 18:3,7
  28:22,25 29:11
  29:14,21 30:3
  30:14 53:4
  59:10 60:16
  62:4,20 63:2,4
  63:25 64:1 68:8
  68:14,15 70:18
  71:10,25 72:6
  72:15,23 78:2

Robert Gerholdt   -   December 5, 2023

89:24 90:1,3
98:22 101:16
102:15 104:3
112:3,7,20
114:9,24 117:22
118:7 119:2
120:15 122:6,11
123:20
**officer's** 51:5
**officers** 35:3
54:12 63:13,18
68:11 72:7
74:21 77:20,22
100:16 102:4,6
119:20 120:1
**official** 63:12,24
64:9,14,18
**Officially** 54:4
**oh** 8:9 19:19 32:9
48:7 80:11,17
87:3 98:13
**okay** 5:16 6:14
7:16 8:14,19
12:20 17:3,9
19:1,22 22:12
24:3,15,21 28:9
29:21 30:23
31:16,20 38:18
39:23 42:1 43:8
43:11,23 44:7
44:15 45:15,20
47:13,15 48:10
48:16 49:2,14
50:9 53:4 56:13
56:24 57:2,15
57:25 58:10
60:12,19,22
61:5,8,25 62:7
62:10 64:17
65:5,7,12,21
66:4,8,10,10,19
67:12 68:8 69:9
71:10 77:16
78:11,14 79:7
79:18 80:9,11
80:24 82:11,14

83:18 84:13
85:2,14,21
87:25,25 88:3
88:17 89:23
90:20,23 91:9
94:22 95:4,7,17
95:23 97:3,8,17
98:14,19,22,24
99:18 101:3
104:23 106:11
107:21 108:6
109:20,22 110:6
110:9,17 113:8
113:15,24 114:8
114:12,15,23
115:11,17,21
116:19 118:25
119:15,19
121:11 122:14
124:20 125:3,6
125:8
**on-scene** 19:3,7
70:7
**on-site** 76:19,22
103:25
**once** 32:1,18
33:18 34:23
48:5 50:14,17
54:9 69:15 71:7
72:2 85:25
87:21
**open** 11:6 22:25
25:19 32:10,12
32:14,18 58:25
69:23 83:22
84:11,11 116:3
116:4,7 124:23
**opened** 116:5
**operational** 78:9
**opposite** 36:21
**orchestrated**
111:1
**order** 8:2 28:20
41:21 42:17
46:3 57:10,17
57:19,20 59:7

60:8 62:10,16
63:10,11,13,24
64:17 74:19
77:8,14,18,19
78:5,17
**orders** 63:13
**ordinary** 84:4
**outcome** 128:13
**Outer** 96:3
**outside** 38:19
**Owensville** 20:9
108:23 109:1
110:13,14,15,18
**owned** 17:6,7
75:22 93:8
**owner** 74:23
117:15
**owners** 76:20
**ownership** 88:5
117:3

---

**P**

**p.m** 3:11 18:24
19:1 125:14
**P.S** 106:11
**pack** 35:1
**page** 2:4 44:21
45:19 47:8 55:6
57:10 59:7,21
68:25 69:21
78:25 91:13,21
91:21 92:16,25
126:9
**pages** 91:12
**paid** 93:2 100:4,5
**paired** 35:19 37:1
**paperwork** 106:5
**Pardon** 34:21
**parked** 25:20
27:7 39:16,19
66:22 67:4
73:13 81:13
99:13 124:14
**part** 39:4,7,11,14
100:17 108:17
118:10

**partially** 125:6,7
**particular** 11:23
13:18 36:16
37:2 69:17 70:1
106:24
**parties** 12:7,21
88:10
**party** 10:16,17
62:21 63:4,9,10
65:14 128:12
**pass** 99:22
**passed** 8:25 76:1
88:24
**passenger** 34:14
**patrol** 26:7,8
**pavement** 124:7
124:9
**pay** 9:12
**payment** 92:10
92:19 93:2
**PD** 108:23 109:1
110:15
**peace** 8:2 41:21
42:17,19 45:1,8
45:11,17 46:3
57:21 74:22
80:5 82:6
**pen** 98:13
**pendency** 72:5
**pending** 3:14
62:2
**people** 14:10,11
19:15,23 28:21
45:8 74:14 78:2
101:4 107:9
122:22
**people's** 122:18
**perceive** 122:22
**percent** 38:10
**perfect** 52:23
**performing** 64:4
64:25
**period** 35:4 54:2
76:12
**permanent** 10:7
**permit** 63:3

**permitting** 41:9
**person** 42:6
117:25 121:23
123:2
**personal** 57:22
62:21 87:15
**personally** 10:22
13:16 50:23
51:7 67:22
89:15
**personnel** 78:1
**perspective** 27:10
75:21
**PG/LN** 127:3
**phone** 21:1,11,12
22:14 26:22
87:15
**photo** 98:4 99:15
**photograph**
114:15,25 124:7
**phrase** 42:16
87:2
**physically** 35:25
68:12 71:22,25
**pick** 26:22 110:18
**picked** 38:9,11
49:25
**picture** 20:23,24
21:1,12,12
22:13,14,18,20
22:20 27:23
30:10 31:6,6
38:12 41:22,23
84:22,23 95:11
118:2,3 125:2
**pictures** 22:17
94:14
**piece** 7:14
**pile** 61:7
**place** 50:1 59:12
81:15 118:12
**placed** 103:2,3
**plain** 81:8,10,12
81:15 121:18,21
**Plaintiff** 1:6,13
3:5,16 4:3 5:4

