**EXHIBIT**

**17**

exhibitsticker.com

# Transcript of the Testimony of

# **Joshua Cockrell**

December 4, 2023

# **Raymond Thompson v. Joshua Cockrell, et al**

## **Field Reporting Services**
**314-461-2122**
**fieldreporting328@gmail.com**

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION
-----

RAYMOND THOMPSON,          )
                          )
        Plaintiff,        )
                          )
v.                        )Cause No.: 4:23-cv-133-SRW
                          )
JOSHUA COCKRELL, et al,   )
                          )
        Defendant.        )
                          -----

DEPOSITION OF JOSHUA COCKRELL
TAKEN ON BEHALF OF THE PLAINTIFF
DECEMBER 4, 2023

SHEILA FIELD, CCR. No. 1226
-------------------------------------------------
-------------------------------------------------

Field Reporting Services
PO Box 252092
St. Louis, Missouri 63125
314-461-2122

**Page 2**

                    I N D E X

QUESTIONS BY:                              PAGE
Mr. Gelfand                        5, 126, 134
Ms. Robertson                         120, 133


                E X H I B I T S

EXHIBIT          DESCRIPTION              PAGE:
1        Interrogatory Answers            39
2        General Order No. 441            45
3        General Order No. 456            62
4        Investigative/Offense Report     55
5        General Order No. 425            73
6        Title of Vehicle                 85
7        11/14/22 Email Correspondence    91
8        Photograph                       95
9        Photograph                       97
10       Photograph                       100
11       Photograph                       102
15       Photograph                       58
         (Exhibits retained by counsel.)

**Page 3**

1        UNITED STATES DISTRICT COURT
2        EASTERN DISTRICT OF MISSOURI
3               EASTERN DIVISION
4                  -----
5 RAYMOND THOMPSON,          )
                            )
6        Plaintiff,          )
                            )
7 v.                        )Cause No.: 4:23-cv-133-SRW
                            )
8 JOSHUA COCKRELL, et al,   )
                            )
9        Defendant.          )
10                 -----
11
12
13     DEPOSITION OF JOSHUA COCKRELL, produced, sworn,
14 and examined on behalf of the PLAINTIFF, on DECEMBER
15 4, 2023, between the hours of nine o'clock in the
16 morning and one o'clock in the afternoon of that
17 day, at Reichardt Noce & Young, 12444 Powerscourt
18 Drive, Suite 160, St. Louis, Missouri 63131, before
19 Sheila Field, a Certified Court Reporter within and
20 for the State of Missouri, in a certain cause now
21 pending in the United States District Court, Eastern
22 District of Missouri, Eastern Division, in the
23 above-entitled matter.
24
25                 -----

**Page 4**

1          A P P E A R A N C E S
2     The Plaintiff was represented by:
3 Margulis Gelfand, LLC
  7700 Bonhomme Avenue
4 Suite 750
  St. Louis, Missouri 63105
5 By:  Justin Gelfand
6     The Defendant was represented by:
7 Reichardt Noce & Young
  12444 Powerscourt Drive
8 Suite 160
  St. Louis, Missouri 63131
9 By:  Catherine Robertson
10
11
12                 -----
13     IT IS HEREBY STIPULATED AND AGREED by and
14 between counsel for the Plaintiff and counsel for
15 the Defendant that this deposition may be taken by
16 Sheila Field, CCR, a Certified Court Reporter, and
17 afterwards transcribed into typewriting; and the
18 signature of the witness is expressly reserved by
19 agreement of counsel and consent of the witness.
20
21
22
23
24
25

Joshua Cockrell  -  December 4, 2023

---

**5**

1          JOSHUA COCKRELL,
2 of lawful age, produced, sworn, and examined on
3 behalf of the PLAINTIFF, deposes and says:
4
5          EXAMINATION
6 QUESTIONS BY MR. GELFAND:
7      Q.   Good morning.  Could you please state and
8 spell your full name, for the benefit of the court
9 reporter?
10     **A.   State and spell?  Officer Joshua Charles**
11 **Cockrell.  It's J-O-S-H-U-A, middle C-H-A-R-L-E-S,**
12 **and then Cockrell, C-O-C-K-R-E-L-L.**
13     Q.   Have you ever had your deposition taken?
14     **A.   Never.**
15     Q.   Over the course of this deposition, I'm
16 going to ask you a number of questions.  Your own
17 lawyer has the opportunity to ask you questions as
18 well.
19     **A.   Okay.**
20     Q.   If there's any question that any lawyer
21 asks you, that you don't understand, please tell us
22 that.  I promise you, you won't offend me.  You
23 won't offend her.  We'd rather you understand the
24 question.
25     **A.   Okay.**

---

**6**

1      Q.   Fair enough?
2      **A.   Fair.**
3      Q.   So similarly, if you answer a question,
4 I'm going to assume that you understood the
5 question.  Fair enough?
6      **A.   Yep.**
7      Q.   Okay.  The only other couple of just very,
8 very quick ground rules, to make our wonderful court
9 reporter's life a lot easier, is if we can make sure
10 not to talk over each other.  She's preparing a
11 transcript of everything that's said.  It makes a
12 lot more sense, when it's not one word, one word, so
13 on and so forth.
14     **A.   No problem.**
15     Q.   So if I complete my question, I'll let you
16 complete your answer.
17     **A.   Okay.**
18     Q.   Whole nine yards.  Fair enough?
19     **A.   Yep.**
20     Q.   Okay.  How are you currently employed?
21     **A.   I am a police officer with the City of**
22 **Manchester.**
23     Q.   How long have you been a police officer
24 with the City of Manchester?
25     **A.   Since 2015.**

---

**7**

1      Q.   What are your duties and responsibilities,
2 as a police officer with the City of Manchester?
3      **A.   I go out, write tickets, answer calls of**
4 **service.  I'm currently assigned the CRU unit, which**
5 **is community response unit.  I have yet to work that**
6 **position, due to staffing.  But once I'm on that,**
7 **I'll be doing fugitive arrests and any work that the**
8 **detectives will need help with.**
9      Q.   Was the role, that you described, the role
10 that you performed on October 22nd of 2022?  In
11 other words, general duties?
12     **A.   No, it was not.**
13     Q.   What was the -- what were your
14 duties and responsibilities on that day?
15     **A.   On that day, I was there basically, to**
16 **keep the peace.  Originally, it came out as my call,**
17 **but I was on traffic that day.  So Officer Gerholdt**
18 **took responsibility and was the first one on call.**
19     Q.   So we'll get into the details of what
20 happened that day, but just more broadly speaking,
21 was your position, that you have with the police
22 department, on that day, just basically a general,
23 on-call police officer?
24     **A.   Yeah.  Like there -- if I was doing any**
25 **other day?**

---

**8**

1      Q.   Yes.
2      **A.   Yeah.  Correct.**
3      Q.   So patrolling traffic, responding to
4 calls?
5      **A.   Patrolling -- yes.**
6      Q.   Those kinds of things.  What is your
7 academic background?
8      **A.   I have an associates degree in criminal**
9 **justice from St. Charles Community College.  I went**
10 **to the police academy there as well.  I also have a**
11 **Class A license.**
12     Q.   When did you obtain your associate's
13 degree?
14     **A.   I want to say 2012.**
15     Q.   And when did you obtain your law
16 enforcement license?
17     **A.   That was in 2013.**
18     Q.   Have you ever been licensed as a law
19 enforcement officer anywhere outside of the State of
20 Missouri?
21     **A.   No.**
22     Q.   Have you ever performed any sort of law
23 enforcement work outside the State of Missouri?
24     **A.   No.**
25     Q.   And that includes any sort of military

---

Joshua Cockrell  -  December 4, 2023

---

9

1  service.
2  **A.  Well -- oh, I guess, military, you could**
3  **say yes.**
4  Q.  Were you a military police officer?
5  **A.  No.  No.  But military work.  I had signed**
6  **up for the National Guard.**
7  Q.  I got you.  In the capacity of your
8  service in the military, did you perform any sort of
9  law enforcement function?
10  **A.  No.**
11  Q.  Okay.  So the only law enforcement
12  function you've ever performed is as a Missouri
13  police officer?
14  **A.  Yes.**
15  Q.  And has it always been with the Manchester
16  Police Department?
17  **A.  No.**
18  Q.  Where were you, prior to Manchester?
19  **A.  City of Pagedale, for a year and a half.**
20  Q.  And approximately when was that?
21  Ballpark.
22  **A.  I'd say 2013 until '15.**
23  Q.  Why did you leave Pagedale and go to
24  Manchester?
25  **A.  Money.  The money.**

---

10

1  Q.  Meaning you made more money?
2  **A.  Made more money.  Yes.  If I got paid what**
3  **I did now, I would still be in Pagedale.**
4  Q.  Okay.  As a law enforcement officer,
5  performing any function, would you agree with me
6  that it's important to be thorough in your job?
7  **A.  I agree.**
8  Q.  Fair?
9  **A.  Yes.**
10  Q.  Keep an open mind?
11  **A.  Yes.**
12  Q.  Follow all leads?
13  **A.  Yes.**
14  Q.  Not rush to judgment, until you have all
15  relevant evidence?
16  **A.  Yes.**
17  Q.  And be honest and accurate, in any reports
18  or affidavits, anything along those lines, that you
19  write?
20  **A.  Yes.**
21  Q.  As a law enforcement officer in
22  Manchester, would you agree with me that you have a
23  number of law enforcement tools at your disposal to
24  use in certain cases?
25  **A.  We do.**

---

11

1  MS. ROBERTSON:  Objection, vague.  You can
2  answer.
3  Q.  (BY MR. GELFAND)  What kind of tools do
4  you have, to use in an investigation, when it's
5  appropriate?
6  **A.  When it's appropriate, I'd say we have the**
7  **detective bureau.  We've got surrounding agencies,**
8  **that have drones, to help with missing children and**
9  **so on.  We have the SWAT team that we can call.  We**
10  **have the FBI that we could call.  We have ICE,**
11  **immigration, who we could call, if we need help with**
12  **anything.**
13  Q.  You have the ability, as a law enforcement
14  officer, to apply for and if approved, execute
15  search warrants, correct?
16  **A.  Yes.**
17  Q.  You have the ability to attempt to conduct
18  witness interviews, correct?
19  **A.  Yes.**
20  Q.  What I mean by that is if someone's
21  willing to voluntarily speak with you.
22  **A.  Correct.**
23  Q.  It happens all the time, correct?
24  **A.  Correct.**
25  Q.  You have the ability to apply for and if

---

12

1  provided, issue subpoenas for documents, correct?
2  **A.  Yes.**
3  Q.  And where appropriate and I understand
4  that this may not be appropriate, in every case, you
5  have access to forensics and crime laboratories, to
6  do the whole gamut of those kinds of investigations,
7  correct?
8  **A.  We don't have access to it.  We have to**
9  **send it off.**
10  Q.  But -- I understand.  In other words, if
11  in a particular case you're working, you want to run
12  fingerprints or run DNA --
13  **A.  Correct.  It all has to be examined and**
14  **then sent off to scientists and stuff that do that.**
15  Q.  And the Manchester Police Department does
16  that, in the ordinary course, correct?
17  **A.  Correct.**
18  Q.  Now, would you agree with me that it's
19  only fair to all parties, in any given circumstance,
20  to use all available resources, to make sure that
21  you've investigated any situation fairly and
22  thoroughly?
23  MS. ROBERTSON:  Objection, calls for
24  speculation.  You can answer if you know.
25  **A.  Can you repeat?**

---

Joshua Cockrell  -  December 4, 2023

13

1    Q.  (BY MR. GELFAND)  Sure.  Would you agree
2  with me that it is only fair to all parties, meaning
3  a potential suspect, if you're investigating a case,
4  potential victim, if you're investigating a case, to
5  use all available resources, to make sure you've
6  investigated any situation fairly and thoroughly?
7        MS. ROBERTSON:  Same objection.
8    **A.  I'm not going to answer that.**
9    Q.  (BY MR. GELFAND)  What do you mean you're
10  not going to answer that?
11   **A.  I mean, I guess you could.  Yeah.  You**
12  **could use the resources available, but sometimes**
13  **they're not readily available.**
14   Q.  Did you personally draft any police
15  reports or affidavits, in connection with this case?
16   **A.  No.**
17   Q.  Have you reviewed any police reports that
18  colleagues prepared, in connection with this case?
19   **A.  No.**
20   Q.  So just to be clear, are you aware that
21  Officer Gerholdt, if I'm pronouncing that correctly,
22  prepared a police report and some supplemental
23  police reports, in this case?
24   **A.  Yes.**
25   Q.  Have you ever read those?

14

1    **A.  No.**
2    Q.  Did anyone ever ask you to read them and
3  opine as to whether, in your opinion, they were
4  accurate and consistent with what you observed?
5    **A.  No.**
6    Q.  With respect to police reports, in
7  general, would you agree with me that it's important
8  to be accurate and complete?
9    **A.  Yes.**
10   Q.  Now, I want to direct your attention to
11  the night of October 22nd of 2022.  Do you recall
12  that evening?
13   **A.  Briefly.**
14   Q.  Meaning you recall some details, but not
15  others?
16   **A.  I recall some details, but not all of**
17  **them.**
18   Q.  Okay.  Were you on duty that evening?
19   **A.  Yes.**
20   Q.  Were you on duty with the Manchester
21  Police Department?
22   **A.  Yes.**
23   Q.  Did you come into contact with an
24  individual named Amara Elmore?
25   **A.  Yes.**

15

1    Q.  Did you also come into contact with an
2  individual named Steven Mackenzie?
3    **A.  Yes.**
4    Q.  Where did you come into contact with those
5  two people?
6    **A.  His address.**
7    Q.  Are you referring to Mr. Thompson's
8  residence?
9    **A.  Yes.  Yes.**
10   Q.  And Mr. Thompson's house is within the
11  City of Manchester, Missouri, correct?
12   **A.  Correct.**
13   Q.  Within your police department's
14  jurisdiction, correct?
15   **A.  Yes.**
16   Q.  Approximately when did you come into
17  contact with those two individuals, Ms. Elmore and
18  Mr. Mackenzie?
19   **A.  I would -- want to say the call came out**
20  **probably 20 -- 2330 or 2230, somewhere around there.**
21  **And I was there on scene, after my traffic stop, ten**
22  **minutes later.**
23   Q.  So approximately 11:00 p.m. or so?
24   **A.  No.  Be 11 -- 11:30.**
25   Q.  11:30 p.m.?

16

1    **A.  Uh-huh.**
2    Q.  Were you -- when you responded to the
3  scene, were you in a police vehicle?
4    **A.  Yes.**
5    Q.  A marked police vehicle?
6    **A.  Yes.**
7    Q.  Were you alone or did you have a partner
8  or someone with you?
9    **A.  I was alone.**
10   Q.  When you arrived on scene, were there any
11  other law enforcement officers present?
12   **A.  Yes.  Officer Gerholdt was first on scene.**
13   Q.  When you arrived on scene, were there any
14  law enforcement officers present, other than you and
15  Officer Gerholdt?
16   **A.  Not at that time.**
17   Q.  When you arrived on scene, did you
18  immediately make contact with Ms. Elmore and/or
19  Mr. Mackenzie?
20   **A.  I made contact with Officer Gerholdt and**
21  **he told me the situation at hand.**
22   Q.  What did Officer Gerholdt convey to you,
23  when you arrived on scene?
24   **A.  He conveyed to me the same as what**
25  **dispatch said, that Steven and the other female was**

Joshua Cockrell  -  December 4, 2023

17

1    there, because their dad -- her dad lend -- loaned a
2    motorcycle to -- I forgot who --
3        Q.  Mr. Thompson?
4        A.  Mr. Thompson and he didn't return it.  And
5    he's had it for six months.
6        Q.  And is that all that Officer Gerholdt told
7    you?
8        A.  Yes.  At the time.
9        Q.  What did you do, after speaking with
10   Officer Gerholdt, at the scene?
11       A.  After speaking with him, I stood by.  And
12   then they just said the same story as
13   Officer Gerholdt.  Went up and knocked on the door.
14       Q.  Let's back up for a second.  I'm not
15   trying to put words in your mouth.  I want to make
16   sure I understand exactly what happened.
17       A.  Uh-huh.
18       Q.  So if I'm misstating anything, please
19   correct me.
20       A.  Uh-huh.
21       Q.  So my understanding is that after
22   Officer Gerholdt told you what you just testified
23   about --
24       A.  Uh-huh.
25       Q.  -- Officer Gerholdt went to Mr. Thompson's

18

1    door, front door --
2        A.  Front door.
3        Q.  -- to knock on it?
4        A.  Yep.
5        Q.  And then you spoke personally with
6    Ms. Elmore and Mr. Mackenzie?
7        A.  Not -- they were just -- I didn't speak
8    with them personally.  I stood there and they were
9    talking back and forth.
10       Q.  To each other?
11       A.  Correct.
12       Q.  And what, if anything, did you hear, in
13   that conversation that they were having with each
14   other?
15       A.  Just that he had her dad's motorcycle.
16   That is the only thing that I retained from that.
17       Q.  Did you say anything to Ms. Elmore or
18   Mr. Mackenzie?
19       A.  No.
20       Q.  To this day, have you ever spoken with an
21   individual named Nathan Rench?
22       A.  No.
23       Q.  Prior to responding to Mr. Thompson's
24   house, on October 22nd of 2022, what, if any,
25   documents did you see, in connection with this

19

1    motorcycle?
2        A.  The first -- the first time or second
3    time?  Because there was two times I was called
4    there.
5        Q.  The first time.
6        A.  The first time, I just seen the female
7    hand Officer Gerholdt the title.
8        Q.  And when you say a title, are you
9    referring --
10       A.  A Missouri title.
11       Q.  Are you referring to a purported title
12   that the female, Ms. Elmore, represented to
13   Officer Gerholdt was the title for the bike?
14       A.  Correct.
15           MS. ROBERTSON:  Sorry.  Did you hear that
16   he asked you prior to your arrival?  Is that what
17   you asked?
18           MR. GELFAND:  Yes.
19       A.  So before I arrived there?
20       Q.  (BY MR. GELFAND)  Yes.
21       A.  No.  No.
22       Q.  Okay.  When did you see Ms. Elmore hand a
23   copy of the purported title to the motorcycle, to
24   Officer Gerholdt?
25       A.  When Officer Gerholdt couldn't get anybody

20

1    to respond to the door at Mr. Thompson's house.
2        Q.  Okay.  Let's back up for a second.  So you
3    watched Officer Gerholdt essentially knock on the
4    front door --
5        A.  Correct.
6        Q.  -- or ring the doorbell?  Did you go up to
7    the door with him?
8        A.  Yes.
9        Q.  Okay.  Did you knock on the door?
10       A.  No.
11       Q.  But you were there when -- I don't care
12   who did the knocking, but you were both knocking at
13   the door?
14       A.  Correct.
15       Q.  And did you announce yourself as police?
16       A.  Yes.
17       Q.  Was anyone home?
18       A.  No.
19       Q.  Okay.
20       A.  The lights were on, but no one answered
21   the door.
22       Q.  Okay.  How long did you wait to determine
23   that no one was home?
24       A.  I'd say approximately a minute or two.
25       Q.  When you -- is it fair to say you and

**21**

1  Officer Gerholdt concluded that nobody was home,
2  meaning Mr. Thompson wasn't home?
3      **A.  Correct.**
4      Q.   Did you know who the owner of the house
5  was?
6      **A.  No.  Not at the time.**
7      Q.   Had you ever come into contact with
8  Mr. Thompson?
9      **A.  Before?  No.**
10     Q.   Had you ever come into contact with
11  Ms. Elmore and Mr. Mackenzie, before that night?
12     **A.  No.**
13     Q.   To the best of your knowledge, had you
14  ever come into contact with Nathan Rench, before
15  that night?
16     **A.  Never.**
17     Q.   To this day, have you ever spoken with
18  Nathan Rench?
19     **A.  Never.**
20     Q.   The house that you responded to, was that
21  1209 Cottagemill Drive?
22     **A.  Yes.**
23     Q.   In Manchester, Missouri 63021?
24     **A.  Yes.**
25     Q.   When you and Officer Gerholdt concluded

**22**

1  that nobody was home, meaning the homeowner wasn't
2  home --
3      **A.  Uh-huh.**
4      Q.   -- what, if anything, did you do?
5      **A.  What did we do after that?**
6      Q.   Yes.
7      **A.  Officer Gerholdt went back and made
8  contact with the two that were standing out there.
9  They then informed him that the motorcycle was in
10  the back yard.  They could see it from the street.**
11     Q.   And then what did you do?  When you say
12  they informed him, did you observe this?
13     **A.  Yes.  Yes.**
14     Q.   So you could hear it?
15     **A.  I could hear it.  Yes.  Yes.**
16     Q.   Where are you-all standing?
17     **A.  On the side.  Like in the front yard, next
18  to the sidewalk.**
19     Q.   What, if anything, do you do, at that
20  point, when they say that they can see the
21  motorcycle?
22     **A.  I follow Officer Gerholdt, as he continues
23  his investigation, to go to the side of the house,
24  to see if he can observe the motorcycle.**
25     Q.   When you say the side of the house, is

**23**

1  there a driveway?
2      **A.  Yes.  There's a driveway that leads --
3  leads up and I guess around to the backyard.**
4      Q.   Are there any vehicles in the driveway?
5      **A.  There was a Jeep Wrangler in the driveway.**
6      Q.   What, if any, investigative work did you
7  do, to determine the ownership of the Jeep Wrangler?
8      **A.  I don't -- I can't recall.**
9      Q.   So as you -- let's back up, for a second.
10  Who walks in -- does anybody walk into
11  Mr. Thompson's back yard?
12     **A.  Yes.**
13     Q.   Okay.  Who walks first?
14     **A.  Officer Gerholdt.**
15     Q.   So Officer Gerholdt walks into the back
16  yard.  Where are Ms. Elmore and Mr. Mackenzie, at
17  that time?
18     **A.  They're following behind him and then me.**
19     Q.   Okay.  So if there's a line, so to speak,
20  it's Mr. Gerholdt, Ms. Elmore, Mr. Mackenzie, and
21  then you, Mr. Cockrell?
22     **A.  Correct.**
23     Q.   But you're all walking together?  Meaning,
24  you're all walking at the same time?
25     **A.  I would -- I wouldn't necessarily say the**

**24**

1  same time, because we still don't know if anybody's
2  -- we're not getting anybody to answer the door at
3  the house.  So I'm still keeping a visual of the
4  house, to see if anybody's looking out of any of the
5  windows or if someone says hey, I'm here.
6          So Officer Gerholdt approaches from the
7  left side.  I approach from the right side.  Then
8  the other two go behind Officer Gerholdt and they
9  point to where the motorcycle is.
10     Q.   And the motorcycle is in like a gated back
11  yard, correct?
12     **A.  Open gated back yard.  Yes.**
13     Q.   We'll get to that, in a second.  But the
14  back yard has a -- and I'll show you pictures, in a
15  few minutes.  But the back yard, based on what you
16  observed, has a gated tall privacy fence around the
17  perimeter, correct?
18     **A.  Correct.**
19     Q.   Okay.  And just to be clear, so that we're
20  getting our bearings, the motorcycle is fairly deep
21  into that back yard, correct?
22     **A.  I would say --**
23         MS. ROBERTSON:  Objection, calls for
24  speculation.
25     Q.   (BY MR. GELFAND)  Where was the

25

1 motorcycle, in connection with the back yard?
2 Approximately how far was it from where you entered
3 the back yard from the driveway?
4        MS. ROBERTSON:  Objection, calls for
5 speculation.
6     **A.  I can't recall on that.**
7     Q.  (BY MR. GELFAND)  Was it 2 feet?
8     **A.  I can't -- I don't -- I don't -- I'm not**
9 **good at math, so I can't measure.  I mean, I didn't**
10 **-- I could see it from -- with the gate being open.**
11     Q.  Okay.  When you responded to the house,
12 were you wearing a police uniform, for lack of a
13 better way of putting it?
14     **A.  Yes.**
15     Q.  Were you wearing similar to what you're
16 wearing now, which is a walkie-talkie --
17     **A.  Yes.**
18     Q.  -- notification that says police, your
19 name, Cockrell?
20     **A.  Uh-huh.**
21     Q.  Yes?
22     **A.  Yes.**
23     Q.  And did you have a --
24     **A.  The only thing that was different was I**
25 **had my DSN right here, instead of my last name.**

26

1     Q.  Okay.  Did you have -- were you armed?
2     **A.  Yes.**
3     Q.  Okay.  With a sidearm?
4     **A.  Yes.**
5     Q.  And was Officer Cockrell similarly dressed
6 -- I'm sorry -- Officer Gerholdt similarly dressed,
7 but obviously with his name instead of your name?
8     **A.  Yes.**
9     Q.  Were you wearing -- when you arrived at
10 the scene, did you utilize a police vehicle with a
11 dash cam?
12     **A.  Yes.**
13     Q.  Do you know what a dash cam is?
14     **A.  Uh-huh.**
15     Q.  What is the purpose of a dash cam?
16     **A.  To record --**
17        MS. ROBERTSON:  You can answer.
18     **A.  To record your traffic stops and whenever**
19 **you turn on your emergency lights and sirens.**
20     Q.  (BY MR. GELFAND)  When you responded to
21 this scene, did you turn on your emergency lights
22 and sirens?
23     **A.  I did not.**
24     Q.  So to the best of your knowledge, was the
25 dash cam enabled, in connection with this particular

27

1 call?
2     **A.  No.**
3     Q.  When you were on scene at Mr. Thompson's
4 house, were you wearing a body camera?
5     **A.  Yes.**
6     Q.  And what is a body camera?
7     **A.  It records interactions with people on**
8 **traffic stops, as well as when you're on different**
9 **calls.**
10     Q.  What is your understanding of the purpose
11 of a body camera?
12     **A.  My understanding is to record everything.**
13     Q.  And is it fair to say that the benefit of
14 recording everything is it protects police officers
15 from any claims that something that didn't happen
16 did happen?
17        MS. ROBERTSON:  Objection, calls for
18 speculation.
19     Q.  (BY MR. GELFAND)  Is that fair?
20     **A.  Yes.**
21     Q.  And it protects suspects from claiming
22 something did happen that a police officer may say
23 didn't happen, for example?
24        MS. ROBERTSON:  Same objection.
25     **A.  Yes.**

28

1     Q.  (BY MR. GELFAND)  The point is, it creates
2 an accurate memorialization of what happens,
3 correct?
4     **A.  Uh-huh.**
5     Q.  Yes?
6     **A.  Yes.**
7     Q.  Okay.  Did you utilize a body cam, when
8 you responded to Mr. Thompson's house, on October
9 22nd of 2022?
10     **A.  No.**
11     Q.  Were you wearing a body cam?
12     **A.  Yes.**
13     Q.  Is it your testimony that you just didn't
14 turn it on?
15     **A.  Yes.**
16     Q.  Why?
17     **A.  Because I don't -- at the time, there were**
18 **certain calls that we had to -- we could use, to**
19 **turn on our body camera or we could not turn on our**
20 **body camera.  And I wasn't primary officer of that**
21 **call.  So I did not utilize the body cam, because I**
22 **wasn't doing the talking and interaction with other**
23 **people.**
24     Q.  Just to be clear, your testimony, under
25 oath, is that you were wearing a body camera, on

Joshua Cockrell  -  December 4, 2023

29

1  that evening, but you did not record?
2      **A.  Correct.  I did not engage it.**
3      Q.   How does one engage a body cam that you
4  were wearing?
5      **A.   There's a front button on the -- there's a**
6  **button on the front of it.  You push it and a red**
7  **light starts flashing.**
8      Q.   So if a red light is on the body camera,
9  it means it's recording?
10     **A.   Correct.**
11     Q.   And is there a green light?
12     **A.   Yes.**
13     Q.   What, if anything, does the green light
14 indicate?
15     **A.   Just standby.**
16     Q.   Meaning it's on?
17     **A.   Yes.**
18     Q.   So it's not recording?
19     **A.   Correct.**
20     Q.   So if both the red light and the green
21 light are on, it's recording?
22     **A.   Yes.**
23     Q.   What happened, based on what you observed,
24 when you-all, as you were describing, a few minutes
25 ago, entered Mr. Thompson's back yard, through the

30

1  driveway?
2      **A.   What happened, after that?**
3  **Officer Gerholdt went up to the motorcycle.  He**
4  **looked at the VIN of the motorcycle and the same VIN**
5  **coincided with what the female had provided him,**
6  **prior to us going back there.  Officer Gerholdt then**
7  **ran the VIN through our dispatching system, which**
8  **came back to Nathan Rench was the registered owner**
9  **of the motorcycle.**
10     Q.   Was anybody on scene representing himself
11 or herself to be Nathan Rench?
12     **A.   His daughter was there.**
13     Q.   That wasn't my question.  Was anybody on
14 scene representing himself or herself to be
15 Nathan Rench?
16     **A.   No.**
17     Q.   When you say his daughter was there, who
18 are you referring to?
19     **A.   I can't think of her name.**
20     Q.   Are you referring to Ms. Elmore?
21     **A.   Yes.**
22     Q.   Amara Elmore?
23     **A.   Yes.**
24     Q.   What, if any, investigative work did you
25 do, to determine whether Ms. Elmore was actually

31

1  Nathan Rench's daughter?
2      **A.   I did none.**
3      Q.   So the entire basis of your conclusion
4  that she was his daughter was that she told you she
5  was his daughter?
6      **A.   And she provided us with a title, a**
7  **Missouri title, for the motorcycle.**
8      Q.   Does the title indicate a familial
9  relationship between Ms. Elmore and Mr. Rench?
10     **A.   No.**
11     Q.   Is Ms. Elmore's name anywhere on the title
12 that she provided you?
13     **A.   No.**
14     Q.   Was Mr. Mackenzie's name anywhere on the
15 title that she provided you?
16     **A.   No.**
17     Q.   How long were you in the back yard?
18     MS. ROBERTSON:  Objection, calls for
19 speculation.
20     **A.   I don't recall.**
21     Q.   (BY MR. GELFAND) Do you -- do you readily
22 acknowledge that you stepped foot in Mr. Thompson's
23 back yard?
24     **A.   Yes, I do.**
25     Q.   Did you respond to under oath

32

1  interrogatories, in connection with this case?
2      **A.   Yes.**
3      Q.   Prior to responding to under oath
4  interrogatories in this case, did you understand
5  that you were signing these, under penalties of
6  perjury?
7      **A.   Yes.**
8      Q.   And did you take great care, to make sure
9  that every interrogatory answer, that you provided,
10 was accurate, to the best of your knowledge?
11     **A.   To the best of my knowledge.  Yes.**
12     Q.   In your under oath interrogatory, in
13 response to a slightly different question, at what
14 time exactly and for how long did you enter and
15 remain on the plaintiff's property, you estimated,
16 quote, approximately 20 to 25 minutes.
17     MS. ROBERTSON:  Justin, can you tell me
18 what interrogatory answer you're referring to?
19     MR. GELFAND:  Sure.  Number 15.
20     Q.   (BY MR. GELFAND)  You can look at that, if
21 you'd like.
22     **A.   Yeah.  Twenty to -- for the whole time of**
23 **the call.**
24     Q.   Yeah.  I understand.  How much of the time
25 that you were on scene of the call, proportionally,

**33**

1   were you in the back yard?
2      A.   I'd say five minutes, if that.  Five or
3   ten minutes.
4      Q.   What did you personally do, as opposed to
5   Officer Gerholdt, when you were in the back yard?
6      A.   I --
7         MS. ROBERTSON:  Objection, vague, calls
8   for speculation.
9      Q.   (BY MR. GELFAND)  You can answer the
10  question.  Do you understand the question?
11     A.   Yeah.  I was basically there, just to keep
12  the peace.  There was two of them and one of him.
13  So basically, wherever he went, I followed, just to
14  make sure he was safe and that nothing got out of
15  order.
16     Q.   Was it fair to say that based on what you
17  observed, Officer Gerholdt was investigating the
18  ownership of the motorcycle?
19     A.   Yes.
20     Q.   You testified, a few minutes ago, that you
21  observed Officer Gerholdt check the VIN number on
22  the motorcycle?
23     A.   Yes.
24     Q.   Did Officer Gerholdt, based on what you
25  observed, physically touch the motorcycle?