**Plaintiff's** 2:11,12 2:13,14,15,16 2:17,18,19,20 2:21 44:2 45:22 45:23 47:1 55:24 58:14 62:13 68:1 70:11 77:9 91:18 94:17 95:21 97:15 99:11 105:21 123:22 124:6,25
**planet** 38:23
**plate** 25:21 27:7 27:13 64:5 66:1 113:7,8,18,20 113:21 115:9,12
**plates** 95:14 113:12
**please** 5:10,11 6:17,21,25 44:1 46:24 55:6 82:3 106:4 109:25
**PO** 106:12
**point** 25:9 27:5 27:16 28:6,9 31:13,19,25 32:2 49:16 56:12 61:24 86:4,18 93:19 93:23 94:13 99:15 106:21,23 107:3 109:8 115:15,24 119:18 124:1
**points** 106:9
**police** 5:15,25 7:16,22,24 9:8,9 9:20,21 10:4,23 11:2,13,17 13:4 13:5,17,19,21 13:23 14:6,6,8 14:12,14,24 15:2,3,7,15,17 15:18,25 16:1 17:18 18:25

23:2 32:7,19 35:3,3,11 47:22 51:19 52:21 53:14,22 56:17 56:20 59:21 63:17 67:21,22 68:15 69:21 70:18 72:9,18 72:20 86:24 87:6 89:12,13 89:20,20 95:24 100:15,17,21 101:6,11 102:4 102:11,16,20 103:16 105:18 106:1,2 111:19
**police@manch...** 56:14 57:6
**policies** 51:19,25 52:2 53:20,23
**policy** 59:8 62:20 111:25
**position** 10:6 92:8
**possession** 61:10 61:10 63:5,11 66:21 67:8,9,14 74:23 109:1 110:12 111:4 122:7
**possible** 106:6
**possibly** 107:10 112:23
**post** 8:14
**power** 36:2,5 96:9
**Powerscourt** 4:11
**pre-date** 78:12
**precise** 22:17
**prefer** 5:16
**preliminary** 90:7
**premise** 80:2
**prepare** 11:14 111:16,18
**prepared** 32:8 67:23

**present** 23:3 68:12 102:4 119:2,16,18
**preservation** 55:18
**preserve** 54:21,24 107:4
**pressure** 61:10
**pretty** 6:15 9:13 9:17 38:12 66:15,16 82:13
**previous** 9:2 24:15
**previously** 27:6 41:12
**print** 66:2
**printout** 64:6,8
**prior** 16:6,9,19 17:12 18:7 20:12 21:7 25:23 26:1 84:14 85:23 88:3 89:25 109:7
**privacy** 27:25 39:8,20 40:5 83:19 97:22,23
**private** 39:7 40:9 59:12 73:14 84:14
**probable** 40:17
**probably** 26:3 34:13 49:24
**problem** 95:9
**procedure** 62:24
**procedures** 53:20 59:22 62:16
**process** 6:16 49:3
**produced** 3:9
**program** 10:5 50:13,14,19 51:6 53:13
**promise** 7:1
**Proof** 93:2
**proper** 118:11
**property** 39:4,8

40:9 45:22,24 47:2 57:22 58:9 58:17 59:12 60:10 62:17,21 63:2,4,5,11,17 71:14 74:5,15 74:23 83:7 84:15
**prosecutor** 50:21 53:10
**prosecutors** 15:8 15:15,17
**provide** 15:7,14 75:21 92:14
**provided** 43:19 104:9
**providing** 100:1
**public** 59:11 82:19 124:1 126:17
**pull** 52:16
**pulled** 109:4
**purchased** 91:25 100:3
**purported** 21:15 21:17,18,19 22:10
**purpose** 14:5,8 14:11 41:11 62:15 94:4
**purposefully** 13:11
**purposes** 14:14 15:17 39:24 48:23
**pursuant** 46:2,12 121:17
**push** 36:24 49:11 49:12
**pushing** 35:7
**put** 10:8 31:24 47:14 49:17,21 49:22 50:1 77:4
**putting** 9:13 60:7

## Q

**question** 6:21,22 6:24 7:2,5 13:1 13:9 15:13 27:12 28:4 31:12 36:1 39:18 44:17 46:20,25 48:2,2 62:2 67:2 68:16 74:2 82:3 85:9 101:1 104:23 122:2
**questions** 6:19,20 6:22 43:18,20 43:24 44:8 48:23 112:16,17 120:11,15 122:15 123:13 125:8,9
**quick** 35:17
**quickly** 6:15 26:12,13,13 82:13
**quit** 9:23
**quite** 58:22
**quote** 46:1,4

## R

**race** 61:23
**radio** 87:2,6 96:18 116:23
**radius** 34:1
**ran** 25:21 27:7 30:9,11 31:14 31:25 65:25 86:5 95:14 113:7,21 115:9 115:12
**random** 20:18 121:23
**rang** 25:11
**range** 110:10
**rare** 69:18
**rattled** 33:25
**Ray** 91:23,25
**Raymond** 1:5 3:4 17:7 20:6,8

Robert Gerholdt  -  December 5, 2023

25:22 117:10,15
119:10,19,20,23
120:1 126:19
127:2
**reaction** 93:6,16
**read** 46:4 59:16
63:6,8,14,15,21
63:22 65:2
69:24 71:3,4
77:12 80:9
111:18,20
125:10,12 126:6
127:18,20
**readily** 27:24
**reading** 63:1
**readout** 36:5
**real** 21:23,25
35:17 62:2
**really** 38:12,22
60:9 101:23
**rear** 32:16 33:9
81:14 97:11
113:7 114:18
116:12
**reason** 23:12,19
23:20 25:5 26:2
45:9 46:10
54:20 60:23
73:7,8,11,14,17
76:14 84:2,20
85:16 100:6
107:8 127:3
**reasonable** 83:2,3
**reasons** 83:3
**reassert** 46:17
**recall** 15:20 25:24
43:11,17 88:18
98:2 103:8,13
103:16 112:24
113:2 115:17
116:17
**receive** 8:12,21
**received** 8:22
51:24
**receiving** 102:24
**recess** 62:5