**34**

1      A.   I don't recall on that.
2      Q.   Where was the VIN?
3      A.   I think he -- he read the VIN off the
4   front of the forks.
5      Q.   Did you physically watch -- well, scratch
6   that.
7         At any time, when you were in the back
8   yard or able to see the back yard, was anyone
9   physically present, other than you,
10  Officer Gerholdt, Ms. Elmore, and Mr. Mackenzie?
11        MS. ROBERTSON:  Objection, compound, it
12  calls for speculation, vague.  You can answer if you
13  know.
14     Q.   (BY MR. GELFAND)  Do you understand the
15  question?
16     A.   I cannot -- not to my knowledge.
17     Q.   Let me ask it a different way.  During
18  your entire interactions involving the motorcycle,
19  did you see anyone in Mr. Thompson's back yard, with
20  respect to this first time that you went to
21  Mr. Thompson's house?
22     A.   No.
23     Q.   Other than the four people, including
24  yourself, that you've identified?
25     A.   No.

**35**

1      Q.   What, if anything, did you say from the
2   back yard, to determine whether anybody was home?
3      A.   Manchester Police Department.
4      Q.   What, if anything, did Officer Gerholdt
5   say in your presence?
6      A.   He announced the same, before running the
7   VIN.
8      Q.   Did Ms. Elmore or Mr. Mackenzie provide
9   anything to law enforcement, in your presence at the
10  house, other than this purported title?
11        MS. ROBERTSON:  Object to form, calls for
12  speculation.
13     A.   I don't recall.
14     Q.   (BY MR. GELFAND)  Did they provide any
15  pieces of paper?
16     A.   Not that I seen, besides the title.
17     Q.   When you entered Mr. Thompson's back yard,
18  did you have a search warrant?
19     A.   No.
20     Q.   When you entered Mr. Thompson's back yard,
21  did you believe there were exigent circumstances?
22        MS. ROBERTSON:  Objection, calls for a
23  legal conclusion.  You can answer if you know.
24     A.   Yes.
25     Q.   (BY MR. GELFAND)  Do you know what exigent

**36**

1   circumstances are?
2      A.   I do.
3      Q.   Describe what you believe the exigent
4   circumstances were, such that you needed to enter
5   the back yard, without a search warrant.
6      A.   I'd say to check and see if the motorcycle
7   was there, which you could see from, I'd say, when
8   you were halfway on the sidewalk, you could see it.
9   So why would someone make that story up?
10     Q.   So just to be clear, is that the totality
11  of what you're describing were exigent
12  circumstances?
13     A.   I'd say yes.
14     Q.   Did you enter the back yard, to render
15  emergency assistance to an injured person?
16     A.   No.
17     Q.   Did you enter the back yard, to render
18  emergency assistance to protect somebody from
19  imminent injury?
20     A.   No.
21     Q.   Would you agree with me that when you and
22  Officer Gerholdt entered Mr. Thompson's back yard,
23  you did not have Mr. Thompson's consent?
24     A.   Yes.
25     Q.   Would you agree with me that if you had

37

1  probable cause to search the back yard, you had
2  enough time to apply for a search warrant?
3        MS. ROBERTSON: Object to speculation --
4  object to form, calls for speculation, assumes facts
5  not in evidence. You can answer if you know.
6     A. Repeat.
7     Q. (BY MR. GELFAND) I'm focusing solely on
8  the timing issue.
9     A. So repeat the question.
10    Q. Would you agree with me that if you had
11 probable cause to search the back yard, you had
12 enough time to apply for a search warrant?
13       MS. ROBERTSON: Same objection.
14    A. Do I have to answer that one?
15    Q. (BY MR. GELFAND) Yes.
16    A. I do? I don't -- can't say I agree or
17 disagree on that, because we wasn't there for a
18 criminal call. So --
19    Q. Let's back up. When you say you weren't
20 there for a criminal call --
21    A. Meaning Mr. Thompson was not a criminal
22 involved in that case.
23    Q. We can agree on that.
24    A. So --
25    Q. Were you in -- what were you

38

1  investigating, if you were not there for a criminal
2  call?
3     A. I was not investigating anything.
4     Q. What was Officer Gerholdt, as you
5  understood it, investigating as you --
6        MS. ROBERTSON: Object --
7     Q. (BY MR. GELFAND) -- previously testified,
8  if he was not there for a criminal call?
9        MS. ROBERTSON: Object to form, calls for
10 speculation, assumes facts not in evidence. You can
11 answer if you know.
12    A. He was investigating, to determine the
13 ownership of the motorcycle.
14    Q. (BY MR. GELFAND) For what purpose?
15       MS. ROBERTSON: Same objection.
16    A. To see if Raymond -- what was his last
17 name again? I keep -- for some reason --
18    Q. (BY MR. GELFAND) Thompson.
19    A. Thompson was the owner of it.
20    Q. What was your understanding, as to why it
21 was important to determine -- for law enforcement to
22 determine who the owner of the motorcycle was?
23    A. I'd say because if they were the owners of
24 it, that they should have the bike. He shouldn't --
25 he shouldn't be hiding it from them.

39

1     Q. And is it fair to say that that was your
2  understanding of the function Manchester police was
3  performing that night?
4     A. Yes.
5     Q. In your interrogatories, which I'll just
6  mark these as Exhibit 1.
7        (WHEREIN, Plaintiff's Exhibit No. 1 was
8        marked for identification.)
9        MS. ROBERTSON: I've got a copy. Here you
10 go. Well, actually, if you have a spare copy, he'll
11 take it.
12       MR. GELFAND: Sure.
13       MS. ROBERTSON: That way, I can just keep
14 all the exhibits.
15       MR. GELFAND: You're good.
16    Q. (BY MR. GELFAND) I'm showing you what
17 I've marked as Exhibit 1. Can you tell me if you
18 recognize Exhibit 1?
19    A. Yes.
20    Q. Let me ask you this for a second. The
21 Exhibit 1 that we have does not appear to have your
22 signature on it. Did you actually sign these
23 interrogatories?
24    A. I did. I signed -- I signed it and then I
25 faxed it.

40

1     Q. Okay. I will just ask you purposely and
2  that's fine. There's no issues with that.
3        MS. ROBERTSON: I can get you a like copy,
4  right now.
5        MR. GELFAND: Yeah. That's totally fine.
6  No. That's totally fine.
7     Q. (BY MR. GELFAND) I'm just going to ask
8  you, just so we have a comprehensive record, did you
9  sign these answers to these interrogatories under
10 the penalties of perjury?
11    A. Yes.
12    Q. Okay. And you recall doing that, correct?
13    A. Yes.
14    Q. Okay. Now, in your interrogatories,
15 Interrogatory No. 5, you wrote -- if you go to the
16 next page -- this defendant, meaning you, did not
17 activate dash or body cameras.
18       And that's what you've testified about
19 today, correct?
20    A. Yes.
21    Q. Are you familiar with what the Manchester
22 Police Department does, with respect to body camera
23 footage, when you do activate it, on a call?
24       MS. ROBERTSON: Objection, calls for
25 speculation.

Joshua Cockrell  -  December 4, 2023

---

41

1    A.  I don't.  I don't -- I don't know how long
2  it's retained for.
3    Q.  (BY MR. GELFAND)  Have you ever had an
4  instance where you needed to obtain your body camera
5  footage to provide it, for example, to a prosecutor
6  in a case?
7    A.  Yes.
8    Q.  How did you perform that task?
9    A.  I down -- I downloaded it to a CD within
10  24 hours.
11    Q.  And when you say you downloaded it, do you
12  have access, as a Manchester police officer, to body
13  camera footage?
14    A.  Yes.
15    Q.  And when it is appropriate or necessary to
16  do so, is it your job, as the officer, to personally
17  download it?
18    A.  Correct.  For evidence.  Yes.
19    Q.  To the best of your knowledge, did
20  Officer Gerholdt utilize his dash camera or body
21  camera, that evening?
22      MS. ROBERTSON:  Objection, calls for
23  speculation.  You can answer if you know.
24    A.  I thought he had his -- his body camera
25  on.  I seen -- when I approached him, I seen red on

---

42

1  it.  So I knew it was recording.
2    Q.  (BY MR. GELFAND)  Do you know personally
3  what happened to that footage?
4      MS. ROBERTSON:  Same objection.
5    A.  No.  But see, there's a caveat to it.
6  Also, when it records -- when it's blinking red,
7  it's also showing that it's dying.
8    Q.  (BY MR. GELFAND)  Have you ever seen body
9  camera footage from that evening?
10    A.  No.
11    Q.  In your interrogatories, if we go to No.
12  15, please, Page 7.  Do you see your answer to No.
13  15?
14    A.  Yes.
15    Q.  We asked you, if you did enter plaintiff's
16  back yard without a warrant, on what legal
17  authority, if any, did you rely to enter plaintiff's
18  property.
19      MS. ROBERTSON:  Objection, calls for a
20  legal conclusion.
21      MR. GELFAND:  Well, I didn't even ask the
22  question.
23    Q.  (BY MR. GELFAND)  But is that what we
24  asked you?
25    A.  You asked me that earlier?

---

43

1    Q.  No.  Is that what I asked you on 15C?  Did
2  I just read that fairly?  I can read it again.
3    A.  Yeah.
4    Q.  Did I ask you, if you did enter
5  plaintiff's back yard without a warrant, on what
6  legal authority, if any, did you rely to enter
7  plaintiff's property?  Did I just read that
8  correctly?
9    A.  No.  There's nothing on here about a
10  warrant, in No. 15.
11    Q.  If you go to 15C.
12    A.  Oh, that one.  Okay.  I --
13    Q.  Did I read that correctly?
14    A.  Yes.  Yes.
15    Q.  Okay.
16    A.  The bottom portion.  You did.
17    Q.  And if we look at your answer to C, you
18  wrote, under oath, quote, pursuant to the community
19  caretaker exception to the warrant requirement, in
20  order to keep the peace, during a self-help
21  repossession and to ensure officer safety, end
22  quote.  Did I read that correctly?
23    A.  Yes.
24    Q.  Is that a truthful answer?
25    A.  Yes.

---

44

1    Q.  Now, in your interrogatory responses, you
2  reference two general order numbers.  In particular,
3  No. 11, Page 6.  Do you see that?
4    A.  Yes.
5    Q.  Did you represent, in your interrogatory,
6  that your conduct on October 22nd and 23rd, going
7  into the morning hours, of 2022, was consistent with
8  General Order Nos. 441 and 456?
9    A.  Yes.
10    Q.  Are you familiar with General Order No.
11  441?
12    A.  I am.
13    Q.  What is a general order?
14    A.  A general order is practices and orders,
15  that are followed by the department.
16    Q.  What, if any, training do you receive,
17  with respect to general orders?
18    A.  You do not -- you don't receive training,
19  for general orders.  It depends on which general
20  order it is.  If it's spike strips, you will receive
21  training on that.  If it's firearms, you will
22  receive training on that.
23    Q.  Did you receive any training, at all, on
24  General Order No. 441?
25    A.  Can I see which one 441 is?

---

45

1    Q.  Sure.
2        MR. GELFAND:  Let's mark it as Exhibit 2,
3  please.
4        (WHEREIN, Plaintiff's Exhibit No. 2 was
5        marked for identification.)
6    Q.  (BY MR. GELFAND) Can you tell me if you
7  have Exhibit 2 in front of you?  I'm just asking
8  if --
9    A.  Yes.
10   Q.  Okay.  Is Exhibit 2 General Order No. 441,
11 that you referenced in Interrogatory Response No.
12 11?
13   A.  Yes.
14   Q.  Do you recognize Exhibit 2?
15   A.  Yes.
16   Q.  Had you received a copy of Exhibit 2,
17 prior to responding to Mr. Thompson's house on
18 October -- in October of 2022?
19   A.  Yes.
20   Q.  Now, if we look at Exhibit 2, it says, the
21 purpose of this general order is to establish
22 procedures to follow when property interests are in
23 dispute or this department is notified of vehicle
24 repossessions.  Did I read that correctly?
25   A.  Correct.

46

1    Q.  And this was effective in June of 2020,
2  correct?
3    A.  Correct.
4    Q.  If we look at the Page 2, there's a
5  subsection entitled Policy.
6        MS. ROBERTSON:  I'm sorry.  I don't see
7  that, Justin.  I must not have this page.  441?
8  What's at the top of your page?  Is it -- or is it
9  Bates No. 151?
10       MR. GELFAND:  819.
11       THE WITNESS:  I don't have that either.
12       MS. ROBERTSON:  You know what?  I -- I --
13 yeah.
14       MR. GELFAND:  I've got -- is that not on
15 there?
16       THE WITNESS:  Nope.
17       MR. GELFAND:  Sorry.  I think that might
18 have just been a photocopy problem.
19       MS. ROBERTSON:  We can -- we can fix it.
20 Let's see -- actually, you know what?  Can we just
21 take a quick break, because --
22       MR. GELFAND:  Sure.
23       MS. ROBERTSON:  -- I need to use the
24 restroom and we'll run you a copy.
25       MR. GELFAND:  Yeah.  That's fine.

47

1        MS. ROBERTSON:  Does that work?
2        MR. GELFAND:  Yeah.
3        (WHEREIN, a brief break was taken.)
4    Q.  (BY MR. GELFAND) Officer, we're back from
5  a break.  One thing I meant to tell you, at the
6  beginning of this depo, is if, at any time, you need
7  to take a break, it's not a speed contest.  It's
8  totally fine.  Just say so.
9    A.  Okay.
10   Q.  If there's a question that's pending, I
11 would just ask that you answer it.  But at any time,
12 you're welcome to take five, ten minutes, whatever
13 you need.
14   A.  Okay.
15   Q.  Now, I want to show you Exhibit 2.  And
16 I'm going to back up, for a second, so we have a
17 clean record.
18       Exhibit 2 is General Order No. 441,
19 effective 5/26 of 2020, correct?
20   A.  Correct.
21   Q.  Okay.  And if we look at the top of
22 Exhibit 2, it says, the purpose of this general
23 order is to establish procedures to follow, when
24 property interests are in dispute or this department
25 is notified of vehicle repossessions, correct?

48

1    A.  Correct.
2    Q.  And then just under that, there's the
3  policy itself.  Do you see that?
4    A.  Correct.
5    Q.  And the policy says, the officer should
6  not attempt to take personal property away from one
7  party and give it to another, correct?
8    A.  Correct.
9    Q.  Then we see procedure.  Do you see that?
10   A.  Yep.
11   Q.  And could you read what A says?
12   A.  **When property is in dispute, the officer
13 should advise -- advise and permit the courts to
14 determine their respective of rights to the
15 property.  The officer should advise the party in
16 possession of the property not to dispute of it,
17 until the courts have resolved the matter.**
18   Q.  And it says not to dispose of it, correct?
19   A.  Yep.
20   Q.  Okay.  And so is it fair to say what that
21 says is --
22   A.  **Not to dispute.  Yeah.**
23   Q.  Yeah.  Is it fair to say that what that
24 says is that the officer should permit the courts to
25 determine who owns the property, if there's a

49

1  dispute?
2        MS. ROBERTSON: I'd object to form.
3  The -- the exhibit speaks for itself. Calls for
4  speculation.
5        Q. (BY MR. GELFAND) Is that how you
6  understood the policy?
7        A. Yeah.
8        Q. Okay.
9        A. If it's a repossession.
10       Q. Okay. And in this particular instance,
11  just factually speaking, to the best of your
12  knowledge, was there a court determination that
13  Ms. Elmore owned this property?
14       A. No.
15       Q. Was there a court determination that
16  Mr. Mackenzie owned this property?
17       A. No.
18       Q. Was there a court determination that
19  Mr. Rench owned this property?
20       A. No.
21       Q. Could you please tell me if I'm reading B
22  correctly? If one party has a court order, which
23  appears to give that party the right to possession
24  of the property, that order should be enforced only
25  by the official specifically directed to do so in

50

1  the order. Officers are advised to be aware of
2  court orders of suspicious nature. Did I read that
3  correctly?
4        A. Yes.
5        Q. And in this case, of course, as you just
6  testified, there was no court order, correct?
7        A. Yes.
8        Q. Just to be clear, when we go back to that
9  night, in October of 2022, at Mr. Thompson's house,
10  when you arrived on the scene, before you went into
11  the back yard, would you agree with me that the
12  property at issue was a Harley Davidson motorcycle?
13       A. Yes.
14       Q. Would you agree with me that that
15  property, the Harley Davidson motorcycle, was parked
16  inside the back yard of Mr. Thompson's house?
17       A. I would say it was inside the fence,
18  inside the back yard. Yeah.
19       Q. It was on Mr. Thompson's private property,
20  correct?
21       A. Correct.
22       Q. Okay. Inside the -- the privacy fence
23  that you previously described, correct?
24       A. Correct.
25       Q. Okay. And so prior to you-all arriving at

51

1  the house, would you agree with me, to state the
2  obvious, that Mr. Thompson was in possession of the
3  Harley Davidson motorcycle?
4        MS. ROBERTSON: Objection -- objection,
5  calls for a legal conclusion. You can answer if you
6  know.
7        A. I don't know.
8        Q. (BY MR. GELFAND) Was it at his house?
9        A. It was at his house. Correct. But I
10  don't know why it was at his house.
11       Q. And that's a different question. I'm just
12  asking factually speaking, whether he should have
13  been or shouldn't have been, would you agree with me
14  that he was physically in possession of the
15  motorcycle?
16       A. Yeah.
17       MS. ROBERTSON: Same objection.
18       Q. (BY MR. GELFAND) You can answer the
19  question.
20       A. Yes.
21       Q. Okay. Did you believe there was a
22  property dispute?
23       A. I'd say yes.
24       Q. Between whom?
25       A. Mr. Thompson and Rench.

52

1        Q. And Mr. Rench?
2        A. Yep.
3        Q. Is that Nathan Rench?
4        A. Yep.
5        Q. Was there any basis, at all, in which you
6  concluded that Mr. Mackenzie had a legal interest in
7  this property?
8        MS. ROBERTSON: Objection, calls for
9  speculation, calls for a legal conclusion. You can
10  answer if you know.
11       A. I don't have -- I didn't -- I mean, I
12  spoke with him for like ten seconds. I couldn't
13  tell you.
14       Q. (BY MR. GELFAND) Was there any basis, at
15  all, in which you concluded that Ms. Elmore had a
16  legal interest in this property?
17       MS. ROBERTSON: Same objection.
18       A. She was the one that provided the title.
19  Yes.
20       Q. (BY MR. GELFAND) How did she physically
21  provide what you're calling a title?
22       A. I don't -- I don't remember everything.
23  But I remember her pulling -- pulling it out of her
24  Ford Escape. I think she went into her purse, I
25  think, and then she pulled out a title, a Missouri

53

1    title.
2    Q.  Was it a physical piece of paper?
3    A.  Physical document.
4    Q.  And who did she hand that document to?
5    A.  Officer Gerholdt.
6    Q.  Where is that document?
7    A.  I don't have it.  I don't -- I don't know
8  if it was seized for evidence.  Could be seized for
9  evidence or what.
10    Q.  Do you know?
11    A.  I do not know.
12    Q.  Did you personally see the physical piece
13  of paper?
14    A.  I seen the color of it.  And I could tell
15  it was a Missouri title.  It was green.
16    Q.  Did you personally review the document at
17  the scene?
18    A.  No.
19    Q.  Have you ever personally reviewed the
20  document?
21    A.  No.
22    Q.  Did you and Officer Gerholdt ultimately
23  allow Ms. Elmore and Mr. Mackenzie to physically
24  take the Harley Davidson away from Mr. Thompson's
25  private property?

54

1    MS. ROBERTSON:  Objection.  Object to
2  form, assumes facts not in evidence, misstates the
3  evidence, calls for a legal conclusion, calls for
4  speculation.
5    Q.  (BY MR. GELFAND)  You can answer the
6  question.
7    A.  No.  I didn't make the call.
8    Q.  Who did?
9    A.  It would have been Sergeant Waters, who
10  Officer Gerholdt was on the phone with.
11    Q.  Was Sergeant Waters physically present?
12    A.  The second time.  Yes.
13    Q.  I'm talking about the first time.
14    A.  Nope.
15    Q.  And just to be clear, before there was a
16  second time, the motorcycle left the premises,
17  right?
18    A.  Correct.
19    Q.  Okay.  So I want to stay focused, for
20  now -- we'll get to the second time.  But I want to
21  stay focused right now on this incident where
22  you-all are in the back yard, with Ms. Elmore and
23  Mr. Mackenzie, determining what to do with the
24  motorcycle.
25    A.  Fair enough.

55

1    Q.  I'm going to show you Exhibit -- what I'm
2  going to mark as Exhibit 4, please.
3    (WHEREIN, Plaintiff's Exhibit No. 4 was
4  marked for identification.)
5    MS. ROBERTSON:  Did we -- we're skipping
6  3?
7    MR. GELFAND:  Yeah.  We'll get to 3.
8    MS. ROBERTSON:  Okay.
9    Q.  (BY MR. GELFAND)  Do you have Exhibit 4 in
10  front of you?
11    A.  I do.
12    Q.  Does Exhibit 4 appear to be a Manchester
13  Police Department Investigative, slash, Offense
14  Report?
15    A.  Yes.
16    Q.  And do you see where it references the
17  Thompson residence at 1209 Cottagemill Drive in
18  Manchester, Missouri?
19    A.  Yes.
20    Q.  And the date that you're testifying about,
21  10/22/22?
22    A.  You said ten what?
23    Q.  22/22.  It says occurred on.
24    A.  Yes.
25    Q.  And if there may be some confusion, the

56

1  report date --
2    A.  The report date --
3    Q.  -- would be the following morning.  But it
4  was essentially just after midnight.
5    A.  Yep.
6    Q.  Right?
7    A.  Yes.
8    Q.  Okay.  Now, you testified that you have
9  not actually reviewed this report; is that correct?
10    A.  Yes.
11    Q.  I just want to ask you a couple questions,
12  though.
13    A.  Uh-huh.
14    Q.  If we go to page -- do you see the Bates
15  numbers at the bottom?  Meaning just numbers --
16    A.  Yep.
17    Q.  -- that are on here.  It says MPD No. 3?
18    A.  Yep.  Want me to go to 3?
19    Q.  Yep.
20    A.  Okay.
21    Q.  Do you see where it references a 2003
22  Harley Davidson trike, then a VIN number
23  specifically identified there, beginning with 1HD?
24    A.  Yes.
25    Q.  Black in color?

Joshua Cockrell  -  December 4, 2023

57

1    A.   Yes.
2    Q.   To state the obvious, was that the Harley
3  Davidson that was parked in Mr. Thompson's privacy
4  gated enclosure?
5    A.   Yes.
6    Q.   Now, this says, and I recognize that
7  Mr. Gerholdt was the author of this, not you, that
8  Ms. Elmore and Mr. Mackenzie, quote, were in
9  possession of the motorcycle key, end quote.  Do you
10  know anything about that?
11    A.   I think that's -- they had to use
12  something to start it.
13    Q.   Did you ever see a key?
14    A.   I did not.  I didn't see one, but it was
15  the only way that the motorcycle could have been
16  started.
17    Q.   Are you aware that some vehicles don't
18  actually need a key, to be started?
19    A.   Yeah.
20    Q.   Do you know whether this motorcycle is
21  started with a key or a toggle switch?
22    A.   I'd say a key.
23    Q.   Based on what?
24    A.   Based on just looking -- it was dark.
25  Just looking at it from the -- from the distance, it

58

1  had to be started with a key.  It was an older
2  motorcycle.  It wasn't like a newer one -- newer
3  vehicle, where it would be push to start.
4    MR. GELFAND:  I'm going to mark this --
5  I'm going to complicate things, for a second,
6  because I have some other premarked exhibits.  Let's
7  mark this as Exhibit 15.
8    (WHEREIN, Plaintiff's Exhibit No. 15 was
9    marked for identification.)
10    MS. ROBERTSON:  Fifteen?
11    MR. GELFAND:  Yeah.
12    MS. ROBERTSON:  Okay.
13    Q.   (BY MR. GELFAND)  Do you have Exhibit 15
14  in front of you?
15    A.   Yes.
16    Q.   Have you ever seen this part of the
17  motorcycle, in particular, the ignition?
18    A.   No.  To me, it looks like gas, on and off.
19    Q.   If I were to represent to you that this is
20  a toggle switch, that starts the motorcycle, in lieu
21  of a key, would you have any reason to disagree with
22  me?
23    MS. ROBERTSON:  Objection, calls for
24  speculation.  You can answer if you know.
25    A.   I guess it possibly could be used as one.