111:14
**recognize** 44:4,7
56:14,24 67:18
70:16 77:6 93:4
94:23 95:23
97:10 105:6
114:12 115:2
**recollection** 33:19
**recommended**
38:21
**record** 14:20 24:6
36:13,24 38:14
38:15,19 47:23
48:8 55:25
58:15 62:3,14
68:2,4,21,22
70:12 77:10
81:5 91:19
94:18 95:22
96:10 97:16
99:12 105:22
111:11,12,13
114:22 115:6
123:15,17
128:10
**recorded** 36:7
38:7 48:20
54:16,19 86:24
87:6,9,12,15
96:14
**recording** 35:5,10
35:14,15 36:12
37:3,6 48:19
53:25
**recordings** 36:6
37:7
**records** 37:24
38:16 117:3
**recover** 17:15
20:11
**recovered** 108:5
109:11 110:3,24
**rectified** 100:11
**red** 36:9,11,14
37:8,10,11
84:21 96:9

118:5,18,20
**refer** 5:16 17:9
109:16
**reference** 15:18
17:14 32:7 57:9
86:22
**references** 68:4
**refers** 78:17
**reflect** 96:7
**reflecting** 88:5
91:25 92:10,19
**regarding** 106:7
112:21 113:12
**registered** 94:5
100:7
**registration** 64:5
66:2
**Reichardt** 4:10
**REJIS** 64:7 88:16
113:11
**related** 24:24
25:4 106:5
128:12
**relationship** 23:7
23:24
**release** 86:19
**released** 87:22
92:4
**relevance** 15:12
94:10
**relevant** 11:11
**rely** 14:24 45:23
47:1
**remain** 18:3
**remember** 6:8
18:20 19:12,14
19:17,18,19,25
33:3,13 44:12
49:25 52:3
95:16 98:23
101:23 102:2,9
102:18 103:6
109:16,18
**remove** 59:10,16
**removed** 59:11
**Rench** 20:3,7,10

20:13,16,23
23:4,8,13,25
24:23 25:3
31:14 86:2
91:22 92:1,20
93:24 94:3
100:4,8,11
102:24 103:3
107:1 109:4,7
117:9,14
**Rench's** 97:11
103:1
**repeat** 15:13 82:3
**rephrase** 6:25 7:1
101:1
**replace** 85:21
**repo** 66:12,14
**report** 13:19,21
14:6,8,12,14
15:3,17,18
18:25 32:7
60:17 64:1 65:3
67:21,22 68:15
69:21 86:22
89:6 91:1
100:16 101:4
109:17,22,24
111:19 119:23
**reporter** 3:13
5:11 7:9,12
61:9 96:24
105:4 128:2,5
128:19
**Reporter-Master**
3:12 128:5
**reporting** 60:18
65:14
**reports** 11:14
13:17,23 14:24
15:7,15
**repossessed** 60:13
64:3
**repossession** 46:4
60:24 64:2,6,10
64:15,15,19,19
65:1,9,17

108:24
**repossessions**
57:21 62:18
63:24 64:10
**represent** 33:11
77:5 94:19 99:4
**representation**
126:7
**representing**
111:15
**represents** 98:16
110:10
**request** 12:11,12
127:18,20
**requirement** 46:3
46:13 47:3
**resembled** 27:22
**residence** 17:2,18
18:8,13 25:10
26:2 27:15
32:17 41:24
68:5 81:14
83:10 89:15
103:4,9 116:3
119:1,8
**residential** 17:6
**resolution** 45:12
**resolved** 63:6
**resources** 12:22
13:6
**respect** 21:10
46:11 48:4
52:12,14 63:23
76:13 101:15
103:8 113:4,6
113:18
**respective** 63:3
**respond** 17:13,17
36:24 44:10
58:25 72:20
89:15 100:12
**responded** 24:11
28:10 34:4
36:16 45:4 48:8
68:5 89:23 95:5
96:2 107:25

Robert Gerholdt  -  December 5, 2023

109:10 119:1,22
**responding** 7:25
43:12 89:19,25
**responds** 107:13
**response** 24:16
24:17,22 25:1
57:10 60:8
71:14 93:1
105:8 122:15
**responses** 43:20
44:8
**responsibilities**
7:22 8:3
**responsible** 7:24
7:25
**responsive** 84:25
85:17
**rest** 38:13 82:12
**restore** 41:21
42:17
**restoring** 8:2
**result** 117:5,7,8
**results** 64:6 66:3
**retained** 2:25
**retention** 52:2
**return** 17:15 20:9
88:22 89:4
**returned** 45:10
71:17 88:25
89:2 108:20
**Revenue** 76:12
88:14 100:10
105:1 106:4
113:12 117:3
**review** 53:4 54:15
54:18 125:10
**reviewed** 52:5
88:4
**reviewing** 52:6
**revoked** 109:5
**ridden** 69:14
**ride** 90:11
**riding** 109:4
**right** 7:3 21:23
24:5,18 25:18
26:18,20 27:16