59

1  I've never seen one.
2    Q.   (BY MR. GELFAND)  Did you bother looking
3  that night?
4    MS. ROBERTSON:  Objection, argumentative.
5    MR. GELFAND:  I'll rephrase it.
6    Q.   (BY MR. GELFAND)  Did you look that night?
7    A.   No.
8    Q.   If we look back at the police report,
9  Exhibit 4, it says, Mackenzie then started the
10  vehicle with the key and was able to get it out
11  through the open gate and around the Jeep.
12    To be clear, you don't know whether that's
13  true or not true, as far as how Mackenzie started
14  the motorcycle, correct?
15    A.   Correct.
16    Q.   The next sentence says, Elmore and
17  Mackenzie were then allowed to leave.  Did I read
18  that correctly?
19    A.   Yes.
20    Q.   Is that a true statement?
21    A.   Yes.
22    Q.   And to be clear, when you say they were
23  then allowed to leave, meaning they were allowed to
24  leave with the motorcycle, by Manchester police,
25  correct?

60

1    A.   Yes.
2    MS. ROBERTSON:  Objection,
3  mischaracterizes the evidence, assumes facts not in
4  evidence.
5    Q.   (BY MR. GELFAND)  Is that what happened or
6  is that not what happened?
7    A.   Yes.
8    Q.   Okay.  Now, if we look back to Exhibit 2,
9  that's General Order No. 441.  If we go to the
10  second page, Bates No. 151.  It says, repossessions
11  may legally be carried out, based on the terms of
12  the lender's contract or with a court order.
13    To be clear, would you agree with me that
14  no one ever claimed there was a lender's contract?
15    A.   Yes.
16    Q.   And you previously testified that there
17  was no court order, correct?
18    A.   Yes.
19    Q.   Would you also agree with me that there
20  was no traditional company, like a repossession
21  company, performing a repossession?
22    A.   Yes.
23    Q.   Just to be clear, is it your testimony
24  that what you did that night and what you observed
25  Officer Gerholdt do that night, was consistent with

61

1   General Order No. 441?
2       A.  Yes.
3       Q.  Even though you previously agreed with me
4   that you're supposed to defer to a court, not make a
5   decision yourself, right?
6       A.  Correct.  But not every case or call is
7   going to be in direct with all the policies and
8   procedures.
9       Q.  So I want to clarify this, because it's
10  important.  Is it your testimony that what you did
11  was consistent with General Order 441?  Or that 441
12  didn't apply, because of the facts and
13  circumstances?
14      A.  I'd say it was consistent.
15      Q.  How?  Based on everything we just talked
16  about?
17      A.  There to keep the peace.  I'd say it was
18  inconsistent, because -- or it was consistent,
19  because the owner, the daughter's owner, showed up
20  with a piece of paper, that was stating it was
21  theirs.  There was nothing that was saying that the
22  bike was supposed to stay where it was at.
23      Q.  Well, you had never -- by the time the
24  bike left, had you ever spoken with Mr. Thompson?
25      A.  I have not -- I did not.

62

1       Q.  And by the time that the bike left his
2   property, was it your understanding that
3   Mr. Gerholdt has never -- Officer Gerholdt has never
4   spoken with Mr. Thompson?
5       A.  My understanding, yes.
6       Q.  So to be clear, did you-all determine
7   ownership of the bike, without ever speaking with
8   Mr. Thompson?
9       A.  I did not determine anything.
10      Q.  Did Officer Gerholdt?
11          MS. ROBERTSON:  Objection, calls for
12  speculation.
13      A.  Yes.
14      Q.  (BY MR. GELFAND)  And he communicated that
15  to you, correct?
16      A.  Say that again.
17      Q.  And he communicated that to you, correct?
18  Officer Gerholdt told you that, correct?
19      A.  Yeah.
20      Q.  Now, if we look at General Order No. 456.
21          MR. GELFAND:  I'm going to mark that --
22  what are we on, 3?
23          MS. ROBERTSON:  I don't think 3's been --
24          MR. GELFAND:  Yeah.
25          (WHEREIN, Plaintiff's Exhibit No. 3 was

63

1           marked for identification.)
2       Q.  (BY MR. GELFAND)  Can you tell me if you
3   recognize -- well, first of all, do you have Exhibit
4   3 in front of you?
5       A.  I do.
6       Q.  Do you recognize Exhibit 3?
7       A.  Yes.
8       Q.  What is Exhibit 3?
9       A.  It's a policy for towed vehicles and
10  vehicle property lockouts.
11      Q.  And is this the other general order
12  number, that you referenced in Interrogatory No. 11?
13      A.  Yes.
14      Q.  Was this general order effective June of
15  2020?  At least per the document?
16      A.  Yes.
17      Q.  Meaning that's the date that it went into
18  effect, correct?
19      A.  Correct.
20      Q.  And did you have a copy of this, prior to
21  October of 2022, when you went to Mr. Thompson's
22  house?
23      A.  I did not have it up and looking at it,
24  before I went there.  No.  But I have a copy of it
25  on my zip drive.  Yes.

64

1       Q.  Had you been provided a copy of this?
2       A.  Yes.
3       Q.  Prior to that date?
4       A.  Yes.
5       Q.  Okay.  This general order number
6   establishes procedures, according to the purpose,
7   for performing vehicle lockouts and towing of
8   vehicles from the public right-of-way and from
9   private property, as authorized by Missouri state
10  statute; is that correct?
11      A.  Yes.
12      Q.  Just to be clear, in this case, were you
13  performing a vehicle lockout?
14      A.  No.
15      Q.  What is a vehicle lockout?
16      A.  A vehicle lockout is when someone locks
17  their keys in the car and they call the police
18  department, to help get into it.
19      Q.  In other words, if there's no dispute that
20  I'm driving my own car and I go to the market --
21      A.  Correct.
22      Q.  -- and I leave the keys in the car --
23      A.  Yes.
24      Q.  -- you might be able to assist me in
25  getting back in the car?

65

1     A.   Correct.
2     Q.   Were you towing a vehicle from a public
3  right-of-way or from private property, in this case?
4     A.   No.
5     Q.   Did you cause the vehicle to be removed to
6  a garage designated or maintained by the City of
7  Manchester?
8     A.   No.
9     Q.   If we go to policy, on Page 2, Bates No.
10  819, do you see where it says, an officer may remove
11  or cause to be removed any vehicle from a street,
12  highway, public or private property, to the nearest
13  garage or other place of safety or to a garage
14  designated or maintained by the City of Manchester,
15  under any of the below described circumstances,
16  after it is determined that there is no other way to
17  safely remove the vehicle.  Did I read that
18  correctly?
19     A.   Yes.
20     Q.   Would you agree with me that none of that
21  is what happened here?
22     A.   Yes.
23     Q.   Did you complete an MPD Form 003 and
24  forward the form to Mr. Thompson's last known
25  address?

66

1     A.   I did not.
2     Q.   If we look at Page 4, Bates No. 821, would
3  you say -- under V, do you see where it says, if the
4  vehicle owner is not present or aware of when the
5  vehicle is towed, the officer will complete a MPD
6  Form 003 and forward it to the last known address of
7  the owner.
8     A.   Correct.
9     Q.   The truth is, you-all didn't tow the
10  Harley Davidson, correct?
11     A.   No.
12     Q.   And to state the obvious, did you complete
13  a Missouri DOR Form 4569, referenced in Subsection
14  D, which you're supposed to do, when there's an
15  inventory made and a vehicle is towed?
16     A.   No.
17     Q.   Would you agree with me that everything
18  you did, in this case, was inconsistent with order
19  number 456 or that it wasn't applicable?
20     A.   It was --
21        MS. ROBERTSON:  Objection.  Hold on.
22        THE WITNESS:  Sorry.
23        MS. ROBERTSON:  Assumes facts not in
24  evidence, calls for a legal conclusion, calls for
25  speculation.  You can answer if you know.

67

1     Q.   (BY MR. GELFAND)  Is it your testimony --
2  I'll rephrase the question.
3        Is it your testimony that you acted
4  consistently with General Order No. 456, that we
5  just walked through?
6     A.   Yes.
7     Q.   How?
8     A.   I didn't -- I didn't tow a vehicle.  But
9  if I did, that would have been the procedure that I
10  would have went through.
11     Q.   So is it your testimony, more accurately,
12  that 456 just doesn't apply?
13     A.   Correct.
14     Q.   Would you agree with me that when law
15  enforcement tows a vehicle, the vehicle ends up in
16  what is effectively a law enforcement tow lot, so it
17  is secure?
18     A.   I wouldn't say a law enforcement tow yard.
19  I would say a tow yard that we trust and deal with.
20     Q.   Let me ask it a different way.  If my car
21  is towed away --
22     A.   Yeah.
23     Q.   -- and I believe it's wrong and I get a
24  court order saying that I'm entitled to get my car
25  back --

68

1     A.   Uh-huh.
2     Q.   -- it's at a place where I can get it
3  immediately, upon delivery of the court order,
4  correct?
5     A.   Correct.
6        MS. ROBERTSON:  Object to form, calls for
7  a legal conclusion, calls for speculation.
8     Q.   (BY MR. GELFAND)  Would you agree with me
9  that Mr. Thompson's Harley Davidson was not
10  maintained at a place, when it was removed from his
11  property, that law enforcement trusts?
12     A.   I have no idea.
13     Q.   Do you know where it went?
14     A.   No.
15     Q.   Sitting here today, do you know how long
16  Mr. Thompson had lost his possession and use of the
17  vehicle?
18     A.   No.
19     Q.   Did you ever try to find out?
20     A.   No.
21     Q.   Did you ever physically touch the Harley
22  Davidson, at any time?
23     A.   No.
24     Q.   At all times that you were at
25  Mr. Thompson's house and dealing with the

Joshua Cockrell - December 4, 2023

69

1  motorcycle, including in his what I'm calling his
2  back yard, but inside his privacy fence, were you,
3  at all times, on duty, as a law enforcement officer?
4      **A.  Yes.**
5      Q.  Help me understand something.
6  Approximately how much time had passed, from the
7  time you arrived at Mr. Thompson's house to the time
8  that the motorcycle or Harley Davidson left the
9  house?
10     **A.  That's my -- my guesstimated time would be**
11  **20 minutes.**
12     Q.  So is -- that encompassing the 20 to 25
13  minute --
14     **A.  Correct.**
15     Q.  -- estimate that you wrote in your
16  interrogatories?
17     **A.  Correct.**
18     Q.  And during that entire time period, there
19  was no communication with Mr. Thompson, correct?
20     **A.  Correct.**
21     Q.  And during that entire time period, as you
22  testified, Officer Gerholdt and -- was it
23  Sergeant Waters?
24     **A.  Yes.**
25     Q.  And that's the supervisor?

70

1      **A.  Yes.**
2      Q.  Effectively decided, on the spot, that
3  Ms. Elmore and Mr. Mackenzie should be permitted to
4  leave with the motorcycle, correct?
5          MS. ROBERTSON:  Objection, calls for
6  speculation, mischaracterizes the evidence, assumes
7  facts not in evidence.
8      Q.  (BY MR. GELFAND)  Is that correct or is
9  that not correct?
10     **A.  I'd assume.  Yes.**
11     Q.  Because that was communicated to you?
12     **A.  It was never communicated to me.  It just**
13  **-- they were talking on the phone and afterwards,**
14  **the motorcycle was released to him.**
15     Q.  By Officer Gerholdt?
16     **A.  By Officer Gerholdt.  Correct.**
17     Q.  And let's be clear about something.  It's
18  not like these -- I mean, you tell me.  It's not
19  like Ms. Elmore and Mr. Mackenzie just drove off
20  with the motorcycle and then you all engaged in
21  pursuit, because they stole it, right?
22     **A.  No.**
23     Q.  They left with the permission of law
24  enforcement?
25     **A.  Correct.**

71

1          MS. ROBERTSON:  Object --
2          MR. GELFAND:  Okay.
3          MS. ROBERTSON:  Objection, calls for a
4  legal conclusion, assumes facts not in evidence,
5  calls for speculation.
6      Q.  (BY MR. GELFAND)  Was that your
7  understanding?
8      **A.  Yes.**
9      Q.  And you were there, correct?
10     **A.  Yes.**
11     Q.  And at all times, with respect to
12  Mr. Thompson's house and your police work, you and
13  Officer Gerholdt arrived in marked police cars, each
14  of you is wearing a police -- police uniform, each
15  of you had a badge, and each of you had a sidearm,
16  correct?
17     **A.  Yes.**
18     Q.  Would you agree with me that with the
19  benefit of hindsight, knowing what you know now, law
20  enforcement made the wrong decision here?
21         MS. ROBERTSON:  Objection, calls for
22  speculation, assumes facts not in evidence,
23  misstates the evidence, calls for a legal
24  conclusion.
25     Q.  (BY MR. GELFAND)  You can answer.

72

1      **A.  Say it again?**
2      Q.  Would you agree with me that --
3          MR. GELFAND:  You don't have to restate
4  your objections.
5          MS. ROBERTSON:  Okay.  Thank you.
6      Q.  (BY MR. GELFAND)  With the benefit of
7  hindsight, law enforcement made the wrong decision
8  here?
9      **A.  I'd say with information provided and**
10  **given at that time, we made the right decision.**
11     Q.  What was the information given at the
12  time, that leads you to that conclusion?
13     **A.  That Nathan Rench was the owner of the**
14  **motorcycle.**
15     Q.  Do you know, sitting here today, what the
16  relationship, if any, is between Nathan Rench and
17  Amara Elmore?
18     **A.  I do not.**
19     Q.  Do you know, sitting here today, what the
20  relationship is, if any, between Nathan Rench and
21  Mr. Mackenzie?
22     **A.  No.**
23     Q.  Don't you think that's important?
24     **A.  For the --**
25         MS. ROBERTSON:  Object -- objection --

Joshua Cockrell - December 4, 2023

73

1  object to form, vague, calls for speculation.
2      Q.  (BY MR. GELFAND)  You can answer the
3  question.
4      **A.  I'd say it would be important, for the**
5  **primary officer that was doing the report.**
6      Q.  Who was that?
7      **A.  Officer Gerholdt.**
8      Q.  I'm going to show you Exhibit -- what I'm
9  going to mark as Exhibit 5.
10         (WHEREIN, Plaintiff's Exhibit No. 5 was
11         marked for identification.)
12     Q.  (BY MR. GELFAND)  Do you have Exhibit 5 in
13  front of you?
14     **A.  Yes.**
15     Q.  Exhibit 5 is not -- well, let's back up.
16         Is Exhibit 5 another general order?  This
17  one, No. 425?
18     **A.  Yes.**
19     Q.  And was this effective, prior to this
20  incident on May of 2020?
21     **A.  Yes.**
22     Q.  Exhibit 5 was not a general order number
23  that you referenced in your interrogatory response,
24  correct?
25     **A.  Correct.**

74

1      Q.  If you look at Exhibit 5 -- are you
2  familiar with Exhibit 5?
3      **A.  I am.**
4      Q.  Exhibit 5 applies to search warrants and
5  warrant list searches, correct?
6      **A.  Yes.**
7      Q.  Exhibit 5 lists out a whole series of
8  procedural requirements, when Manchester police is
9  involved in applying for and executing a search
10  warrant, correct?
11     **A.  Correct.**
12     Q.  There's various operations, plans, and
13  things like that, that have to be followed, correct?
14     **A.  Correct.**
15     Q.  None of that applied here, because you
16  testified you weren't executing a search warrant,
17  correct?
18     **A.  Correct.**
19     Q.  If we look at Page 5, Section 425.06,
20  Warrant List Searches.  Do you see a list of
21  circumstances whereby warrant list searches are,
22  quote, most often encountered and authorized, end
23  quote?
24     **A.  Yes.**
25     Q.  Would you agree with me that none of that

75

1  applied to your conduct here?
2      MS. ROBERTSON:  Objection, calls for
3  speculation, calls for a legal conclusion.
4      **A.  Yes.**
5      Q.  (BY MR. GELFAND)  And when you were in the
6  moment, you did not believe that you were conducting
7  a warrant list search, pursuant to any of those
8  examples in 425.06, correct?
9      MS. ROBERTSON:  Same objection.
10     **A.  Yes.**
11     Q.  (BY MR. GELFAND)  And on the last page of
12  this, it says -- in Section B, at the top of that
13  last page, it says, police officers must be able to
14  show that their search was based on probable cause
15  or their protective frisk was based on reasonable
16  suspicion and both were conducted in accordance with
17  the U.S. Constitution.
18         And then Section C2 says that all of that
19  needs to be documented, correct?
20     **A.  Correct.**
21     Q.  And you've been trained on that, in
22  connection with your everyday duties, as a law
23  enforcement officer, correct?
24     **A.  Yes.**
25     Q.  Because you would agree with me that

76

1  reasonable suspicion and probable cause searches are
2  part of the bread and butter of daily work of law
3  enforcement, correct?
4      MS. ROBERTSON:  You can answer.
5      Q.  (BY MR. GELFAND)  Is that true or not
6  true?
7      **A.  Yes.**
8      Q.  And none of that happened --
9      **A.  In some cases.**
10     Q.  None of that happened here, correct?
11     MS. ROBERTSON:  Object to form, vague.
12     Q.  (BY MR. GELFAND)  Is that correct?
13     **A.  Correct.**
14     Q.  And do you understand what I'm asking?
15     **A.  Yeah.**
16     Q.  Do you see at the bottom, where it says
17  this is distributed to all department personnel?
18     **A.  Uh-huh.**
19     Q.  Yes?
20     **A.  Yes.**
21     Q.  I'm sorry.  I'm not trying to be rude, but
22  when you say uh-huh, it's hard for the court
23  reporter.
24     **A.  Yeah.  I know.  I know you need a yes or**
25  **no answer.**

77

1    Q.   And so all department personnel would be
2    -- would include you and Officer Gerholdt, correct?
3    **A.   Yes.**
4    Q.   And Sergeant Waters, correct?
5    **A.   Yes.**
6    Q.   Now, prior to the bike leaving, in those
7    20 to 25 minutes, what, if anything, did you do
8    personally, to investigate the veracity of
9    Ms. Elmore's and Mr. Mackenzie's story?
10   **A.   None.**
11   Q.   So in that vein, is it fair to say that
12   you did not actually investigate who owned the bike,
13   based on records and financial documents?
14   **A.   Correct.**
15   Q.   That you did not speak to Mr. Thompson?
16   **A.   Is this Mr. Thompson?**
17   Q.   Yes.
18   **A.   The second time I did.**
19   Q.   Prior to the bike leaving?
20   **A.   Nope.  Not prior.  After the bike left.**
21   Q.   Yeah.  But prior to the bike leaving, you
22   did not review the check that Mr. Thompson wrote to
23   Mr. Rench, two years earlier, buying the bike?
24   **A.   No.**
25   Q.   Meaning that's correct?

78

1    **A.   Correct.**
2    Q.   That you did not investigate the actual
3    relationship, between Ms. Elmore and Mr. Mackenzie
4    and Nathan Rench?
5    **A.   Correct.**
6    Q.   That you did not obtain any documents,
7    from any third parties?
8    **A.   Correct.**
9    Q.   You did not, in any way, obtain
10   Mr. Thompson's side of the story, so to speak?
11   **A.   Correct.**
12   Q.   That the first time you attempted to talk
13   to Mr. Thompson about this was at approximately
14   11:30 p.m. by randomly knocking on his door when he
15   wasn't home, correct?
16   **A.   Correct.**
17   Q.   In other words, you never called him,
18   emailed him, anything along those lines, correct?
19   **A.   No.**
20   Q.   Are you aware that he's a longtime
21   resident of Manchester?
22   **A.   I did not know that.**
23   Q.   Is it fair to say you did not look on
24   case.net, at all, to see if there was any litigation
25   over the ownership of the bike?

79

1    **A.   No.**
2    Q.   And is it fair to say that you did not --
3    and remember, this is all prior to the bike leaving,
4    contact the Missouri Department of Revenue, to
5    attempt to obtain title information, regarding the
6    bike?
7    **A.   Not at 11:00 a.m. -- not at 11:00 p.m. at**
8    **night.**
9    Q.   What did you do, after Ms. Elmore and
10   Mr. Mackenzie were allowed, by law enforcement, to
11   leave with the bike?
12        MS. ROBERTSON:  Objection,
13   mischaracterizes the testimony and evidence.  You
14   can answer if you know.
15   **A.   I went in service.**
16   Q.   (BY MR. GELFAND)  And just to be clear, in
17   kind of simple English, did you leave Mr. Thompson's
18   residence?
19   **A.   Yes.  I left his residence.**
20   Q.   And by going in service, meaning you
21   responded to other calls or --
22   **A.   Correct.**
23   Q.   -- went to the station or whatever it is
24   you did?
25   **A.   Correct.**

80

1    Q.   Later that night, technically, the
2    following morning, but within a very short period of
3    time, did you, at any point, return to
4    Mr. Thompson's house?
5    **A.   Yes.**
6    Q.   Approximately when?
7    **A.   I don't -- I don't know the time, but I**
8    **know we went back there.**
9    Q.   When you say we went back there, who went
10   back there?
11   **A.   Officer Gerholdt was dispatched and then I**
12   **think I was dispatched, as the assist officer again.**
13   Q.   Were any other officers or employees of
14   the Manchester Police Department present?
15   **A.   Sergeant Waters responded later.**
16   Q.   Okay.  So before we get to Sergeant Waters
17   responding later, is it fair that initially, the
18   same two officers, meaning you and Officer Gerholdt,
19   returned to the house?
20   **A.   Correct.**
21   Q.   Mr. Thompson's house?
22   **A.   Correct.**
23   Q.   Approximately how much time had passed
24   from the moment you left to the moment you were
25   dispatched to return?

81

1    A.  I couldn't tell you.  I don't know.  I
2  can't recall.
3    Q.  Minutes?  Hours?
4    A.  I don't know.
5    Q.  Okay.
6    A.  I mean, it was right between my workout
7  time.  So I couldn't tell you if it was before or
8  after.
9    Q.  I didn't understand what you're saying.
10  Right between your workout time?
11    A.  Yeah.  I work out every day, when I'm on
12  duty at 11:30 to 12:30.  Or if I'm on call, 12:30 to
13  1:30.  So I couldn't tell you exactly what time that
14  day.
15    Q.  Okay.  But it was the same shift?
16    A.  Yes.  Same shift.
17    Q.  Why did you return?
18    A.  Because Mr. Thompson was wanting to report
19  his motorcycle stolen.
20    Q.  And in fact, you're aware that
21  Mr. Thompson called the police?
22    A.  Yes.
23    Q.  Is it fair to say, as you understood it,
24  he comes home, he sees the motorcycle missing.  He
25  has no clue what had previously transpired?

82

1    A.  Correct.
2    MS. ROBERTSON:  Objection, calls for
3  speculation.
4    A.  Yes.
5    Q.  (BY MR. GELFAND)  When you return, who
6  arrives first, from law enforcement?
7    A.  Officer Gerholdt.
8    Q.  And approximately how soon thereafter did
9  you arrive?
10    A.  I'd say minutes.
11    Q.  What happened, when you arrived back at
12  Mr. Thompson's residence?  Let's back up.  I'm
13  sorry.
14    When you arrived back at Mr. Thompson's
15  residence, you're in your same police vehicle, same
16  police uniform?
17    A.  Yes.
18    Q.  Did you activate your dash cam?
19    A.  No.
20    Q.  Did you activate your body cam?
21    A.  No.
22    Q.  At that time, were you responding to a
23  theft of a motor vehicle call?
24    A.  Yes.
25    Q.  So why didn't you activate your body cam

83

1  or dash cam?
2    A.  Because we were there previously.  So we
3  had history there.  We knew what had happened.
4    Q.  What happened, when you showed up?
5    A.  Mr. Thomas (sic) was furious and outraged
6  that his motorcycle wasn't there.  When I --
7    Q.  Let's back up for a second.  When you
8  arrived, did you exit your police vehicle?
9    A.  Yes.
10    Q.  Where did you make contact with
11  Mr. Thompson?
12    A.  On his front porch.
13    Q.  Was he waiting for you?
14    A.  I think he was -- he was already talking
15  to Officer Gerholdt.
16    Q.  What, if anything, did Mr. Thompson convey
17  to you?
18    A.  He just said it was -- he was angry --
19  upset.  It was bull crap.  His motor -- we let
20  somebody take his motorcycle.  He was also on the
21  phone, with another police department agency,
22  because I heard the dispatch on the phone.
23    And then he proceeded to go in and get the
24  original title for the bike, which he gave to me,
25  and I provided it to Officer Gerholdt.

84

1    Q.  And you reviewed the documents that
2  Mr. Thompson provided you, correct?
3    A.  Correct.
4    Q.  And what did those reveal?
5    A.  They revealed that he was the owner of the
6  bike, possibly.  But it was never registered to him.
7    Q.  Let's back up.  Is it fair to say that --
8  let's back up.
9    Before Mr. Thompson went into his house,
10  to go retrieve documents, which we'll get to, in a
11  second, what, if anything, did you tell Mr. Thompson
12  about what had transpired?
13    A.  I didn't tell him anything.  He was
14  already on the phone.
15    Q.  What, if anything, did Officer Gerholdt
16  tell Mr. Thompson in your presence?
17    A.  I have no idea.
18    Q.  What, if anything, did Mr. Thompson say,
19  in your presence, either to you or to
20  Officer Gerholdt, before he went into the house?
21  I'm just trying to break up what happened when.
22    A.  And I said that already, I thought.  He
23  just said that his motorcycle was gone and he had to
24  go in and get the title.
25    Q.  And did you permit him to go in and get

85

1    the title?
2        A.   I didn't stop him.  Yeah.
3        Q.   But --
4        A.   He wasn't --
5        Q.   -- to be blunt, that made sense, right?
6    To have him go get the title?
7        A.   I mean, if he wanted to get the title, to
8    show proof, yeah.
9        Q.   Is it fair to say you guys welcomed that?
10       A.   Huh?
11       Q.   You guys welcomed that?
12       A.   You say welcomed that?
13       Q.   Yeah.  You welcomed him to go inside the
14   house, to go get the title and show you proof.
15       A.   I mean, he was -- he wasn't detained or
16   anything.  He was free to do whatever he wanted.
17       Q.   Well, did you want to see the title?
18       A.   Did I?
19       Q.   Yeah.
20       A.   I mean, I was curious, yeah, at the time.
21       Q.   I'm going to mark as Exhibit 6 a series of
22   documents.
23           (WHEREIN, Plaintiff's Exhibit No. 6 was
24           marked for identification.)
25       MS. ROBERTSON:  Thanks.

86

1        Q.   (BY MR. GELFAND) Can you please tell me
2    if you recognize Exhibit 6?  I'll just make this
3    very clear, for purposes of our record.  The top
4    page.
5        A.   I mean --
6        Q.   And the second page?  In other words, back
7    and front.
8        A.   This possibly could have been the title
9    that Mr. Thompson provided me, that I gave
10   Officer Gerholdt.
11       Q.   My question for you is was it or wasn't
12   it?  Just the top two pages, front and back.
13       A.   I believe this is.  Yes.
14       Q.   Okay.  And would you agree with me, if we
15   look at the second page of this, MPD0029 at the
16   bottom.
17       A.   Uh-huh.
18       Q.   Do you see that?
19       A.   Yeah.
20       Q.   That clearly indicates that Mr. Thompson
21   purchased the motorcycle from Nathan Rench, correct?
22       MS. ROBERTSON:  Objection, calls for a
23   legal conclusion.  You can answer if you know.
24       A.   I'd say somebody purchased it from him.
25   But what date did he purchase it on?

87

1        Q.   (BY MR. GELFAND)  We'll get to that, in a
2    second.  But do you see where it says Ray Thompson
3    as the purchaser and Nathan Rench as the seller?
4        A.   Correct.
5        Q.   Okay.  And do you see where it says date
6    of sale?
7        A.   Yep.
8        Q.   And what does it say for date of sale?
9        A.   March 30th, 2020.
10       Q.   Would you agree that was approximately two
11   and a half years prior to that date?
12       A.   Correct.
13       Q.   And this referred to a Harley Davidson
14   2003, correct?
15       A.   Yes.
16       Q.   And this was the same VIN number that
17   we're talking about, correct?
18       A.   Yes.
19       Q.   And if we go later on -- if we go to
20   MPD0032, do you see a check, from Mr. Thompson to
21   Mr. Key, paying off a lien in connection with this?
22       A.   I've never seen this.
23       Q.   Let's back up.
24       A.   I mean, I see the check, but who -- I
25   don't know who Jim Key is.