28:6 30:9 31:4
33:5,8,17,18
34:10,13 37:14
55:17 56:5 59:2
60:25 61:15
63:10 66:12
73:1 98:17,18
101:6,22 104:16
107:12 116:21
116:21 124:2
125:5
**rightful** 74:23
**rightly** 104:6
**rights** 63:3
**road** 10:2,8 84:3
**Rob** 106:12
**Robert** 1:12 2:3
3:9 5:1,12,18
125:13 126:5,12
127:2 128:7
**Robertson** 2:6,8
4:10 11:20
12:24 13:7,13
14:7,16,25
15:11 22:2 28:2
40:20 42:20,24
44:12 46:15
47:4,24 48:21
51:13 55:20
56:8 61:19
63:19 66:24
70:3,13 73:3,21
74:7,25 75:8,18
75:23 79:9,23
80:16,18,24
81:21,23 83:11
83:24 85:7
93:10 94:10
97:8 100:18
103:11 108:11
110:20 111:8
112:17,19 114:1
114:4,7,9 115:7
117:19 120:4,7
120:12 121:24
123:4,10,14,19

125:11
**Rost** 56:7
**rotating** 10:6
**ruin** 98:9
**rules** 6:15
**run** 27:13 64:4
66:3 113:2
**running** 48:21,24
51:14 55:20
73:9,24 80:21
86:1,16 88:15
112:23 113:8,18
113:20
**rush** 11:10

### S

**S** 2:10
**s/** 128:18
**safe** 76:7 95:19
**safely** 59:16
**safety** 59:13
82:19 83:4
**sale** 91:2
**Saturday** 9:24
**saved** 48:20
53:25
**saw** 23:1 27:21
37:11 70:16
84:23 101:10
113:23 118:18
**saying** 19:13,20
30:13 39:18
42:6 48:6 55:23
63:16 66:9
68:20 90:8 99:9
**says** 5:4 44:25
57:16 59:8,10
62:15,20 63:9
71:2 78:1 95:24
106:11 123:1,2
**scenario** 84:7
**scene** 17:12 34:15
36:16,24 64:1
76:24 87:24,25
90:13,14
**Schmelz** 3:12

126:22 128:4,18
128:18
**school** 8:8,9,14
**scooter** 23:15
**screen** 36:4
**search** 11:25
40:11,14,17,18
41:6,8 78:17,21
80:3,13 81:5,8
81:11 82:15,16
82:18,18,22,22
83:1,6,7,23
117:2
**searched** 31:1
**searches** 78:18
79:2
**seat** 34:14
**second** 6:4 21:4
24:9 27:24 32:4
38:25 39:7 41:4
41:25 45:14
49:15 50:8 55:6
61:14 66:20
68:21 71:20
77:15 82:10
91:20 99:25
101:10,15 103:8
108:14 112:12
118:12,13
123:16
**second-guessed**
94:12
**seconds** 29:18
61:16
**section** 63:25
64:9,21 65:2
**sector** 17:20
**sectors** 90:12
**secured** 122:3
**see** 7:9 22:25
25:18 27:14
30:22 37:9,10
44:23 45:21,25
46:1 53:15
55:17,23 56:1,6
57:16,16 59:8

59:21 60:15,19
60:20 62:24
68:17,23 70:8
70:21 78:25
79:6 84:10 92:9
92:16,24 95:11
95:13 99:1
105:13 113:22
115:16,25
120:24 121:8
123:23 124:6,13
125:5,6
**seeing** 84:3 86:1
**Seele** 56:7
**seen** 54:9 55:3,4,7
55:9,12 66:15
77:11,12 108:15
108:15 112:5
**seize** 121:21
122:5
**seized** 83:7
121:12,20
**select** 51:2
**self-help** 46:4
57:21
**seller** 93:2
**sent** 17:14 56:7
57:5 109:9
**sentence** 71:2
**separate** 122:23
**Sergeant** 86:9,13
86:19,21,23
87:18,24 88:2
89:24 90:15
102:19 104:3
**serial** 36:7
**server** 50:2 52:19
**servers** 53:14
**service** 8:1 49:19
71:18
**set** 77:19 128:15
**shared** 90:4
**she'll** 40:2
**SHEET** 127:1
**shift** 49:6,9 89:17
**shining** 37:8

Robert Gerholdt  -  December 5, 2023

125:1
**shocked** 93:17
**show** 22:14 29:22
  32:6 35:15
  43:11,25 49:16
  55:2 58:13
  61:13 66:14
  67:17 70:6 77:1
  91:9 94:14
  96:21 99:1
  104:18,20,22
  105:2 115:8,8
**showed** 20:23,25
  20:25 21:10
  22:13,18,19
  25:6 27:23
  30:11 31:7
  70:24 73:10,23
  84:22,24 86:1
  90:20,23 91:5
  91:15 93:8,19
  101:10 123:1,2
**showing** 95:17
**shown** 38:12
**shows** 36:2,5,14
**side** 33:5,7
**sidewalk** 124:4
**sign** 125:12
**SIGNATURE**
  125:15 127:22
**signatures** 91:22
**significance**
  17:24 27:9 36:9
**signing** 44:12
**similar** 53:19
**similarly** 7:5
  16:18 78:24
**simple** 26:18,20
  35:7 45:8 52:20
  58:12 74:1
**simply** 31:25
**simultaneously**
  28:18,19
**single** 100:20
**sir** 5:11,22 6:6,23
  7:4 8:7 10:5,11