88

1        Q.   Well, if we look at what Mr. Thompson gave
2    you, in MPD0029, do you see Mr. Key as the lien
3    release?
4        A.   Oh, lienholder.
5        Q.   Do you see that?
6        A.   Yes.
7        Q.   And then finally, do you see a check from
8    Mr. Thompson, on Page MPD0033, from Mr. Thompson to
9    Nathan Rench, for the 2003 Harley Davidson Trike in
10   the amount of $2,366.37?
11       A.   Yes.
12       Q.   So is it fair to say that the first time
13   you ever talked to Mr. Thompson, he provided you
14   documents, within minutes, that at least on their
15   face, establish his ownership of the Harley
16   Davidson --
17       MS. ROBERTSON:  Objection, calls for --
18       Q.   (BY MR. GELFAND)  -- that was parked in
19   his back yard?
20       MS. ROBERTSON:  Calls for a legal
21   conclusion.
22       Q.   (BY MR. GELFAND)  Is that accurate?
23       A.   Yes.
24       Q.   Okay.  Did that surprise you?
25       MS. ROBERTSON:  Objection, calls for

Joshua Cockrell - December 4, 2023

---

89

1  speculation.
2  **A.  It didn't surprise me.**
3  Q.  (BY MR. GELFAND)  Why not?
4  **A.  Because I wasn't the officer making**
5  **decisions on that call.  So I provided it to the**
6  **reporting officer.**
7  Q.  When you provided it to Officer Gerholdt
8  -- is that who you mean by the reporting officer?
9  **A.  Correct.**
10  Q.  When you provided it to Officer Gerholdt,
11  what, if anything, did he say?
12  **A.  I think, at that time, he had a supervisor**
13  **respond.  That's when Sergeant Waters responded.**
14  Q.  Did Officer Gerholdt, when you handed this
15  to him, say anything, at all, to you, about his
16  reaction?
17  **A.  No.**
18  Q.  Then what happened at the house?
19  **A.  When Officer Waters arrived on scene, I**
20  **was told to leave.**
21  Q.  You were told to leave by who?
22  **A.  By Officer -- by Sergeant Waters.**
23  Q.  Did you observe Sergeant Waters engage in
24  any communication with Mr. Thompson?
25  **A.  Yes.**

---

90

1  Q.  Describe, if you would, what you observed.
2  **A.  I -- I couldn't tell you.  My window was**
3  **rolled up.  But I just seen him walking up towards**
4  **the front of his residence, where Mr. Thompson was.**
5  **And I assumed they were talking.**
6  Q.  But you couldn't hear anything?
7  **A.  Nope.**
8  Q.  Did you hear Mr. -- I'm sorry,
9  Sergeant Waters -- is that his title, sergeant?
10  **A.  Uh-huh.**
11  Q.  Sergeant Waters engage in any
12  communication with Officer Gerholdt?
13  **A.  I did not hear.**
14  Q.  Did you and Officer Gerholdt ever
15  subsequently discuss what had happened?
16  A.  No.
17  Q.  Ever?
18  A.  No.
19  Q.  So at no point back at the station or a
20  day or two later or weeks later?
21  **A.  No.  Because he was -- he was tied up on**
22  **trying to get it solved.**
23  Q.  To get what solved?
24  **A.  To get the case solved or whatever they**
25  **did afterwards.  I couldn't tell you.  I distanced**

---

91

1  **myself from it.  He was working with detectives and**
2  **the supervisor.**
3  Q.  For how long?
4  MS. ROBERTSON:  Objection, calls for
5  speculation.
6  **A.  I couldn't tell you.**
7  Q.  (BY MR. GELFAND)  Did he ever ask your
8  assistance?
9  **A.  No.**
10  Q.  Did anyone else ever ask for your
11  assistance?
12  **A.  No.**
13  Q.  I'm going to show you what I am marking as
14  Exhibit 7.
15  (WHEREIN, Plaintiff's Exhibit No. 7 was
16  marked for identification.)
17  Q.  (BY MR. GELFAND)  Do you have Exhibit 7 in
18  front of you?
19  **A.  I do.**
20  Q.  Does Exhibit 7 appear to be an email from
21  me to a bunch of lawyers and to police at
22  manchestermo.gov?
23  MS. ROBERTSON:  Hold on.  I'm just going
24  to object to questioning on this.  Lack of
25  foundation.  This officer is not copied on this

---

92

1  email.  He's never seen it.
2  MR. GELFAND:  That's not what I'm asking,
3  though.
4  MS. ROBERTSON:  This is asking for a legal
5  conclusion.  I'm just making my objection.
6  MR. GELFAND:  That's fine.
7  **A.  I've never seen this.**
8  Q.  (BY MR. GELFAND)  Okay.  That wasn't my
9  question.  Do you see an email address,
10  police@manchestermo.gov at the top?
11  **A.  Yes.**
12  Q.  As the recipient of an email dated
13  11/14/2022, at 9:29 a.m.?
14  **A.  Yes.**
15  MS. ROBERTSON:  And I don't want to -- I
16  don't want to keep interrupting you.  This whole
17  line of questioning, same objection to foundation.
18  Okay?
19  MR. GELFAND:  If you're asking whether you
20  can have a standing objection, sure.
21  MS. ROBERTSON:  Yeah.  I'm asking for a
22  running objection.
23  MR. GELFAND:  Sure.
24  **A.  I said yes.**
25  Q.  (BY MR. GELFAND)  Okay.  Do you recognize

---

93

1  that email address?
2     **A.  I do not.**
3     Q.  If you go to the second page, do you see a
4  letter dated November 14th, 2022?
5     **A.  Yes.**
6     Q.  And is that the same date as the email?
7     **A.  Yes.**
8     Q.  Do you know who Paul Rost is?
9     **A.  No.**
10    Q.  Do you know who Aaron Seal is?
11    **A.  No.**
12    Q.  Do you know who receives email at
13  police@manchestermo.gov?
14    **A.  It depends.  Depends on who you click on.**
15  **You can't just send it to mopolice.gov, because**
16  **our -- our email don't work like that.**
17    Q.  Is that your testimony?
18    **A.  Yes.**
19    Q.  So when an email is sent to that address,
20  it sounds like you know about this.  What happens?
21    **A.  I would imagine it just goes to a blank**
22  **folder.**
23    Q.  Are you aware, and you may not be, but are
24  you aware that that's the email address on the
25  Manchester Police Department public website?

94

1     **A.  It could be, but I'm not aware of it.**
2     Q.  In this letter, do you see a request to
3  preserve, meaning not destroy, body cam footage and
4  dash cam footage, among other documents?
5     **A.  Yes.**
6     Q.  Have you ever seen this letter?
7     **A.  No.**
8     Q.  Did anyone in or after November 14th of
9  2022, ask you to make any efforts to preserve
10  evidence, in connection with this case?
11    MS. ROBERTSON:  Hold on.  Hold on.  Same
12  objection as this running objection.  But also
13  because city attorneys are copied on this email, I
14  have to object to attorney client privilege and work
15  product.  And I don't know what his answer is to
16  this.  So --
17    THE WITNESS:  I can answer?
18    MS. ROBERTSON:  Well, can we go off the
19  record, for a second?
20    MR. GELFAND:  Sure.
21    (WHEREIN, a discussion was held off the
22    record.)
23    (WHEREIN, a brief break was taken.)
24    Q.  (BY MR. GELFAND)  Officer, we're back from
25  a break.  You understand you're still testifying

95

1  under oath?
2     **A.  Yes.**
3     Q.  Officer, I don't really remember the last
4  question I asked you.  So we're going to strike it,
5  if there was a question pending.  And I want to just
6  start right now.
7     At -- without getting into any specific
8  conversations that any lawyer representing you or
9  the City of Manchester Police Department has had
10  with you, has anyone on earth, prior to today, ever
11  asked you to make any effort to personally preserve
12  the items that are listed in Exhibit --
13    **A.  Seven?**
14    Q.  -- 7?
15    **A.  No.**
16    Q.  Okay.  Now, I want to show you a couple of
17  photos and mark -- I was just going to do this
18  one-by-one, but I'll just give you a stack.
19    MS. ROBERTSON:  All right.
20    MR. GELFAND:  I'm going to mark this top
21  photo as Exhibit 8.
22    (WHEREIN, Plaintiff's Exhibit No. 8 was
23    marked for identification.)
24    Q.  (BY MR. GELFAND)  Just ask you the
25  simplest question of the whole depo.  Is that the

96

1  house that you responded to, on the night of October
2  22nd of 2022?
3     **A.  Yes.**
4     Q.  If we look at Exhibit 8, you testified
5  earlier that when you arrived at the residence, you
6  initially walked up, after some initial discussions,
7  to the front door --
8     **A.  Correct.**
9     Q.  -- is that correct?  And then you
10  testified that you entered the -- and we'll get to
11  some more detailed pictures, in a few minutes, but
12  that you entered, basically, the gated back yard?
13  Or gated enclosure of Mr. Thompson's residence,
14  correct?
15    **A.  Yes.**
16    Q.  How did you physically walk into the back
17  yard, if we look at this photo?
18    **A.  I walked -- Officer Gerholdt took the left**
19  **side and I walked on the right side.**
20    Q.  Of what?
21    **A.  The Jeep.**
22    Q.  Okay.  So you both walked down the
23  driveway that's reflected -- there's only one
24  driveway in this photo, correct?
25    **A.  Correct.**

Joshua Cockrell - December 4, 2023

97

1    Q.   You both walked down the driveway,
2 correct?
3    A.   Correct.
4    Q.   And -- I'll describe this in a second, for
5 the record.  But Officer Gerholdt is on the left
6 side, where I just drew that arrow, correct?
7    A.   Correct.
8    Q.   Essentially the driver's side of the Jeep?
9    A.   Uh-huh.
10    Q.   And you're on the right side, the
11 passenger side of the Jeep.
12    A.   Correct.
13    Q.   Okay.  And obviously, this was nighttime,
14 correct?
15    A.   Correct.
16         (WHEREIN, Plaintiff's Exhibit No. 9 was
17         marked for identification.)
18    Q.   (BY MR. GELFAND)  I'm going to show you
19 Exhibit 9.  Do you have Exhibit 9 in front of you?
20    A.   Yep.  Yes.
21    Q.   Do you recognize who is depicted, at least
22 in part, in Exhibit 9?
23    A.   Yes.
24    Q.   And who is that?
25    A.   Officer Gerholdt.

98

1    Q.   Now, if we look at Exhibit 9 and you have
2 a color copy, correct?
3    A.   Correct.
4    Q.   Do you see a -- first of all, is
5 Officer Gerholdt, in this exhibit, wearing a police
6 vest, that is virtually identical to the one you're
7 wearing today, in your deposition?
8    A.   Correct.
9    Q.   And it says Gerholdt and then his DSN
10 number, 5375?
11    A.   Yes.
12    Q.   Just to the left, in the photo, of where
13 it says Gerholdt, so to the right on his body, do
14 you see a device that appears to be a body camera?
15    A.   Yes.
16    Q.   And do you recognize what that device is,
17 based on your training and experience, as a
18 Manchester police officer?
19    A.   Yes.
20    Q.   Is that, in fact, a body camera?
21    A.   Yes.
22    Q.   And was that, in fact, generally speaking,
23 the make and model of the body cameras that were
24 assigned to you, on October 22nd of 2022?
25    A.   Yes.  Watchguard.

99

1    Q.   If we see the lighting that you previously
2 testified to --
3    A.   Uh-huh.
4    Q.   -- would you agree with me that in
5 Exhibit 9 -- is that what this is?
6    A.   Yep.
7    Q.   Exhibit 9?  That the body camera lights
8 for green and red are on?
9    A.   I cannot answer that.  Lighting.
10    Q.   Meaning you cannot see, in that photo,
11 whether it appears to be on?
12    A.   Correct.
13    Q.   Okay.  If, in fact, a jury were to find
14 that those lights are on, in that photo, as you
15 previously testified, does that indicate that it is
16 recording?
17         MS. ROBERTSON:  Hold on.  Objection.
18 Object to form, compound, vague, calls for
19 speculation, assumes facts not in evidence.
20         MR. GELFAND:  I'll ask a different
21 question.
22    Q.   (BY MR. GELFAND)  If -- when the green
23 light and the red light, depicted in Exhibit 9, are
24 on, does that indicate it's recording?
25    A.   Yes.

100

1    Q.   Okay.
2         (WHEREIN, Plaintiff's Exhibit No. 10 was
3         marked for identification.)
4    Q.   (BY MR. GELFAND)  I want to show you
5 Exhibit 10.  Can you tell me -- ignoring what's
6 marked in blue, on Exhibit 10, if you recognize the
7 place depicted on Exhibit 10?
8    A.   Say it -- repeat.
9    Q.   Sure.  Ignoring -- there's an X and an
10 O --
11    A.   Correct.
12    Q.   -- on Exhibit 10 that appears to be
13 drawings.
14    A.   Uh-huh.
15    Q.   Ignoring that --
16    A.   Uh-huh.
17    Q.   -- can you tell me if you recognize the
18 place, that is depicted on Exhibit 10?
19    A.   Correct.
20    Q.   And what is that place?
21    A.   It looks like Mr. Thompson's back yard.
22    Q.   And so to be clear, you've testified,
23 throughout the course of this deposition, that
24 certain events happened in a place, that you've
25 described as either Mr. Thompson's back yard or the

**101**

1  enclosed back portion of his property, correct?
2  **A.  Yes.**
3      Q.  Does Exhibit 10 depict that place?
4  **A.  Yes.**
5      Q.  In other words, that's where it happened,
6  correct?
7  **A.  Yes.**
8      Q.  Okay.  Sometimes, we lawyers make things
9  unnecessarily complicated.
10 **A.  Agree.**
11     Q.  Where was the bike, when it was parked,
12 before it was removed, when you and Officer Gerholdt
13 first entered what is depicted in Exhibit 10?
14 **A.  I'd say it would be right here, up by that**
15 **water spot.**
16     Q.  Can you draw it and initial it, on Exhibit
17 10?
18 **A.  (Complying.)**
19     Q.  So just to be clear, so we have a clear
20 record, you just, at my request, drew a circle.  And
21 I understand you're approximating.  And then wrote
22 JCC5349.  I assume that's your DSN?
23 **A.  Correct.**
24     Q.  And JCC are your initials?
25 **A.  Yes.**

**102**

1      Q.  Okay.
2      MS. ROBERTSON:  Can I -- I can't quite see
3  what he drew, from here.
4      MR. GELFAND:  Sure.
5      MS. ROBERTSON:  Okay.  Thanks.
6      Q.  (BY MR. GELFAND)  So is it fair to say
7  that the circle, that you depicted, represents
8  approximately where the bike was parked?
9  **A.  Approximately.  Yes.**
10     Q.  Okay.  Would you agree with what is
11 clearly within the enclosed privacy fence?
12 **A.  Yes.**
13     Q.  I'm going to show you what I'm marking as
14 Exhibit 11.
15     (WHEREIN, Plaintiff's Exhibit No. 11 was
16     marked for identification.)
17     Q.  (BY MR. GELFAND)  I'm sorry.  Before we
18 get to Exhibit 11, if you go back to Exhibit 10.
19 Where were you standing, when you observed
20 Officer Gerholdt check the VIN number on this bike?
21 **A.  On here?**
22     Q.  Yes.
23 **A.  I was standing at a vantage point.  So I**
24 **was probably right over here in this area, where I**
25 **could still see the windows.**

**103**

1      Q.  So right near the front right tire of the
2  Jeep, that is currently depicted in the photo, even
3  though there wasn't a Jeep there then?
4  **A.  I'd say right -- about right there.**
5      Q.  Can you put an X and initial that there?
6  Just something to differentiate, though.
7  **A.  (Complying.)**
8      Q.  So just to be clear, for the record, the X
9  followed by JCC5349, as opposed to the O followed by
10 JCC5349, depicts where you were physically standing
11 in the back yard?
12 **A.  Correct.**
13     Q.  Okay.  Clearly within the privacy fence,
14 correct?
15 **A.  Yes.**
16     Q.  And would you agree with me that if we
17 look at the privacy fence, that's depicted in this
18 photo, it's a fairly tall privacy fence?
19     MS. ROBERTSON:  Objection, calls for
20 speculation, vague.  Object to form.
21 **A.  It depends on -- I mean, tall for me, yes,**
22 **because I'm short.  But for Officer Gerholdt, it**
23 **would be short for him, because he's tall.**
24     Q.  (BY MR. GELFAND)  How tall are you?
25 **A.  Five-seven.**

**104**

1      Q.  Okay.  If -- is it fair to say that when
2  this is closed, you -- at five-seven, you can't see
3  over the privacy fence?
4  **A.  Yes.**
5      Q.  Okay.  How tall is Officer Gerholdt?
6  **A.  Six -- six-two, six-three, I think.**
7      Q.  I'm going to leave this here.  Now, if you
8  look at Exhibit 11, do you have that in front of
9  you?
10 **A.  I do.**
11     Q.  Now, I will represent to you that Exhibit
12 11 represents a vantage point from -- essentially
13 depicting the front of the gate from the driveway;
14 is that accurate?
15 **A.  Yes.**
16     Q.  As opposed to the prior exhibits, which
17 were from the other angle, correct?
18 **A.  Yes.**
19     Q.  Okay.  To get to what is depicted on
20 Exhibit 10, that you previously just testified to,
21 did you have to cross the threshold of what is
22 depicted, the fence, the gate, in Exhibit 11?
23 **A.  Yes.**
24     Q.  Do you know anything about Harley
25 Davidsons?

Joshua Cockrell  -  December 4, 2023

---

105

1    A.  No.
2    Q.  Based on everything you did, in connection
3  with this case, do you have any firsthand knowledge
4  about the particular make and model of the Harley
5  Davidson, that you observed, on October 22nd of
6  2022, and that Ms. Elmore and Mr. Mackenzie left
7  with, on that date?
8        MS. ROBERTSON: Object to form, vague.
9    A.  No.
10    Q.  (BY MR. GELFAND) For example, do you have
11  any knowledge as to what the fair market value of it
12  would be or anything along those lines?
13    A.  I do not.
14    Q.  Any knowledge about what it would cost to
15  fix damage on it?
16    A.  No.
17    Q.  Are you a motorcycle guy?
18    A.  I'm not a Harley guy.
19    Q.  Are you another motorcycle guy?
20    A.  Crotch rockets.
21    Q.  Do you own any motorcycles?
22    A.  As of now, no.
23    Q.  Have you ever owned any motorcycles?
24    A.  Yes.
25    Q.  How many?

---

106

1    A.  Probably five or six.
2    Q.  Has it been a passion of yours?
3    A.  No.
4    Q.  Do you enjoy riding your motorcycles?
5    A.  Before I had my daughter, yes.
6    Q.  Meaning that -- putting aside safety
7  concerns, it's fun?
8    A.  It is.
9    Q.  When you observed the Harley Davidson, in
10  Mr. Thompson's back yard, on October 22nd of 2022,
11  before it was removed, did you observe any custom
12  parts on the vehicle?
13        MS. ROBERTSON: Objection, calls for
14  speculation.
15    A.  I -- no.  I didn't pay attention to it.
16    Q.  (BY MR. GELFAND) Meaning you wouldn't
17  have known, one way or the other?
18    A.  I mean, I would have known if I seen
19  something custom on it, but no.  I didn't pay
20  attention to it.
21    Q.  Okay.  So just to be clear, you're not
22  saying that it didn't have any custom parts.  You're
23  just saying you didn't pay attention?
24    A.  Correct.
25    Q.  So it might have, it might not have?

---

107

1    A.  Correct.
2    Q.  How would you describe the condition of
3  the Harley Davidson that you observed that night?
4        MS. ROBERTSON: Objection, vague, calls
5  for speculation.
6    A.  Just from the looks of it, it was pretty
7  dusty, like it hasn't been -- like it hasn't been
8  rode in a while.  That's the only thing I remember
9  from it.  And it had three wheels.
10    Q.  (BY MR. GELFAND) Have you ever rented a
11  motorcycle?
12        MS. ROBERTSON: Objection, relevance.
13    Q.  (BY MR. GELFAND) Have you ever rented a
14  motorcycle?
15    A.  Yes.
16    Q.  Like on vacation?
17    A.  Florida, every year.
18    Q.  If you recall, approximately what does it
19  cost to rent a motorcycle per day?
20        MS. ROBERTSON: Objection, calls for
21  speculation.
22    A.  I'd say down there, it was $750 deposit
23  and then hourly, it's 200 bucks an hour.
24    Q.  (BY MR. GELFAND) Prior to the removal of
25  the motorcycle, from Mr. Thompson's back yard, did

---

108

1  law enforcement provide Mr. Thompson with notice or
2  a hearing?
3        MS. ROBERTSON: Objection, asked and
4  answered.
5    Q.  (BY MR. GELFAND) You can answer.
6    A.  No.
7    Q.  At any time, when you interacted with
8  Mr. Thompson -- let's back up for a second.
9        I asked you about two times that you
10  responded to Mr. Thompson's house and you testified
11  about both of them, you know, within a short period
12  of one another, correct?
13    A.  Yes.
14    Q.  And both of those times related to this
15  single Harley Davidson motorcycle, that you've
16  testified about, what this lawsuit is about,
17  correct?
18    A.  Yes.
19    Q.  The first time Mr. Thompson wasn't there.
20  The second time Mr. Thompson had initiated the call
21  reporting his bike stolen, correct?
22    A.  Yes.
23    Q.  Have you ever interacted with
24  Mr. Thompson, at any other time?
25    A.  No.

---

Joshua Cockrell  -  December 4, 2023

28 (Pages 109 to 112)

---

109

1    Q.  Have you ever responded to his house, at
2  any other time?
3    **A.  No.  Not that I can remember.**
4    Q.  At any time, during your interactions with
5  Mr. Thompson, in connection with the motorcycle, did
6  you tell him anything along the lines of we are the
7  police, we can go anywhere, we can't trespass?
8    **A.  No.**
9    Q.  At any time, during your interactions with
10  Mr. Thompson, in connection with the motorcycle that
11  you've testified about, that's the subject of the
12  lawsuit, did any other law enforcement, in your
13  presence, tell Mr. Thompson anything along the lines
14  of we are the police, we can go anywhere, we can't
15  trespass?
16    **A.  Not to my knowledge.**
17    Q.  When Ms. Elmore and Mr. Mackenzie left
18  Mr. Thompson's back yard with the motorcycle, did
19  you observe how they drove it out?
20    **A.  Yes.**
21    Q.  How did they drive it out?
22    **A.  Elmore -- Mr. Elmore got on it and drove**
23  **it.  And he squeezed right past the Jeep and the**
24  **fence.**
25    Q.  So I'm sorry.  When you say -- so there

---

110

1  was a Ms. Elmore and Mr. Mackenzie --
2    **A.  Okay.  Mackenzie.**
3    Q.  That's fine.  But I'm saying -- I just
4  want to clarify.  Was it the male person that was
5  there --
6    **A.  It was the male that drove.  Yes.  He was**
7  **the one that got it started.**
8    Q.  And where was Ms. Elmore?
9    **A.  Watching.**
10    Q.  From where?
11    **A.  The back yard.**
12    Q.  Where were you, when Mr. Mackenzie drove
13  out of the back yard into the driveway?
14    **A.  I was still in the back, where I circled**
15  **on Exhibit 10.**
16    Q.  Where was Mr. Gerholdt --
17  Officer Gerholdt?
18    **A.  I don't recall.  He should have still been**
19  **in the back yard.**
20    Q.  So you believe he was in the back yard?
21  You just don't recall where, in the back yard, he
22  was?
23    **A.  Yeah.**
24    Q.  Okay.  Did you observe Mr. Mackenzie make
25  contact with Mr. Thompson's physical property --

---

111

1    **A.  No.**
2    Q.  -- while riding the motorcycle?
3    **A.  No.**
4    Q.  Did you observe Mr. Mackenzie leave the
5  premises with the motorcycle?
6    **A.  Yes.**
7    Q.  In other words, drive it onto the street
8  or wherever he went from there?
9    **A.  Yep.**
10    Q.  And then what did Ms. Elmore do?
11    **A.  She got into the vehicle that they drove**
12  **down the road, which I think was a Ford, silver in**
13  **color, gray in color, Ford Escape, and drove off.**
14    Q.  Immediately after Mr. Mackenzie left?
15    **A.  Well, no.  They sat there in the street**
16  **and he said he had to go get gas.  And she followed**
17  **him to the gas station.**
18    Q.  And is -- at that time, what, if anything,
19  did you and/or Officer Gerholdt do?
20    **A.  I just said it was going to be a cold ride**
21  **and that was it.**
22    Q.  And who did you say that to?
23    **A.  Mackenzie.**
24    Q.  What did he say?
25    **A.  Nothing.  Just laughed.**

---

112

1    Q.  Are you aware, as you sit here today, that
2  Ms. Elmore is not actually Mr. Rench's daughter?
3    **A.  I did not know that.**
4    Q.  Are you aware, as you sit here today, that
5  Mr. Mackenzie is not actually related to Mr. Rench?
6    **A.  I did not know that.**
7    Q.  Does that surprise you?
8    **A.  With the story they told, no.**
9    Q.  Why not?
10    **A.  I don't know.  I mean, if you go -- if you**
11  **go all the way to make the police believe that your**
12  **father was handicapped and his three-wheel trike got**
13  **stolen, I would believe that they probably didn't**
14  **know him.  And you provide falsified documents.  So**
15  **yes.  I believe -- I believe they probably don't**
16  **know each other.**
17    Q.  When Mr. Mackenzie and Ms. Elmore left on
18  the Harley Davidson, that belonged to Mr. Thompson,
19  did you consider Manchester Police Department's
20  investigation into the matter complete?
21    **A.  My position, yes.  I felt like my**
22  **assistance was no longer needed.**
23    Q.  At that time, you had been a law
24  enforcement officer for a number of years, correct?
25    **A.  Yes.**

---

Joshua Cockrell - December 4, 2023

113

1      Q.  As of October of 2022, had you personally
2  conducted investigations into matters?
3      **A.  No.**
4      Q.  Have you ever investigated a crime?
5      **A.  Yes.  But not into these matters.**
6      Q.  No.  I'm talking about just generally.
7      **A.  Yes.**
8      Q.  Approximately how many investigations have
9  you participated in?
10        MS. ROBERTSON:  Objection, calls for
11  speculation.
12     **A.  I couldn't tell you.  At least 12 or 15,**
13  **within this year.**
14     Q.  (BY MR. GELFAND)  And prior to October
15  2022, you had participated in a number of
16  investigations, correct?
17     **A.  Yes.**
18     Q.  Have you ever considered an investigation
19  complete, without attempting to get both sides of
20  the story?
21        MS. ROBERTSON:  Object to form, vague,
22  calls for speculation.
23     Q.  (BY MR. GELFAND)  You can answer.
24     **A.  No.  There's always two sides to a story.**
25     Q.  Now, if we look back, finally, at your

114

1  interrogatory responses, which is Exhibit 1.  Can
2  you pull that?
3        MS. ROBERTSON:  Justin, did you mark this?
4        MR. GELFAND:  No.  Well, it's in a packet.
5        MS. ROBERTSON:  Okay.
6      Q.  (BY MR. GELFAND)  You answered a number of
7  questions -- and I can go through them one by one,
8  but I think you'll appreciate me just summing this
9  up, about whether you've ever been the subject of
10  any sort of discipline, as a law enforcement
11  officer.  Do you recall that?
12     **A.  Yes.**
13     Q.  And your answer was no, correct?
14     **A.  Yes.**
15     Q.  Is that still your answer today?
16     **A.  Yes.**
17     Q.  Similarly, you answered that you had never
18  previously been a party to any lawsuit, correct?
19     **A.  Yes.**
20     Q.  Is that still your answer today?
21     **A.  Well --**
22     Q.  Other than this lawsuit?
23     **A.  -- other than this one, yes.**
24     Q.  So to be clear, you've never been sued,
25  correct?

115

1      **A.  Correct.**
2      Q.  Have you ever testified in a case?  We'll
3  just start there, for a second.
4      **A.  Yes.**
5      Q.  In court?
6      **A.  Yes.**
7      Q.  Was that all in connection with criminal
8  cases that you investigated?
9      **A.  Yes.**
10     Q.  Have you ever testified -- in other words,
11  putting that aside -- that's a topic that we're not
12  going to get into -- have you ever testified in any
13  proceeding, in court or otherwise, in connection
14  with anything, other than a criminal case that you
15  investigated?
16     **A.  No.**
17     Q.  You used the phrase in your
18  interrogatories, keep the peace.
19     **A.  Correct.**
20     Q.  What does that mean to you?
21     **A.  Means to make sure -- make sure the**
22  **parties are not arguing and to make sure another**
23  **officer goes home to their family.**
24     Q.  Were you present, when Officer Gerholdt
25  communicated with Sergeant Waters?