10:19,25 11:3,5
  12:19 13:9,19
  13:24 14:1,4
  15:9,13 16:2,5
  16:11,14,17,20
  17:8,11 18:1,5
  18:10,12,16
  19:2,25 20:14
  20:20 21:9,14
  21:21,24 22:7
  22:16 23:5,22
  24:17,19,25
  25:5,15,25
  26:10,15,21
  27:4,18 28:12
  28:14 29:13
  30:25,25 31:8
  33:1 34:6,17,19
  35:6,16 36:19
  37:4,12,15,17
  39:10 40:10,12
  40:15 41:3,7
  42:15 43:14,21
  44:24 46:20
  47:9,12,20 50:7
  52:24 53:3,18
  54:23 55:1,5,7
  55:10,13,16,23
  56:19 57:7,12
  58:18,20 59:3,6
  59:9,18,23 60:3
  60:5,18,25 61:4
  62:6,9,12,19,23
  62:25 63:15,22
  64:16 65:2,18
  66:7,13 67:2
  68:16 69:3,5,8
  69:15 70:16,22
  71:1,12,24 72:8
  72:10,14,17,19
  72:22 74:16
  75:14,19 76:10
  76:14 78:4,11
  78:14,23 79:1,6
  79:17 80:8,15
  81:17 82:17

86:25 87:13
  88:6,8,11,20
  89:14 90:2,6,11
  90:22 91:11,17
  91:24 92:5,13
  92:21,23 95:20
  96:13 97:1,14
  97:20,23 98:1
  99:3,10,17,20
  99:24 101:1,12
  102:14,22
  103:15,18 106:2
  106:8,10,17,20
  106:23 107:2,6
  107:15,19 108:7
  108:17 109:21
  110:8,16 121:16
  121:19 122:4
  123:11
**sirens** 18:9,11,12
**site** 76:23
**sits** 34:10,13
  49:10
**sitting** 27:22 75:5
  75:11
**situation** 12:23
**six** 10:7 54:8
**Sixteen** 9:9
**size** 34:24,25
**skipping** 24:1,5
**slip** 110:7
**slipping** 29:8
**slips** 108:16
**slot** 70:21
**small** 34:25 36:3
  36:3 53:7
**smiles** 19:12
**smirk** 120:8,10
**sold** 100:9
**somebody** 25:12
  41:24 58:23
  122:19,24 123:1
  123:8
**someone's** 83:10
  118:7
**sorry** 15:13 17:7

21:16,24 22:24
  27:21 37:19
  44:9,16 46:21
  61:8 68:25
  73:23 76:16
  79:21 82:1,1
  85:2 87:8 90:22
  92:8 95:8 97:3
  97:14 98:11
  100:8 104:13
  105:3 106:12
  109:4 113:4,17
**sort** 14:20
**sounds** 6:15
**south** 115:3
**Southern** 8:10
**speak** 17:17 31:6
  45:17 52:20
  67:13 90:1,15
  96:16 102:6
  111:21 119:6,10
**speaking** 7:21
  13:20 53:20
  101:7 112:15
**Special** 105:1
  107:13
**specific** 11:21
  74:9 75:16 90:2
**specifically** 15:24
  17:1 18:25
  19:24 26:3,4
  30:14 63:12
  87:18 96:4
  112:1,14
**speculate** 54:5
**speculation** 12:25
  13:8 14:17 15:1
  15:12 22:3
  40:23 42:24
  47:25 48:25
  51:14 63:20
  66:25 70:4,14
  73:4,22 74:8
  75:1,9 79:10
  81:1 83:12,25
  93:11 108:12

110:21 122:1
  123:5
**speed** 17:4
**spell** 5:10
**spelled** 5:12
**spoke** 119:21,23
**spoken** 16:10,18
  20:13 75:17
  88:7 112:3,7
**spot** 10:7
**St** 4:6,11 12:19
**staff** 51:8
**stammering**
  118:23
**stand** 22:9 81:16
  81:19 82:4
**standby** 45:1
**standing** 18:14
  32:21 33:5
  98:17,23 120:19
  120:23 121:9
**start** 23:21 58:12
  105:9,10,12
**started** 9:25 32:3
  33:9,25 37:5
  69:22 71:7
**starts** 49:9 70:9
  117:24
**state** 3:13 5:10
  126:1 128:6,19
**stated** 20:3 23:12
  27:6 46:17 47:5
  104:15
**statement** 22:21
  46:7 73:5
**statements** 32:10
  118:1
**states** 1:2 3:1,15
  44:25
**station** 49:21
  50:1 52:17,21
  53:14 91:8
**stations** 49:7,8
**status** 36:2,5
**stay** 24:18
**stealing** 103:3

Robert Gerholdt  -  December 5, 2023

stepped 93:20
steps 86:3 90:25
  113:22 116:14
Steven 16:16
  28:23 31:15
  32:1 119:3
stick 50:8 85:11
stole 90:8
stolen 89:7 91:1
  101:5 103:2
  109:6,8 117:4
  119:22
stop 31:18 48:16
  84:12
stops 49:18
stored 49:7 51:11
  51:16
stories 118:11
  122:18
story 14:9 20:22
  84:5,17,21 85:6
  85:16,25 118:21
straight 9:20 30:8
  39:6
strain 9:13
street 17:2 18:15
  59:11 83:15
  99:14 114:20
  124:1
strike 115:17
stroke 23:14
stuff 121:5
subject 10:12
  54:13 55:18
  67:24 83:3
  111:22,23,24
subpoenas 12:6,9
  12:11
Subscribed
  126:14
subsequent
  107:22 119:15
  119:20
sued 10:20,21
Suite 4:5,11
sun 125:1

sun's 37:8
Sunday 9:24
supervisor 86:5,8
  86:10
supervisors 51:8
supervisory 8:3
support 118:14
Supposed 21:20
sure 7:11 11:22
  12:22 14:2
  24:10 35:12
  37:8 38:22,23
  40:2 43:16,18
  46:25 48:3 49:5
  55:7 74:3,22
  77:5 84:12 90:3
  94:25 96:11
  98:25 120:8
  121:6
surprised 93:17
  100:23 101:17
  101:18,23
surrounding
  97:22
suspicion 83:2
suspicious 63:14
  123:3
switch 70:10
sworn 3:9 5:2
  128:8
syncs 49:15
system 51:12
  54:3 60:18 66:6
  113:11