116

1      **A.  I was there, when he arrived.  Yes.  Did I**
2  **hear what they communicated?  No.  Because I was**
3  **told to leave.**
4      Q.  So I asked an imprecise question.  In the
5  first time, that you showed up, when Officer -- when
6  Sergeant Waters wasn't there, there was a phone
7  call?
8      **A.  Correct.**
9      Q.  Were you present, to hear
10  Officer Gerholdt's --
11     **A.  No.**
12     Q.  -- side of that phone call?
13     **A.  Nope.**
14     Q.  So is it fair to say that you don't know
15  what, if anything, was actually conveyed --
16     **A.  Correct.**
17     Q.  -- to Sergeant Waters?
18     **A.  He makes his phone calls in his vehicle.**
19     Q.  Officer Gerholdt does?
20     **A.  Uh-huh.**
21     Q.  Are you friends with Officer Gerholdt?
22     **A.  No.**
23     Q.  Okay.  Have you ever hung out socially?
24     **A.  No.  I don't have an issue with him.  I**
25  **just --**

Joshua Cockrell - December 4, 2023

---

117

1    Q.  I understand.
2    **A.  I worked with him briefly.**
3    Q.  Is he still at the department?
4    **A.  Yes.**
5    Q.  Did you work together frequently, at this
6  time?
7    **A.  Who was -- I was under Waters, until I got**
8  **transferred.  I don't know how many -- it wasn't**
9  **long.  I think four or five months.**
10   Q.  In response to Interrogatory No. 18 -- and
11  we touched on this and I think I know your answer,
12  but just to be clear, you wrote that Ms. Elmore and
13  Mr. Mackenzie produced the key to the motorcycle,
14  which started it.
15   **A.  Yes.**
16   Q.  And I'm not critical of what you said
17  here.  I don't really care.  I just want to get --
18  is it more accurate to say that they claimed they
19  had a key?
20   **A.  I -- I -- I'm sticking to -- I could have**
21  **swore he pulled a key out of his pocket and he got**
22  **on top of the motorcycle and he put it in and that's**
23  **what he started it with.**
24   Q.  And that's --
25   **A.  Because I heard keys -- I heard keys**

---

118

1  **jingling that night.  I remember that.  But I was**
2  **still looking up at the house, as they were doing**
3  **what they were doing with the motorcycle.**
4    Q.  And that's what you assumed?
5    **A.  So I can assume -- yes.  He started it**
6  **with a key.**
7    Q.  This said that a record search was
8  consistent with statements made by Ms. Elmore and
9  Mr. Mackenzie.
10   **A.  Correct.**
11   Q.  What was the record search?
12   **A.  The VIN.**
13   Q.  Describe in detail, if you would, what you
14  mean by that.  What search did you conduct?
15   **A.  The vehicle identification, which is the**
16  **VIN, was conducted on the vehicle -- or on the**
17  **motorcycle, which came back to being Nathan Rench's**
18  **motorcycle.**
19   Q.  When you saying being his motorcycle --
20   **A.  It was still registered in his name.**
21   Q.  Did you do any investigation, to determine
22  why the registration hadn't been changed?
23   **A.  No.**
24      MS. ROBERTSON:  Objection.  Objection.
25  assumes facts not in evidence.

---

119

1    Q.  (BY MR. GELFAND)  So bottom line, I
2  understand there's some things that -- that we
3  disagree with, but I think there's a couple of
4  things we agree with.  And I want to make sure that
5  that's accurate.
6       We agree that you entered Mr. Thompson's
7  back yard that night, correct?
8    **A.  Yes.**
9    Q.  We agree that you did so without a search
10  warrant, correct?
11   **A.  Yes.**
12   Q.  And we agree that you did so under the
13  community caretaking exception, that you described
14  in your interrogatories, correct?
15   **A.  Yes.**
16   Q.  We agree that Mr. Thompson's Harley
17  Davidson was parked in the gated enclosure, when you
18  arrived on the scene, correct?
19   **A.  Open gated enclosure.  Yes.**
20   Q.  When you say open, meaning you're claiming
21  the gate to the enclosure was open?
22   **A.  Yes.  It was, because that's the only way**
23  **we could see that -- that Officer Gerholdt saw the**
24  **motorcycle.**
25   Q.  Sitting here today, do you have any idea

---

120

1  who opened it?
2    **A.  That, I don't know.**
3    Q.  And Officer Gerholdt was already present,
4  when you arrived, correct?
5    **A.  Correct.**
6    Q.  And when you left, the motorcycle was no
7  longer parked on the premises, because Mr. Mackenzie
8  rode off with it, correct?
9    **A.  Yes.**
10      MR. GELFAND:  I don't believe I have any
11  further questions.  Give me one minute, if you
12  would, with my client, just off the record.
13      MS. ROBERTSON:  Yeah.  Let's take a quick
14  break.
15      MR. GELFAND:  That sounds great.
16       (WHEREIN, a brief break was taken.)
17      MR. GELFAND:  I have no further questions
18  for you, Officer Cockrell.  Thank you for your time.
19  Your lawyer may have some questions for you and now,
20  it's her turn.
21      THE WITNESS:  Okay.
22      MS. ROBERTSON:  Briefly, I do.  Just a
23  few.
24           EXAMINATION
25  QUESTIONS BY MS. ROBERTSON:

---

Joshua Cockrell  -  December 4, 2023

---

121

1    Q.  Officer Cockrell, on October 22nd of 2022,
2  when you responded to Mr. Thompson's residence, you
3  made contact with Amara Elmore and Steven Mackenzie?
4    **A.  Yes.**
5    Q.  And they told you some things?
6    **A.  Yes.**
7    Q.  Did you believe what they told you?
8    **A.  I did.  I did.  I did believe their story.**
9  **I mean --**
10    Q.  Why?
11    **A.  I don't know.  It's -- the story they told**
12  **is that their dad was handicapped, that he'd been in**
13  **the hospital and he loves riding, but the motorcycle**
14  **was missing.  And that the friend, which was**
15  **Mr. Thomas (sic), had had it for six months.**
16         **And then after we go over everything and**
17  **then go back to the back yard, I look at the**
18  **motorcycle.  I figured that the story was true,**
19  **because to me, most people that ride trikes are**
20  **usually women or older people, that are overweight**
21  **or just have a problem with riding motorcycles, in**
22  **general, that are two wheels.  So I believed -- I**
23  **believed the story that they told.**
24    Q.  A few more questions.  Is there anything
25  else Amara Elmore or Steven Mackenzie said, that

---

122

1  evening, that we haven't discussed?
2    **A.  I'd say yes.  The one thing that wasn't**
3  **brought up, but I don't know if Officer Gerholdt**
4  **would or not, is I remember is that when we were**
5  **there, after he ran the VIN and it came back still**
6  **registered to -- I can't think of his name now.**
7    Q.  Mr. Rench?
8    **A.  Yeah.  Mr. Rench.  They told us -- they**
9  **were like we could show you where the bike is.  You**
10  **can see it from over here.  If you want us to go**
11  **back there, we can show you.  If not, we can have a**
12  **tow truck respond, to have the bike removed.**
13    Q.  Did they -- did they indicate whether that
14  would have been like a commercial tow truck or
15  something else?
16    **A.  They did not.  They just said they'd have**
17  **a tow truck respond.  And I guess the guy -- he said**
18  **he used to work for a tow company.  So he knows a**
19  **lot -- a lot of people.**
20    Q.  Okay.  And Mr. Gelfand showed you a few
21  pictures of Mr. Thompson's residence and -- do you
22  have Exhibit 8?
23    **A.  Somewhere.  Exhibit 9, Exhibit 8.**
24    Q.  And on Exhibit 8, that's Mr. Thompson's --
25  or that's the residence you responded to, on October

---

123

1  22nd, 2022, correct?
2    **A.  Yes.**
3    Q.  Is there a driveway depicted in that
4  photograph?
5    **A.  Yes.**
6    Q.  And is there then a vehicle in the
7  driveway?
8    **A.  Yes.**
9    Q.  Okay.  Now, we can't see, from the
10  photograph, what's in front of that vehicle, which
11  is kind of -- would you agree that looks like a
12  Jeep?
13    **A.  Yes.**
14    Q.  And you would agree we can't quite see
15  what's in front of it, from this photograph?
16    **A.  Yes.**
17    Q.  Okay.  But you have been there, correct?
18    **A.  Yes.**
19    Q.  And do you know what's in front of the
20  vehicle?
21    **A.  Yes.**
22    Q.  Okay.  What's in front of it?
23    **A.  There's a fence that leads to the back**
24  **yard, where a garage is.**
25    Q.  Is there a gate in front of where that

---

124

1  vehicle is?
2    **A.  Yes.**
3    Q.  And when you -- when you arrived, was the
4  gate open?
5    **A.  Yes.**
6    Q.  Did you open it?
7    **A.  No.**
8    Q.  Did anyone in your presence open it?
9    **A.  No.**
10    Q.  Is -- does -- Mr. Thompson's driveway is
11  paved?  Yes?
12    **A.  Yes.**
13    Q.  Does that paving extend through the gate
14  into the back yard?
15    **A.  I would say yes, because it extends**
16  **through and then goes around, to where it meets up**
17  **at the garage.**
18    Q.  Okay.  And looking at Exhibit No. 8, I
19  guess our left side of the house, as we look at
20  this, there's -- to the right of the Jeep, there's a
21  window?
22    **A.  Uh-huh.**
23    Q.  Do you see what I'm talking about?
24    **A.  Uh-huh.**
25    Q.  Is that a yes?

---

Joshua Cockrell  -  December 4, 2023

---

125

1    A.  Yes.
2    Q.   Do you -- is that the garage you were
3 referring to?
4    A.  I think so.  Or if there -- I don't know
5 if that -- it was a weird design back there.  I'm
6 pretty -- I think there was a garage, that was right
7 behind the house, because I know there was a patio.
8 But I don't know what that is.  I don't know if
9 that's just a side piece to the house or what.  But
10 there could have been a little one-car garage in the
11 back.
12    Q.   Could you look at Exhibit No. 10?  And do
13 you see, in Exhibit No. 10, where the -- where the
14 gate is?
15    A.  Yeah.
16    Q.   Okay.  Where is the gate?
17    A.  The gate is to the -- in the left corner.
18    Q.   And could you mark that, with a star, for
19 me and initial it?
20    A.  (Complying.)
21    Q.   And so when we were just talking about the
22 driveway, in Exhibit No. 8 --
23    A.  Uh-huh.
24    Q.   -- where you have just marked a star, is
25 that where that driveway continues, in Exhibit No.

---

126

1 10?
2    A.  Yes.
3    Q.   And when -- when we've been using the term
4 back yard, throughout your deposition, is -- is the
5 star, that we just discussed, encompassed in what
6 you've referred to as the back yard?
7    A.  Yes.
8    Q.   Is it your understanding that
9 Officer Gerholdt ran the vehicle identification
10 number, for the motorcycle through dispatch?
11    A.  Yes.
12    Q.   And when -- in your training and
13 experience, as a law enforcement officer, in your
14 normal course of dealings, what does that mean?
15    A.  That means when he does that, it brings up
16 a record through DOR.  It will tell you who the
17 actual owner is and when the last time it was
18 registered or reregistered.
19    Q.   And DOR means the Department of Revenue?
20    A.  Yes.
21       MS. ROBERTSON:  I don't think I have any
22 more questions.
23       FURTHER EXAMINATION
24 QUESTIONS BY MR. GELFAND:
25    Q.   I have a few follow-ups, based on what you

---

127

1 were just asked.
2       You were asked, a few minutes ago, by your
3 lawyer, whether you believed the story that
4 Ms. Elmore and Mr. Mackenzie provided to law
5 enforcement; is that correct?
6    A.  Yes.
7    Q.   At the time, that you were there, on
8 October 22nd of 2022, before the bike was removed
9 from the premises, did you believe that it was your
10 role, as law enforcement, to determine which side to
11 believe, when property is in dispute?
12    A.  At that time, it wasn't my -- at that
13 time, I did not.
14    Q.   Would you agree with me that based on the
15 policies that we reviewed, it's the role of a Court
16 to decide that, not the role of law enforcement?
17       MS. ROBERTSON:  Objection, calls for a
18 legal conclusion.
19    A.  I agree.
20    Q.   (BY MR. GELFAND)  Now, you were asked a
21 number of questions about a -- the possibility of a
22 -- or the offer of a tow company coming.
23    A.  Uh-huh.
24    Q.   Throughout the entire time that you dealt
25 with this motorcycle and interacted with the people

---

128

1 that you've testified about today --
2    A.  Uh-huh.
3    Q.   -- was there ever a tow company involved?
4    A.  No.
5    Q.   Was there ever a tow truck involved?
6    A.  No.
7    Q.   So not withstanding statements by
8 Mr. Mackenzie -- when you say that guy said he used
9 to work for a tow company, are you referring to
10 Mr. Mackenzie?
11    A.  Mr. Mackenzie.  Yes.
12    Q.   So -- and to be clear, you don't even know
13 whether that's true, right?
14    A.  No.
15    Q.   Fair to say Mr. Mackenzie has some honesty
16 issues?
17    A.  Agree.
18    Q.   So regardless of whether that's true or
19 untrue, that Mr. Mackenzie has friends in the tow
20 business or whatever it was he was trying to
21 suggest, the bottom line is, he just rode the bike
22 off, right?
23    A.  Yes.  After an investigation was done.  A
24 minor investigation was done on it.
25    Q.   By law enforcement?

---

Joshua Cockrell - December 4, 2023

129

1    A.  By law enforcement.  Correct.
2    Q.  And the two people present, before that
3  happened, at the scene for law enforcement, were you
4  and Officer Gerholdt, correct?
5    A.  Yes.
6    Q.  Okay.  Now, finally, you were shown
7  Exhibit 8, the picture, and asked some questions
8  about the driveway, correct?
9    A.  Yes.
10    Q.  And you were asked and I believe you
11  testified, that in front of the Jeep, in that photo,
12  the Google Maps photo -- let's be clear, for a
13  second.
14        Exhibit 8 is a Google Maps photo on a date
15  that's different from the date you showed up,
16  correct?
17    A.  Correct.
18    Q.  And so it generally depicts the property,
19  but it doesn't necessarily depict where certain
20  vehicles and trash cans and other things were, on
21  that night, correct?
22    A.  Correct.
23    Q.  Okay.  But the bottom line is --
24    A.  Well, that Jeep was parked there, like
25  that, that night.

130

1    Q.  Okay.  Meaning just coincidentally --
2    A.  Yeah.
3    Q.  -- even though it's a different date,
4  correct?
5    A.  Correct.
6    Q.  And you see the date on the top left
7  corner --
8    A.  Yep.
9    Q.  -- of the picture?
10    A.  June of '23.
11    Q.  Okay.  Now, the bottom line, though, is
12  what really -- if I understood the question and your
13  answer correctly, what you're really saying is that
14  when you arrived, the entire back yard is enclosed,
15  but there's a gate that was open, before you got
16  there, correct?
17    A.  Yes.
18    Q.  And you testified that you have no idea
19  who opened it, how it was opened, correct?
20    A.  Yes.
21    Q.  And you would agree with me that one of
22  the possibilities is that Officer Gerholdt opened
23  it?
24        MS. ROBERTSON:  Objection, calls for
25  speculation.

131

1    A.  I disagree on that.
2    Q.  (BY MR. GELFAND)  How do you know that, if
3  you weren't there the whole time?
4    A.  I was -- because the first -- I was there
5  probably two minutes behind.  And he was -- he was
6  getting the story before anything.  So by the time
7  he got -- by the time I arrived on scene, he was
8  still getting the story.  So he didn't go anywhere.
9  And he was right by his vehicle.
10    Q.  Do you know whether Ms. Elmore opened the
11  gate?
12    A.  I do not.
13    Q.  Do you know whether Mr. Mackenzie opened
14  the gate?
15    A.  I do not.
16    Q.  Would you agree with me that that's a
17  possibility?
18    A.  Possibility.  Yeah.
19    Q.  These are people that you now know are
20  willing to do some pretty crazy stuff, right?
21    A.  True.
22    Q.  Do you believe that as a law enforcement
23  officer, you can enter a person's gated enclosure,
24  if the gate is open?
25        MS. ROBERTSON:  Object to form, vague,

132

1  calls for speculation.
2    A.  Yes.
3    Q.  (BY MR. GELFAND)  So just to be clear, you
4  believe that if you're driving down a street --
5    A.  Not just -- go ahead.
6    Q.  You're driving down a street and you see
7  the equivalent of Mr. Thompson's driveway and house
8  and the gate is open, you can just walk back into
9  the back yard?
10        MS. ROBERTSON:  Same objection.
11    Q.  (BY MR. GELFAND)  Is that your testimony?
12    A.  Yes.
13    Q.  Without a warrant?  Is that your
14  testimony?
15        MS. ROBERTSON:  Same objection.
16    A.  Yes.
17    Q.  (BY MR. GELFAND)  What's your
18  understanding of what gives you the right to go into
19  someone's back yard, just because the gate is open?
20    A.  It would either be a call of service or an
21  investigative stop.  If I'm patrolling at night and
22  I see somebody's gate open, that's usually never
23  open, I'm going to go back there, to see if somebody
24  -- if they left it open or if something's going on
25  back there, that shouldn't be going on.

133

1    Q.   Had you driven by this house before?
2    A.   Never.
3    Q.   So do you know whether the gate was
4  normally open or closed?
5    A.   No.
6    Q.   Do you understand, Officer, that you can't
7  just walk into someone's back yard?
8        MS. ROBERTSON:  Objection, argumentative,
9  calls for a legal conclusion.
10   A.   Repeat.
11   Q.   (BY MR. GELFAND)  Do you understand,
12  Officer, that you can't just walk into someone's
13  back yard?
14       MS. ROBERTSON:  I'm going to object to
15  form, vague, calls for a legal conclusion,
16  argumentative, assumes facts not in evidence.  You
17  can answer if you know.
18   A.   I disagree with you on that.
19       MR. GELFAND:  I have no further questions.
20  Thank you.
21       FURTHER EXAMINATION
22  QUESTIONS BY MS. ROBERTSON:
23   Q.   I have one -- one -- one question.
24  Officer Cockrell, in your training and experience,
25  as a law enforcement officer, do criminals usually

134

1  call the police, to come watch, before they do
2  something like steal a vehicle?
3    A.   They -- no.
4        MS. ROBERTSON:  No further questions.
5        MR. GELFAND:  I can't resist.
6        FURTHER EXAMINATION
7  QUESTIONS BY MR. GELFAND:
8    Q.   In your experience, as a law enforcement
9  officer, do police officers generally investigate
10  all of the facts, before jumping to conclusions?
11       MS. ROBERTSON:  Object to -- object to
12  form, vague, assumes facts not in evidence,
13  speculation.
14   A.   Most officers.
15   Q.   (BY MR. GELFAND)  Is that what happened
16  here?
17       MS. ROBERTSON:  Same objection.
18   Q.   (BY MR. GELFAND)  You can answer the
19  question.  You know the answer to this question.
20   A.   I don't know what happened.
21   Q.   You were there.
22   A.   Yeah.  I was there and with the facts and
23  information that was given, I think the right
24  decision was made, at that time.
25   Q.   Even as you sit here today --

135

1    A.   At that time.
2    Q.   -- no regrets?
3    A.   I don't have any regrets.  My name's not
4  even on the report.  I don't have no regrets.
5    Q.   I was going to ask you about that.  Why is
6  your name nowhere on the report, when you're one of
7  two people who were there?
8        MS. ROBERTSON:  Objection, calls for
9  speculation.
10   Q.   (BY MR. GELFAND)  You can answer that
11  question.
12   A.   Because I had nothing to do with the
13  decisions that was made.  Do you think it would be
14  fair to put your name on a report, if you were just
15  there for safety reasons?  Now, if I made a decision
16  on something or did something, I agree that I should
17  be in the report and do a supplement.
18   Q.   Well, let's talk about that, for a second.
19  Can you please go to the report?  I think it's
20  Exhibit 4.  Did I get the exhibit number correctly?
21   A.   Yeah.
22   Q.   Are you familiar with the general form of
23  Manchester Police Department Investigative, slash,
24  Offense Reports?
25   A.   Yes.

136

1    Q.   On the front page, there's a list of
2  officers, including their names, identification
3  numbers, and roles, correct?
4    A.   Yes.
5    Q.   Would you agree that this lists various
6  officers down to Al Gerholdt?
7    A.   Yes.
8    Q.   And it includes, when somebody arrives on
9  scene, when somebody departs the scene, so on and so
10  forth, correct?
11   A.   Yes.
12   Q.   Why are you nowhere listed on there?
13       MS. ROBERTSON:  Objection, calls for
14  speculation.
15   A.   Because I was assist officer.
16   Q.   (BY MR. GELFAND)  Based on your training
17  and experience, as a Manchester Police Department
18  officer, is it your testimony that when an officer
19  is physically present, they should not be in that
20  part?
21       MS. ROBERTSON:  Objection, vague, calls
22  for speculation.
23   A.   At times they are needed, they should be
24  entered in.  But when they were just standing by, to
25  keep the peace, no.

137

1    Q.  (BY MR. GELFAND)  And finally, when you
2  just used the phrase -- and I think I asked you this
3  before, but I'll just ask you again.  When you used
4  the phrase standing by and keeping the peace, that's
5  all in connection with what you call the community
6  caretaker exception, correct?
7    A.  Correct.
8        MR. GELFAND:  Thank you.  I have no
9  further questions.
10       MS. ROBERTSON:  Nothing further.
11       MR. GELFAND:  Okay.  Officer --
12       MS. ROBERTSON:  We'll review and sign.
13           (WHEREIN, the deposition was concluded.)
14
15
16
17
18
19
20
21
22
23
24
25

138

1        CERTIFICATE OF REPORTER
2  STATE OF MISSOURI      )
                           )  ss.
3  CITY OF ST. LOUIS      )
4    I, Sheila Field, do hereby certify that
5  pursuant to Notice, there came before me at
6  Reichardt Noce & Young, 12444 Powerscourt Drive,
7  Suite 160, in the City of St. Louis, State of
8  Missouri,
9        JOSHUA COCKRELL,
10  who was by me first duly sworn to tell the whole
11  truth of his knowledge touching the matter in
12  controversy aforesaid; that the witness was examined
13  on the day and place in that first aforesaid, and
14  the examination was taken by voice shorthand and
15  later reduced to typewriting; that the signature of
16  the deponent was reserved by agreement of counsel,
17  and the deposition is herewith returned.
18    IN WITNESS WHEREOF, I have hereunto set my hand
19  and seal this 17th day of December, 2023.
20
21
22
23           /s/ Sheila Field
24           Sheila Field, CCR
25

139

1        FIELD REPORTING SERVICES
2  P.O. Box 252092        St. Louis, MO 63125
3  314-461-2122      Federal ID No. 92-1238320
4  --------------------------------------------------------
5  December 17, 2023
6  Reichardt Noce & Young
    12444 Powerscourt Drive, Suite 160
7  St. Louis, Missouri 63131
    Attn: Catherine Robertson
8
   In re: Raymond Thompson v. Joshua Cockrell, et al
9
   Dear Ms. Robertson:
10
   Please find enclosed your copy of the deposition of
11  Joshua Cockrell, taken in the above-styled cause on
   December 4, 2023.  Also enclosed is the original
12  signature page and errata sheet.
13  Please have the witness read your copy of the
   transcript, indicate any changes and/or corrections
14  desired on the errata sheet, and sign the signature
   page before a Notary Public.
15
   Please return the errata sheets and notarized
16  signature to Mr. Gelfand, for filing, prior to the
   trial date.
17
   If you have any questions or concerns, please do not
18  hesitate to contact me.  Thank you in advance for
   your cooperation.
19
   Sincerely,
20
21
   Sheila Field
22  CCR No. 1226
23  CC: Justin Gelfand
24
25

140

1    SIGNATURE PAGE OF JOSHUA COCKRELL
2      UNITED STATES DISTRICT COURT
3      EASTERN DISTRICT OF MISSOURI
4         EASTERN DIVISION
5  RAYMOND THOMPSON,      )
                           )
6      Plaintiff,    )
                      )
7  v.            )Cause No.: 4:23-cv-133-SRW
                 )
8  JOSHUA COCKRELL, et al, )
                           )
9      Defendant.    )
10
11    I, JOSHUA COCKRELL, do hereby certify that
12  I have read the foregoing deposition given by me
13  before Sheila Field, Certified Court Reporter in and
14  for the State of Missouri on December 4, 2023.
15
16
17  _____
18      JOSHUA COCKRELL
19
20  Subscribed and sworn to before me this
21  _____ day of _____, 20_____.
22  My commission expires_____.
23
24  _____
25      Notary Public

Joshua Cockrell  -  December 4, 2023

141

```
 1          JOSHUA COCKRELL
 2             ERRATA
 3  In re:  RAYMOND THOMPSON v. JOSHUA COCKRELL, et al
 4  Upon reading the deposition and before subscribing
 5  thereto, the deponent requested the following:
 6  Page      Line    Should Read:
 7  Reason for Change:
 8  Page      Line    Should Read:
 9  Reason for Change:
10  Page      Line    Should Read:
11  Reason for Change:
12  Page      Line    Should Read:
13  Reason for Change:
14  Page      Line    Should Read:
15  Reason for Change:
16  Page      Line    Should Read:
17  Reason for Change:
18  Page      Line    Should Read:
19  Reason for Change:
20  Page      Line    Should Read:
21  Reason for Change:
22  Page      Line    Should Read:
23  Reason for Change:
24  _____
25          Signature of Witness
```

Joshua Cockrell  -  December 4, 2023

**A**

**a.m** 79:7 92:13
**Aaron** 93:10
**ability** 11:13,17
    11:25
**able** 34:8 59:10
    64:24 75:13
**above-entitled**
    3:23
**above-styled**
    139:11
**academic** 8:7
**academy** 8:10
**access** 12:5,8
    41:12
**accurate** 10:17
    14:4,8 28:2
    32:10 88:22
    104:14 117:18
    119:5
**accurately** 67:11
**acknowledge**
    31:22
**acted** 67:3
**activate** 40:17,23
    82:18,20,25
**actual** 78:2
    126:17
**address** 15:6
    65:25 66:6 92:9
    93:1,19,24
**advance** 139:18
**advise** 48:13,13
    48:15
**advised** 50:1
**affidavits** 10:18
    13:15
**aforesaid** 138:12
    138:13
**afternoon** 3:16
**age** 5:2
**agencies** 11:7
**agency** 83:21
**ago** 29:25 33:20
    127:2
**agree** 10:5,7,22

12:18 13:1 14:7
    36:21,25 37:10
    37:16,23 50:11
    50:14 51:1,13
    60:13,19 65:20
    66:17 67:14
    68:8 71:18 72:2
    74:25 75:25
    86:14 87:10
    99:4 101:10
    102:10 103:16
    119:4,6,9,12,16
    123:11,14
    127:14,19
    128:17 130:21
    131:16 135:16
    136:5
**agreed** 4:13 61:3
**agreement** 4:19
    138:16
**ahead** 132:5
**al** 1:8 3:8 136:6
    139:8 140:8
    141:3
**allow** 53:23
**allowed** 59:17,23
    59:23 79:10
**Amara** 14:24
    30:22 72:17
    121:3,25
**amount** 88:10
**and/or** 16:18
    111:19 139:13
**angle** 104:17
**angry** 83:18
**announce** 20:15
**announced** 35:6
**answer** 6:3,16 7:3
    11:2 12:24 13:8
    13:10 24:2
    26:17 32:9,18
    33:9 34:12
    35:23 37:5,14
    38:11 41:23
    42:12 43:17,24
    47:11 51:5,18

52:10 54:5
    58:24 66:25
    71:25 73:2 76:4
    76:25 79:14
    86:23 94:15,17
    99:9 108:5
    113:23 114:13
    114:15,20
    117:11 130:13
    133:17 134:18
    134:19 135:10
**answered** 20:20
    108:4 114:6,17
**answers** 2:9 40:9
**anybody** 19:25
    23:10 24:2
    30:10,13 35:2
**anybody's** 24:1,4
**appear** 39:21
    55:12 91:20
**appears** 49:23
    98:14 99:11
    100:12
**applicable** 66:19
**applied** 74:15
    75:1
**applies** 74:4
**apply** 11:14,25
    37:2,12 61:12
    67:12
**applying** 74:9
**appreciate** 114:8
**approach** 24:7
**approached**
    41:25
**approaches** 24:6
**appropriate** 11:5
    11:6 12:3,4
    41:15
**approved** 11:14
**approximately**
    9:20 15:16,23
    20:24 25:2
    32:16 69:6
    78:13 80:6,23
    82:8 87:10