———————
T
———————
T 2:10
tab 51:2
take 14:2 49:16
  49:20 55:3
  61:14,15,17,23
  62:21 63:25
  65:3 87:23 88:1
  88:4 94:9 98:24
taken 64:23 99:4
  110:11,12

116:15
takes 50:16,17
  122:6
talk 7:11 12:3
  60:15 64:24
  65:11 117:25
talked 103:7,14
  103:17 104:10
talking 18:6 20:3
  29:18,19,19
  80:6 84:4
tall 5:19 97:23
task 50:24
technically 88:21
Technology 8:17
telephone 86:11
  87:5 93:20
tell 5:2 14:8 18:21
  28:20 29:3 30:5
  32:15 54:5
  61:21 63:1
  67:17 72:4
  79:18 85:4
  86:12 87:19
  95:17 97:9
  100:2 102:10,15
  102:19 109:11
  117:22 118:7,21
  125:1
telling 23:18
  85:24 87:21
  110:23 123:8
terms 39:6
testified 7:16
  13:12 18:13
  21:6 26:25 31:5
  32:24 39:14
  41:12 42:9
  47:16 52:9
  78:20 96:5
  97:19 101:13
  118:18 120:19
testify 19:16 30:6
  77:13 88:18
  104:4
testifying 24:16

47:10,12 50:10
  62:5
testimony 21:11
  28:3 39:3 40:21
  42:21 46:9 55:8
  85:8 126:8
  128:10
thank 9:19 43:21
  44:16 58:5 77:5
  88:6 98:14
  105:5 106:7
  123:12 125:8
thing 8:23 35:16
  36:19 61:20
  118:12,13,24
things 12:17 42:7
  42:14 64:22
  65:24 79:3
  88:10 112:21
  118:15 122:15
think 13:1 16:14
  31:13 36:7 39:2
  64:12 66:9 76:7
  78:24 82:12
  85:3 95:19
  100:20 104:23
  113:15
thinking 61:1
  78:14
third 12:7 88:9
Thirteen 96:24
thirty 61:16
Thomp 109:3
Thompson 1:5
  3:4 17:7 20:6,8
  25:22,24 26:23
  27:8 29:6 43:4
  45:16 66:21
  68:4 75:17,21
  82:24 88:7 89:6
  90:8,25 91:15
  91:23,25 92:9
  92:14,19 93:6,7
  93:21 94:5
  100:2,3,7,8,15
  101:9 103:20,25

104:2,6 108:9
  108:20,24
  110:17,23
  117:10,15 119:6
  119:10,16,17,21
  119:23 120:1,3
  126:19 127:2
Thompson's
  17:10 20:12
  21:8 22:22
  24:12 25:2,10
  27:11,15 28:13
  28:15 39:4,7
  40:9 43:2,9
  54:14 64:14
  66:20 67:4,12
  67:14 70:8
  72:25 73:6,7,11
  73:14,19 76:2
  78:7 79:8 81:19
  82:5 84:14
  88:22 94:24
  95:2,15 96:2
  97:13,14 103:4
  103:9,20 107:24
  108:1 109:10
  110:11 111:6
  116:2 119:1
  120:20,25
thorough 11:2
thoroughly 12:23
thought 86:6
  87:16
threaten 45:17
threatening
  42:19
three 6:8 52:6
  65:25 89:1
threshold 40:7,8
  99:22 124:17,20
throw 118:4
tied 113:14
time 16:13 18:22
  22:5,13 23:9,17
  25:1 28:10,17
  28:25 29:10,22

Field Reporting Services
314-461-2122

35:4,5 38:13
40:11,13,16
54:1 55:12 68:6
71:19 72:1 73:6
73:10 75:17,20
76:1,11,14,18
76:23 84:6
87:11,14 88:19
88:24,25,25
89:2 90:13,13
91:8 99:25
101:10,15
102:10,15,19
103:5,8,19,21
103:24 105:25
108:22,23
110:17 112:9,16
119:1,7,11
**timeframes** 51:16
**times** 6:7 15:3
24:13 25:11
26:4,12 72:7,9
72:11 107:25
111:19
**tiny** 34:25 53:7
**title** 5:14 20:24
20:25 21:1,1,13
21:15,17,18,23
21:25 22:11
73:10,23 76:13
84:22 91:2,15
91:17,21,21
100:9 104:10
106:6 111:2
118:3
**today** 7:13 10:18
22:9 46:9 47:10
48:9 51:20
56:18 75:5,11
**today's** 111:17,18
**toggle** 70:10
**toilet** 42:13
**token** 36:23
**told** 9:17 20:7,22
25:7 41:22
61:21 75:6,12

**Trust** 5:22
**truth** 5:2,3,3
84:16,19 85:22
85:24 123:8
**try** 25:11 26:22
30:19,21 93:25
100:11
**trying** 29:22
48:17 58:2
76:17 80:10
94:23,25 95:10
97:4
**turn** 35:19,25
36:22 37:13,21
**Twenty** 19:8
**two** 7:20 9:10
57:9 89:1 91:12
100:4 122:18,22
122:23
**two-story** 32:17
**two-year** 10:6
**type** 8:23