102:8,9 107:18
    113:8
**approximating**
    101:21
**area** 102:24
**arguing** 115:22
**argumentative**
    59:4 133:8,16
**armed** 26:1
**arrests** 7:7
**arrival** 19:16
**arrive** 82:9
**arrived** 16:10,13
    16:17,23 19:19
    26:9 50:10 69:7
    71:13 82:11,14
    83:8 89:19 96:5
    116:1 119:18
    120:4 124:3
    130:14 131:7
**arrives** 82:6
    136:8
**arriving** 50:25
**arrow** 97:6
**aside** 106:6
    115:11
**asked** 19:16,17
    42:15,24,25
    43:1 95:4,11
    108:3,9 116:4
    127:1,2,20
    129:7,10 137:2
**asking** 45:7 51:12
    76:14 92:2,4,19
    92:21
**asks** 5:21
**assigned** 7:4
    98:24
**assist** 64:24 80:12
    136:15
**assistance** 36:15
    36:18 91:8,11
    112:22
**associate's** 8:12
**associates** 8:8
**assume** 6:4 70:10

101:22 118:5
**assumed** 90:5
    118:4
**assumes** 37:4
    38:10 54:2 60:3
    66:23 70:6 71:4
    71:22 99:19
    118:25 133:16
    134:12
**attempt** 11:17
    48:6 79:5
**attempted** 78:12
**attempting**
    113:19
**attention** 14:10
    106:15,20,23
**Attn** 139:7
**attorney** 94:14
**attorneys** 94:13
**author** 57:7
**authority** 42:17
    43:6
**authorized** 64:9
    74:22
**available** 12:20
    13:5,12,13
**Avenue** 4:3
**aware** 13:20 50:1
    57:17 66:4
    78:20 81:20
    93:23,24 94:1
    112:1,4

**B**

**B** 2:7 49:21 75:12
**back** 17:14 18:9
    20:2 22:7,10
    23:9,11,15
    24:10,12,14,15
    24:21 25:1,3
    29:25 30:6,8
    31:17,23 33:1,5
    34:7,8,19 35:2
    35:17,20 36:5
    36:14,17,22
    37:1,11,19

42:16 43:5 47:4
47:16 50:8,11
50:16,18 54:22
59:8 60:8 64:25
67:25 69:2
73:15 80:8,9,10
82:11,12,14
83:7 84:7,8
86:6,12 87:23
88:19 90:19
94:24 96:12,16
100:21,25 101:1
102:18 103:11
106:10 107:25
108:8 109:18
110:11,13,14,19
110:20,21
113:25 118:17
119:7 121:17,17
122:5,11 123:23
124:14 125:5,11
126:4,6 130:14
132:8,9,19,23
132:25 133:7,13
**background** 8:7
**backyard** 23:3
**badge** 71:15
**Ballpark** 9:21
**based** 24:15
29:23 33:16,24
57:23,24 60:11
61:15 75:14,15
77:13 98:17
105:2 126:25
127:14 136:16
**basically** 7:15,22
33:11,13 96:12
**basis** 31:3 52:5
52:14
**Bates** 46:9 56:14
60:10 65:9 66:2
**bearings** 24:20
**beginning** 47:6
56:23
**behalf** 1:13 3:14
5:3

**believe** 35:21
36:3 51:21
67:23 75:6
86:13 110:20
112:11,13,15,15
120:10 121:7,8
127:9,11 129:10
131:22 132:4
**believed** 121:22
121:23 127:3
**belonged** 112:18
**benefit** 5:8 27:13
71:19 72:6
**best** 21:13 26:24
32:10,11 41:19
49:11
**better** 25:13
**bike** 19:13 38:24
61:22,24 62:1,7
77:6,12,19,20
77:21,23 78:25
79:3,6,11 83:24
84:6 101:11
102:8,20 108:21
122:9,12 127:8
128:21
**Black** 56:25
**blank** 93:21
**blinking** 42:6
**blue** 100:6
**blunt** 85:5
**body** 27:4,6,11
28:7,11,19,20
28:21,25 29:3,8
40:17,22 41:4
41:12,20,24
42:8 82:20,25
94:3 98:13,14
98:20,23 99:7
**Bonhomme** 4:3
**bother** 59:2
**bottom** 43:16
56:15 76:16
86:16 119:1
128:21 129:23
130:11

**Box** 1:23 139:2
**bread** 76:2
**break** 46:21 47:3
47:5,7 84:21
94:23,25 120:14
120:16
**brief** 47:3 94:23
120:16
**briefly** 14:13
117:2 120:22
**brings** 126:15
**broadly** 7:20
**brought** 122:3
**bucks** 107:23
**bull** 83:19
**bunch** 91:21
**bureau** 11:7
**business** 128:20
**butter** 76:2
**button** 29:5,6
**buying** 77:23

_____

## C

**C** 4:1 43:17
**C-H-A-R-L-E-S**
5:12
**C-O-C-K-R-E-...**
5:12
**C2** 75:18
**call** 7:16,18 11:9
11:10,11 15:19
27:1 28:21
32:23,25 37:18
37:20 38:2,8
40:23 54:7 61:6
64:17 81:12
82:23 89:5
108:20 116:7,12
132:20 134:1
137:5
**called** 19:3 78:17
81:21
**calling** 52:21 69:1
**calls** 7:3 8:4
12:23 24:23
25:4 27:9,17

28:18 31:18
33:7 34:12
35:11,22 37:4
38:9 40:24
41:22 42:19
49:3 51:5 52:8
52:9 54:3,3
58:23 62:11
66:24,24 68:6,7
70:5 71:3,5,21
71:23 73:1 75:2
75:3 79:21 82:2
86:22 88:17,20
88:25 91:4
99:18 103:19
106:13 107:4,20
113:10,22
116:18 127:17
130:24 132:1
133:9,15 135:8
136:13,21
**cam** 26:11,13,15
26:25 28:7,11
28:21 29:3
82:18,20,25
83:1 94:3,4
**camera** 27:4,6,11
28:19,20,25
29:8 40:22 41:4
41:13,20,21,24
42:9 98:14,20
99:7
**cameras** 40:17
98:23
**cans** 129:20
**capacity** 9:7
**car** 64:17,20,22
64:25 67:20,24
**care** 20:11 32:8
117:17
**caretaker** 43:19
137:6
**caretaking**
119:13
**carried** 60:11
**cars** 71:13

**case** 12:4,11 13:3
13:4,15,18,23
32:1,4 37:22
41:6 50:5 61:6
64:12 65:3
66:18 90:24
94:10 105:3
115:2,14
**case.net** 78:24
**cases** 10:24 76:9
115:8
**Catherine** 4:9
139:7
**cause** 1:7 3:7,20
37:1,11 65:5,11
75:14 76:1
139:11 140:7
**caveat** 42:5
**CC** 139:23
**CCR** 1:20 4:16
138:24 139:2
**CD** 41:9
**certain** 3:20
10:24 28:18
100:24 129:19
**CERTIFICATE**
138:1
**Certified** 3:19
4:16 140:13
**certify** 138:4
140:11
**Change** 141:7,9
141:11,13,15,17
141:19,21,23
**changed** 118:22
**changes** 139:13
**Charles** 5:10 8:9
**check** 33:21 36:6
77:22 87:20,24
88:7 102:20
**children** 11:8
**circle** 101:20
102:7
**circled** 110:14
**circumstance**
12:19

Joshua Cockrell  -  December 4, 2023

circumstances
  35:21 36:1,4,12
  61:13 65:15
  74:21
city 6:21,24 7:2
  9:19 15:11 65:6
  65:14 94:13
  95:9 138:3,7
claimed 60:14
  117:18
claiming 27:21
  119:20
claims 27:15
clarify 61:9 110:4
Class 8:11
clean 47:17
clear 13:20 24:19
  28:24 36:10
  50:8 54:15
  59:12,22 60:13
  60:23 62:6
  64:12 70:17
  79:16 86:3
  100:22 101:19
  101:19 103:8
  106:21 114:24
  117:12 128:12
  129:12 132:3
clearly 86:20
  102:11 103:13
click 93:14
client 94:14
  120:12
closed 104:2
  133:4
clue 81:25
Cockrell 1:8,12
  3:8,13 5:1,11,12
  23:21 25:19
  26:5 120:18
  121:1 133:24
  138:9 139:8,11
  140:1,8,11,18
  141:1,3
coincided 30:5
coincidentally

130:1
cold 111:20
colleagues 13:18
College 8:9
color 53:14 56:25
  98:2 111:13,13
come 14:23 15:1
  15:4,16 21:7,10
  21:14 134:1
comes 81:24
coming 127:22
commercial
  122:14
commission
  140:22
communicated
  62:14,17 70:11
  70:12 115:25
  116:2
communication
  69:19 89:24
  90:12
community 7:5
  8:9 43:18
  119:13 137:5
company 60:20
  60:21 122:18
  127:22 128:3,9
complete 6:15,16
  14:8 65:23 66:5
  66:12 112:20
  113:19
complicate 58:5
complicated
  101:9
Complying
  101:18 103:7
  125:20
compound 34:11
  99:18
comprehensive
  40:8
concerns 106:7
  139:17
concluded 21:1
  21:25 52:6,15

137:13
conclusion 31:3
  35:23 42:20
  51:5 52:9 54:3
  66:24 68:7 71:4
  71:24 72:12
  75:3 86:23
  88:21 92:5
  127:18 133:9,15
conclusions
  134:10
condition 107:2
conduct 11:17
  44:6 75:1
  118:14
conducted 75:16
  113:2 118:16
conducting 75:6
confusion 55:25
connection 13:15
  13:18 18:25
  25:1 26:25 32:1
  75:22 87:21
  94:10 105:2
  109:5,10 115:7
  115:13 137:5
consent 4:19
  36:23
consider 112:19
considered
  113:18
consistent 14:4
  44:7 60:25
  61:11,14,18
  118:8
consistently 67:4
Constitution
  75:17
contact 14:23
  15:1,4,17 16:18
  16:20 21:7,10
  21:14 22:8 79:4
  83:10 110:25
  121:3 139:18
contest 47:7
continues 22:22

125:25
contract 60:12,14
controversy
  138:12
conversation
  18:13
conversations
  95:8
convey 16:22
  83:16
conveyed 16:24
  116:15
cooperation
  139:18
copied 91:25
  94:13
copy 19:23 39:9
  39:10 40:3
  45:16 46:24
  63:20,24 64:1
  98:2 139:10,13
corner 125:17
  130:7
correct 8:2 11:15
  11:18,22,23,24
  12:1,7,13,16,17
  15:11,12,14
  17:19 18:11
  19:14 20:5,14
  21:3 23:22
  24:11,17,18,21
  28:3 29:2,10,19
  40:12,19 41:18
  45:25 46:2,3
  47:19,20,25
  48:1,4,7,8,18
  50:6,20,21,23
  50:24 51:9
  54:18 56:9
  59:14,15,25
  60:17 61:6
  62:15,17,18
  63:18,19 64:10
  64:21 65:1 66:8
  66:10 67:13
  68:4,5 69:14,17

69:19,20 70:4,8
  70:9,16,25 71:9
  71:16 73:24,25
  74:5,10,11,13
  74:14,17,18
  75:8,19,20,23
  76:3,10,12,13
  77:2,4,14,25
  78:1,5,8,11,15
  78:16,18 79:22
  79:25 80:20,22
  82:1 84:2,3
  86:21 87:4,12
  87:14,17 89:9
  96:8,9,14,24,25
  97:2,3,6,7,12,14
  97:15 98:2,3,8
  99:12 100:11,19
  101:1,6,23
  103:12,14
  104:17 106:24
  107:1 108:12,17
  108:21 112:24
  113:16 114:13
  114:18,25 115:1
  115:19 116:8,16
  118:10 119:7,10
  119:14,18 120:4
  120:5,8 123:1
  123:17 127:5
  129:1,4,8,16,17
  129:21,22 130:4
  130:5,16,19
  136:3,10 137:6
  137:7
corrections
  139:13
correctly 13:21
  43:8,13,22
  45:24 49:22
  50:3 59:18
  65:18 130:13
  135:20
Correspondence
  2:15
cost 105:14

Joshua Cockrell  -  December 4, 2023

107:19
**Cottagemill**
21:21 55:17
**counsel** 2:21 4:14
4:14,19 138:16
**couple** 6:7 56:11
95:16 119:3
**course** 5:15 12:16
50:5 100:23
126:14
**court** 1:1 3:1,19
3:21 4:16 5:8
6:8 49:12,15,18
49:22 50:2,6
60:12,17 61:4
67:24 68:3
76:22 115:5,13
127:15 140:2,13
**courts** 48:13,17
48:24
**crap** 83:19
**crazy** 131:20
**creates** 28:1
**crime** 12:5 113:4
**criminal** 8:8
37:18,20,21
38:1,8 115:7,14
**criminals** 133:25
**critical** 117:16
**cross** 104:21
**Crotch** 105:20
**CRU** 7:4
**curious** 85:20
**currently** 6:20
7:4 103:2
**custom** 106:11,19
106:22

**D**

**D** 2:1 66:14
**dad** 17:1,1
121:12
**dad's** 18:15
**daily** 76:2
**damage** 105:15
**dark** 57:24

**dash** 26:11,13,15
26:25 40:17
41:20 82:18
83:1 94:4
**date** 55:20 56:1,2
63:17 64:3
86:25 87:5,8,11
93:6 105:7
129:14,15 130:3
130:6 139:16
**dated** 92:12 93:4
**daughter** 30:12
30:17 31:1,4,5
106:5 112:2
**daughter's** 61:19
**Davidson** 50:12
50:15 51:3
53:24 56:22
57:3 66:10 68:9
68:22 69:8
87:13 88:9,16
105:5 106:9
107:3 108:15
112:18 119:17
**Davidsons** 104:25
**day** 3:17 7:14,15
7:17,20,22,25
18:20 21:17
81:11,14 90:20
107:19 138:13
138:19 140:21
**deal** 67:19
**dealing** 68:25
**dealings** 126:14
**dealt** 127:24
**Dear** 139:9
**December** 1:14
3:14 138:19
139:5,11 140:14
**decide** 127:16
**decided** 70:2
**decision** 61:5
71:20 72:7,10
134:24 135:15
**decisions** 89:5
135:13

**deep** 24:20
**defendant** 1:9 3:9
4:6,15 40:16
140:9
**defer** 61:4
**degree** 8:8,13
**delivery** 68:3
**department** 7:22
9:16 12:15
14:21 35:3
40:22 44:15
45:23 47:24
55:13 64:18
76:17 77:1 79:4
80:14 83:21
93:25 95:9
117:3 126:19
135:23 136:17
**department's**
15:13 112:19
**departs** 136:9
**depends** 44:19
93:14,14 103:21
**depict** 101:3
129:19
**depicted** 97:21
99:23 100:7,18
101:13 102:7
103:2,17 104:19
104:22 123:3
**depicting** 104:13
**depicts** 103:10
129:18
**depo** 47:6 95:25
**deponent** 138:16
141:5
**deposes** 5:3
**deposit** 107:22
**deposition** 1:12
3:13 4:15 5:13
5:15 98:7
100:23 126:4
137:13 138:17
139:10 140:12
141:4
**describe** 36:3

90:1 97:4 107:2
118:13
**described** 7:9
50:23 65:15
100:25 119:13
**describing** 29:24
36:11
**DESCRIPTION**
2:8
**design** 125:5
**designated** 65:6
65:14
**desired** 139:14
**destroy** 94:3
**detail** 118:13
**detailed** 96:11
**details** 7:19 14:14
14:16
**detained** 85:15
**detective** 11:7
**detectives** 7:8
91:1
**determination**
49:12,15,18
**determine** 20:22
23:7 30:25 35:2
38:12,21,22
48:14,25 62:6,9
118:21 127:10
**determined** 65:16
**determining**
54:23
**device** 98:14,16
**different** 25:24
27:8 32:13
34:17 51:11
67:20 99:20
129:15 130:3
**differentiate**
103:6
**direct** 14:10 61:7
**directed** 49:25
**disagree** 37:17
58:21 119:3
131:1 133:18
**discipline** 114:10

**discuss** 90:15
**discussed** 122:1
126:5
**discussion** 94:21
**discussions** 96:6
**dispatch** 16:25
83:22 126:10
**dispatched** 80:11
80:12,25
**dispatching** 30:7
**disposal** 10:23
**dispose** 48:18
**dispute** 45:23
47:24 48:12,16
48:22 49:1
51:22 64:19
127:11
**distance** 57:25
**distanced** 90:25
**distributed** 76:17
**District** 1:1,2 3:1
3:2,21,22 140:2
140:3
**Division** 1:3 3:3
3:22 140:4
**DNA** 12:12
**document** 53:3,4
53:6,16,20
63:15
**documented**
75:19
**documents** 12:1
18:25 77:13
78:6 84:1,10
85:22 88:14
94:4 112:14
**doing** 7:7,24
28:22 40:12
73:5 118:2,3
**door** 17:13 18:1,1
18:2 20:1,4,7,9
20:13,21 24:2
78:14 96:7
**doorbell** 20:6
**DOR** 66:13
126:16,19

download 41:17
downloaded 41:9
41:11
draft 13:14
draw 101:16
drawings 100:13
dressed 26:5,6
drew 97:6 101:20
102:3
drive 3:18 4:7
21:21 55:17
63:25 109:21
111:7 138:6
139:6
driven 133:1
driver's 97:8
driveway 23:1,2
23:4,5 25:3
30:1 96:23,24
97:1 104:13
110:13 123:3,7
124:10 125:22
125:25 129:8
132:7
driving 64:20
132:4,6
drones 11:8
drove 70:19
109:19,22 110:6
110:12 111:11
111:13
DSN 25:25 98:9
101:22
due 7:6
duly 138:10
dusty 107:7
duties 7:1,11,14
75:22
duty 14:18,20
69:3 81:12
dying 42:7

———
E

E 2:1,7 4:1,1
earlier 42:25
77:23 96:5

earth 95:10
easier 6:9
Eastern 1:2,3 3:2
3:3,21,22 140:3
140:4
effect 63:18
effective 46:1
47:19 63:14
73:19
effectively 67:16
70:2
effort 95:11
efforts 94:9
either 46:11
84:19 100:25
132:20
Elmore 14:24
15:17 16:18
18:6,17 19:12
19:22 21:11
23:16,20 30:20
30:22,25 31:9
34:10 35:8
49:13 52:15
53:23 54:22
57:8 59:16 70:3
70:19 72:17
78:3 79:9 105:6
109:17,22,22
110:1,8 111:10
112:2,17 117:12
118:8 121:3,25
127:4 131:10
Elmore's 31:11
77:9
email 2:15 91:20
92:1,9,12 93:1,6
93:12,16,19,24
94:13
emailed 78:18
emergency 26:19
26:21 36:15,18
employed 6:20
employees 80:13
enabled 26:25
enclosed 101:1

102:11 130:14
139:10,11
enclosure 57:4
96:13 119:17,19
119:21 131:23
encompassed
126:5
encompassing
69:12
encountered
74:22
ends 67:15
enforced 49:24
enforcement 8:16
8:19,23 9:9,11
10:4,21,23
11:13 16:11,14
35:9 38:21
67:15,16,18
68:11 69:3
70:24 71:20
72:7 75:23 76:3
79:10 82:6
108:1 109:12
112:24 114:10
126:13 127:5,10
127:16 128:25
129:1,3 131:22
133:25 134:8
engage 29:2,3
89:23 90:11
engaged 70:20
English 79:17
enjoy 106:4
ensure 43:21
enter 32:14 36:4
36:14,17 42:15
42:17 43:4,6
131:23
entered 25:2
29:25 35:17,20
36:22 96:10,12
101:13 119:6
136:24
entire 31:3 34:18
69:18,21 127:24

130:14
entitled 46:5
67:24
equivalent 132:7
errata 139:12,14
139:15 141:2
Escape 52:24
111:13
essentially 20:3
56:4 97:8
104:12
establish 45:21
47:23 88:15
establishes 64:6
estimate 69:15
estimated 32:15
et 1:8 3:8 139:8
140:8 141:3
evening 14:12,18
29:1 41:21 42:9
122:1
events 100:24
everyday 75:22
evidence 10:15
37:5 38:10
41:18 53:8,9
54:2,3 60:3,4
66:24 70:6,7
71:4,22,23
79:13 94:10
99:19 118:25
133:16 134:12
exactly 17:16
32:14 81:13
examination 5:5
120:24 126:23
133:21 134:6
138:14
examined 3:14
5:2 12:13
138:12
example 27:23
41:5 105:10
examples 75:8
exception 43:19
119:13 137:6

execute 11:14
executing 74:9,16
exhibit 2:8 39:6,7
39:17,18,21
45:2,4,7,10,14
45:16,20 47:15
47:18,22 49:3
55:1,2,3,9,12
58:7,8,13 59:9
60:8 62:25 63:3
63:6,8 73:8,9,10
73:12,15,16,22
74:1,2,4,7 85:21
85:23 86:2
91:14,15,17,20
95:12,21,22
96:4 97:16,19
97:19,22 98:1,5
99:5,7,23 100:2
100:5,6,7,12,18
101:3,13,16
102:14,15,18,18
104:8,11,20,22
110:15 114:1
122:22,23,23,24
124:18 125:12
125:13,22,25
129:7,14 135:20
135:20
exhibits 2:21
39:14 58:6
104:16
exigent 35:21,25
36:3,11
exit 83:8
experience 98:17
126:13 133:24
134:8 136:17
expires 140:22
expressly 4:18
extend 124:13
extends 124:15

———
F

face 88:15
fact 81:20 98:20

Joshua Cockrell - December 4, 2023

98:22 99:13
**facts** 37:4 38:10
54:2 60:3 61:12
66:23 70:7 71:4
71:22 99:19
118:25 133:16
134:10,12,22
**factually** 49:11
51:12
**fair** 6:1,2,5,18
10:8 12:19 13:2
20:25 27:13,19
33:16 39:1
48:20,23 54:25
77:11 78:23
79:2 80:17
81:23 84:7 85:9
88:12 102:6
104:1 105:11
116:14 128:15
135:14
**fairly** 12:21 13:6
24:20 43:2
103:18
**falsified** 112:14
**familial** 31:8
**familiar** 40:21
44:10 74:2
135:22
**family** 115:23
**far** 25:2 59:11
**father** 112:12
**faxed** 39:25
**FBI** 11:10
**Federal** 139:3
**feet** 25:7
**felt** 112:21
**female** 16:25 19:6
19:12 30:5
**fence** 24:16 50:17
50:22 69:2
102:11 103:13
103:17,18 104:3
104:22 109:24
123:23
**Field** 1:20,23

3:19 4:16 138:4
138:23,24 139:1
139:21 140:13
**Fifteen** 58:10
**figured** 121:18
**filing** 139:16
**finally** 88:7
113:25 129:6
137:1
**financial** 77:13
**find** 68:19 99:13
139:10
**fine** 40:2,5,6
46:25 47:8 92:6
110:3
**fingerprints**
12:12
**firearms** 44:21
**first** 7:18 16:12
19:2,2,5,6 23:13
34:20 54:13
63:3 78:12 82:6
88:12 98:4
101:13 108:19
116:5 131:4
**firsthand** 105:3
**five** 33:2,2 47:12
106:1 117:9
**five-seven** 103:25
104:2
**fix** 46:19 105:15
**flashing** 29:7
**Florida** 107:17
**focused** 54:19,21
**focusing** 37:7
**folder** 93:22
**follow** 10:12
22:22 45:22
47:23
**follow-ups**
126:25
**followed** 33:13
44:15 74:13
103:9,9 111:16
**following** 23:18

56:3 80:2 141:5
**foot** 31:22
**footage** 40:23
41:5,13 42:3,9
94:3,4
**Ford** 52:24
111:12,13
**foregoing** 140:12
**forensics** 12:5
**forgot** 17:2
**forks** 34:4
**form** 35:11 37:4
38:9 49:2 54:2
65:23,24 66:6
66:13 68:6 73:1
76:11 99:18
103:20 105:8
113:21 131:25
133:15 134:12
135:22
**forth** 6:13 18:9
136:10
**forward** 65:24
66:6
**foundation** 91:25
92:17
**four** 34:23 117:9
**free** 85:16
**frequently** 117:5
**friend** 121:14
**friends** 116:21
128:19
**frisk** 75:15
**front** 18:1,2 20:4
22:17 29:5,6
34:4 45:7 55:10
58:14 63:4
73:13 83:12
86:7,12 90:4
91:18 96:7
97:19 103:1
104:8,13 123:10
123:15,19,22,25
129:11 136:1
**fugitive** 7:7
**full** 5:8

**fun** 106:7
**function** 9:9,12
10:5 39:2
**furious** 83:5
**further** 120:11,17
126:23 133:19
133:21 134:4,6
137:9,10

**G**

**gamut** 12:6
**garage** 65:6,13,13
123:24 124:17
125:2,6,10
**gas** 58:18 111:16
111:17
**gate** 25:10 59:11
104:13,22
119:21 123:25
124:4,13 125:14
125:16,17
130:15 131:11
131:14,24 132:8
132:19,22 133:3
**gated** 24:10,12,16
57:4 96:12,13
119:17,19
131:23
**Gelfand** 2:3 4:3,5
5:6 11:3 13:1,9
19:18,20 24:25
25:7 26:20
27:19 28:1
31:21 32:19,20
33:9 34:14
35:14,25 37:7
37:15 38:7,14
38:18 39:12,15
39:16 40:5,7
41:3 42:2,8,21
42:23 45:2,6
46:10,14,17,22
46:25 47:2,4
49:5 51:8,18
52:14,20 54:5
55:7,9 58:4,11

58:13 59:2,5,6
60:5 62:14,21
62:24 63:2 67:1
68:8 70:8 71:2
71:6,25 72:3,6
73:2,12 75:5,11
76:5,12 79:16
82:5 86:1 87:1
88:18,22 89:3
91:7,17 92:2,6,8
92:19,23,25
94:20,24 95:20
95:24 97:18
99:20,22 100:4
102:4,6,17
103:24 105:10
106:16 107:10
107:13,24 108:5
113:14,23 114:4
114:6 119:1
120:10,15,17
122:20 126:24
127:20 131:2
132:3,11,17
133:11,19 134:5
134:7,15,18
135:10 136:16
137:1,8,11
139:16,23
**general** 2:10,11
2:13 7:11,13,22
14:7 44:2,8,10
44:13,14,17,19
44:19,24 45:10
45:21 47:18,22
60:9 61:1,11
62:20 63:11,14
64:5 67:4 73:16
73:22 121:22
135:22
**generally** 98:22
113:6 129:18
134:9
**Gerholdt** 7:17
13:21 16:12,15
16:20,22 17:6

17:10,13,22,25
19:7,13,24,25
20:3 21:1,25
22:7,22 23:14
23:15,20 24:6,8
26:6 30:3,6
33:5,17,21,24
34:10 35:4
36:22 38:4
41:20 53:5,22
54:10 57:7
60:25 62:3,3,10
62:18 69:22
70:15,16 71:13
73:7 77:2 80:11
80:18 82:7
83:15,25 84:15
84:20 86:10
89:7,10,14
90:12,14 96:18
97:5,25 98:5,9
98:13 101:12
102:20 103:22
104:5 110:16,17
111:19 115:24
116:19,21
119:23 120:3
122:3 126:9
129:4 130:22
136:6
**Gerholdt's**
116:10
**getting** 24:2,20
64:25 95:7
131:6,8
**give** 48:7 49:23
95:18 120:11
**given** 12:19 72:10
72:11 134:23
140:12
**gives** 132:18
**go** 7:3 9:23 20:6
22:23 24:8
39:10 40:15
42:11 43:11
50:8 56:14,18

60:9 64:20 65:9
83:23 84:10,24
84:25 85:6,13
85:14 87:19,19
93:3 94:18
102:18 109:7,14
111:16 112:10
112:11 114:7
121:16,17
122:10 131:8
132:5,18,23
135:19
**goes** 93:21 115:23
124:16
**going** 5:16 6:4
13:8,10 30:6
40:7 44:6 47:16
55:1,2 58:4,5
61:7 62:21 73:8
73:9 79:20
85:21 91:13,23
95:4,17,20
97:18 102:13
104:7 111:20
115:12 132:23
132:24,25
133:14 135:5
**good** 5:7 25:9
39:15
**Google** 129:12,14
**gray** 111:13
**great** 32:8 120:15
**green** 29:11,13,20
53:15 99:8,22
**ground** 6:8
**Guard** 9:6
**guess** 9:2 13:11
23:3 58:25
122:17 124:19
**guesstimated**
69:10
**guy** 105:17,18,19
122:17 128:8
**guys** 85:9,11