79:23 80:2
84:21 85:15
93:15,21,22
100:3,6,16
102:6
**tools** 11:19
**top** 36:5
**tossup** 50:15
**Totally** 97:5
**touch** 31:24
71:22,25
**tow** 59:22 110:7
**towed** 59:5,20
60:10,16
**towing** 57:21
58:9 108:16
**traffic** 7:25 48:16
49:18
**training** 14:22
47:21 48:18
51:24 74:11
77:17 117:21
118:6
**transcript** 1:19
7:9
**transcription**
128:9
**transferred** 52:18
**transpired** 17:24
101:15 103:5
112:8 123:9
**travel** 18:9
**traveled** 18:8
**traveling** 17:18
**treated** 45:7
**tree** 115:14
**trick** 44:17 58:2
80:10 94:24
**tried** 41:23
**trike** 20:4 46:11
69:1 92:22
**Triple** 108:16
**true** 23:18 46:7
70:20 75:7,12
126:7 128:9,9
**truly** 74:22

**U**

**ugly** 5:19
**Uh-huh** 112:1
**ultimately** 39:15
61:9
**understand** 6:22
6:24 7:2,6 13:9
14:18 21:7,11
21:22,25 27:12
30:13,14 39:17
43:21 62:4 65:4
66:9 67:2 74:11
85:18 96:5
99:18 122:12
**understanding**
14:5 24:8,11
32:7 39:24 54:1
71:10 81:10
83:9 101:9
108:19
**understood** 39:2
89:9
**unfortunately**

69:12 118:9
**uniform** 89:20
**uniforms** 72:9
**Unit** 105:1
**United** 1:2 3:1,15
**University** 8:11
**untrue** 23:18
**upper** 32:18
124:16
**upset** 45:9,10
101:20,22,24
104:6
**use** 12:21 13:6,12
33:21 34:14
43:16,17 87:1
96:15 108:9
122:16
**utilize** 34:5

**V**

**v** 1:7 3:5 126:19
**vague** 11:20 13:8
14:7,17,25
15:11 76:17
103:11 121:25
123:5
**valid** 78:8 80:13
81:6 82:23
**vantage** 99:14
115:24 124:1
**various** 79:3
**vehicle** 17:15
25:20,21 27:6,7
27:13 34:3,11
34:12 37:4,5
38:13,17 52:21
53:8 56:17,20
58:9,19,21,22
58:24,25 59:4
59:11,16,20
60:10,16,24
62:18 63:24
64:3,4,9,14,19
64:23,25 66:1
69:22 71:7,17
71:22 82:7 83:7

84:9,22 101:5
112:23 113:5,6
113:7,9,19
115:12 116:23
119:22 121:13
121:21 124:14
**vehicles** 57:21
60:13 72:21
**veracity** 84:16,18
85:5,20 117:20
**verbal** 93:1 105:8
**Verbatim** 3:12
128:4
**verification** 44:13
**verified** 30:10
**verify** 54:9 82:7
**vertical** 98:19
**vest** 95:24 96:1,3
96:3
**video** 35:2 50:15
50:19,21 51:22
107:11 123:9
**video's** 50:2
**videos** 51:4,5
53:15
**view** 50:19 81:8
81:10,12,15
114:18 121:18
121:21
**VIN** 21:2 30:9,10
30:11 31:1,3,5,6
31:14 41:12,22
64:4 66:1,3
69:1 73:9,24
82:7 86:2,16
88:15 97:18
102:25 106:5,7
112:23 113:2
116:20 117:3,8
117:10
**visible** 38:8
**visit** 119:12,13,15
119:20
**volition** 104:9,12
**voluntary** 12:2
**vs** 127:2

Robert Gerholdt  -  December 5, 2023

## W

**wait** 29:2,3 37:19 49:15

**WAIVED** 125:15

**walked** 26:25 27:25 30:8,23 31:16,18 115:9 115:12,14,19 116:19 124:18

**walkie-talkie** 87:2 96:11

**walking** 25:19 38:6 113:20

**want** 5:20 15:19 24:4 29:6 32:6 38:22 39:25 43:11 47:15 48:22 53:5,9 54:5 61:6,23 77:2,4 78:6 80:20 85:10 98:5,9 104:16 121:3 125:10