_____
**H**

**H** 2:7
**half** 9:19 87:11
**halfway** 36:8
**hand** 16:21 19:7
19:22 53:4
138:18
**handed** 89:14
**handicapped**
112:12 121:12
**happen** 27:15,16
27:22,23
**happened** 7:20
17:16 29:23
30:2 42:3 60:5
60:6 65:21 76:8
76:10 82:11
83:3,4 84:21
89:18 90:15
100:24 101:5
129:3 134:15,20
**happens** 11:23
28:2 93:20
**hard** 76:22
**Harley** 50:12,15
51:3 53:24
56:22 57:2
66:10 68:9,21
69:8 87:13 88:9
88:15 104:24
105:4,18 106:9
107:3 108:15
112:18 119:16
**he'll** 39:10
**hear** 18:12 19:15
22:14,15 90:6,8
90:13 116:2,9
**heard** 83:22
117:25,25
**hearing** 108:2
**held** 94:21
**help** 7:8 11:8,11
64:18 69:5
**hereunto** 138:18
**herewith** 138:17
**hesitate** 139:18
**hey** 24:5

**hiding** 38:25
**highway** 65:12
**hindsight** 71:19
72:7
**history** 83:3
**Hold** 66:21 91:23
94:11,11 99:17
**home** 20:17,23
21:1,2 22:1,2
35:2 78:11
81:24 115:23
**homeowner** 22:1
**honest** 10:17
**honesty** 128:15
**hospital** 121:13
**hour** 107:23
**hourly** 107:23
**hours** 3:15 41:10
44:7 81:3
**house** 15:10
18:24 20:1 21:4
21:20 22:23,25
24:3,4 25:11
27:4 28:8 34:21
35:10 45:17
50:9,16 51:1,8,9
51:10 63:22
68:25 69:7,9
71:12 80:4,19
80:21 84:9,20
85:14 89:18
96:1 108:10
109:1 118:2
124:19 125:7,9
132:7 133:1
**Huh** 85:10
**hung** 116:23

_____
**I**

**ICE** 11:10
**ID** 139:3
**idea** 68:12 84:17
119:25 130:18
**identical** 98:6
**identification**
39:8 45:5 55:4

58:9 63:1 73:11
85:24 91:16
95:23 97:17
100:3 102:16
118:15 126:9
136:2
**identified** 34:24
56:23
**ignition** 58:17
**ignoring** 100:5,9
100:15
**imagine** 93:21
**immediately**
16:18 68:3
111:14
**immigration**
11:11
**imminent** 36:19
**important** 10:6
14:7 38:21
61:10 72:23
73:4
**imprecise** 116:4
**incident** 54:21
73:20
**include** 77:2
**includes** 8:25
136:8
**including** 34:23
69:1 136:2
**inconsistent**
61:18 66:18
**indicate** 29:14
31:8 99:15,24
122:13 139:13
**indicates** 86:20
**individual** 14:24
15:2 18:21
**individuals** 15:17
**information** 72:9
72:11 79:5
134:23
**informed** 22:9,12
**initial** 96:6
101:16 103:5
125:19

**initially** 80:17 96:6
**initials** 101:24
**initiated** 108:20
**injured** 36:15
**injury** 36:19
**inside** 50:16,17 50:18,22 69:2 85:13
**instance** 41:4 49:10
**interacted** 108:7 108:23 127:25
**interaction** 28:22
**interactions** 27:7 34:18 109:4,9
**interest** 52:6,16
**interests** 45:22 47:24
**interrogatories** 32:1,4 39:5,23 40:9,14 42:11 69:16 115:18 119:14
**interrogatory** 2:9 32:9,12,18 40:15 44:1,5 45:11 63:12 73:23 114:1 117:10
**interrupting** 92:16
**interviews** 11:18
**inventory** 66:15
**investigate** 77:8 77:12 78:2 134:9
**investigated** 12:21 13:6 113:4 115:8,15
**investigating** 13:3,4 33:17 38:1,3,5,12
**investigation** 11:4 22:23 112:20 113:18

118:21 128:23 128:24
**investigations** 12:6 113:2,8,16
**investigative** 23:6 30:24 55:13 132:21 135:23
**Investigative/O...** 2:12
**involved** 37:22 74:9 128:3,5
**involving** 34:18
**issue** 12:1 37:8 50:12 116:24
**issues** 40:2 128:16
**items** 95:12

_____

**J**
**J-O-S-H-U-A** 5:11
**JCC** 101:24
**JCC5349** 101:22 103:9,10
**Jeep** 23:5,7 59:11 96:21 97:8,11 103:2,3 109:23 123:12 124:20 129:11,24
**Jim** 87:25
**jingling** 118:1
**job** 10:6 41:16
**Joshua** 1:8,12 3:8 3:13 5:1,10 138:9 139:8,11 140:1,8,11,18 141:1,3
**judgment** 10:14
**jumping** 134:10
**June** 46:1 63:14 130:10
**jurisdiction** 15:14
**jury** 99:13
**justice** 8:9
**Justin** 4:5 32:17

46:7 114:3 139:23

_____

**K**
**keep** 7:16 10:10 33:11 38:17 39:13 43:20 61:17 92:16 115:18 136:25
**keeping** 24:3 137:4
**key** 57:9,13,18,21 57:22 58:1,21 59:10 87:21,25 88:2 117:13,19 117:21 118:6
**keys** 64:17,22 117:25,25
**kind** 11:3 79:17 123:11
**kinds** 8:6 12:6
**knew** 42:1 83:3
**knock** 18:3 20:3,9
**knocked** 17:13
**knocking** 20:12 20:12 78:14
**know** 12:24 21:4 24:1 26:13 34:13 35:23,25 37:5 38:11 41:1 41:23 42:2 46:12,20 51:6,7 51:10 52:10 53:7,10,11 57:10,20 58:24 59:12 66:25 68:13,15 71:19 72:15,19 76:24 76:24 78:22 79:14 80:7,8 81:1,4 86:23 87:25 93:8,10 93:12,20 94:15 104:24 108:11 112:3,6,10,14 112:16 116:14

117:8,11 120:2 121:11 122:3 123:19 125:4,7 125:8,8 128:12 131:2,10,13,19 133:3,17 134:19 134:20
**knowing** 71:19
**knowledge** 21:13 26:24 32:10,11 34:16 41:19 49:12 105:3,11 105:14 109:16 138:11
**known** 65:24 66:6 106:17,18
**knows** 122:18

_____

**L**
**laboratories** 12:5
**lack** 25:12 91:24
**laughed** 111:25
**law** 8:15,18,22 9:9,11 10:4,21 10:23 11:13 16:11,14 35:9 38:21 67:14,16 67:18 68:11 69:3 70:23 71:19 72:7 75:22 76:2 79:10 82:6 108:1 109:12 112:23 114:10 126:13 127:4,10 127:16 128:25 129:1,3 131:22 133:25 134:8
**lawful** 5:2
**lawsuit** 108:16 109:12 114:18 114:22
**lawyer** 5:17,20 95:8 120:19 127:3
**lawyers** 91:21

101:8
**leads** 10:12 23:2 23:3 72:12 123:23
**leave** 9:23 59:17 59:23,24 64:22 70:4 79:11,17 89:20,21 104:7 111:4 116:3
**leaving** 77:6,19 77:21 79:3
**left** 24:7 54:16 61:24 62:1 69:8 70:23 77:20 79:19 80:24 96:18 97:5 98:12 105:6 109:17 111:14 112:17 120:6 124:19 125:17 130:6 132:24
**legal** 35:23 42:16 42:20 43:6 51:5 52:6,9,16 54:3 66:24 68:7 71:4 71:23 75:3 86:23 88:20 92:4 127:18 133:9,15
**legally** 60:11
**lend** 17:1
**lender's** 60:12,14
**let's** 17:14 20:2 23:9 37:19 45:2 46:20 58:6 70:17 73:15 82:12 83:7 84:7 84:8 87:23 108:8 120:13 129:12 135:18
**letter** 93:4 94:2,6
**license** 8:11,16
**licensed** 8:18
**lien** 87:21 88:2
**lienholder** 88:4
**lieu** 58:20

life 6:9
light 29:7,8,11,13
  29:20,21 99:23
  99:23
lighting 99:1,9
lights 20:20 26:19
  26:21 99:7,14
line 23:19 92:17
  119:1 128:21
  129:23 130:11
  141:6,8,10,12
  141:14,16,18,20
  141:22
lines 10:18 78:18
  105:12 109:6,13
list 74:5,20,20,21
  75:7 136:1
listed 95:12
  136:12
lists 74:7 136:5
litigation 78:24
little 125:10
LLC 4:3
loaned 17:1
lockout 64:13,15
  64:16
lockouts 63:10
  64:7
locks 64:16
long 6:23 20:22
  31:17 32:14
  41:1 68:15 91:3
  117:9
longer 112:22
  120:7
longtime 78:20
look 32:20 43:17
  45:20 46:4
  47:21 59:6,8
  60:8 62:20 66:2
  74:1,19 78:23
  86:15 88:1 96:4
  96:17 98:1
  103:17 104:8
  113:25 121:17
  124:19 125:12

looked 30:4
looking 24:4
  57:24,25 59:2
  63:23 118:2
  124:18
looks 58:18
  100:21 107:6
  123:11
lost 68:16
lot 6:9,12 67:16
  122:19,19
Louis 1:24 3:18
  4:4,8 138:3,7
  139:2,7
loves 121:13

—————————

## M

Mackenzie 15:2
  15:18 16:19
  18:6,18 21:11
  23:16,20 34:10
  35:8 49:16 52:6
  53:23 54:23
  57:8 59:9,13,17
  70:3,19 72:21
  78:3 79:10
  105:6 109:17
  110:1,2,12,24
  111:4,14,23
  112:5,17 117:13
  118:9 120:7
  121:3,25 127:4
  128:8,10,11,15
  128:19 131:13
Mackenzie's
  31:14 77:9
maintained 65:6
  65:14 68:10
making 89:4 92:5
male 110:4,6
Manchester 6:22
  6:24 7:2 9:15
  9:18,24 10:22
  12:15 14:20
  15:11 21:23
  35:3 39:2 40:21

41:12 55:12,18
59:24 65:7,14
74:8 78:21
80:14 93:25
95:9 98:18
112:19 135:23
136:17
manchestermo....
  91:22
Maps 129:12,14
March 87:9
Margulis 4:3
mark 39:6 45:2
  55:2 58:4,7
  62:21 73:9
  85:21 95:17,20
  114:3 125:18
marked 16:5 39:8
  39:17 45:5 55:4
  58:9 63:1 71:13
  73:11 85:24
  91:16 95:23
  97:17 100:3,6
  102:16 125:24
market 64:20
  105:11
marking 91:13
  102:13
math 25:9
matter 3:23
  48:17 112:20
  138:11
matters 113:2,5
mean 11:20 13:9
  13:11 25:9
  52:11 70:18
  81:6 85:7,15,20
  86:5 87:24 89:8
  103:21 106:18
  112:10 115:20
  118:14 121:9
  126:14
meaning 10:1
  13:2 14:14 21:2
  22:1 23:23
  29:16 37:21

40:16 56:15
59:23 63:17
77:25 79:20
80:18 94:3
99:10 106:6,16
119:20 130:1
means 29:9
  115:21 126:15
  126:19
meant 47:5
measure 25:9
meets 124:16
memorialization
  28:2
middle 5:11
midnight 56:4
military 8:25 9:2
  9:4,5,8
mind 10:10
minor 128:24
minute 20:24
  69:13 120:11
minutes 15:22
  24:15 29:24
  32:16 33:2,3,20
  47:12 69:11
  77:7 81:3 82:10
  88:14 96:11
  127:2 131:5
mischaracterizes
  60:3 70:6 79:13
missing 11:8
  81:24 121:14
Missouri 1:2,24
  3:2,18,20,22 4:4
  4:8 8:20,23
  9:12 15:11
  19:10 21:23
  31:7 52:25
  53:15 55:18
  64:9 66:13 79:4
  138:2,8 139:7
  140:3,14
misstates 54:2
  71:23
misstating 17:18

MO 139:2
model 98:23
  105:4
moment 75:6
  80:24,24
money 9:25,25
  10:1,2
months 17:5
  117:9 121:15
mopolice.gov
  93:15
morning 3:16 5:7
  44:7 56:3 80:2
motor 82:23
  83:19
motorcycle 17:2
  18:15 19:1,23
  22:9,21,24 24:9
  24:10,20 25:1
  30:3,4,9 31:7
  33:18,22,25
  34:18 36:6
  38:13,22 50:12
  50:15 51:3,15
  54:16,24 57:9
  57:15,20 58:2
  58:17,20 59:14
  59:24 69:1,8
  70:4,14,20
  72:14 81:19,24
  83:6,20 84:23
  86:21 105:17,19
  107:11,14,19,25
  108:15 109:5,10
  109:18 111:2,5
  117:13,22 118:3
  118:17,18,19
  119:24 120:6
  121:13,18
  126:10 127:25
motorcycles
  105:21,23 106:4
  121:21
mouth 17:15
MPD 56:17 65:23
  66:5

**MPD0029** 86:15
88:2
**MPD0032** 87:20
**MPD0033** 88:8

---

### N

**N** 2:1 4:1
**name** 5:8 25:19
25:25 26:7,7
30:19 31:11,14
38:17 118:20
122:6 135:6,14
**name's** 135:3
**named** 14:24
15:2 18:21
**names** 136:2
**Nathan** 18:21
21:14,18 30:8
30:11,15 31:1
52:3 72:13,16
72:20 78:4
86:21 87:3 88:9
118:17
**National** 9:6
**nature** 50:2
**near** 103:1
**nearest** 65:12
**necessarily** 23:25
129:19
**necessary** 41:15
**need** 7:8 11:11
46:23 47:6,13
57:18 76:24
**needed** 36:4 41:4
112:22 136:23
**needs** 75:19
**never** 5:14 21:16
21:19 59:1
61:23 62:3,3
70:12 78:17
84:6 87:22 92:1
92:7 114:17,24
132:22 133:2
**newer** 58:2,2
**night** 14:11 21:11
21:15 39:3 50:9

59:3,6 60:24,25
79:8 80:1 96:1
107:3 118:1
119:7 129:21,25
132:21
**nighttime** 97:13
**nine** 3:15 6:18
**Noce** 3:17 4:7
138:6 139:6
**Nope** 46:16 54:14
77:20 90:7
116:13
**normal** 126:14
**normally** 133:4
**Nos** 44:8
**notarized** 139:15
**Notary** 139:14
140:25
**notice** 108:1
138:5
**notification**
25:18
**notified** 45:23
47:25
**November** 93:4
94:8
**number** 5:16
10:23 32:19
33:21 56:22
63:12 64:5
66:19 73:22
87:16 98:10
102:20 112:24
113:15 114:6
126:10 127:21
135:20
**numbers** 44:2
56:15,15 136:3

---

### O

**O** 100:10 103:9
**o'clock** 3:15,16
**oath** 28:25 31:25
32:3,12 43:18
95:1
**object** 35:11 37:3

37:4 38:6,9
49:2 54:1 68:6
71:1 72:25 73:1
76:11 91:24
94:14 99:18
103:20 105:8
113:21 131:25
133:14 134:11
134:11
**objection** 11:1
12:23 13:7
24:23 25:4
27:17,24 31:18
33:7 34:11
35:22 37:13
38:15 40:24
41:22 42:4,19
51:4,4,17 52:8
52:17 54:1
58:23 59:4 60:2
62:11 66:21
70:5 71:3,21
72:25 75:2,9
79:12 82:2
86:22 88:17,25
91:4 92:5,17,20
92:22 94:12,12
99:17 103:19
106:13 107:4,12
107:20 108:3
113:10 118:24
118:24 127:17
130:24 132:10
132:15 133:8
134:17 135:8
136:13,21
**objections** 72:4
**observe** 22:12,24
89:23 106:11
109:19 110:24
111:4
**observed** 14:4
24:16 29:23
33:17,21,25
60:24 90:1
102:19 105:5

106:9 107:3
**obtain** 8:12,15
41:4 78:6,9
79:5
**obvious** 51:2 57:2
66:12
**obviously** 26:7
97:13
**occurred** 55:23
**October** 7:10
14:11 18:24
28:8 44:6 45:18
45:18 50:9
63:21 96:1
98:24 105:5
106:10 113:1,14
121:1 122:25
127:8
**offend** 5:22,23
**Offense** 55:13
135:24
**offer** 127:22
**officer** 5:10 6:21
6:23 7:2,17,23
8:19 9:4,13
10:4,21 11:14
13:21 16:12,15
16:20,22 17:6
17:10,13,22,25
19:7,13,24,25
20:3 21:1,25
22:7,22 23:14
23:15 24:6,8
26:5,6 27:22
28:20 30:3,6
33:5,17,21,24
34:10 35:4
36:22 38:4
41:12,16,20
43:21 47:4 48:5
48:12,15,24
53:5,22 54:10
60:25 62:3,10
62:18 65:10
66:5 69:3,22
70:15,16 71:13

73:5,7 75:23
77:2 80:11,12
80:18 82:7
83:15,25 84:15
84:20 86:10
89:4,6,7,8,10,14
89:19,22 90:12
90:14 91:25
94:24 95:3
96:18 97:5,25
98:5,18 101:12
102:20 103:22
104:5 110:17
111:19 112:24
114:11 115:23
115:24 116:5,10
116:19,21
119:23 120:3,18
121:1 122:3
126:9,13 129:4
130:22 131:23
133:6,12,24,25
134:9 136:15,18
136:18 137:11
**officers** 16:11,14
27:14 50:1
75:13 80:13,18
134:9,14 136:2
136:6
**official** 49:25
**oh** 9:2 43:12 88:4
**Okay** 5:19,25 6:7
6:17,20 9:11
10:4 14:18
19:22 20:2,9,19
20:22 23:13,19
24:19 25:11
26:1,3 28:7
40:1,12,14
43:12,15 45:10
47:9,14,21
48:20 49:8,10
50:22,25 51:21
54:19 55:8 56:8
56:20 58:12
60:8 64:5 71:2

72:5 80:16 81:5
81:15 86:14
87:5 88:24 92:8
92:18,25 95:16
96:22 97:13
99:13 100:1
101:8 102:1,5
102:10 103:13
104:1,5,19
106:21 110:2,24
114:5 116:23
120:21 122:20
123:9,17,22
124:18 125:16
129:6,23 130:1
130:11 137:11
**older** 58:1 121:20
**on-call** 7:23
**once** 7:6
**one-by-one** 95:18
**one-car** 125:10
**open** 10:10 24:12
25:10 59:11
119:19,20,21
124:4,6,8
130:15 131:24
132:8,19,22,23
132:24 133:4
**opened** 120:1
130:19,19,22
131:10,13
**operations** 74:12
**opine** 14:3
**opinion** 14:3
**opportunity** 5:17
**opposed** 33:4
103:9 104:16
**order** 2:10,11,13
33:15 43:20
44:2,8,10,13,14
44:20,24 45:10
45:21 47:18,23
49:22,24 50:1,6
60:9,12,17 61:1
61:11 62:20
63:11,14 64:5

66:18 67:4,24
68:3 73:16,22
**orders** 44:14,17
44:19 50:2
**ordinary** 12:16
**original** 83:24
139:11
**Originally** 7:16
**outraged** 83:5
**outside** 8:19,23
**overweight**
121:20
**owned** 49:13,16
49:19 77:12
105:23
**owner** 21:4 30:8
38:19,22 61:19
61:19 66:4,7
72:13 84:5
126:17
**owners** 38:23
**ownership** 23:7
33:18 38:13
62:7 78:25
88:15
**owns** 48:25

_____
**P**
**P** 4:1,1
**p.m** 15:23,25
78:14 79:7
**P.O** 139:2
**packet** 114:4
**page** 2:2,8 40:16
42:12 44:3 46:4
46:7,8 56:14
60:10 65:9 66:2
74:19 75:11,13
86:4,6,15 88:8
93:3 136:1
139:12,14 140:1
141:6,8,10,12
141:14,16,18,20
141:22
**Pagedale** 9:19,23
10:3

**pages** 86:12
**paid** 10:2
**paper** 35:15 53:2
53:13 61:20
**parked** 50:15
57:3 88:18
101:11 102:8
119:17 120:7
129:24
**part** 58:16 76:2
97:22 136:20
**participated**
113:9,15
**particular** 12:11
26:25 44:2
49:10 58:17
105:4
**parties** 12:19
13:2 78:7
115:22
**partner** 16:7
**parts** 106:12,22
**party** 48:7,15
49:22,23 114:18
**passed** 69:6 80:23
**passenger** 97:11
**passion** 106:2
**patio** 125:7
**patrolling** 8:3,5
132:21
**Paul** 93:8
**paved** 124:11
**paving** 124:13
**pay** 106:15,19,23
**paying** 87:21
**peace** 7:16 33:12
43:20 61:17
115:18 136:25
137:4
**penalties** 32:5
40:10
**pending** 3:21
47:10 95:5
**people** 15:5 27:7
28:23 34:23
121:19,20

122:19 127:25
129:2 131:19
135:7
**perform** 9:8 41:8
**performed** 7:10
8:22 9:12
**performing** 10:5
39:3 60:21 64:7
64:13
**perimeter** 24:17
**period** 69:18,21
80:2 108:11
**perjury** 32:6
40:10
**permission** 70:23
**permit** 48:13,24
84:25
**permitted** 70:3
**person** 36:15
110:4
**person's** 131:23
**personal** 48:6
**personally** 13:14
18:5,8 33:4
41:16 42:2
53:12,16,19
77:8 95:11
113:1
**personnel** 76:17
77:1
**phone** 54:10
70:13 83:21,22
84:14 116:6,12
116:18
**photo** 95:21
96:17,24 98:12
99:10,14 103:2
103:18 129:11
129:12,14
**photocopy** 46:18
**photograph** 2:16
2:17,18,19,20
123:4,10,15
**photos** 95:17
**phrase** 115:17
137:2,4

**physical** 53:2,3
53:12 110:25
**physically** 33:25
34:5,9 51:14
52:20 53:23
54:11 68:21
96:16 103:10
136:19
**picture** 129:7
130:9
**pictures** 24:14
96:11 122:21
**piece** 53:2,12
61:20 125:9
**pieces** 35:15
**place** 65:13 68:2
68:10 100:7,18
100:20,24 101:3
138:13
**Plaintiff** 1:6,13
3:6,14 4:2,14
5:3 140:6
**plaintiff's** 32:15
39:7 42:15,17
43:5,7 45:4
55:3 58:8 62:25
73:10 85:23
91:15 95:22
97:16 100:2
102:15
**plans** 74:12
**please** 5:7,21
17:18 42:12
45:3 49:21 55:2
86:1 135:19
139:10,13,15,17
**PO** 1:23
**pocket** 117:21
**point** 22:20 24:9
28:1 80:3 90:19
102:23 104:12
**police** 6:21,23 7:2
7:21,23 8:10
9:4,13,16 12:15
13:14,17,22,23
14:6,21 15:13

Joshua Cockrell - December 4, 2023

16:3,5 20:15 25:12,18 26:10 27:14,22 35:3 39:2 40:22 41:12 55:13 59:8,24 64:17 71:12,13,14,14 74:8 75:13 80:14 81:21 82:15,16 83:8 83:21 91:21 93:25 95:9 98:5 98:18 109:7,14 112:11,19 134:1 134:9 135:23 136:17

**police@manch...** 92:10 93:13

**policies** 61:7 127:15

**policy** 46:5 48:3,5 49:6 63:9 65:9

**porch** 83:12

**portion** 43:16 101:1

**position** 7:6,21 112:21

**possession** 48:16 49:23 51:2,14 57:9 68:16

**possibilities** 130:22

**possibility** 127:21 131:17,18

**possibly** 58:25 84:6 86:8

**potential** 13:3,4

**Powerscourt** 3:17 4:7 138:6 139:6

**practices** 44:14

**premarked** 58:6

**premises** 54:16 111:5 120:7 127:9

**prepared** 13:18 13:22

**preparing** 6:10

**presence** 35:5,9 84:16,19 109:13 124:8

**present** 16:11,14 34:9 54:11 66:4 80:14 115:24 116:9 120:3 129:2 136:19

**preserve** 94:3,9 95:11

**pretty** 107:6 125:6 131:20

**previously** 38:7 50:23 60:16 61:3 81:25 83:2 99:1,15 104:20 114:18

**primary** 28:20 73:5

**prior** 9:18 18:23 19:16 30:6 32:3 45:17 50:25 63:20 64:3 73:19 77:6,19 77:20,21 79:3 87:11 95:10 104:16 107:24 113:14 139:16

**privacy** 24:16 50:22 57:3 69:2 102:11 103:13 103:17,18 104:3

**private** 50:19 53:25 64:9 65:3 65:12

**privilege** 94:14

**probable** 37:1,11 75:14 76:1

**probably** 15:20 102:24 106:1 112:13,15 131:5

**problem** 6:14 46:18 121:21

**procedural** 74:8

**procedure** 48:9

67:9

**procedures** 45:22 47:23 61:8 64:6

**proceeded** 83:23

**proceeding** 115:13

**produced** 3:13 5:2 117:13

**product** 94:15

**promise** 5:22

**pronouncing** 13:21

**proof** 85:8,14

**property** 32:15 42:18 43:7 45:22 47:24 48:6,12,15,16 48:25 49:13,16 49:19,24 50:12 50:15,19 51:22 52:7,16 53:25 62:2 63:10 64:9 65:3,12 68:11 101:1 110:25 127:11 129:18

**proportionally** 32:25

**prosecutor** 41:5

**protect** 36:18

**protective** 75:15

**protects** 27:14,21

**provide** 35:8,14 41:5 52:21 108:1 112:14

**provided** 12:1 30:5 31:6,12,15 32:9 52:18 64:1 72:9 83:25 84:2 86:9 88:13 89:5 89:7,10 127:4

**public** 64:8 65:2 65:12 93:25 139:14 140:25

**pull** 114:2

**pulled** 52:25 117:21

**pulling** 52:23,23

**purchase** 86:25

**purchased** 86:21 86:24

**purchaser** 87:3

**purported** 19:11 19:23 35:10

**purpose** 26:15 27:10 38:14 45:21 47:22 64:6

**purposely** 40:1

**purposes** 86:3

**purse** 52:24

**pursuant** 43:18 75:7 138:5

**pursuit** 70:21

**push** 29:6 58:3

**put** 17:15 103:5 117:22 135:14

**putting** 25:13 106:6 115:11

---

**Q**

**question** 5:20,24 6:3,5,15 30:13 32:13 33:10,10 34:15 37:9 42:22 47:10 51:11,19 54:6 67:2 73:3 86:11 92:9 95:4,5,25 99:21 116:4 130:12 133:23 134:19,19 135:11

**questioning** 91:24 92:17

**questions** 2:2 5:6 5:16,17 56:11 114:7 120:11,17 120:19,25 121:24 126:22 126:24 127:21 129:7 133:19,22 134:4,7 137:9

139:17

**quick** 6:8 46:21 120:13

**quite** 102:2 123:14

**quote** 32:16 43:18,22 57:8,9 74:22,23

---

**R**

**R** 4:1

**ran** 30:7 122:5 126:9

**randomly** 78:14

**Ray** 87:2

**Raymond** 1:5 3:5 38:16 139:8 140:5 141:3

**reaction** 89:16

**read** 13:25 14:2 34:3 43:2,2,7,13 43:22 45:24 48:11 50:2 59:17 65:17 139:13 140:12 141:6,8,10,12 141:14,16,18,20 141:22

**readily** 13:13 31:21

**reading** 49:21 141:4

**really** 95:3 117:17 130:12 130:13

**reason** 38:17 58:21 141:7,9 141:11,13,15,17 141:19,21,23

**reasonable** 75:15 76:1

**reasons** 135:15

**recall** 14:11,14,16 23:8 25:6 31:20 34:1 35:13 40:12 81:2

Joshua Cockrell - December 4, 2023

107:18 110:18
110:21 114:11
**receive** 44:16,18
44:20,22,23
**received** 45:16
**receives** 93:12
**recipient** 92:12
**recognize** 39:18
45:14 57:6 63:3
63:6 86:2 92:25
97:21 98:16
100:6,17
**record** 26:16,18
27:12 29:1 40:8
47:17 86:3
94:19,22 97:5
101:20 103:8
118:7,11 120:12
126:16
**recording** 27:14
29:9,18,21 42:1
99:16,24
**records** 27:7 42:6
77:13
**red** 29:6,8,20
41:25 42:6 99:8
99:23
**reduced** 138:15
**reference** 44:2
**referenced** 45:11
63:12 66:13
73:23
**references** 55:16
56:21
**referred** 87:13
126:6
**referring** 15:7
19:9,11 30:18
30:20 32:18
125:3 128:9
**reflected** 96:23
**regarding** 79:5
**regardless** 128:18
**registered** 30:8
84:6 118:20
122:6 126:18