**wanted** 50:25 89:6 91:1 103:3

**warrant** 15:16 40:11,14,17,18 41:6,9 45:22 46:3,13 47:3 78:22 82:5

**warrantless** 78:17 79:2 80:3 80:13 81:5 82:15,18,22 83:1,6

**warrants** 11:25 78:17

**wasn't** 10:6 21:22 21:25 23:13,15 28:5 42:15 45:18 75:7 79:24 84:25 111:9 120:8

**watch** 30:14 33:21 37:6 53:6

**WatchGuard**

50:14,19 51:1 53:16

**Waters** 86:9,12 86:13,19,21,23 87:19,24 88:2 89:24 90:15 102:19 104:3

**way** 7:10 17:15 24:7 35:24 44:22 59:16 69:19 70:20,22 77:25 85:13 87:16 100:20 128:13

**ways** 122:23

**we'll** 6:3 13:20 82:9

**we're** 24:1 28:6 29:19,19 32:4 57:12 61:22 64:12 68:4 102:11,16,20 124:1 125:11,12

**we've** 61:17

**weapons** 121:13 121:20

**wearing** 34:15 35:13 72:9,11 72:12 96:1

**weeks** 20:8 52:6

**welcome** 98:15

**went** 14:10 25:9 28:22 30:17 33:8 47:18 65:4 71:17 84:13 99:25 111:3

**weren't** 20:5 23:21 42:12 65:16

**west** 33:6 99:16 115:14

**WHEREOF** 128:15

**Wi-Fi** 52:16,17 52:25 53:2,3

**wife** 9:16

**willing** 12:3

**willy-nilly** 29:7

**window** 32:11,12 32:14,18,22

**windows** 33:25

**wish** 69:15 94:8

**witness** 2:3 12:3 61:25 80:17 96:25 97:3 114:5,8 127:2 128:7,10,15

**woman** 16:13

**word** 21:18 84:18 85:19 99:22 104:12

**wording** 53:24

**words** 6:10 14:9 21:22 39:12 43:14,17 51:21 52:20 76:15,16 78:12 99:13 122:5 123:1

**work** 6:10 9:6 11:2,15 13:4 36:20 52:14,16 53:2

**worked** 10:10 111:2

**working** 52:25 72:6 106:6

**works** 52:10 53:3

**world** 52:23

**worry** 37:25

**worrying** 42:12

**wouldn't** 112:13

**write** 14:19 114:5

**writing** 43:18

**written** 14:20 43:12,19 44:8 44:18

**wrong** 85:4

**wrote** 46:23 47:2 100:13

## X

**X** 2:10

## Y

**yard** 83:10 97:22 99:5 116:12

**yards** 12:18

**yeah** 7:20 15:14 19:19 44:23 46:22 61:19 80:24 94:25 98:6 109:25 125:11

**year** 6:2 8:13 21:2 54:8 112:9 100:4

**years** 7:18,20,20 8:18 9:7 10:23 100:4

**yelled** 32:18,21

**yesterday** 97:7 112:6

**Yim** 104:24,25 105:19 106:4 107:13,17

**Young** 4:10

## Z

**zone** 52:17

## 0

**000131** 78:25

**0002** 68:23

**0003** 68:25 69:21

**003** 59:25

**0218** 89:3

**038** 59:25

## 1

**1** 64:22 65:2 79:18 80:23

**1:00** 84:7

**100** 38:10

**105** 2:20

**11** 2:17 57:11,12 99:1,2,4,11

**11:00** 18:24

**11:15** 19:1

**112** 2:6

**114** 2:22

**115** 2:23

**12** 2:18 43:25 44:2,5,7 57:8 110:10

**12/12** 110:4

**12/12/2023** 110:1

**120** 2:7

**1209** 17:1 112:22 115:3

**123** 2:8

**12444** 4:11

**1267** 3:13 126:22 128:5

**13** 2:19 96:23 97:10,15 123:22 124:6,13,16,25

**14** 2:20 55:19 105:5,7,21

**14th** 55:15

**15** 2:21 45:14,19 47:8 70:7,9,11

**1570** 9:12

**15th** 128:16

**16** 108:21

**160** 4:11

**16th** 9:23

**17** 44:20,23

**18th** 9:24

**1HD1GDV353...** 69:2

## 2

**2** 2:11 59:7 61:13 62:7,9,13 64:22 65:6

**2/12** 110:4,5

**2:00** 84:8

**2:18** 89:4,5

**20** 76:9

**2003** 20:4 46:11 59:5 69:1 92:22 111:6

**2020** 92:1,3,20

**2022** 15:20 18:23 47:18,19 51:20 55:15,19 64:13

Field Reporting Services
314-461-2122

Robert Gerholdt   -   December 5, 2023

| | | |
|---|---|---|
| 106:15 108:9 119:7 | **456** 57:17,23,24 58:6,12 59:8 60:8,12 61:2 | **91** 2:15 |
| **2023** 1:16 3:10 94:21 108:6,9 108:21 110:9,10 112:21 126:15 126:21 128:16 | **456-07** 60:13 | **911** 89:9,10 |
| | **456.07** 60:15 | **97** 2:19 |
| | **4569** 59:25 | **99** 2:17 |

**2030** 110:2
**2175** 92:11
**22** 15:20 18:23
    47:18 64:13
    110:9 112:21
    118:25 119:7
**22nd** 108:8
**23** 47:19 118:25
**2300** 18:24
**2316** 18:25
**25** 19:8 76:6
**27** 106:15
**28** 107:15,16

**5**

**5** 1:16 2:5,14 77:1
    77:5,7,9,25
    78:25 126:21
**5-inch** 34:13
**5:45** 49:7
**5000** 100:5
**5375** 106:13
**55** 2:16
**58** 2:12
**5th** 3:10

**3**

**3** 2:12 58:13,14
    59:7 64:22
**3:00** 84:8
**3:58** 125:14
**30** 54:8 76:7 94:5
**314.390.0234** 4:6
**314.789.1199**
    4:12
**32** 49:8
**35** 8:18

**6**

**6** 2:15 57:10 91:9
    91:10,18 97:23
    105:3,3
**6:00** 3:11
**62** 2:11
**63105** 4:6
**63131** 4:11
**68** 2:13

**7**

**7** 2:16 55:3,4,9,17
    55:24 79:18
    80:23
**70** 2:21
**75** 35:23
**750** 4:5
**77** 2:14
**7700** 4:5

**4**

**4** 2:13 59:21
    67:17,18,20
    68:1 109:23
**4:23-CV-133-S...**
    1:7 3:5
**425** 77:8 78:17
**425.06** 79:18
**44** 2:18
**441** 57:17,19,20
    61:5,11 62:11
    64:18 65:22
**441.02** 62:24

**8**

**8** 45:19 47:8
    94:15,17 95:11
**8:00** 3:11

**9**

**9** 44:21 95:17,18
    95:21