**registration**
118:22
**regrets** 135:2,3,4
**Reichardt** 3:17
4:7 138:6 139:6
**related** 108:14
112:5
**relationship** 31:9
72:16,20 78:3
**release** 88:3
**released** 70:14
**relevance** 107:12
**relevant** 10:15
**rely** 42:17 43:6
**remain** 32:15
**remember** 52:22
52:23 79:3 95:3
107:8 109:3
118:1 122:4
**removal** 107:24
**remove** 65:10,17
**removed** 65:5,11
68:10 101:12
106:11 122:12
127:8
**Rench** 18:21
21:14,18 30:8
30:11,15 31:9
49:19 51:25
52:1,3 72:13,16
72:20 77:23
78:4 86:21 87:3
88:9 112:5
122:7,8
**Rench's** 31:1
112:2 118:17
**render** 36:14,17
**rent** 107:19
**rented** 107:10,13
**repeat** 12:25 37:6
37:9 100:8
133:10
**rephrase** 59:5
67:2
**report** 2:12 13:22
55:14 56:1,2,9

59:8 73:5 81:18
135:4,6,14,17
135:19
**reporter** 3:19
4:16 5:9 76:23
138:1 140:13
**reporter's** 6:9
**reporting** 1:23
89:6,8 108:21
139:1
**reports** 10:17
13:15,17,23
14:6 135:24
**repossession**
43:21 49:9
60:20,21
**repossessions**
45:24 47:25
60:10
**represent** 44:5
58:19 104:11
**represented** 4:2,6
19:12
**representing**
30:10,14 95:8
**represents** 102:7
104:12
**request** 94:2
101:20
**requested** 141:5
**requirement**
43:19
**requirements**
74:8
**reregistered**
126:18
**reserved** 4:18
138:16
**residence** 15:8
55:17 79:18,19
82:12,15 90:4
96:5,13 121:2
122:21,25
**resident** 78:21
**resist** 134:5
**resolved** 48:17

**resources** 12:20
13:5,12
**respect** 14:6
34:20 40:22
44:17 71:11
**respective** 48:14
**respond** 20:1
31:25 89:13
122:12,17
**responded** 16:2
21:20 25:11
26:20 28:8
79:21 80:15
89:13 96:1
108:10 109:1
121:2 122:25
**responding** 8:3
18:23 32:3
45:17 80:17
82:22
**response** 7:5
32:13 45:11
73:23 117:10
**responses** 44:1
114:1
**responsibilities**
7:1,14
**responsibility**
7:18
**restate** 72:3
**restroom** 46:24
**retained** 2:21
18:16 41:2
**retrieve** 84:10
**return** 17:4 80:3
80:25 81:17
82:5 139:15
**returned** 80:19
138:17
**reveal** 84:4
**revealed** 84:5
**Revenue** 79:4
126:19
**review** 53:16
77:22 137:12
**reviewed** 13:17

53:19 56:9 84:1
127:15
**ride** 111:20
121:19
**riding** 106:4
111:2 121:13,21
**right** 24:7 25:25
40:4 49:23
54:17,21 56:6
61:5 70:21
72:10 81:6,10
85:5 95:6,19
96:19 97:10
98:13 101:14
102:24 103:1,1
103:4,4 109:23
124:20 125:6
128:13,22 131:9
131:20 132:18
134:23
**right-of-way** 64:8
65:3
**rights** 48:14
**ring** 20:6
**road** 111:12
**Robertson** 2:4
4:9 11:1 12:23
13:7 19:15
24:23 25:4
26:17 27:17,24
31:18 32:17
33:7 34:11
35:11,22 37:3
37:13 38:6,9,15
39:9,13 40:3,24
41:22 42:4,19
46:6,12,19,23
47:1 49:2 51:4
51:17 52:8,17
54:1 55:5,8
58:10,12,23
59:4 60:2 62:11
62:23 66:21,23
68:6 70:5 71:1
71:3,21 72:5,25
75:2,9 76:4,11

Joshua Cockrell  -  December 4, 2023

79:12 82:2
85:25 86:22
88:17,20,25
91:4,23 92:4,15
92:21 94:11,18
95:19 99:17
102:2,5 103:19
105:8 106:13
107:4,12,20
108:3 113:10,21
114:3,5 118:24
120:13,22,25
126:21 127:17
130:24 131:25
132:10,15 133:8
133:14,22 134:4
134:11,17 135:8
136:13,21
137:10,12 139:7
139:9
**rockets** 105:20
**rode** 107:8 120:8
128:21
**role** 7:9,9 127:10
127:15,16
**roles** 136:3
**rolled** 90:3
**Rost** 93:8
**rude** 76:21
**rules** 6:8
**run** 12:11,12
46:24
**running** 35:6
92:22 94:12
**rush** 10:14

**S**

**S** 2:7 4:1
**s/** 138:23
**safe** 33:14
**safely** 65:17
**safety** 43:21
65:13 106:6
135:15
**sale** 87:6,8
**sat** 111:15

**saw** 119:23
**saying** 61:21
67:24 81:9
106:22,23 110:3
118:19 130:13
**says** 5:3 24:5
25:18 45:20
47:22 48:5,11
48:18,21,24
55:23 56:17
57:6 59:9,16
60:10 65:10
66:3 75:12,13
75:18 76:16
87:2,5 98:9,13
**scene** 15:21 16:3
16:10,12,13,17
16:23 17:10
26:10,21 27:3
30:10,14 32:25
50:10 53:17
89:19 119:18
129:3 131:7
136:9,9
**scientists** 12:14
**scratch** 34:5
**seal** 93:10 138:19
**search** 11:15
35:18 36:5 37:1
37:2,11,12 74:4
74:9,16 75:7,14
118:7,11,14
119:9
**searches** 74:5,20
74:21 76:1
**second** 17:14
19:2 20:2 23:9
24:13 39:20
47:16 54:12,16
54:20 58:5
60:10 77:18
83:7 84:11 86:6
86:15 87:2 93:3
94:19 97:4
108:8,20 115:3
129:13 135:18

**seconds** 52:12
**Section** 74:19
75:12,18
**secure** 67:17
**see** 18:25 19:22
22:10,20,24
24:4 25:10 34:8
34:19 36:6,7,8
38:16 42:5,12
44:3,25 46:6,20
48:3,9,9 53:12
55:16 56:14,21
57:13,14 65:10
66:3 74:20
76:16 78:24
85:17 86:18
87:2,5,20,24
88:2,5,7 92:9
93:3 94:2 98:4
98:14 99:1,10
102:2,25 104:2
119:23 122:10
123:9,14 124:23
125:13 130:6
132:6,22,23
**seen** 19:6 35:16
41:25,25 42:8
53:14 58:16
59:1 87:22 90:3
92:1,7 94:6
106:18
**sees** 81:24
**seized** 53:8,8
**self-help** 43:20
**seller** 87:3
**send** 12:9 93:15
**sense** 6:12 85:5
**sent** 12:14 93:19
**sentence** 59:16
**sergeant** 54:9,11
69:23 77:4
80:15,16 89:13
89:22,23 90:9,9
90:11 115:25
116:6,17
**series** 74:7 85:21

**service** 7:4 9:1,8
79:15,20 132:20
**Services** 1:23
139:1
**set** 138:18
**Seven** 95:13
**sheet** 139:12,14
**sheets** 139:15
**Sheila** 1:20 3:19
4:16 138:4,23
138:24 139:21
140:13
**shift** 81:15,16
**short** 80:2 103:22
103:23 108:11
**shorthand** 138:14
**show** 24:14 47:15
55:1 73:8 75:14
85:8,14 91:13
95:16 97:18
100:4 102:13
122:9,11
**showed** 61:19
83:4 116:5
122:20 129:15
**showing** 39:16
42:7
**shown** 129:6
**sic** 83:5 121:15
**side** 22:17,23,25
24:7,7 78:10
96:19,19 97:6,8
97:10,11 116:12
124:19 125:9
127:10
**sidearm** 26:3
71:15
**sides** 113:19,24
**sidewalk** 22:18
36:8
**sign** 39:22 40:9
137:12 139:14
**signature** 4:18
39:22 138:15
139:12,14,16
140:1 141:25

**signed** 9:5 39:24
39:24
**signing** 32:5
**silver** 111:12
**similar** 25:15
**similarly** 6:3 26:5
26:6 114:17
**simple** 79:17
**simplest** 95:25
**Sincerely** 139:19
**single** 108:15
**sirens** 26:19,22
**sit** 112:1,4 134:25
**sitting** 68:15
72:15,19 119:25
**situation** 12:21
13:6 16:21
**six** 17:5 104:6
106:1 121:15
**six-three** 104:6
**six-two** 104:6
**skipping** 55:5
**slash** 55:13
135:23
**slightly** 32:13
**socially** 116:23
**solely** 37:7
**solved** 90:22,23
90:24
**somebody** 36:18
83:20 86:24
132:23 136:8,9
**somebody's**
132:22
**someone's** 11:20
132:19 133:7,12
**something's**
132:24
**soon** 82:8
**sorry** 19:15 26:6
46:6,17 66:22
76:21 82:13
90:8 102:17
109:25
**sort** 8:22,25 9:8
114:10

sounds 93:20
  120:15
spare 39:10
speak 11:21 18:7
  23:19 77:15
  78:10
speaking 7:20
  17:9,11 49:11
  51:12 62:7
  98:22
speaks 49:3
specific 95:7
specifically 49:25
  56:23
speculation 12:24
  24:24 25:5
  27:18 31:19
  33:8 34:12
  35:12 37:3,4
  38:10 40:25
  41:23 49:4 52:9
  54:4 58:24
  62:12 66:25
  68:7 70:6 71:5
  71:22 73:1 75:3
  82:3 89:1 91:5
  99:19 103:20
  106:14 107:5,21
  113:11,22
  130:25 132:1
  134:13 135:9
  136:14,22
speed 47:7
spell 5:8,10
spike 44:20
spoke 18:5 52:12
spoken 18:20
  21:17 61:24
  62:4
spot 70:2 101:15
squeezed 109:23
ss 138:2
St 1:24 3:18 4:4,8
  8:9 138:3,7
  139:2,7
stack 95:18

staffing 7:6
standby 29:15
standing 22:8,16
  92:20 102:19,23
  103:10 136:24
  137:4
star 125:18,24
  126:5
start 57:12 58:3
  95:6 115:3
started 57:16,18
  57:21 58:1 59:9
  59:13 110:7
  117:14,23 118:5
starts 29:7 58:20
state 3:20 5:7,10
  8:19,23 51:1
  57:2 64:9 66:12
  138:2,7 140:14
statement 59:20
statements 118:8
  128:7
States 1:1 3:1,21
  140:2
stating 61:20
station 79:23
  90:19 111:17
statute 64:10
stay 54:19,21
  61:22
steal 134:2
stepped 31:22
Steven 15:2 16:25
  121:3,25
sticking 117:20
STIPULATED
  4:13
stole 70:21
stolen 81:19
  108:21 112:13
stood 17:11 18:8
stop 15:21 85:2
  132:21
stops 26:18 27:8
story 17:12 36:9
  77:9 78:10

112:8 113:20,24
  121:8,11,18,23
  127:3 131:6,8
street 22:10
  65:11 111:7,15
  132:4,6
strike 95:4
strips 44:20
stuff 12:14
  131:20
subject 109:11
  114:9
subpoenas 12:1
Subscribed
  140:20
subscribing
  141:4
subsection 46:5
  66:13
subsequently
  90:15
sued 114:24
suggest 128:21
Suite 3:18 4:4,8
  138:7 139:6
summing 114:3
supervisor 69:25
  89:12 91:2
supplement
  135:17
supplemental
  13:22
supposed 61:4,22
  66:14
sure 6:9 12:20
  13:1,5 17:16
  32:8,19 33:14
  39:12 45:1
  46:22 92:20,23
  94:20 100:9
  102:4 115:21,21
  115:22 119:4
surprise 88:24
  89:2 112:7
surrounding 11:7
suspect 13:3

suspects 27:21
suspicion 75:16
  76:1
suspicious 50:2
SWAT 11:9
switch 57:21
  58:20
swore 117:21
sworn 3:13 5:2
  138:10 140:20
system 30:7

———————
          T
———————
T 2:7
take 32:8 39:11
  46:21 47:7,12
  48:6 53:24
  83:20 120:13
taken 1:13 4:15
  5:13 47:3 94:23
  120:16 138:14
  139:11
talk 6:10 78:12
  135:18
talked 61:15
  88:13
talking 18:9
  28:22 54:13
  70:13 83:14
  87:17 90:5
  113:6 124:23
  125:21
tall 24:16 103:18
  103:21,23,24
  104:5
task 41:8
team 11:9
technically 80:1
tell 5:21 32:17
  39:17 45:6 47:5
  49:21 52:13
  53:14 63:2
  70:18 81:1,7,13
  84:11,13,16
  86:1 90:2,25
  91:6 100:5,17

109:6,13 113:12
  126:16 138:10
ten 15:21 33:3
  47:12 52:12
  55:22
term 126:3
terms 60:11
testified 17:22
  33:20 38:7
  40:18 50:6 56:8
  60:16 69:22
  74:16 96:4,10
  99:2,15 100:22
  104:20 108:10
  108:16 109:11
  115:2,10,12
  128:1 129:11
  130:18
testifying 55:20
  94:25
testimony 28:13
  28:24 60:23
  61:10 67:1,3,11
  79:13 93:17
  132:11,14
  136:18
Thank 72:5
  120:18 133:20
  137:8 139:18
Thanks 85:25
  102:5
theft 82:23
theirs 61:21
thereto 141:5
they'd 122:16
thing 18:16 25:24
  47:5 107:8
  122:2
things 8:6 58:5
  74:13 101:8
  119:2,4 121:5
  129:20
think 30:19 34:3
  46:17 52:24,25
  57:11 62:23
  72:23 80:12

83:14 89:12
104:6 111:12
114:8 117:9,11
119:3 122:6
125:4,6 126:21
134:23 135:13
135:19 137:2
**third** 78:7
**Thomas** 83:5
121:15
**Thompson** 1:5
3:5 17:3,4 21:2
21:8 37:21
38:18,19 51:2
51:25 55:17
61:24 62:4,8
68:16 69:19
77:15,16,22
78:13 81:18,21
83:11,16 84:2,9
84:11,16,18
86:9,20 87:2,20
88:1,8,8,13
89:24 90:4
108:1,8,19,20
108:24 109:5,10
109:13 112:18
139:8 140:5
141:3
**Thompson's** 15:7
15:10 17:25
18:23 20:1
23:11 27:3 28:8
29:25 31:22
34:19,21 35:17
35:20 36:22,23
45:17 50:9,16
50:19 53:24
57:3 63:21
65:24 68:9,25
69:7 71:12
78:10 79:17
80:4,21 82:12
82:14 96:13
100:21,25
106:10 107:25

108:10 109:18
110:25 119:6,16
121:2 122:21,24
124:10 132:7
**thorough** 10:6
**thoroughly** 12:22
13:6
**thought** 41:24
84:22
**three** 107:9
**three-wheel**
112:12
**threshold** 104:21
**tickets** 7:3
**tied** 90:21
**time** 11:23 16:16
17:8 19:2,3,5,6
21:6 23:17,24
24:1 28:17
32:14,22,24
34:7,20 37:2,12
47:6,11 54:12
54:13,16,20
61:23 62:1
68:22 69:6,7,7
69:10,18,21
72:10,12 77:18
78:12 80:3,7,23
81:7,10,13
82:22 85:20
88:12 89:12
108:7,19,20,24
109:2,4,9
111:18 112:23
116:5 117:6
120:18 126:17
127:7,12,13,24
131:3,6,7
134:24 135:1
**times** 19:3 68:24
69:3 71:11
108:9,14 136:23
**timing** 37:8
**tire** 103:1
**title** 2:14 19:7,8
19:10,11,13,23

31:6,7,8,11,15
35:10,16 52:18
52:21,25 53:1
53:15 79:5
83:24 84:24
85:1,6,7,14,17
86:8 90:9
**today** 40:19
68:15 72:15,19
95:10 98:7
112:1,4 114:15
114:20 119:25
128:1 134:25
**toggle** 57:21
58:20
**told** 16:21 17:6
17:22 31:4
62:18 89:20,21
112:8 116:3
121:5,7,11,23
122:8
**tools** 10:23 11:3
**top** 46:8 47:21
75:12 86:3,12
92:10 95:20
117:22 130:6
**topic** 115:11
**totality** 36:10
**totally** 40:5,6
47:8
**touch** 33:25
68:21
**touched** 117:11
**touching** 138:11
**tow** 66:9 67:8,16
67:18,19 122:12
122:14,17,18
127:22 128:3,5
128:9,19
**towed** 63:9 66:5
66:15 67:21
**towing** 64:7 65:2
**tows** 67:15
**traditional** 60:20
**traffic** 7:17 8:3
15:21 26:18

27:8
**trained** 75:21
**training** 44:16,18
44:21,22,23
98:17 126:12
133:24 136:16
**transcribed** 4:17
**transcript** 6:11
139:13
**transferred** 117:8
**transpired** 81:25
84:12
**trash** 129:20
**trespass** 109:7,15
**trial** 139:16
**trike** 56:22 88:9
112:12
**trikes** 121:19
**truck** 122:12,14
122:17 128:5
**true** 59:13,13,20
76:5,6 121:18
128:13,18
131:21
**trust** 67:19
**trusts** 68:11
**truth** 66:9 138:11
**truthful** 43:24
**try** 68:19
**trying** 17:15
76:21 84:21
90:22 128:20
**turn** 26:19,21
28:14,19,19
120:20
**Twenty** 32:22
**two** 15:5,17 19:3
20:24 22:8 24:8
33:12 44:2
77:23 80:18
86:12 87:10
90:20 108:9
113:24 121:22
129:2 131:5
135:7
**typewriting** 4:17

138:15

---
**U**
---

**U.S** 75:17
**uh-huh** 16:1
17:17,20,24
22:3 25:20
26:14 28:4
56:13 68:1
76:18,22 86:17
90:10 97:9 99:3
100:14,16
116:20 124:22
124:24 125:23
127:23 128:2
**ultimately** 53:22
**understand** 5:21
5:23 12:3,10
17:16 32:4,24
33:10 34:14
69:5 76:14 81:9
94:25 101:21
117:1 119:2
133:6,11
**understanding**
17:21 27:10,12
38:20 39:2 62:2
62:5 71:7 126:8
132:18
**understood** 6:4
38:5 49:6 81:23
130:12
**uniform** 25:12
71:14 82:16
**unit** 7:4,5
**United** 1:1 3:1,21
140:2
**unnecessarily**
101:9
**untrue** 128:19
**upset** 83:19
**use** 10:24 11:4
12:20 13:5,12
28:18 46:23
57:11 68:16
**usually** 121:20

Joshua Cockrell  -  December 4, 2023

132:22 133:25
**utilize** 26:10 28:7
28:21 41:20

---

**V**

**v** 1:7 3:7 66:3
139:8 140:7
141:3
**vacation** 107:16
**vague** 11:1 33:7
34:12 73:1
76:11 99:18
103:20 105:8
107:4 113:21
131:25 133:15
134:12 136:21
**value** 105:11
**vantage** 102:23
104:12
**various** 74:12
136:5
**vehicle** 2:14 16:3
16:5 26:10
45:23 47:25
58:3 59:10
63:10 64:7,13
64:15,16 65:2,5
65:11,17 66:4,5
66:15 67:8,15
67:15 68:17
82:15,23 83:8
106:12 111:11
116:18 118:15
118:16 123:6,10
123:20 124:1
126:9 131:9
134:2
**vehicles** 23:4
57:17 63:9 64:8
129:20
**vein** 77:11
**veracity** 77:8
**vest** 98:6
**victim** 13:4
**VIN** 30:4,4,7
33:21 34:2,3

35:7 56:22
87:16 102:20
118:12,16 122:5
**virtually** 98:6
**visual** 24:3
**voice** 138:14
**voluntarily** 11:21

---

**W**

**wait** 20:22
**waiting** 83:13
**walk** 23:10 96:16
132:8 133:7,12
**walked** 67:5 96:6
96:18,19,22
97:1
**walkie-talkie**
25:16
**walking** 23:23,24
90:3
**walks** 23:10,13
23:15
**want** 8:14 12:11
14:10 15:19
17:15 47:15
54:19,20 56:11
56:18 61:9
85:17 92:15,16
95:5,16 100:4
110:4 117:17
119:4 122:10
**wanted** 85:7,16
**wanting** 81:18
**warrant** 35:18
36:5 37:2,12
42:16 43:5,10
43:19 74:5,10
74:16,20,21
75:7 119:10
132:13
**warrants** 11:15
74:4
**wasn't** 21:2 22:1
28:20,22 30:13
37:17 58:2
66:19 78:15

83:6 85:4,15
86:11 89:4 92:8
103:3 108:19
116:6 117:8
122:2 127:12
**watch** 34:5 134:1
**watched** 20:3
**Watchguard**
98:25
**Watching** 110:9
**water** 101:15
**Waters** 54:9,11
69:23 77:4
80:15,16 89:13
89:19,22,23
90:9,11 115:25
116:6,17 117:7
**way** 25:13 34:17
39:13 57:15
65:16 67:20
78:9 106:17
112:11 119:22
**we'll** 7:19 24:13
46:24 54:20
55:7 84:10 87:1
96:10 115:2
137:12
**we're** 24:2,19
47:4 55:5 87:17
94:24 95:4
115:11
**we've** 11:7 126:3
**wearing** 25:12,15
25:16 26:9 27:4
28:11,25 29:4
71:14 98:5,7
**website** 93:25
**weeks** 90:20
**weird** 125:5
**welcome** 47:12
**welcomed** 85:9
85:11,12,13
**went** 8:9 17:13,25
22:7 30:3 33:13
34:20 50:10
52:24 63:17,21

63:24 67:10
68:13 79:15,23
80:8,9,9 84:9,20
111:8
**weren't** 37:19
74:16 131:3
**wheels** 107:9
121:22
**WHEREOF**
138:18
**willing** 11:21
131:20
**window** 90:2
124:21
**windows** 24:5
102:25
**withstanding**
128:7
**witness** 4:18,19
11:18 46:11,16
66:22 94:17
120:21 138:12
138:18 139:13
141:25
**women** 121:20
**wonderful** 6:8
**word** 6:12,12
**words** 7:11 12:10
17:15 64:19
78:17 86:6
101:5 111:7
115:10
**work** 7:5,7 8:23
9:5 23:6 30:24
47:1 71:12 76:2
81:11 93:16
94:14 117:5
122:18 128:9
**worked** 117:2
**working** 12:11
91:1
**workout** 81:6,10
**wouldn't** 23:25
67:18 106:16
**Wrangler** 23:5,7
**write** 7:3 10:19

**wrong** 67:23
71:20 72:7
**wrote** 40:15
43:18 69:15
77:22 101:21
117:12

---

**X**

**X** 2:1,7 100:9
103:5,8

---

**Y**

**yard** 22:10,17
23:11,16 24:11
24:12,14,15,21
25:1,3 29:25
31:17,23 33:1,5
34:8,8,19 35:2
35:17,20 36:5
36:14,17,22
37:1,11 42:16
43:5 50:11,16
50:18 54:22
67:18,19 69:2
88:19 96:12,17
100:21,25
103:11 106:10
107:25 109:18
110:11,13,19,20
110:21 119:7
121:17 123:24
124:14 126:4,6
130:14 132:9,19
133:7,13
**yards** 6:18
**yeah** 7:24 8:2
13:11 32:22,24
33:11 40:5 43:3
46:13,25 47:2
48:22,23 49:7
50:18 51:16
55:7 57:19
58:11 62:19,24
67:22 76:15,24
77:21 81:11
85:2,8,13,19,20

Joshua Cockrell  -  December 4, 2023

86:19 92:21
110:23 120:13
122:8 125:15
130:2 131:18
134:22 135:21
**year** 9:19 107:17
113:13
**years** 77:23 87:11
112:24
**Yep** 6:6,19 18:4
48:10,19 52:2,4
56:5,16,18,19
87:7 97:20 99:6
111:9 130:8
**you-all** 22:16
29:24 50:25
54:22 62:6 66:9
**Young** 3:17 4:7
138:6 139:6

---

**Z**
**zip** 63:25

---

**0**
**003** 65:23 66:6

---

**1**
**1** 2:9 39:6,7,17,18
39:21 114:1
**1:30** 81:13
**10** 2:18 100:2,5,6
100:7,12,18
101:3,13,17
102:18 104:20
110:15 125:12
125:13 126:1
**10/22/22** 55:21
**100** 2:18
**102** 2:19
**11** 2:19 15:24
44:3 45:12
63:12 102:14,15
102:18 104:8,12
104:22
**11/14/2022** 92:13
**11/14/22** 2:15
**11:00** 15:23 79:7

79:7
**11:30** 15:24,25
78:14 81:12
**12** 113:12
**12:30** 81:12,12
**120** 2:4
**1209** 21:21 55:17
**1226** 1:20 139:22
**12444** 3:17 4:7
138:6 139:6
**126** 2:3
**133** 2:4
**134** 2:3
**14th** 93:4 94:8
**15** 2:20 9:22
32:19 42:12,13
43:10 58:7,8,13
113:12
**151** 46:9 60:10
**15C** 43:1,11
**160** 3:18 4:8
138:7 139:6
**17** 139:5
**17th** 138:19
**18** 117:10
**1HD** 56:23

---

**2**
**2** 2:10 25:7 45:2,4
45:7,10,14,16
45:20 46:4
47:15,18,22
60:8 65:9
**2,366.37** 88:10
**20** 15:20 32:16
69:11,12 77:7
140:21
**200** 107:23
**2003** 56:21 87:14
88:9
**2012** 8:14
**2013** 8:17 9:22
**2015** 6:25
**2020** 46:1 47:19
63:15 73:20
87:9

**2022** 7:10 14:11
18:24 28:9 44:7
45:18 50:9
63:21 93:4 94:9
96:2 98:24
105:6 106:10
113:1,15 121:1
123:1 127:8
**2023** 1:14 3:15
138:19 139:5,11
140:14
**22/22** 55:23
**2230** 15:20
**22nd** 7:10 14:11
18:24 28:9 44:6
96:2 98:24
105:5 106:10
121:1 123:1
127:8
**23** 130:10
**2330** 15:20
**23rd** 44:6
**24** 41:10
**25** 32:16 69:12
77:7
**252092** 1:23
139:2

---

**3**
**3** 2:11 55:6,7
56:17,18 62:22
62:25 63:4,6,8
**3's** 62:23
**30th** 87:9
**314-461-2122**
1:24 139:3
**39** 2:9

---

**4**
**4** 1:14 2:12 3:15
55:2,3,9,12 59:9
66:2 135:20
139:11 140:14
**4:23-cv-133-S...**
1:7 3:7 140:7
**425** 2:13 73:17

**425.06** 74:19 75:8
**441** 2:10 44:8,11
44:24,25 45:10
46:7 47:18 60:9
61:1,11,11
**45** 2:10
**456** 2:11 44:8
62:20 66:19
67:4,12
**4569** 66:13

---

**5**
**5** 2:3,13 40:15
73:9,10,12,15
73:16,22 74:1,2
74:4,7,19
**5/26** 47:19
**5375** 98:10
**55** 2:12
**58** 2:20

---

**6**
**6** 2:14 44:3 85:21
85:23 86:2
**62** 2:11
**63021** 21:23
**63105** 4:4
**63125** 1:24 139:2
**63131** 3:18 4:8
139:7

---

**7**
**7** 2:15 42:12
91:14,15,17,20
95:14
**73** 2:13
**750** 4:4 107:22
**7700** 4:3

---

**8**
**8** 2:16 95:21,22
96:4 122:22,23
122:24 124:18
125:22 129:7,14
**819** 46:10 65:10
**821** 66:2
**85** 2:14

---

**9**
**9** 2:17 97:16,19
97:19,22 98:1
99:5,7,23
122:23
**9:29** 92:13
**91** 2:15
**92-1238320** 139:3
**95** 2:16
**97** 2:17

---