**Page 1**

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF MISSOURI
                    EASTERN DIVISION
RAYMOND THOMPSON,              )
                              )
        Plaintiff,            )
                              )
v.                            )  No. 4:23-cv-00133 SRW
                              )
JOSHUA COCKRELL AND ROBERT    )
GERHOLDT,                     )
                              )
        Defendants.
```

```
              DEPOSITION OF RAYMOND THOMPSON
                    December 6, 2023


        Reporter:   Jude Arndt, CSR, CCR, RPR
                    CSR No. 084-004847
                    CCR No. 1450
```

**Page 3**

                    INDEX OF INTERROGATION
Examination by Ms. Robertson                Page 4

                    INDEX OF EXHIBITS

Defendant's Exhibit C                        Page 23
Defendant's Exhibit D                        Page 26
Defendant's Exhibit F                        Page 29
Defendant's Exhibit G                        Page 29
Defendant's Exhibit H                        Page 29
Defendant's Exhibit I                        Page 59
Defendant's Exhibit J                        Page 69
Defendant's Exhibit K                        Page 82
Defendant's Exhibit L                        Page 98
Defendant's Exhibit M                        Page 102
Defendant's Exhibit N                        Page 107
Defendant's Exhibit O                        Page 123
Defendant's Exhibit P                        Page 127
Defendant's Exhibit Q                        Page 127
Defendant's Exhibit R                        Page 127
Defendant's Exhibit S                        Page 127
Defendant's Exhibit T                        Page 127
Defendant's Exhibit U                        Page 127
Defendant's Exhibit V                        Page 127
Defendant's Exhibit W                        Page 136
Defendant's Exhibit X                        Page 161
Defendant's Exhibit Y                        Page 163
Defendant's Exhibit Z                        Page 163
Defendant's Exhibit AA                       Page 167
Defendant's Exhibit BB                       Page 167
Defendant's Exhibit CC                       Page 170
Defendant's Exhibit DD                       Page 170
Defendant's Exhibit EE                       Page 170
Defendant's Exhibit FF                       Page 170
Defendant's Exhibit GG                       Page 170

            (Exhibit was retained by counsel.)

**Page 2**

```
            DEPOSITION OF RAYMOND THOMPSON, taken
pursuant to Notice of Taking Deposition, before Jude
Arndt, a Certified Shorthand Reporter and Certified
Court Reporter, at 7700 Bonhomme Avenue, Suite 750, St.
Louis, Missouri, on December 6, 2023.


              APPEARANCES OF COUNSEL

On Behalf of Plaintiff:
        Margulis Gelfand
        7700 Bonhomme Avenue, Suite 750
        St. Louis, MO 63105
        314-390-0230
        By:   Justin K. Gelfand
              justin@margulisgelfand.com
              Stone T. Hendrickson
              stone@margulisgelfand.com
        Margulis Gelfand
        1325 G Street, N.W., Suite 500
        Washington, D.C. 20004
        202-975-0895
        By:   Greg Bailey (via Zoom)
              greg@margulisgelfand.com

On Behalf of Defendants:
        Reichardt, Noce & Young LLC
        12444 Powerscourt Drive, Suite 160
        St. Louis, MO 63131
        314-789-1199
        By:   Catherine Robertson
              cmr@reichardtnoce.com
```

**EXHIBIT 18**

**Page 4**

```
 1      [10:05 a.m.]
 2      The witness, RAYMOND THOMPSON, first having been
 3  duly sworn, testified as follows:
 4          EXAMINATION
 5  BY MS. ROBERTSON:
 6      Q.  Good morning, Mr. Thompson.
 7      A.  Good morning.
 8      Q.  You and I haven't formally met, but we've
 9  spent the last couple of days together.
10      A.  Yes.
11      Q.  My name is Cate Robertson, and I represent
12  Officers Gerholdt and Cockrell, whom you've met over
13  the last couple of days.
14      A.  Right.
15      Q.  Would you state and spell your name for
16  the record?
17      A.  Raymond Thompson.  R-A-Y-M-O-N-D
18  T-H-O-M-P-S-O-N.
19      Q.  Do you have a middle initial?
20      A.  Yeah.  My middle name is Anthony, A.
21  Yeah.
22      Q.  I think you have heard your attorney
23  probably explain to the other witnesses over the last
24  couple of days some ground rules for depositions.
25      I don't have a whole lot more to say
```

RAYMOND THOMPSON

**5**

1  differently.
2      A.   Okay.
3      Q.   This gentleman is taking down everything
4  we're saying, so it's very important that we not talk
5  over one another so a clear record is made.
6      Do you understand that?
7      A.   I do.
8      Q.   Do you understand you have to answer out
9  loud, yes or no?  You can't -- it can't be shakes of
10 the heads, uh-huhs and huh-uhs, because that doesn't
11 come across clear in the record?
12     A.   Right.
13     Q.   Have you ever had your deposition taken
14 before?
15     A.   I don't believe so.
16     Q.   Is there any reason you can't tell me the
17 truth today?
18     A.   No.
19     Q.   You're well-rested?
20     A.   Yeah.
21     Q.   Not under the influence of any medicine or
22 drug that affects your memory?
23     A.   No.
24     Q.   Not under any drug or medication that
25 affects your ability to tell the truth?

**6**

1      A.   No.
2      Q.   Can we agree that if you don't understand
3  a question I have asked, which will probably happen at
4  some point because lawyers can be wordy --
5      A.   Right.
6      Q.    -- you will let me know that you didn't
7  understand my question?
8      A.   I will.
9      Q.   And if you didn't hear me, you'll let me
10 know?
11     A.   Yes.
12     Q.   And if you would like me to rephrase it,
13 you'll let me know?
14     A.   I will.
15     Q.   And you understand you're under oath
16 today?
17     A.   I do.
18     Q.   You agree to tell me the truth?
19     A.   Yes.
20     Q.   Did you do anything to prepare for your
21 deposition?
22     A.   Umm.  Just spoke to my attorneys.
23     Q.   And throughout the course of today I don't
24 want to know anything you've said to your attorneys;
25 okay?

**7**

1      A.   Okay.  Right.
2      Q.   Did you review any documents?
3      A.   No.
4      Q.   What is the address of your primary
5  residence?
6      A.   1209 Cottagemill Drive, Manchester,
7  Missouri, 63021.
8      Q.   Is that in St. Louis County?
9      A.   Yes.
10     Q.   Was that your primary residence in 2022?
11     A.   Yes.
12     Q.   How long have you lived there?
13     A.   I think 22 or 23 years.
14     Q.   Do you own or rent?
15     A.   Own.
16     Q.   Has anyone ever lived there with you?
17     A.   I have a -- I have shared custody with my
18 15-year-old daughter, Abigail Marie Thompson, and she
19 is there basically 40, 50 percent of the time.
20     And my cousin, who is Kevin Kelly.  He's
21 divorced, he stays there in between.  He works
22 out-of-state a lot, with construction, so he'll stay
23 there periodically as well.
24     Q.   Do you -- did Mr. Kelly stay with you in
25 October of 2022?

**8**

1      A.   He -- he was there -- I don't believe that
2  night, but he was there after, shortly after.  He was
3  working on a job, and he was working the refinery in
4  Illinois, and so he was staying over there, and then
5  he -- I think he came back a couple of days after this
6  incident occurred.
7      Q.   To the best of your knowledge, Mr. Kelly
8  was not present at your residence in your yard --
9      A.   No.
10     Q.    -- on October 22nd, 2022?
11     A.   Right.  No, he was not.
12     Q.   And same for October 23rd, he was not
13 there?
14     A.   Correct.
15     Q.   Since 2019, have you -- have you owned or
16 rented any other real property?
17     A.   I -- I own other houses, yeah.
18     Q.   Where are those located?
19     A.   I have two houses in Florida.  I have
20 property in Florida.  I have property in Beaufort,
21 Missouri.  I have property in Arizona.  Parker Canyon
22 Lake.
23     Q.   What's the address of the Beaufort,
24 Missouri, property?
25     A.   3676 Fox Creek Road.

2  (Pages 5 to 8)

RAYMOND THOMPSON

9

1    Q.    How long have you owned that property?
2    A.    Three -- three years, I believe, three or
3    four years.
4    Q.    I don't want to put words in your mouth,
5    but since 2020?  Does that sound right?  Or 20 --
6    A.    It was after -- I believe it's about --
7    believe it was later than that.
8    Q.    Okay.
9    A.    I can't -- I can't remember when I
10   actually closed on it, but it was after that, I
11   believe.
12   Q.    Are you currently married?
13   A.    No.  Divorced.
14   Q.    You're divorced?
15   A.    Yeah.
16   Q.    What was the name of your spouse?
17   A.    Carrie Thompson.
18   Q.    When did you divorce?
19   A.    2011.
20   Q.    Any other spouses?
21   A.    No.
22   Q.    And you mentioned you have a daughter,
23   Abigail?
24   A.    Yeah.
25   Q.    Do you have any other children?

10

1    A.    No.
2    Q.    Do you have any siblings?
3    A.    I do.  I have three siblings.  Jeremiah
4    Thompson, Kimberly Thompson, and Ashley Thompson.
5    Q.    Do Kimberly or Ashley live in Missouri?
6    A.    Kimberly lives in Missouri, and Jeremiah
7    lives in Missouri, and Ashley lives in Florida.
8    Q.    Does Kimberly -- whereabouts does Kimberly
9    live?
10   A.    Robertsville, Missouri.
11   Q.    Was she at your residence on October 22nd
12   or 23rd of 2022?
13   A.    No.
14   Q.    What about Ashley?
15   A.    No.
16   Q.    Are your parents still living?
17   A.    Yes.
18   Q.    What are their names?
19   A.    Ray and Mary Thompson.
20   Q.    Where do they live?
21   A.    Robertsville, Missouri.
22   Q.    Were either of your parents at your
23   residence on October 22nd --
24   A.    No.
25   Q.    -- or 23rd, 2022?

11

1    A.    No.
2    Q.    And just to keep it simple, would it be
3    okay -- we know what night we're talking about here.
4    A.    Right.
5    Q.    If I just say October 22nd --
6    A.    Right.
7    Q.    -- from here on out, you know I mean
8    2022?
9    A.    Right.  Of course.
10        [Interruption by the reporter.]
11   Q.    It's okay.  It happens to everybody.
12   That's just how we talk.
13   A.    Yeah.  Okay.
14   Q.    And it's -- nobody -- you know, I might
15   say is that a yes or something, and it's not meant to
16   be offensive.  It's just so we have a clear --
17   A.    It's just -- if you ask the question, and
18   you know, when you ask another question it seems
19   redundant, but -- You know, okay.
20   BY MS. ROBERTSON:
21   Q.    It's just the nature of how this goes.
22   A.    Okay.  All right.  Sorry.
23   Q.    No.  You're okay.
24   Are you employed?
25   A.    I am.

12

1    Q.    How are you employed?
2    A.    By Happy Tree Service.
3    Q.    What is your position with Happy Tree
4    Service?
5    A.    Co-owner.
6    Q.    Who do you own the business with?
7    A.    My brother Jeremiah Thompson.
8    Q.    What kind of business is Happy Tree
9    Service?
10   A.    We do tree -- tree work.  Commercial and
11   residential tree removals, tree maintenance, tree
12   spraying.  All that sort of stuff.
13   Q.    What are your job duties?
14   A.    I manage the crews, and I dispatch the
15   crews, and I do sales.
16   Q.    Anything else?
17   A.    I mean, as a business owner, you know, I
18   do a variety -- sometimes I fill in, you know.
19   Q.    What's your educational background?
20   A.    High school and, I guess, probably junior
21   college.  I have 130-something credit hours.
22   Q.    And one just ground rule I forgot to
23   mention.  We're still earlier on in this, but if you
24   need a break at some point, just let us know.
25   A.    I will.

3 (Pages 9 to 12)

RAYMOND THOMPSON

13

1    Q.    The only thing I'd ask is, if I've asked a
2    question, if a question is pending, please answer
3    before we take the break.
4        Fair enough?
5        A.    Sure.  Yeah.
6        Q.    Do you possess any diplomas or
7    certificates?
8        A.    Work-related, or education?  Like --
9        Q.    Both.
10       A.    Oh.  High school and I have various
11   work-type dip -- certificates and things like that,
12   like CPR training, just various, you know, like
13   work-related-type certificates.  Pesticide sprays,
14   spraying, things like that.
15       Q.    What did you -- what did you study in
16   junior college?
17       A.    Biology.  It was Missouri State.  Not
18   junior college.
19       Q.    I'm sorry.
20       A.    Yeah.
21       Q.    Do you have any special skills as a
22   mechanic?
23       A.    No.  I mean, I occasionally help my
24   mechanic work on trucks and things like that, but I'm
25   not a mechanic or -- yeah.

14

1        Q.    Do you have any special skills pertaining
2    to vehicle appraisal?
3        A.    No.
4        Q.    Do you have any certifications as a
5    mechanic?
6        A.    No.
7        Q.    Any certifications as a vehicle appraiser?
8        A.    No.
9        Q.    Have you ever been a plaintiff or a
10   defendant in a lawsuit before?
11       A.    No.
12       Q.    Have you ever pled guilty to a felony or
13   misdemeanor?
14       A.    No.
15       Q.    Do you consider yourself an expert in
16   motorcycle repair?
17       A.    No.
18       Q.    Do you consider yourself an expert in
19   motorcycle valuation?
20       A.    Sort of.  Yeah.  I would say to a degree.
21   I'm an that's true, so I have motorcycles, and I have a
22   pretty extensive knowledge of values and things like
23   that.
24       Q.    What quali -- on what qualifications do
25   you consider yourself an expert in motorcycle

15

1    valuation?
2        A.    I'm a collector, so I -- I own many
3    motorcycles.  I'm a collector, so I shop around for
4    parts for various vintage motorcycles.  And I know lots
5    of -- I have lots of friends that I ride motorcycles
6    with, or, you know, talk to them about motorcycles.
7        Q.    Have you ever served as an expert for
8    anyone with respect to motorcycle valuation?
9        A.    No.
10       Q.    Do you have any training in motorcycle
11   valuation?
12       A.    No.
13       Q.    And you just kind of mentioned a little
14   bit about owning motorcycles.
15       Do you own any vehicles currently?
16       A.    Own vehicles?
17       Q.    Uh-huh.
18       A.    Yes.
19       Q.    What do you own?
20       A.    I have a Jeep Gladiator, a 2022 Jeep
21   Gladiator.  I have a 1997 Jeep Wrangler.  I have a 2000
22   Jeep -- 2014 Jeep Wrangler.  I have a 1965 Corvette
23   Stingray.  I have a Harley-Davidson -- 2003 anniversary
24   Harley-Davidson trike.  I have a custom-built low
25   Hardtail motorcycle.  I have a 2002 Harley-Davidson

16

1    Softail.  And I have numerous Harley-Davidson and/or
2    Triumph Indian 1970s models Enduros motorcycles.  I
3    can't even remember how many.  There's probably 10 or
4    15 of them.
5        Q.    What year is the custom Hardtail?
6        A.    2005.
7        Q.    And you mentioned you had numerous other
8    Harley-Davidson or Indian 1970s motorcycles?
9        A.    Yeah, Enduros.  I have probably 10 -- 10
10   to 15 of them.
11       Q.    Where do you -- where do you keep those?
12       A.    My parents have a farm in Robertsville,
13   and they have a storage -- storage barns.
14       Q.    Are you the registered owner of those 10
15   to 15?
16       A.    Yeah.  Yes.  Most of them aren't
17   registered, you know, they're vintage.  So I -- you
18   know, you just purchase them on eBay.  They're Enduros.
19       Q.    What does Enduro mean?
20       A.    It's off-road, and -- and they are like
21   dirt bikes or street legal.  You can get them street
22   legal.
23       I don't currently have any of them street legal,
24   but --
25       Q.    You cannot, did you say?

RAYMOND THOMPSON

**Page 17**

1  A.  You can.  You can either get them street
2  licensed and street legal, or you can -- they are made
3  for off-road and on-road usage.
4  **Q.  And the ones you own are not street legal?**
5  A.  Those -- those are not, no.  But the 2005
6  Hardtail, the 2002 Softail, and the 2003 custom trike,
7  anniversary trike, is -- those are street legal
8  motorcycles.
9  **Q.  How long -- how long have you owned the**
10  **Hardtail?**
11  A.  I can't remember exactly.  I'm going to
12  say 10 years.  I'm going to guess 10 years.
13  **Q.  You're not the original owner?**
14  A.  No.
15  **Q.  What about the 2002 Softail?**
16  A.  I was the original owner.  I bought that
17  in 2002.  It was the first new motorcycle I've ever
18  bought.
19  **Q.  How long have you owned the other 10 to 15**
20  **motorcycles you mentioned?**
21  A.  I acquired them over the last five years.
22  Bought them at, you know, different auctions and
23  things.  eBay auctions.
24  **Q.  So you mentioned a 2003 Harley anniversary**
25  **trike.**

**Page 18**

1  A.  Uh-huh.
2  **Q.  Is that the motorcycle that is mentioned**
3  **in your lawsuit?**
4  A.  That's the one that was stolen, yes.
5  **Q.  Okay.  And do you own any other trikes?**
6  A.  No.
7  **Q.  So if I say "trike" throughout this**
8  **deposition --**
9  A.  I'll understand.  It's unique, so it's --
10  compared to all the other bikes, it's a very unique --
11  **Q.  That's the one we are talking about?**
12  A.  Yeah.  If you say trike, I'll know.  It
13  unique.
14  **Q.  When did you purchase the trike?**
15  A.  I think -- I think in 2020 -- 2020, 2021.
16  I would have to reference the paperwork.  But it's on
17  the checks, when I purchased it.
18  **Q.  In October -- October of 2022 through**
19  **March of 2023, did you have working vehicles?**
20  **And by that, I mean, did you have vehicles that**
21  **were operational, and that you could use for your**
22  **commute or errands or things like that?**
23  A.  Like a car?
24  **Q.  Yes.**
25  A.  Yeah.  I did.  I had my Jeeps.  Well, I

**Page 19**

1  bought the Jeep -- the Gladiator in 2022, and I had
2  the -- I had a 2004 Ford F-150 that I've sold.  And
3  then I had the Jeep Wrangler, 2014 Jeep Wrangler.
4  The 1997 is in Florida -- I keep in Florida at
5  my house there.
6  **Q.  So between October of 2022 and March of**
7  **2023, you had the 2004 Ford F-450?**
8  A.  F-150.
9  **Q.  It's a 150?**
10  **Do you also own a 450?**
11  A.  No.  I mean, I probably have -- I have
12  numerous vehicles with the company I own, so -- as
13  well -- but those are separate -- the company-owned
14  vehicles.
15  **Q.  Between October of 2022 and March of 2023,**
16  **were you without a vehicle, aside from the Harley?**
17  A.  Only the trike I was without.  Yeah.
18  **Q.  Okay.  Which vehicle did you use for your**
19  **daily commute between October of 2022 and March of**
20  **2023?**
21  A.  Probably the F-150 and the -- yeah, F-150.
22  **Q.  Do you use any of the vehicles for**
23  **pleasure?**
24  A.  The trike and the custom -- Harley trike,
25  and the 1965 Corvette.

**Page 20**

1  **Q.  With respect to your business, does the**
2  **business own other vehicles?**
3  A.  They do -- it does, yeah.
4  **Q.  Others that we haven't talked about?**
5  A.  Well, they're work vehicles.  So they're
6  big utility trucks, you know, so they're not daily
7  drivers, no.
8  **Q.  Does your business use motorcycles for any**
9  **business purposes?**
10  A.  No.
11  **Q.  How many motorcycles would you say you've**
12  **owned over the course of your life?**
13  A.  That's hard to say.  I've been riding
14  since I was a kid, so I've had many.
15  **Q.  So the trike that forms the basis of this**
16  **lawsuit -- I would like to ask some specifics about the**
17  **trike.**
18  A.  Sure.
19  **Q.  And so what is the make of the trike?**
20  A.  It's a Harley-Davidson.
21  **Q.  What is the year?**
22  A.  It's a 2003 anniversary, 100-year
23  anniversary custom -- custom three-wheel motorcycle,
24  trike.
25  **Q.  I was going to ask you what's the specific**

RAYMOND THOMPSON

21

1 model, but do you have anything to add?
2     A.   Well, it's a low rider, so it's called a
3 low rider, would be the model.  But it's been modified,
4 you know, because of my knees and deteriorating knees
5 and stuff and old age.  That's the reason I sought this
6 bike out.  And, you know, it's very special, and that's
7 why I sought this one out.  So --
8     Q.   Does it have a trim level?
9     A.   A what?
10     Q.   A trim level?
11     So I'm -- I'm certain you know more about
12 motorcycles than I do.
13     A.   Okay.
14     Q.   But for example, on a car, maybe there'll
15 be a limited or a sport.
16     A.   It's a 2003 anniversary low rider,
17 which -- that would be the model.
18     Q.   Okay.
19     A.   Are you talking about the cubic inch
20 motor?
21     Q.   Well, I was going to ask you what the
22 motor is, but I'll get to that in a second.
23     A.   Okay.
24     Q.   So do you know if in 2003, Harley-Davidson
25 produced more than one level of 100-anniversary trike?

22

1     A.   No.  They produced numerous anniversary
2 model, different -- there is a Hardtail, Softail, a
3 Sportster.  There's different models, but I believe
4 this is the only anniversary three-wheel trike that
5 they produced.
6     Q.   And so maybe folks have different colors,
7 do you know, or are they all the same color of those
8 that were produced?
9     A.   I'm not sure about that about that.  This
10 one is -- this one was the original black, with the
11 anniversary -- a lot of them were black or blue -- not
12 specifically the trikes, but were black or blue, and
13 they had specific decals on them that indicated the
14 anniversary.  I had to locate some of those.  It was
15 tough to locate many of the parts for that.
16     Q.   Okay.  Do you know what colors the 2003
17 100th Anniversary trike came in?
18     A.   I don't.  I believe it was just black, but
19 I can't -- I can't attest to that.
20     Q.   Do you know how many 2003 100th
21 Anniversary custom trikes Harley-Davidson produced?
22     A.   I don't.  I can guesstimate how many are
23 available locally, which is very, very few, if any.
24     Q.   When you say very few, what do you mean?
25     A.   I mean if you were to go seek out one like

23

1 I did, you would have a hard time locating one.  It
2 would -- you would have to shop around, and you may
3 have to drive to another state to locate one.
4     Q.   Do you know how many are available in the
5 country, in the U.S.?
6     A.   I don't.  I know I looked a long time for
7 mine.
8     Q.   How long do you think you looked?
9     A.   Years.
10     Q.   More than five years?
11     A.   Probably a couple.  I mean, as my knees
12 gradually got worse, I wanted a three-wheel bike, so it
13 took me several years to locate one.  And when I did,
14 it was in pieces, so I couldn't even locate a
15 functioning anniversary model one.
16     Q.   Why did you want the 2003 --
17     A.   Because it's a 100-year anniversary
18 collector's item.
19     They make other trikes.  This one is unique,
20 very unique.
21         [Defendant's Exhibit C
22     marked for identification.]
23 BY MS. ROBERTSON:
24     Q.   Mr. Thompson, I'm showing you what's been
25 marked as Defendant's Exhibit C.

24

1     Do you recognize that document?
2     A.   I do.
3     Q.   How do you recognize that document?
4     A.   This was the title that Nathan Rench
5 provided me when I purchased the motorcycle from him.
6     Q.   What is the --
7         MR. GELFAND:  I'm sorry to interrupt for a
8 second.
9     Is C just the top page or the second page too?
10         MS. ROBERTSON:  No, I did -- I did single
11 pages, so it's just the top page.
12         MR. GELFAND:  Okay.  Gotcha.  Sorry to
13 interrupt.
14         MS. ROBERTSON:  That's okay.
15 BY MS. ROBERTSON:
16     Q.   Mr. Thompson, what is the VIN number on
17 Exhibit C?
18     A.   1HD1GDV353K323459.
19     Q.   Is that the VIN number for the physical
20 embodiment of the trike we've been talking about?
21     A.   I would have to check, but I believe so.
22     Q.   Do you have any reason to think that the
23 trike that you had had a different VIN?
24     A.   No.
25         MS. ROBERTSON:  Off the record.

6 (Pages 21 to 24)

**25**

1            [Discussion off the record.]
2    BY MS. ROBERTSON:
3        Q.   Is it your position, Mr. Thompson --
4    strike that.
5            So when we're referring to the trike throughout
6    this deposition, is it your understanding that the VIN
7    that you just read to me is the VIN that corresponds
8    with that trike?
9        A.   I -- I'm not looking at the VIN on the
10   trike.  But I assume that that's -- yeah.
11       Q.   Is it your position that you were the
12   owner of that motorcycle?
13       A.   Yes.
14       Q.   Why is the -- is the motorcycle we are
15   talking about commonly referred to as a trike?
16       A.   Yes.
17       Q.   Why is it referred to that way?
18       A.   It has three wheels, as opposed to two.
19       Q.   How did you come to own that trike
20   motorcycle?
21       A.   I spoke to another friend of mine who is a
22   motorcycle enthusiast, and I told him I was looking for
23   one, I had been looking for one for a while.
24           And he said I know someone that has one, but
25   it's all in pieces in a garage out in Beaufort,

**26**

1    Missouri.  And he -- you know, he may be willing to
2    sell it.
3        Q.   What is the name of that friend?
4        A.   Garrett Gist.
5        Q.   What is the name of -- did you ultimately
6    learn the name of the individual that had the
7    motorcycle that was in pieces in Beaufort?
8        A.   Yeah, from Garrett.  His name was Nathan
9    Rench.
10           [Defendant's Exhibit D
11           marked for identification.]
12   BY MS. ROBERTSON:
13       Q.   Mr. Thompson, do you recognize Defendant's
14   Exhibit D?
15       A.   I do.
16       Q.   How do you recognize that?
17       A.   It's the back of the title that Nathan
18   provided when I purchased the motorcycle from him.
19       Q.   Do you recognize your signature on that
20   document?
21       A.   I do.
22       Q.   Where -- is your signature located under a
23   particular box?
24       A.   It's signature of purchaser.  It's in that
25   box.

**27**

1        Q.   Is the date of sale reflected on that
2    document?
3        A.   3-4-20.  Or --
4        Q.   If you look about two lines above your
5    signature.
6            MR. GELFAND:  (Indicating.)
7        A.   Oh.  Two lines above my signature.
8    BY MS. ROBERTSON:
9        Q.   Do you see the box that says assignment on
10   the left?
11       A.   Yes.
12       Q.   And then kind of right across from the T,
13   what does that say?
14       A.   Across --
15       Q.   The T in the word assignment.
16       A.   Oh, March 30th, 2020.  Sorry.  I see it
17   now.  Sorry.
18       Q.   Okay.
19           It says date of sale March 30th, 2020?
20       A.   Yes.
21       Q.   Does that refresh your recollection as to
22   the date you purchased the trike?
23       A.   Yeah.  Yeah.
24       Q.   Is that accurate?
25       A.   Yeah.

**28**

1        Q.   Did you purchase the trike from Nathan
2    Rench?
3        A.   I did.
4        Q.   Where did the sale take place?
5        A.   In Union, Missouri.
6        Q.   Where at in Union?
7        A.   It was in -- I believe it's Highway 50 in
8    town, near a bank.
9        Q.   Did the sale take place at a residence or
10   Nathan -- you know, a business, or just a parking lot
11   or something?
12       A.   It was just a parking lot.
13       Q.   Do you recall the price of the sale?
14       A.   $5,000.
15       Q.   Were there any terms of the sale?
16       A.   Yeah.  I was to pay off -- he had two
17   liens on the bike, and I was to pay those liens and
18   give him the balance of the $5,000 once the liens were
19   satisfied.
20       Q.   Who were the lienholders?
21       A.   Jimmy Keye of Union, Missouri, had a lien
22   on the bike, and the State of Missouri had a lien on
23   the bike.
24       Q.   Do you recall how much Mr. Keye's lien
25   was?

RAYMOND THOMPSON

29

1    A.  I don't.  It's on one of the check -- one
2  of your exhibits.
3    Q.  Do you know how much the State of
4  Missouri's lien was?
5    A.  I don't.  It was -- it's -- there again,
6  it's on --
7    Q.  Well, we'll help you out there.
8    A.  Yeah.  You know.  You have the documents.
9  You'll know exactly how much they are.
10    Q.  I'll mark -- oops.
11    Let's mark E, F, G, and H.
12      [Defendant's Exhibit E, F, G, and H
13      marked for identification.]
14  BY MS. ROBERTSON:
15    Q.  Mr. Thompson.
16    A.  Yes.
17    Q.  Does any of the exhibits, E, F, G, or H,
18  refresh your recollection as to the amount of the liens
19  that Mr. Keye or the State of Missouri held on the
20  trike?
21    A.  Yes.
22    Q.  What was the amount of Mr. Keye's lien?
23    A.  $2,175.
24    Q.  Are you referring to Exhibit F?  Or --
25    A.  I am.

30

1    Q.  Are you referring to Exhibit E?  It's F?
2    A.  F.  F.
3    Q.  Okay.
4    What is Exhibit F?
5    A.  That is a check that I paid Mr. Keye to
6  satisfy a lien that Nathan had on this 2003 anniversary
7  trike.
8    Q.  What is the date of that check?
9    A.  March 20th, two thousand -- March 5th,
10  2020.
11    Q.  When -- when did the process of purchasing
12  this trike begin?
13    A.  I'm not sure.  It was a process.  But --
14    Q.  Is March 5th, 2020, the date that you --
15  excuse me -- paid Mr. Keye?
16    A.  Yes.  I was not told he had liens on it,
17  initially.  Nathan deceived me.  And the bike was all
18  in pieces.  You know, I bought -- I purchased it as
19  incomplete, in pieces, many missing pieces.
20    Q.  Did you -- how did you transfer this check
21  to Mr. Keye?
22    A.  I met him in Union prior to me and
23  Nathan -- giving Nathan the final check, because I had
24  to satisfy the liens before I paid Nathan the balance.
25    Q.  Had you ever met Mr. Keye before?

31

1    A.  No.
2    Q.  Did Mr. Keye tell you anything about Mr.
3  Rench?
4    A.  Other than he had given him money in
5  regard to this.
6    Q.  Have you spoken with Mr. Keye since March
7  5th of 2020?
8    A.  I think so, yeah, a couple of times.
9    Q.  What was the nature of your conversations
10  or communications with Mr. Keye?
11    A.  I think I told -- I talked to -- I tried
12  to talk to him one time, stopped by, and talked to him
13  one in time, pertaining to -- telling him that the City
14  of Manchester and that Nathan, of course, and stealing
15  the motorcycle.
16    Q.  I didn't quite hear you.  Could you repeat
17  that?
18    A.  The City of Manchester and Nathan, you
19  know, stole the motorcycle, and that he may have to
20  provide documents or appear as a witness.
21    Q.  When was the last time you spoke with Mr.
22  Keye?
23    A.  It's a couple years, or a year.  I don't
24  remember.
25    Q.  Have you spoken to Mr. Keye in 2023?

32

1    A.  No, I don't believe so.
2    Q.  On Exhibit F, there's some handwriting at
3  the bottom.
4    Do you see that?
5    A.  Yeah.  The circled?
6    Q.  Yes.
7    A.  Yes.
8    Q.  What does that handwriting say?  Or --
9    A.  Proof of payment for motorcycle.  Buyer
10  paid this lien.
11    Q.  Do you know whose handwriting that is?
12    A.  It's Jeremiah Thompson's, my brother.
13    Q.  Okay.
14    And Exhibit G -- do you recognize Exhibit G?
15    A.  I do.
16    Q.  What's Exhibit G?
17    A.  That's the check I wrote to Nathan, the
18  balance of the $5,000.
19    Q.  What is that check -- what is the date of
20  that check?
21    A.  March 4th, 2020.
22    Q.  Is that the date that you provided Mr.
23  Rench the check?
24    A.  I believe so, yes.
25    Q.  How did -- how did you provide that to

8 (Pages 29 to 32)

33

1  him?  Via mail, in-person?
2      A.   In-person.
3      Q.   Where did you meet him to --
4      A.   In Union.
5      Q.   At a business or a residence or something
6  like that?
7      A.   I think it was in a PNC Bank parking lot.
8  He wanted to cash the check immediately.
9      Q.   When was possession of the motorcycle
10  transferred to you from Mr. Rench?
11     A.   It was after that.  Because it was in
12  pieces -- I can't remember the exact date, but it was
13  shortly after this, I went and picked it up in pieces.
14  My mechanic brought a trailer -- a mechanic from work
15  brought a trailer and boxes, and we loaded up all the
16  material, all the parts.
17     Q.   What is the name of your mechanic?
18     A.   Derick Compton.
19     Q.   How do you spell that?
20     A.   D-E-R-I-C-K, C-O-M-P-T-O-N.
21     Q.   Does Mr. Compton work for Happy Tree
22  Service?
23     A.   Yes.
24     Q.   How long has he been so employed?
25     A.   10 years.

34

1      Q.   Is that Jeremiah Thompson's handwriting at
2  the bottom?
3      A.   Yes.
4      Q.   And going back to Exhibit E.
5      Is that Jeremiah Thompson's handwriting on
6  Exhibit E as well?
7      A.   Yes.
8      Q.   And on Exhibit H, is that Jeremiah
9  Thompson's handwriting?
10     A.   Yes.
11     Q.   When did you sign Exhibit D?
12     A.   March 30th.
13     Q.   Is that -- did you have possession of the
14  trike before or after March 30th?
15     A.   I think it was the same day.
16     Q.   What was the total purchase price of the
17  trike?
18     A.   $5,000.
19     Q.   I'll submit to you that I have got my
20  calculator out here, and I have added together $2,175
21  and $2,366.37, and the total is $4,541.37.
22     A.   And then I paid the state lien if you
23  have --
24     Q.   The remainder of --
25     A.   Right.  The $453.83.  It totals $5,000.

35

1      Q.   What was the number again?
2      MR. GELFAND:  It's on one on Exhibit E.
3      Exhibit E.  $453 -- I can't read the rest.
4  But the total was $5,000.
5  BY MS. ROBERTSON:
6      Q.   Okay.
7      And how did you pay the state?  Check, credit
8  card, cash --
9      A.   Debit card.  I went with Nathan Rench to
10  the license bureau, government building in Union,
11  Missouri, and I paid that with the debit card.
12     Q.   And is March 30th of 2020 the date you
13  received the title from Mr. Rench?
14     A.   Yes.
15     Q.   So you've mentioned the trike was in
16  pieces at the time of your purchase?
17     A.   That's correct.  There were lots of pieces
18  missing.
19     Q.   What was missing?
20     A.   Handlebars, wiring harness, seat -- I
21  believe a seat.  Various pieces.  I can't remember them
22  all.
23     Q.   Was the frame intact?
24     A.   The frame and chassis were intact.  It had
25  not run in years.

36

1      Q.   Was the engine included?
2      A.   Yes.  There was pieces missing, and I
3  don't believe there was a battery.  I don't -- and I
4  think there were some -- maybe the primary transmission
5  case cover was missing.
6      Q.   Did the -- did the motorcycle -- strike
7  that.
8      Is the fork part of the frame?
9      A.   Yes.
10     Q.   Is that all one piece, or is that a
11  separate piece?
12     A.   No, separate pieces.
13     Q.   Did the motorcycle come with the fork when
14  you purchased it?
15     A.   It had forks, and the chassis was there.
16     Q.   If I didn't -- if I asked you this before,
17  I apologize.
18     What type of engine did the trike have?
19     A.   It's a Harley-Davidson 96 cubic inch.
20     Q.   Is it fair to say the motorcycle is
21  inoperable at your time --
22     A.   Yes, it was inoperable.
23     Q.   Were you able to make any inspections of
24  the engine or the transmission, or some of those moving
25  parts?

RAYMOND THOMPSON

37

1    A.   I -- my mechanic did, made some
2  assessments for me.  Derick Compton.
3    Q.   Is it fair to say you were unable to test
4  drive it?
5    A.   Yes.
6    Q.   You mentioned your mechanic brought a
7  trailer.
8       Is that how you transported the motorcycle --
9    A.   Yes.
10    Q.   -- from Mr. Rench?
11    A.   Correct.
12    Q.   Where did you take it?
13    A.   To a friend of mine who works on
14  motorcycles.
15    Q.   What's that person's name?
16    A.   Aaron -- I can't remember his last name
17  now.  I think it's --
18    Q.   Phillips?
19    A.   No.  I can look at my phone.
20  Blumhorst.  Blumhorst.
21    Q.   Could you spell that for me?  I'm sorry.
22    A.   B-L-U-M-H-O-R-S-T.  In Washington,
23  Missouri.  He has a garage where he works on
24  motorcycles.
25    Q.   What's the name of his garage?

38

1    A.   He just privately builds motorcycles.
2    Q.   Out of his residence?
3    A.   Out of -- yes.
4    Q.   Did you pay Mr. Blumhorst?
5    A.   Yeah, various different payments, but
6  yeah, over time.
7    Q.   How much did you pay Mr. Blumhorst?
8    A.   I don't know.  I paid him periodically, as
9  he did -- needed -- when he needed parts, he would give
10  me an update.  I told him to take his time, because he
11  had other projects he was working on.
12    Q.   How did you pay Mr. Blumhorst --
13  Blumhorst?
14    A.   Cash.
15    Q.   Did Mr. Blumhorst provide you any receipt
16  for the work he was --
17    A.   For the parts, he did.
18    Q.   Do you have those receipts?
19    A.   I don't -- I don't know.  I wouldn't know
20  where they're at.
21    Q.   Who purchased the parts that were needed?
22    A.   Aaron did, some of them.  And I reimbursed
23  him.
24       And then other parts, I gave him my credit or
25  debit card to use.

39

1    Q.   Do you know where the parts were purchased
2  from?
3    A.   Different -- different motorcycle supply
4  places.  eBay.
5    Q.   And you have no recollection of how much
6  you paid Mr. Blumhorst for his labor?
7    A.   I gave him numerous payments, but at one
8  point I remember giving him $400, and then I gave him a
9  couple hundred a few other times.
10       He kind of gave me a friend discount, and I told
11  him I wasn't in that big of a hurry, so -- I knew he
12  had other projects, so --
13    Q.   Do you know how much in total you paid Mr.
14  Blumhorst for labor?
15    A.   I don't.
16    Q.   Was it less than $1,000?
17    A.   It probably was right around $1,000.
18    Q.   Do you know how much you paid Mr.
19  Blumhorst or that you spent yourself for parts?
20    A.   Parts, paint -- paint and decals, you
21  know, several thousand.
22    Q.   More or less than $5,000?
23    A.   Probably less.
24    Q.   At some point did the motorcycle become
25  operational?

40

1    A.   Yes.
2    Q.   When?
3    A.   I would say Aaron finished it maybe eight
4  months to a year from purchase.  From when I delivered
5  it to him.
6    Q.   So sometime -- when did you deliver it to
7  him?
8    A.   I don't remember.  It was shortly after
9  purchase date.
10    Q.   So is it fair to say the motorcycle became
11  operational sometime around the end of 2020 and the
12  beginning of 2021?
13    A.   I would say that's -- I can't remember.
14  But I would say that sounds -- 2021 sounds accurate.
15    Q.   Were there any other costs associated with
16  making the motorcycle operational that we have not yet
17  discussed?
18    A.   Paint.  I had it painted.  I put -- had to
19  put a tire on the front.  Danny Arnold, who is
20  another -- he builds Harley-Davidsons, he put the tire
21  on the front.  That was $300.
22    Q.   What was the name of the individual?
23    A.   Danny Arnold.
24    Q.   How do you know him?
25    A.   Working on motorcycles.  That's his job.

Golkow Litigation Services

RAYMOND THOMPSON

41

1    He has a garage of his own.
2        Q.    What's the name of his garage?
3        A.    I don't know.  I don't know the name of
4    that.  He just -- he works out of his -- he's got a
5    big, detached garage from his home where he works on
6    Harley-Davidsons exclusively.
7        Q.    Where does Mr. Arnold live?
8        A.    Catawissa, Missouri.
9        Q.    Do you know his address?
10       A.    I don't.
11       Q.    Is the $300 you paid Mr. Arnold -- was
12   that included in the $5,000 you told me for parts
13   earlier?
14       A.    Probably.  And then I paid Velocity Motor
15   Sports to paint the motorcycle, and put the anniversary
16   decals on it.
17           And I believe that was -- the paint, I believe,
18   was around $1,100, and then -- to paint the chassis the
19   frame.
20           And I believe the -- I forgot how much the
21   decals.  He had to search high and low to locate the
22   2003 anniversary decals.  I forgot how much they were,
23   in addition to the paint.
24       Q.    Were the costs you just mentioned, the
25   $1,100 for the paint and the decals, included in the

42

1    $5,000 you told me earlier?
2        A.    I don't think so.  I think that was in
3    addition to that.
4        Q.    How much additional was that cost?
5        A.    Well, the paint was $1,100.
6        Q.    How much were the decals?
7        A.    I can't remember, offhand.  That's
8    Velocity Motor Sports.
9        Q.    So I have got $5,000 you told me for
10   parts.  Right around $1,000 for labor.  That brings it
11   to $6,000.  $1,100 for paint brings it to $7,100, plus
12   an unknown amount for decals.
13           Is that correct?
14       A.    That sounds correct.
15       Q.    Would you say that all in all to bring the
16   motorcycle operational was under $8,000?
17       A.    I would say so, yeah.
18       Q.    And do you have any receipts, check stubs,
19   credit card records for these repairs?
20       A.    I could probably provide the paint receipt
21   from Velocity Motor Sports.
22           The rest of them are mostly friends, you know,
23   like Danny Arnold is a friend that works on bikes.
24   Aaron Blumhorst is a friend that works on bikes.  My
25   mechanic at work did some work on the bike for me.

43

1    Some of the more basic stuff, I did myself.
2        Q.    And I know we've talked a little bit about
3    this, and you've mentioned some things, but just so I
4    understand.  So the bike comes in in pieces.  What --
5    did you have to replace the engine, or was it able to
6    be repaired?
7        A.    It was able to repaired.
8        Q.    And the transmission, was that -- did that
9    have to be replaced, or was it able to be repaired?
10       A.    It was able to repaired.
11       Q.    Did any repairs need to be made to the
12   frame?
13       A.    No.  It needed a tire.  It needed
14   handlebars.  There was numerous parts it needed.  It
15   needed wiring.
16           So it was not operational when I purchased it,
17   and the -- like the gas tank was not on the bike.
18   So -- and many parts missing when I purchased it.
19       Q.    Was -- a gas tank came with it?
20       A.    With it.
21       Q.    It just was not attached?
22       A.    Yeah.
23       Q.    Was that gas tank able to used?
24       A.    Yeah.  Once I got it repaired, yes.
25       Q.    Were any other mechanical components that

44

1    we have not yet discussed -- were there any other
2    mechanical components that we have not yet discussed
3    that needed to be repaired or replaced?
4        A.    Yeah.  My -- Aaron would know a lot more
5    about what he replaced, but there were lots of -- you
6    know, ignition, things like that, that needed to be
7    replaced.
8        Q.    Any other electronic components that we
9    have not discussed?  I know you mentioned the wiring
10   harness.
11       A.    Uh-huh.
12       Q.    Anything else?
13       A.    There was a few things, yes.
14       Q.    Like what?
15       A.    I can't remember specifically, but --
16       Q.    You mentioned that this trike was the
17   100th Anniversary.
18           But I think you said it was special.
19       A.    Very special.
20       Q.    Can you tell me a little bit more about
21   what was special about the trike?
22       A.    To me, I -- you know, I had searched a
23   long time for this model, so it was, you know -- I had
24   been looking for one for years.  And locating one was
25   pretty great.

RAYMOND THOMPSON

45

```
1      And even though, you know, it was in pieces and
2  required repairs, I -- you know, it was -- I was
3  willing to do that.
4      I had put on numerous custom parts, like
5  handlebars, to fit me.  There were custom pedals to fit
6  my height, weight.
7      I had a custom air cleaner put on it that was
8  laser engraved with a Bushmaster skull on it, so that
9  was in addition.  So that was very unique.
10     But -- and there was lots of -- lots of
11  different unique parts I put on it.
12     Q.   Other than the -- strike that.
13         After the trike became operational, did you have
14  the opportunity to ride it?
15     A.   I -- I did.  I mean, I was -- it was
16  difficult, because I couldn't get -- Nathan had filed
17  the fraudulent title, and I couldn't get legal plates
18  put on it.
19         But I did occasionally ride it.
20     Q.   When did you first -- when did you first
21  ride it?
22     A.   Once I -- once I got it back.  Once Aaron
23  delivered it, once he completed it, I drove it.
24         He delivered -- he lives in Washington, so he
25  delivered it to my parents' farm in Robertsville, and I
```

46

```
1  drove it back to St. Louis, to Manchester.
2      Q.   When was this?
3      A.   I'm not sure.  There again, I can't
4  remember the exact date.  Aaron had it close to
5  locating -- locating -- it took a while to locate all
6  the specific parts it needed, to put the custom work
7  into it.
8          You know, those parts, it took him close to a
9  year to do this.  You know, so it was in that time,
10  that's when Nathan filed for the fraudulent title.  And
11  so --
12     Q.   Is that -- after the trike was delivered
13  to your parents' home in Robertsville, did you
14  physically drive the bike?
15     A.   Yes.
16     Q.   Okay.
17         You didn't tow it?
18     A.   No.
19     Q.   And that is the first time you ever rode
20  the bike?
21     A.   That's correct.
22     Q.   What was that like?
23     A.   It was wonderful.  It was -- you know,
24  because my -- the whole reason I searched high and low
25  for this bike was because I have two-wheel bikes, and
```

47

```
1  my knees don't work like they used to, so this was --
2  yeah, it was great.
3          And it was exactly what I wanted.  So it was --
4  yeah, it was great.
5      Q.   Do you remember that ride?
6      A.   I do.
7      Q.   Do you remember the route you took?
8      A.   I took Highway N to Highway O to Old 66.
9  And I rode Old 66 to Interstate 44, and I rode on
10  Interstate 44 to 141 to my home.
11     Q.   Do you remember the season?
12     A.   Yeah, it was warm out.  You know, I
13  remember it was warm.
14     Q.   Do you know if there was foliage on the
15  trees?
16     A.   I believe so, yeah.
17     Q.   Excuse me.
18         MR. GELFAND:  Bless you.
19  BY MS. ROBERTSON:
20     Q.   Has the trike ever had license plates
21  since your ownership of it?
22     A.   No.
23     Q.   If you go back to Exhibit C.  That's the
24  front page of the certificate of title.
25         Do you see where it says body style?
```

48

```
1      A.   Uh-huh.
2      Q.   What does it say?
3      A.   Two-wheel.
4      Q.   Do you know why it says two-wheel?
5      A.   Because it's -- it was factory two-wheel,
6  and then they custom-made it into a three-wheel.
7      Q.   Who custom-made it into a three-wheel?
8      A.   I'm not sure.
9      Q.   Did Harley-Davidson make it into a
10  three-wheel?
11     A.   Sometimes they did, and sometimes you
12  would take it to a registered Harley dealer, and they
13  would do that.
14         I'm not sure who did it.  But --
15     Q.   Are you familiar with Harley's FXD model?
16     A.   Yeah.
17     Q.   What does FXD mean?
18     A.   That encompasses several 88 or 96 cubic
19  inch model motorcycles.
20     Q.   Does it encompass any three-wheel models?
21     A.   Yes.
22     Q.   Is your trike -- excuse me, or excuse you.
23         Is your trike an FXD?
24     A.   It's an FX model.  I'm not sure which.
25     Q.   Have you registered the trike?
```

12 (Pages 45 to 48)

RAYMOND THOMPSON

49

1    A.   No, I've been unable to.
2    Q.   **Why not?**
3    A.   Because Nathan filed -- Nathan Rench filed
4    a lost title.
5         So when I went to the DMV to register it shortly
6    after Nathan -- or Aaron Blumhorst delivered it to me,
7    I went to the DMV to get it registered and plates.
8         And they said that they were unable to do that
9    because he had filed for this fraudulent title.
10        They referred me to the DMV in Jeff City.  I
11   called them, who referred me to Highway Patrol.  Said
12   it was criminal, and they referred me to Owensville
13   Police.
14   Q.   **Do you recall the date that -- strike**
15   **that.**
16        **What department of motor vehicle, what license**
17   **registration office did you go to --**
18   A.   Des Peres.
19   Q.   **-- to first register?**
20   A.   Des Peres.
21   Q.   **Okay.**
22        **When was that?**
23   A.   I can't remember.  It was shortly after
24   Nathan -- or Aaron delivered the bike.  It was within a
25   couple days of that.  It was warm outside, I remember.

50

1    Q.   **Have you paid sales tax on the motorcycle?**
2    A.   I've been unable to.
3    Q.   **Have you paid any personal property tax on**
4    **the motorcycle?**
5    A.   I've been unable to.
6    Q.   **Have you made a declaration to St. Louis**
7    **County or the State of Missouri that you currently**
8    **own --**
9    A.   I have.
10   Q.   **You have?**
11   A.   I have to -- that's -- my brother
12   Jeremiah, we applied for -- to the Department of
13   Revenue.  And that's why this -- his handwriting's on
14   here, because we sent all of that to the Department of
15   Revenue, to try to fix the title situation.
16   Q.   **When -- if I say DOR, do you know I mean**
17   **Department of Revenue?**
18   A.   Right.
19   Q.   **When did you send all of that to DOR?**
20   A.   I don't remember.  It was a while ago.
21   Jeremiah did it for me a while ago.
22        And then I got a letter back that said they were
23   unable to do this, that it would have to go to court.
24   Q.   **Do you still have a copy of the letter**
25   **from DOR?**

51

1    A.   I do.
2    Q.   **Have you produced that in this lawsuit?**
3    A.   No.
4    Q.   **Have you ever paid personal property taxes**
5    **on the trike?**
6    A.   No.
7    Q.   **Do you know if the first time you went to**
8    **register the motor vehicle was in 2021?**
9    A.   I can't remember.  I mean --
10   Q.   **Did you go in 2021 to register the motor**
11   **vehicle -- or the trike?**
12   A.   When it was completed, I went to do it all
13   at one time, to get it licensed and registered at one
14   time.
15   Q.   **Was it more or less than a year after you**
16   **first took possession of the motor -- of the trike that**
17   **went to register it?**
18        MR. GELFAND:  Objection to the form of the
19   question, and asked and answered.  You can answer.
20   A.   I don't know.  I believe it was less than
21   a year.
22        [Interruption by the reporter.]
23   BY MS. ROBERTSON:
24   Q.   **So that would be earlier than March of**
25   **2021?**

52

1    A.   I -- I can't remember.
2    Q.   **Do you --**
3    A.   It took Aaron about a year to complete,
4    locate all the parts, and do the custom work.  And then
5    it took some time to get it painted.
6         So once I had it completed, I took it to the
7    DMV -- or I took -- went to the DMV with all of this
8    paperwork and tried to get it licensed.
9         I don't remember when that was.
10   Q.   **Is there anything that would refresh your**
11   **recollection as to when that was?**
12   A.   Maybe the DMV would have a record.  I --
13   after -- I made many phone calls to -- after that to
14   other agencies trying to solve this.
15   Q.   **Did you -- at the point in time that you**
16   **first went to the DMV and attempted to register their**
17   **vehicle, did you discuss that with anyone?**
18   A.   I'm sorry?
19   Q.   **Other than the DMV itself and its**
20   **employees --**
21   A.   Uh-huh.
22   Q.   **-- did you discuss with anyone at the**
23   **time that you -- this is one of those wordy questions.**
24   A.   Right.
25   Q.   **At the time you went to register that**

RAYMOND THOMPSON

53

1  motor vehicle --
2      A.  Uh-huh.
3      Q.  -- did you discuss it with anyone?
4  And I'm not asking you for the names of DMV
5  employees.
6      A.  I don't remember.  I don't think so.
7      Q.  Did you discuss it with your brother?
8      A.  Possibly.  I mean, I discussed it -- I
9  certainly discussed it with people after the DMV said
10 that Nathan had filed for this lost title.
11     Q.  That's what I'm asking.
12     A.  Yeah.
13     Q.  After the DMV told you --
14     A.  Yes, then I discussed it with people.  I
15 talked to -- yeah, I discussed it with numerous people,
16 and agencies.  I discussed it with Jeff City DMV.
17 I discussed it with Missouri Highway Patrol and various
18 other agencies -- Owensville Police, Franklin County.
19     Q.  Did Jeff City --
20     A.  Officer -- the officer on the document.
21 Yes. (Indicating.)
22     Q.  Did the Des Peres license office give you
23 any documentation at the time they told you that you
24 could not register the trike?
25     A.  No.

54

1      Q.  Did the Jeff City license office -- and
2  let me -- I guess let me clarify.
3          Did you go to a license office in Jefferson
4  City, or did you go to the Department of Motor Vehicles
5  in Jefferson City?
6      A.  I did not go.  I called them on the phone,
7  because Des Peres -- the Des Peres license -- licensing
8  bureau said that they could not help me.
9          I asked them what to do, and they said we are
10 not confused with this.  We have not dealt with this
11 before.
12         So they referred me to -- they said try calling
13 the Jeff City DMV.
14         So I called them, and they said this is a
15 criminal act.  You need to call Missouri Highway
16 Patrol.
17         So I called them, and they said this happened in
18 Franklin County.
19         So I called them, and I talked to numerous
20 sheriffs.  I drove to Franklin County, gave them all
21 the paperwork that we have here, and they were going to
22 try to retrieve the title.
23         And then it actually went to the prosecuting
24 attorney in Franklin County.  She kicked it back and
25 said specifically it happened in Owensville, because

55

1  Nathan lived in Owensville, even though this
2  transaction happened in Franklin County.
3          So then I started dealing with Owensville Police
4  on it, and I drove out there, and then gave them
5  everything.  And they said, we'll try to get the title
6  from Nathan, you know, the fraudulent title.
7          And then -- and they worked on that.  There were
8  several officers that worked on that for me for a
9  while.
10     Q.  Did the Jeff City DMV send you any
11 paperwork when you -- after you called them?
12     A.  No.
13     Q.  Did the Missouri State Highway Patrol send
14 you any paperwork after you called them?
15     A.  No.  They referred me to -- they kept
16 referring me to each other.
17     Q.  Did the Franklin County Sheriff's Office
18 provide you with any paperwork?
19     A.  His card, and I had many conversations
20 with the prosecuting attorney out there, as well as
21 sheriffs out there.
22     Q.  Do you know if a police report was made by
23 the Franklin County Sheriff's Office?
24     A.  I believe so.
25     Q.  And was the nature of that the report of

56

1  the fraudulent title?
2      A.  Correct.
3      Q.  Did the Franklin County prosecuting
4  attorney actually charge Nathan Rench?
5      A.  No.  They said -- I was told that that was
6  out of their jurisdiction, that that would be more
7  specific to Owensville.
8      Q.  Did you make any written statements at the
9  time you were dealing with the Franklin County
10 Sheriff's Office and prosecuting attorney?
11     A.  No.  There was COVID, so the officers met
12 me in the parking lot and took all my information, made
13 copies, and brought it back out to me.
14         The officer, you know, on the one document, as
15 well as I think -- I believe there was another officer
16 that did that.
17         The same thing with Owensville.
18     Q.  Did you give them anything different than
19 what's in front of you right now?
20     A.  I believe it was -- it was just this.  You
21 know, the originals.
22     Q.  You didn't write -- you didn't get like a
23 blank piece of paper from Franklin County to write out
24 your story?
25     A.  No.

RAYMOND THOMPSON

57

1    Q.    When did you contact Owensville?
2    A.    After Franklin County -- I called to
3 follow up with the prosecution -- Franklin County
4 prosecutor.
5        And she said that they were not able to do that,
6 because it was out of their jurisdiction.
7        So she referred me to Owensville shortly after
8 that, and I don't remember the dates, but I followed up
9 with -- I met an officer in Owensville, gave him the
10 information.  They were -- they knew Nathan Rench and
11 were aware of him.  And so --
12    Q.    At the time you first made contact with
13 any law enforcement officer from Owensville regarding
14 the trike --
15    A.    Uh-huh.
16    Q.    -- was that before or after October 22nd,
17 2022?
18    A.    I talked -- are you talking about in
19 regards to the title?
20    Q.    Yes.
21    A.    I talked to them way before October 2022.
22    I talked to them after October 2022 as well.
23 Not regarding the title, but more specifically
24 regarding the theft by Manchester Police and Nathan
25 Rench and the other two people representing Nathan

58

1 Rench and the bike.
2    Q.    And the what?
3    A.    And the -- and the stolen bike.
4    Q.    The first time you talked to Owensville
5 about the fraudulent title --
6    A.    Uh-huh.
7    Q.    Did that occur in 2021?
8    A.    I -- I'm not sure.  I can't remember.
9    Q.    Do you know if it occurred in 2022?
10    A.    I believe it occurred in 2021.
11    Q.    Is there --
12    A.    I'm not sure.
13    Q.    Did you provide Owensville any
14 documentation different than what's in front of you
15 right now?
16    A.    I provided them the originals to all of
17 this.  They made copies and brought mine back, and I
18 kept in contact with several sheriffs.
19        [A recess was taken.]
20 BY MS. ROBERTSON:
21    Q.    Mr. Thompson, we talked about the steps
22 you took to report the title fraud to various agencies.
23        Did you make any of those reports in writing?
24    A.    They did not -- no one requested that.
25    Q.    I'm going to show you what's been marked

59

1 for identification as Defendant's Exhibit I.
2        Would you take a look at that?
3        [Defendant's Exhibit I
4        marked for identification.]
5 BY MS. ROBERTSON:
6    Q.    Do you recognize Defendant's Exhibit I?
7    A.    I do.
8    Q.    What is Defendant's Exhibit I?
9    A.    That is the form my brother filled out for
10 me that I signed and was sent to the DMV.
11    Q.    And this is -- it looks in the top left
12 like it's identified as Form 4683, Missouri Department
13 of Revenue complaint.
14        Is that accurate?
15    A.    Yes, to try to resolve the title issue.
16    Q.    And it has your information in the top
17 box.
18        Is that right?
19    A.    Correct.
20    Q.    The next box refers to the trike we've
21 been talking about today.
22        Is that right?
23    A.    Yes.
24    Q.    The next box is the largest box on the
25 page, and it says complaint against.

60

1        Is that accurate?
2    A.    The seller, Nathan L. Rench?  Is that what
3 you're referring to?
4    Q.    If you kind of look on the left-hand side,
5 there's these --
6    A.    Oh, yeah.
7    Q.    Do you see that box?
8    A.    Complaint against.  Yes.
9    Q.    And within that box, there is another box
10 that says nature of complaint.
11        Do you see that?
12    A.    Yes.
13    Q.    Could you read me what that says?
14    A.    Buyer tried to title motorcycle and
15 learned seller fraudulently filed a new title after
16 purchase.  Seller will not give buyer new title unless
17 buyer pays more money.  On 10-22-22, seller stole
18 motorcycle from buyer's residence.  Please refer to
19 Manchester Police Department Report Number 22-12985.
20    Q.    In this statement, your signature is at
21 the bottom; correct?
22    A.    Yes.
23    Q.    Did you read this before you signed it?
24    A.    I did.
25    Q.    Who is the seller?

15 (Pages 57 to 60)

61

1    A.  Nathan Rench.
2    Q.  Who is the buyer?
3    A.  Ray Thompson.
4    Q.  That's you?
5    A.  Yeah.
6    Q.  And then at the bottom of the complaint
7   box it says any other agencies contacted, the Union
8   Police Department, the Owensville Police Department,
9   and the Franklin County Sheriff's Department, the DMV,
10  Des Peres.
11       Is that accurate?
12   A.  As well as the DMV in Jeff City.
13   Q.  That you mentioned earlier?
14   A.  Yes.
15   Q.  What is the date of this complaint?
16   A.  10-25-22.
17   Q.  Did you provide this document, Exhibit I,
18  to the Missouri Department of Revenue?
19   A.  I did.
20   Q.  Did you provide this document near in time
21  to October 25th of 2022?
22   A.  I don't remember.
23   Q.  Do you know if it would have been within
24  days of October 25th?
25   A.  I don't remember.

62

1    Q.  Do you know if it was provided before
2   October 25th?
3    A.  I don't remember that either.  I remember
4   providing the document, because I was referred to
5   provide this to the Department of Revenue to resolve
6   the title issue.
7       I don't remember the time frame.
8    Q.  Who told you to provide this form to the
9   Department of Revenue?
10   A.  The Franklin County -- or the Owensville
11  Police.
12   Q.  That second sentence in that nature of
13  complaint, it says seller will not give buyer new title
14  unless buyer paid more money.
15   A.  Yeah.
16   Q.  Can you tell me more about that?
17   A.  He wanted -- he said the only way he
18  would -- I can't remember if it was -- how it was
19  communicated, but he said the only way he would get
20  the -- give the title was through more money, you know.
21   Q.  When did Nathan Rench tell you this?
22   A.  I don't know that he even told me that
23  directly.  He may have told that to someone else to
24  relay to me.
25   Q.  Do you know that someone else?

63

1    A.  I don't -- I can't remember offhand.
2    Q.  Do you know how much Nathan Rench was
3   requiring or requesting that you pay him to get the
4   title?
5    A.  I don't, because we agreed on $5,000.
6   And, you know, it seemed ridiculous.
7    Q.  Did you contact Nathan Rench after the
8   October 22nd-23rd incident?
9    A.  No, I did not.
10   Q.  Other than this lawsuit, do you know if
11  the 2003 Harley trike we've been talking about is the
12  subject of any other legal proceeding?
13   A.  With -- involving me?
14   Q.  Just involving anything.
15   A.  I -- I only know this lawsuit.  Yeah.
16   Q.  Do you know if there are any other
17  investigations regarding the 2003 Harley trike we've
18  been talking about, that we haven't discussed today?
19   A.  No.  Not that I'm aware of.
20   Q.  Has any complaint been made against you
21  with respect to the 2003 Harley trike we've been
22  talking about?
23   A.  No.
24   Q.  Have you made any other reports to law
25  enforcement regarding Nathan Rench that aren't about

64

1   the trike?
2    A.  One time, I made a report to Franklin
3   County because he -- I purchased some property from him
4   after the trike, and he vandalized and stole off the
5   property.
6    Q.  Any other reports about Nathan Rench?
7    A.  I don't believe so.
8    Q.  Do you know an individual by the name of
9   Dallas Smith?
10   A.  I don't.
11   Q.  Are you aware of any other complaints that
12  have been made against Nathan Rench not by you, just by
13  anybody else?
14       MR. GELFAND:  Object to the form of the
15  question.  You can answer.
16   A.  I'm sure there are many.  I don't -- I'm
17  sure there are many, but I don't -- I'm not aware of
18  any specific.
19  BY MS. ROBERTSON:
20   Q.  Why do you say, I'm sure there are many?
21   A.  He has a long criminal history.
22   Q.  How do you know that?
23   A.  CaseNet, and in working with Manchester
24  Police to break into my property and steal my
25  motorcycle.

16 (Pages 61 to 64)

65

1    Q.    Are you aware that Nathan Rench is being
2  prosecuted in Gasconade County for felony theft in
3  connection with your trike?
4    A.    I am.  Yes.
5    Q.    Have you offered any testimony in that
6  case?
7    A.    Yeah, I was subpoenaed and gave testimony.
8    Q.    Do you know what type of hearing that was?
9    A.    Criminal.  I mean --
10    Q.    Was it a deposition like this?
11    A.    No, it was a court.
12    Q.    You went to court?
13    A.    Yeah.  I was subpoenaed by the Gasconade
14  prosecuting attorney, and I appeared.
15    Q.    Was there a jury?
16    A.    No, it was continued.  I just appeared the
17  once, and then it was continued for, I guess,
18  sentencing or court, you know.
19    I got -- I was put on the stand to answer
20  questions by the prosecutor after being subpoenaed in
21  regards to this, and then I don't know what happened
22  after that.
23    Q.    Does a preliminary hearing sound familiar?
24    A.    That's probably what it was, yes.
25    Q.    But you took the stand, you were put under

66

1  oath, and you provided testimony?
2    A.    Yes.  Correct.
3    Q.    Did you -- have you provided any other
4  testimony in the criminal case that we're talking
5  about, this Gasconade County case with Rench?
6    A.    No.
7    Q.    Have you been deposed in the Gasconade
8  County criminal case against Nathan Rench?
9    A.    No.
10    Q.    Have you provided any victim impact
11  statements to the prosecutor's office?
12    A.    Other than my subpoena and -- no.
13    Q.    You haven't written any -- have you
14  written any letters to the Gasconade County prosecutor?
15    A.    No.  No.
16    Q.    Have you provided any -- has the Gasconade
17  County prosecutor asked you for documents supporting
18  restitution?
19    A.    No.  They -- I provided these documents to
20  her, the prosecuting attorney, Gasconade County
21  prosecuting attorney.  (Indicating.)
22    Q.    Have you received any restitution payments
23  from Nathan Rench in connection?
24    A.    No.
25    Q.    Have you provided any written statements

67

1  in the Gasconade County case?
2    A.    No.
3    Q.    At the time you purchased the -- kind of
4  changing gears here.
5    A.    Okay.
6    Q.    At the time you purchased the trike, did
7  the ignition on -- what type of ignition did the trike
8  have?
9    A.    It had a toggle switch.
10    Q.    What does that mean?
11    A.    It means it's keyless.  You flip a switch
12  on and off to turn it on and off, the motorcycle.
13    There is actually two forms of -- to turn it on,
14  you flip a toggle switch and you hit the ignition
15  button on the handlebars.  There is no key.
16    Q.    Do you have to have any sort of fob in
17  your pocket?
18    A.    No.
19    Q.    Do you know if the toggle switch is how
20  the trike was delivered from the factory?
21    A.    I -- no, I believe that was after,
22  after-market.
23    Q.    Did you install the toggle switch?
24    A.    No.
25    Q.    At the time -- excuse me.

68

1    At the time you purchased the trike from Nathan
2  Rench, you indicated it was in pieces.
3    Did the former ignition come with the trike?
4    MR. GELFAND:  Sorry.  You said former?
5  F-O-R-M-E-R?
6    MS. ROBERTSON:  Yeah -- yes.
7    MR. GELFAND:  I just didn't hear it.
8  BY MS. ROBERTSON:
9    Q.    Just so -- you said when you got it, it
10  had a toggle switch.
11    A.    Correct.
12    Q.    So was there a separate piece that was the
13  ignition that had previously been on the bike?
14    MR. GELFAND:  Yeah, I just didn't hear.
15    A.    Yeah.  There was -- so they had -- there
16  is an actual -- there's several ways to start them.
17    You flip an ignition button on the tank, and
18  then there is -- on the handlebars, there is a
19  ignition.
20    And this one had an added feature which was a
21  toggle switch hidden under the seat.  We added that --
22  or that was added on there after -- after the factory.
23  BY MS. ROBERTSON:
24    Q.    I don't mean to make you go through this
25  again, but I want to make sure I understand this.

17 (Pages 65 to 68)

RAYMOND THOMPSON

69

1     A.   Okay.
2     Q.   So on this trike --
3     A.   Correct.
4     Q.   -- when it was delivered to you, you
5  mentioned there were several ways to establish, and I
6  don't know if you were just talking about Harleys
7  generally or this particular trike.
8          And I want to focus on this particular trike.
9     A.   Okay.
10    Q.   So when this particular trike was
11  delivered to you, how many ways were there to start it?
12    A.   There was one way to start it.  With the
13  toggle switch, and then hitting the ignition button on
14  the handlebars.
15         Factory, they will come with a key.
16         MS. ROBERTSON:  I'm not going to use
17  everything yet, but --
18  BY MS. ROBERTSON:
19    Q.   Mr. Thompson, I'm going to show you what's
20  been marked for identification as Defendant's Exhibit
21  J.
22         [Defendant's Exhibit J
23          marked for identification.]
24  BY MS. ROBERTSON:
25    Q.   Do you see Defendant's Exhibit J?

70

1     A.   I do.
2     Q.   What is that?
3     A.   That's the toggle switch, the ignition.
4     Q.   Is that something you produced in
5  discovery in this lawsuit?
6     A.   Yes.
7     Q.   And so is that the toggle switch we have
8  just been talking about?
9     A.   Yes.
10    Q.   Where is this toggle switch located on the
11  Harley -- or on the trike?
12    A.   Behind the battery under the seat on the
13  right side of the motorcycle.
14    Q.   So --
15    A.   Hidden -- kind of hidden up under there.
16    Q.   Do you have to lift up the seat cushion?
17    A.   No, you have to feel back in there to know
18  where it's located.  You would kind of have to know
19  where it's located to start it.
20    Q.   Okay.
21         So I'll use myself kind of --
22    A.   Uh-huh.
23    Q.   I'm seating here, and this chair let's
24  pretend is the seat of the Harley, of the trike.
25    A.   Okay.

71

1     Q.   I have kind of got my right hand down here
2  by my right hip.
3          Am I in the ballpark of where the --
4     A.   Yes, it would be under -- you lift under
5  the seat, reach down under the seat, and it's located
6  under there.
7     Q.   So in Exhibit -- are we on J?
8     A.   Uh-huh.
9     Q.   So at the top of Exhibit J, is that the
10  seat cushion?
11    A.   That's the seat.
12    Q.   Okay.
13         And so is this on the right or the left side of
14  the --
15    A.   The right side.
16    Q.   And to -- if I wanted to start this trike,
17  what do I do?
18    A.   You would flip that up.
19    Q.   This lever, flip it just straight up?
20    A.   Right.  Yeah.
21    Q.   Does it need to be on one -- it says off,
22  ACC, and ignition.
23    A.   No, you just flip it up.
24    Q.   Just flip it up?
25    A.   Correct.

72

1     Q.   Does -- do I have to turn it afterwards?
2     A.   You flip it up, and then you hit your
3  ignition on the handlebars.
4     Q.   So --
5     A.   That's an on and off switch.
6     Q.   So if this is down and I hit the button on
7  the handlebar, the trike is not going to start?
8     A.   Correct.
9     Q.   And if I have flipped this up and hit the
10  ignition on the trike, and I've driven it around, and
11  now I want to park and turn it off, what do I do?
12    A.   You turn off the -- turn -- you can turn
13  it off from the handlebars, the on and off switch, and
14  then you hit that down.
15    Q.   Just hit it down?
16    A.   Correct.
17    Q.   What happens if I turn it off on the
18  handlebar, and I don't hit it down?
19    A.   The accessory might be on, and it might
20  drain the battery.
21    Q.   Are there any anti-theft devices or
22  mechanisms on the trike?
23    A.   Just -- just that.
24    Q.   How does that function as an anti-theft
25  mechanism?

RAYMOND THOMPSON

73

1     A.    You have to know where it's located.  I
2  mean, you would have to look -- you can lock, lock the
3  ignition, you know, the factory ignition as well.
4     But in order to start it, you'd have to use that
5  toggle switch.
6     Q.    When you say --
7     A.    So that is an anti-theft, because you have
8  to know where that's at, and you have to have, you
9  know -- if the bike is -- if the original factory
10 ignition is locked, you can't -- you cannot start the
11 bike with that -- with just that.
12    Q.    How does the --
13    A.    So it's an added feature to an anti-theft.
14    Q.    Let me ask you this.
15    At the time a toggle switch is installed --
16    A.    Uh-huh.
17    Q.     -- is the factory ignition removed?
18    A.    No.
19    Q.    So when you buy a trike from the factory
20 and I just take it however it comes off the truck --
21    A.    Right.
22    Q.     -- does Harley give you a key?
23    A.    They do.  They give you a key -- for the
24 ignition that's on the tank, they give you a key for
25 that ignition.

74

1     And then you have the hand ignition, the
2  starter, you know.
3     And then that's how they come factory.
4     This was added on as an extra safety device,
5  because you would need to know where that is as well.
6     So if someone even had the key, you would still
7  need to know where this is to access this to start the
8  motorcycle.
9     Q.    Okay.
10    Let me back up.
11    Fresh off the truck from Harley, I've done
12 nothing to it.
13    A.    Uh-huh.
14    Q.    So the key that Harley gives you does
15 not -- if you get in a normal passenger vehicle, you
16 know, four wheeled vehicle --
17    A.    Uh-huh.
18    Q.     -- usually you stick the key -- well,
19 sometimes we don't even have keys anymore.
20    But for cars that have a key, you stick the key
21 in, you turn it, and the ignition turns on and it's
22 running.
23    Would you agree with that?
24    A.    Yeah.
25    Q.    So on the Harley, when it comes from the

75

1  factory, and you turn the ignition with the key, that's
2  not starting the Harley?
3     A.    No.
4     Q.    That's just unlocking it to be able to
5  start it from the handlebars?
6     A.    Correct.  Correct.
7     Q.    And so this acts as an additional
8  anti-theft device, because -- and you correct me if I'm
9  wrong here; okay?
10    A.    Right.
11    Q.    Because to start the trike, you have to
12 make sure the ignition is unlocked.
13    A.    Uh-huh.
14    Q.    And then flip this -- the toggle switch
15 up, and then also start it on the handlebar?
16    A.    Correct.
17    Q.    As of October 22nd, 2022, had the ignition
18 locking mechanism been removed from your trike?
19    A.    I never received a key, so I never
20 unlocked it or locked it.  It just -- I just started it
21 with this, and then the ignition from the handlebars.
22    Q.    Was there still, for lack of a better,
23 more proper term, a keyhole?
24    A.    Yeah.  It's still there, but --
25    Q.    It's still there?

76

1     A.    But there was -- I was never given a key,
2  nor did I --
3     Q.    Mr. Rench never gave you a key?
4     A.    No.
5     Q.    Did you ever write to Harley and say I
6  have a 2003 100 anniversary trike, VIN number whatever
7  it is, I'd like a key?
8     A.    No.
9     Q.    So to this date, you have never had a key
10 to lock or unlock the ignition on your trike?
11    A.    I never needed one.
12    Q.    I'm sorry?
13    A.    I never needed one.
14    Q.    Well, that wasn't exactly the answer to --
15    A.    Okay.
16    Q.    I'm going to ask you that in a second.
17    A.    Okay.
18    Q.    But you never possessed a key --
19    A.    No.
20    Q.     -- to the ignition locking mechanism?
21    A.    Right.
22    Q.    Okay.
23    Why did you never need one?
24    A.    Because I have the toggle switch on there.
25    Q.    Does what we are looking at in Exhibit

19 (Pages 73 to 76)

RAYMOND THOMPSON

77

1    J -- that's J; right?
2        A.   Yeah.
3        Q.   I'm sorry, I can't remember that.
4        Does this get covered up?
5        A.   The photo is deceiving, because it -- I
6    took this picture for Justin.  So I stuck my phone
7    under the seat and everything.
8        So it would take someone -- you couldn't just
9    find this in seconds.  You would have to actually look
10   and look under the seat, you know, get down low and
11   look.
12       So it's not -- the photo is deceiving.
13       Q.   And I apologize if I've asked you this
14   before.
15       When you took possession of the trike from Mr.
16   Rench, was the toggle switch already installed?
17       A.   Yes.
18       Q.   Did you move the toggle switch during your
19   repairs, or is this the same location that the toggle
20   switch was in at the time you took possession of the
21   Harley from Mr. Rench?
22       A.   Same location.
23       Q.   Did your trike have any other anti-theft
24   mechanisms?
25       A.   Sometimes -- sometimes they have fork

78

1    locks with a key, where you can't turn.
2        I'm not sure that that one does or doesn't.
3    Some of my other bikes do.  I don't know.  I don't
4    think that one does.
5        Q.   And I apologize if I asked this.
6        But some modern vehicles today, you need -- you
7    don't even need a physical key; you just have a fob.
8        A.   Right.
9        Q.   Was there a fob that went with this trike?
10       A.   No.
11       Q.   I'd like to shift gears just a little bit
12   and talk about Nathan Rench, if that's all right.
13           MR. GELFAND:  No pun intended?  Shift
14   gears?  That's my joke for the day.
15   BY MS. ROBERTSON:
16       Q.   Let's see.  I know you told me that
17   someone introduced you to Nathan Rench.  I do not
18   remember what that person's -- was it Garrett Gist?
19       A.   Gist.
20       Q.   Introduced you to Nathan Rench?
21       A.   Yes.
22       Q.   Okay.
23       When did you first become acquainted with Nathan
24   Rench?
25       A.   When Garrett introduced us to, you know --

79

1    he said he had a motorcycle -- a trike, a Harley --
2    2003 anniversary trike in a barn garage out in Union --
3    or out in Beaufort.
4        Q.   And we've talked about that the purchase
5    date was, I think, March 30th, and some checks were
6    exchanged in early March for the purchase of the
7    vehicle.
8        A.   Uh-huh.
9        Q.   Do you know how much before that you had
10   met Mr. Rench?
11       A.   I believe one time.
12       Q.   Do you know if that was -- do you know if
13   you were introduced to him in February of 2020?
14       A.   I don't know.
15       Q.   Do you know if it was January of 2020?
16       A.   It was cold out.  That's all I remember,
17   it was cold out.
18       Q.   Did you communicate with Mr. Rench via
19   telephone, e-mail, text message?
20       A.   Garrett communicated -- Garrett Gist knew
21   Mr. Rench.
22       Mr. Rench had a motorcycle repair company, and
23   Garrett -- and he had motorcycles.  Garrett knew him.
24   He introduced us.  I never spoke to him before.
25       Q.   The first time you spoke to Mr. Rench, was

80

1    it the first time you met him in person?  Were those
2    one and the same?
3        A.   Uh-huh.
4        Q.   Was that a yes?
5        A.   Yes.  Sorry.
6        Q.   That's okay.
7        And if my recollection is correct, I believe the
8    check to Mr. Rench is dated March 4th.
9        So would on or about March 4th be the first time
10   you spoke with Mr. Rench?
11       A.   No, I spoke to him before that.
12       Q.   You met him in-person before that?
13       A.   With Garrett, to look at the bike.
14       Q.   To -- okay.
15       Do you know if that was --
16       A.   It was cold outside.  I don't remember the
17   date.
18       Q.   Do you know if it was days, weeks, or
19   months before you gave Rench that check?
20       A.   Probably months.  We were negotiating the
21   price.
22       Q.   How many times in total do you think you
23   met Nathan Rench, through the history -- the course of
24   your life?
25       A.   Maybe five, six times.  I met -- well,

Golkow Litigation Services

RAYMOND THOMPSON

81

1  including going to court, with -- or Gasconade County,
2  I saw him in court.  So if that counts, maybe five or
3  six times.
4      Q.   When you went to court in Gasconade
5  County, did you stay for the entire hearing?
6      A.   Yes.
7      Q.   Did anybody else testify?
8      A.   Police officers.
9      Q.   Did Mr. Rench testify?
10     A.   No.
11     Q.   Prior to March 30th of 2020, did you have
12  any other conversations with Mr. Rench that were on
13  topics other than the trike?
14     And I don't care if you had talked about the
15  weather or small talk.
16     But any other substantive conversations about
17  anything else?
18     A.   I don't know if it was prior to 2020.  We
19  talked about purchasing some -- purchasing some
20  property from him, the property where the trike was
21  actually located.
22     Q.   Did you ever communicate with Mr. Rench
23  via text message?
24     A.   Yes.
25     Q.   I'm going to mark this as a packet rather

82

1  than marking each page.  So I believe we are on
2  Defendant's Exhibit K.
3         [Defendant's Exhibit K
4         marked for identification.]
5  BY MS. ROBERTSON:
6      Q.   Mr. Thompson, feel free to review the
7  entirety of Exhibit K if you need to, but I will submit
8  that these are the -- everything I've handed you has
9  been given to me by your attorney.
10     A.   Right.
11     Q.   So if you don't need time to look at it,
12  do you recognize what Exhibit K is?
13     A.   I kind of do.
14     Q.   What is Exhibit K?
15     A.   It's communication between Nathan Rench
16  and myself.
17     Q.   At the time it's got N, and it says Nathan
18  Beaufort?
19     A.   Right.  Because I have several Nathans in
20  my phone, and I could not remember his last name.  I
21  just knew him from Beaufort.
22     Q.   So Nathan Beaufort and Nathan Rench are
23  one and the same?
24     A.   Correct.
25     Q.   And if -- I'm looking at the first message

83

1  of Exhibit K, it looks like it's dated June 13th of
2  2020.
3      Is that accurate?
4      A.   Uh-huh.
5      Q.   And I don't want to be tedious and go
6  through everything, but it looks like Mr. Rench is --
7  the first message is from him.
8      Is that right?
9      A.   Uh-huh.
10     Q.   So the black messages are Mr. Rench, and
11  the green messages are from you?
12     A.   Correct.
13     Q.   And it looks like Mr. Rench is asking you
14  to come to -- I think that means accountant's office.
15     Is that accurate?
16     A.   Yes.
17     Q.   What is that in reference to?
18     A.   A property purchase from Nathan after the
19  motorcycle incident.
20     Q.   What -- what property did you purchase?
21     A.   The 3676 Fox Creek Avenue, Beaufort,
22  Missouri.
23     Q.   What type of property is that?
24     A.   It's just rural property.
25     Q.   Is it a residence?

84

1      A.   No.  I mean, I have since put up some
2  cabins, like campground -- hunt and camp, fish and
3  camp, all that.
4      Q.   How many acres is it?
5      A.   Two.  I believe two.
6      Q.   And you purchased this property from Mr.
7  Rench?
8      A.   Yes.
9      Q.   What were the terms of your sales, of the
10  purchase with Mr. Rench?
11     A.   It was unique.  He had a bunch of debris
12  and things on the property, and there was some
13  buildings and things on the property that he wanted --
14  that -- and I gave him 90 days to remove everything off
15  the property.
16     So I believe the closing cost was $23,000,
17  something like that, $23,000 for the property.  I can't
18  remember the exact amount.
19     Q.   But amount of money; correct?
20     A.   Amount of money.
21     Q.   Were there any other terms?  Were you
22  paying off liens?
23     A.   Yes.
24     Q.   On top of --
25     A.   Not originally.  He did not tell me he had

RAYMOND THOMPSON

85

1  liens on the property we went to the title company, and
2  the title company informed me he had many liens against
3  his property.
4        Q.   Were those -- okay -- tax liens?
5        A.   Various.  Tax liens, personal liens.
6        Q.   Is the $23,000, ballpark, give or take --
7  does that include the liens you paid off?
8        A.   Actually, I paid him more for the property
9  than the agreed amount because of the liens.
10       Q.   Okay.
11       And I guess I probably didn't actually ask you
12  that.
13       Did you pay off the liens?
14       A.   Yes.
15       Q.   How much more than the agreed-upon price
16  do you think you paid?
17       A.   I can't remember offhand.  Probably in the
18  ballpark of $5,000 to $10,000.
19       Q.   On top of the $23,000?
20       A.   Yes, I -- yeah.
21       Q.   How did you become interested in this, in
22  purchasing this property?
23       A.   When I went up there to purchase the
24  motorcycle, Mr. Rench said he was interested in just
25  selling all the property.

86

1        At first I wasn't interested in it, and then I
2  noticed it backed up to a conservation area and was
3  near the Missouri Anglers Club and canoe rental places,
4  and I thought it might be neat to turn into a
5  campground and eventually rent out cabins.
6        But it had lots of garbage on the property and
7  stuff, you know, he just collected over the years.  And
8  there were buildings -- old buildings full of debris.
9        And so I wanted -- I gave him an extension to
10  closing, three months, to removal all of the stuff, and
11  I gave him $5,000 escrow to help fund that initial
12  escrow payment, just to fund -- help him fund getting
13  rid of the debris that he never got rid of.
14       Q.   Do you know when you closed on the
15  property?
16       A.   I have it at home.  I don't know a year,
17  but I have all the closing -- closing paperwork from
18  the title -- meeting title company.
19       MR. GELFAND:  I'm just going to generally
20  object.  What does this have to do with anything?
21       MS. ROBERTSON:  Well, you produced -- I
22  just want to understand what these text messages are
23  that you've produced and the relationship between Mr.
24  Thompson and Mr. Rench.
25       MR. GELFAND:  Okay.

87

1        MS. ROBERTSON:  And the communications
2  between them.  I think it's fair.
3        MR. GELFAND:  Even though they have
4  literally nothing to do with the basis of the lawsuit?
5        MS. ROBERTSON:  I don't know -- I don't
6  know that, because I haven't had an opportunity to ask
7  your client about it.
8        MR. GELFAND:  So ask him -- I don't think
9  that -- let's move on.
10  BY MS. ROBERTSON:
11       Q.   Do you have an actual sales agreement with
12  Mr. Rench, like written up?
13       A.   Yeah, contract with Union Title Company
14  for the property and everything.  Yes.  I have -- the
15  property is titled to my name.  I pay personal property
16  tax and everything on it.
17       None of this text pertains to the bike, the
18  motorcycle, though, until maybe the latter part, you
19  know.
20       Q.   When Rench is saying accountant's office,
21  does he mean the title office or something else?  Do
22  you know?
23       A.   That is his accountant's office.  Like I
24  assume -- we met in his accountant's office before
25  going to the title company.

88

1        Q.   For what purpose was that?
2        A.   I don't know that.  He just requested it,
3  for whatever reason.
4        Q.   So then you get a text in July 2020 from
5  Rench, and he says that somebody ransacked his truck
6  and stole a winch and a boom and some other stuff.
7        And -- but on the next page, there's another
8  text that he's talking about a trailer along with that
9  bike.
10       He talks about a gun safe.
11       And then he says he's going to report it all
12  stolen tomorrow.  The trailer, my bike, my toolbox,
13  everything else that was there.
14       Do you know what Mr. Rench is talking about?
15       MR. GELFAND:  Objection to the form of the
16  question.  You can answer.
17       A.   Yeah -- huh?
18       MR. GELFAND:  I said objection to the form
19  of the question.  But you can answer.
20       A.   So on the property, he was given a certain
21  amount of time to remove all this stuff.  I don't even
22  know what was on the property.
23       And he did not do that, so I called the title
24  company.  I called Franklin County Title Company in
25  Union.

22 (Pages 85 to 88)

89

1    I called the realtor, and I asked them, what do
2  I do with this?
3    And they said it belongs to you.  Just get rid
4  of it.
5    So I paid Garrett Gist to remove everything on
6  the property.
7  BY MS. ROBERTSON:
8    Q.   When you say you called Franklin County,
9  do you just mean their government offices or the
10 sheriff's department, or something else?
11   A.   Their government office as well as the
12 title company where we closed that.
13   And I said, I don't think he is ever going to
14 get all of this stuff off of here.  I've given him
15 three months prior to closing, and then I've given him
16 another two months.  What can I do about this?
17   And they said you can just dispose of it however
18 you want at this point.  You own whatever is on the
19 property.
20   So that's what I did.  I paid someone to come
21 out there with tractors and trucks and load everything
22 up and get it off.
23   Q.   And that person was Garrett Gist?
24   A.   Yes.
25   Q.   What is Garrett Gist's occupation?

90

1    A.   He does -- well, he has got various -- you
2  know, various -- he owns a warehouse in Union.  He
3  rents out space.  He does carpentry.  He is a builder.
4  He does -- there's lots -- he's a jack-of-all-trades.
5    Q.   So is removing the things described in
6  these text messages part of Garrett's like normal
7  business?
8    MR. GELFAND:  Objection to the form of the
9  question.  I think it calls for speculation.
10   A.   He does -- like I said, he's a
11 jack-of-all-trades.  He had dump trucks and loaders,
12 and he offered to do it, so I said, how much do you
13 want, you know.
14 BY MS. ROBERTSON:
15   Q.   How much did you pay him?
16   A.   $5,000.
17   Q.   Do you know what Mr. Gist did with the
18 items he removed?
19   A.   I have no idea.
20   Q.   There's a text message in here where
21 Nathan seems to be making an accusation that you burned
22 his daughter's piano.
23   Do you know anything about that?
24   MR. GELFAND:  Object to the form of the
25 question.  Calls for speculation.  And again, this is

91

1  totally irrelevant to anything that has to do with this
2  lawsuit.
3    MS. ROBERTSON:  These are communications
4  between two witnesses in this lawsuit.  You know --
5    MR. GELFAND:  Nathan Rench actually wasn't
6  there.  He's literally not a witness in this lawsuit.
7    A.   I don't know that there was even a piano
8  on the property.  I didn't know what was on there.  It
9  was all refuse to me.  So I paid Garrett to get rid of
10 it.  If there was a burnt piano, then I know nothing
11 about that.
12 BY MS. ROBERTSON:
13   Q.   Do you know what Nathan Rench's daughter's
14 name is?
15   A.   I think he has two daughters.  I believe
16 one of them's name is Madeline.
17   Q.   Do you know what the other one's name is?
18   A.   I don't.
19   Q.   Have you ever met them?
20   A.   I met Madeline at the closing with Nathan.
21   Q.   Is she an adult or --
22   A.   Yeah.
23   Q.   On Page 2, Nathan says, that trailer is
24 titled to me as well as that bike.
25   Do you know what he's referring to?

92

1    MR. GELFAND:  Object to the form of the
2  question.  Calls for speculation.  Calls for the state
3  of mind of a third party.
4    A.   There were apparently -- he said there was
5  another bike on the property.  Not the trike, another
6  bike on the property.
7    I have no knowledge of it, because I just paid
8  Garrett to get rid of everything.  I didn't know what
9  was -- there were several trailers, enclosed trailers.
10 There were buildings.  And I don't know what was in
11 them.  I had never seen inside them.
12   So I paid Garrett to remove everything.  And if
13 there was a bike in there, I don't know anything about
14 it.  So it's not referring to the bike that I
15 purchased.
16 BY MS. ROBERTSON:
17   Q.   There's a message in here about -- where
18 Nathan accuses you of hammering the ignition out of his
19 truck?
20   A.   I never touched the truck.
21   Q.   Do you know what kind of truck it was?
22   MR. GELFAND:  Objection to the form of the
23 question.  Calls for speculation.
24 BY MS. ROBERTSON:
25   Q.   You can answer.

23 (Pages 89 to 92)

RAYMOND THOMPSON

93

```
1        A.   Okay.
2        There was an old truck out there that Nathan was
3   supposed to get off the property.
4        After -- after -- once the title company and the
5   police said that I -- everything on the property I
6   could do whatever I wanted with, I let Nathan come get
7   the truck and some other things, and that's when I --
8   he vandalized the cabins I had already put on the
9   property and stole building materials.  So that's when
10  I filed the police report.
11       I don't know anything about ignition on a truck.
12  I let him come get the truck.  Him and his family.
13       Q.   So on Page 4, Nathan says, Ray, I was kind
14  enough to let you move four cabins out there that I was
15  liable for, and nothing ever happened to them.
16       So he's talking about cabins, you're talking
17  about cabins.
18       Are these the same cabins?
19            MR. GELFAND:  Objection to the form of the
20  question.  Calls for speculation.  Calls for the state
21  of mind of a third party.
22       You can answer.
23       A.   Yeah, they're the same cabins.  He was
24  confused.  Nathan was confused.
25  BY MS. ROBERTSON:
```

94

```
1        Q.   Okay.
2        When -- are these -- the cabins -- I mean, are
3   these like mobile home-type cabins, you can move them
4   different places?
5        A.   They're -- they're prefab cabins that I
6   purchased and moved out on the property.
7        Q.   Okay.
8        Mr. Rench has, I think, a lawsuit with a entity
9   called Graceland Properties.
10       Are you familiar with that?
11       A.   No.
12       Q.   It says something about cabins.
13       Are you familiar with that?  Do you know what
14  I'm talking about?
15       A.   I settled a lien with a cabin that he
16  bought, but that's not -- has nothing to do with this.
17       Q.   Not these cabins?
18       A.   No.  I purchased these outright from a
19  different place.
20       He had one repoed.  I think you are referring to
21  that.  Years prior to this.
22       Q.   So I'm not sure of the date.
23       It looks to me like it's July 17th, 2020, but
24  it's a few pages in here.
25       You sent a message that says, "Hi Nathan, I'm
```

95

```
1   going to leave the gate open today for you to get the
2   trailers, camper shell, and remainder of your things
3   and garbage that is left.  I will lock up the gate
4   tomorrow.  Nobody will be allowed to access the
5   property.  Please bring back the lumber that put into
6   the barn.  Thanks, Ray."
7        What are you referring to there?
8        A.   Because I let him and his family come out
9   and retrieve some of these items, even after I was told
10  that I owned everything.  I was just being kind, and
11  let him come out and get some things.
12       And then they stole composite flooring out of
13  the cabins.  I was finishing the cabins.  They stole
14  composite flooring.  They stole stuff off the property.
15       So I filed a police report.  And I was just
16  telling him, bring it back.
17       Q.   So the flooring, is that what you mean by
18  the lumber?
19       A.   Lumber.  There was lumber.  The cabins had
20  lofts, so I had two-by-fours there for ladders for the
21  lofts.
22       I had various other lumber, and steps -- to make
23  steps for the cabins, and the prefab flooring, yes.
24       Q.   So I don't know how many pages -- 12 pages
25  in, there is a photograph that it looks like you sent.
```

96

```
1        A.   Yeah.
2        Q.   Can you tell me what that photograph is?
3        A.   That's something -- that was vandalism
4   that sent to the police that when I let him come out
5   and get his things, the truck -- they spray painted the
6   inside of one of the cabins with that.
7        Q.   What does that say?
8        A.   I'm not sure.  Your guess is as good as
9   mine.  The spelling looks -- yeah.  I know as much
10  about what that says as you do.
11       It was just van -- I took a picture because it
12  was vandalism.
13       Q.   A little bit later, Nathan sends a text
14  that Garrett wants to charge him $7,000 for his stuff
15  back.
16       Do you know anything about the dealings between
17  Garrett and Mr. Rench?
18       A.   I do not.
19       Q.   And I cannot find the exact message here,
20  but one of these messages I think you referenced that
21  the flooring and lumber we were just talking about was
22  worth several thousand dollars.
23       A.   Yes.
24       Q.   Is that an accurate --
25       A.   Yes.
```

RAYMOND THOMPSON

97

1    Q.    -- estimate?  Okay.
2    A.    That's why I filed a police report.
3    Q.    Aside from the trike we've been talking
4 about and the purchase of this property at Fox Creek,
5 are there any other transactions that you've entered
6 into with Nathan Rench?
7    A.    No.
8    Q.    Have you bought any other vehicles from
9 Mr. Rench?
10    A.    No.
11    Q.    Bought any other real property?
12    A.    No.
13    Q.    On August 26th of 2020, it looks like you
14 sent a photograph.
15    It's the second-to-last page.
16    A.    Yeah.
17    Q.    Do you know who -- or what is that photo
18 of?
19    A.    There was a car there.  I put cameras up
20 on the property, because Nathan stole.
21    And so I put up cameras, and there was just --
22 that car pulled into the driveway, and I think I -- in
23 the course of -- I was just letting Nathan know there's
24 cameras, you can no longer go on the property.
25    You know, this is your car.  I'm definitely

98

1 giving the picture to the police.
2    Q.    I'll mark this as another packet,
3 Exhibit -- Defendant's Exhibit L.
4    [Defendant's Exhibit L
5    marked for identification.]
6 BY MS. ROBERTSON:
7    Q.    Mr. Thompson, have you had an opportunity
8 to review Defendant's Exhibit L?
9    A.    I know -- no, but I know what this is
10 pertaining to.  Yeah.
11    Q.    I will submit to you that these are text
12 messages your attorney provided.
13    A.    Right.
14    Q.    The top text message, do you know what
15 that is?
16    A.    I -- I don't.  Honestly, I don't know.  It
17 was in -- in my text messages.
18    Q.    And Defendant's Exhibit L also has Nathan
19 Beaufort at the top.
20    Do you agree that Defendant's Exhibit L is text
21 message communications between yourself and Mr. Rench?
22    A.    Yes.
23    Q.    And the texts that are on the left side
24 that are in black are messages from Mr. Rench?
25    A.    Yes.

99

1    Q.    And the text messages that are in green on
2 the right side are messages from you?
3    A.    Yes.
4    Q.    That photograph on the first page, the
5 sort of right-hand side, it looks similar to the back
6 of the title.
7    And there's a box that says purchaser's name.  I
8 don't know if that says Aaron or Adam Phillips.
9    Do you know an individual by the name Aaron or
10 Adam Phillips?
11    A.    I have no idea who that is.
12    Q.    Do you know the name of Nathan Rench's
13 father?
14    A.    Steve Rench.  I think he has passed away.
15    Q.    Do you know if he has passed away in the
16 last two years?
17    A.    I believe so.
18    Q.    Do you know what -- do you know who Tina
19 is?
20    A.    I believe that's Nathan's cousin or aunt.
21 I don't -- it's some relation to Nathan.
22    Q.    Do you know who -- and these are names I
23 picked out of the text messages.
24    A.    Yeah.
25    Q.    Do you know who Mullins is?

100

1    A.    Mullins?  Mullins is a refuse hauling
2 company.
3    Q.    You said hauling?
4    A.    Hauling, yeah.  They have a waste yard
5 at -- in between Union and Beaufort.
6    Q.    You don't know Aaron Phillips?
7    A.    No.  I've already said that.
8    Q.    Sorry?
9    A.    I said that already.  Yeah.
10    Q.    I'm sorry.
11    Exhibit L looks to be -- excuse me -- text
12 messages beginning in June of 2021.
13    Is that accurate?
14    A.    Yes, that's what it says.
15    Q.    On June 13th of 2021, you sent a message
16 to Mr. Rench.
17    It said, you don't have to pay -- and I'm sorry.
18 That's one, two, three, four, five -- the sixth page
19 in.
20    It's a green message at the bottom.  There's a
21 black message at the top.
22    A.    Okay.
23    Q.    Do you see -- you do see the timestamp?
24    A.    Yeah.
25    Q.    Is there any reason these timestamps would

25 (Pages 97 to 100)

RAYMOND THOMPSON

---

101

1  be inaccurate?
2      A.  I don't think -- I don't -- I'm not sure
3  what that means, what you mean.
4      Q.  What type of phone do you use, an Android
5  or an Apple?
6      A.  Apple iPhone.
7      Q.  Does your phone automatically update with
8  time changes?
9      A.  Yes.
10     Q.  Could you read for me June 13th message at
11 12:33 AM?  And actually you just have to read the first
12 sentence.
13     A.  You don't have to pay taxes on the trike,
14 because I already paid them.
15     Q.  Are you talking about the trike that forms
16 the basis of this lawsuit?
17     A.  Yes.
18     Q.  Did you pay taxes on that trike?
19     A.  No.  I tried, because I had intentions of
20 paying them.  And I tried, but he had already -- or
21 he -- shortly after he did the title fraud.
22     Q.  Bear with me a moment.
23     Do you have -- do you have a -- never mind.
24     Have you ever -- I thought there was a reference
25 in here.  I can't find it.

---

102

1      But have you ever gotten pulled over and
2  received a traffic ticket on the trike?
3      A.  No.
4      Q.  Did you tell Nathan that you received
5  tickets on the trike?
6      A.  No.
7      Q.  Did he tell you that you had received
8  tickets?
9      A.  No.
10     Q.  Are these Exhibits K and L -- are those
11 the only text messages you have ever exchanged with
12 Nathan Rench?
13     A.  I believe so.
14     Wait.  I go through phones, so maybe a former
15 phone there was a couple text messages.  I think these
16 are all of them.
17     Q.  I'm going to mark this as Defendant's
18 Exhibit M.  It's a copy of your interrogatory.
19         [Defendant's Exhibit M
20         marked for identification.]
21 BY MS. ROBERTSON:
22     Q.  In your -- these are your answers to
23 Officer Cockrell's interrogatories.
24     And if you turn to Page 6, Interrogatory Number
25 11 is asking you about communications between yourself

---

103

1  and Nathan Rench.
2      And if you turn to the next page at the top and
3  go to Bullet Point C, you state, "Since October
4  22nd-23rd, 2022, Nathan Rench has sent me text
5  messages.  I have not responded to the messages."
6      I don't see those messages in what you've
7  produced.
8      A.  I may have been confused with the dates.
9  I don't know.
10     Q.  Has Nathan Rench contacted you since
11 October 22nd of 2022?
12     A.  No.
13     Q.  Has he sent you any text messages?
14     A.  No.  Since that -- since October 22nd,
15 2022?  No.
16     Q.  Correct.
17     With respect to the removal of the debris in
18 those text messages, did you -- was that included in
19 your sales agreement?
20     A.  No.  I had to pay that after the fact.
21 He --
22     Q.  I think you misunderstand my question.
23 I'm sorry.
24     A.  Okay.
25     Q.  I thought you said you gave Nathan Rench

---

104

1  like an amount of time, 90 days, something like that.
2      A.  I did.  And he failed to do that.  He
3  failed to close on the closing date.  So we arranged a
4  new close date.
5      I wasn't required to give him more time, but I
6  did give him more time, empathetically, and he didn't
7  fulfill that.
8      So then I hired Garrett to haul everything, get
9  everything off the property.
10     Q.  Okay.
11     Just so I understand, a closing was held;
12 correct?
13     A.  Yes.
14     Q.  And after that closing, did Mr. Rench have
15 a certain period of time to remove items from the
16 property?
17     A.  No.  That was -- I gave that to him --
18     Q.  Prior to closing?
19     A.  Prior to closing.  We had a special real
20 estate closing agreement.  He had 90 days.
21     Q.  Prior to closing?
22     A.  Prior to closing.
23     Q.  Okay.
24     Did you send him any letters, communications, or
25 notices after closing that you were going to remove the

---

RAYMOND THOMPSON

105

1 property?
2    A.   No.
3    Q.   Did you have any contact with him after
4 closing, before removal of the items from the property?
5    A.   I did.  That's when he came out and
6 vandalized and stole from the property, and I let him
7 come out and remove some -- what items -- what he
8 wanted.
9    Q.   Now I want to -- I'd like to switch gears
10 here to October 22nd of 2022.
11        On that date, where did you normally store the
12 trike?
13    A.   In my garage.
14    Q.   Where is your garage located?
15    A.   Behind my house.
16    Q.   Is your garage visible from the front of
17 your house?
18    A.   No.
19        [Discussion off the record.]
20 BY MS. ROBERTSON:
21    Q.   Mr. Thompson, I'm going to show you what's
22 been marked for identification as Plaintiff's Exhibit
23 Number 8.
24        Can you take a look at that and tell me if you
25 recognize that?

106

1    A.   I do.
2    Q.   How do you recognize that?
3    A.   That's my home.
4    Q.   Would you agree there's a driveway
5 depicted in that photograph?
6    A.   Yes.
7    Q.   And would you agree there's a vehicle in
8 the driveway of that photograph?
9    A.   Yes.
10    Q.   To the right of that vehicle, I can see
11 some shutters and a window.
12    A.   Uh-huh.
13    Q.   What room of that -- is that in your
14 residence?
15    A.   It's the garage.
16    Q.   Where's the door, the vehicle door to the
17 garage?
18    A.   The back side of the home.
19    Q.   Okay.
20        And I think I've -- so is that the garage where
21 you stored your trike?
22    A.   Yes.
23    Q.   On October 22nd of 2023 (sic), where was
24 your trike?
25    A.   Outside of -- in my driveway, in my

107

1 backyard.
2    Q.   Is that where it was the last time you saw
3 it?
4    A.   Yes.
5    Q.   Had you driven it that day?
6    A.   I was changing the oil, and -- it was the
7 day before, I was changing the oil and draining some
8 fuel out of it.
9    Q.   I'm going to show you what's been marked
10 for identification as Defendant's Exhibit --
11        MS. ROBERTSON:  Do you know what we're on?
12        THE REPORTER:  The next one's N.
13        MS. ROBERTSON:  N?
14        [Defendant's Exhibit N
15        marked for identification.]
16 BY MS. ROBERTSON:
17    Q.   Mr. Thompson, do you recognize Defendant's
18 Exhibit N?
19    A.   I do.
20    Q.   How do you recognize that?
21    A.   That's my backyard.
22    Q.   And there is a blue marking in that
23 photograph.
24    A.   Uh-huh.
25    Q.   Do you know what that is?

108

1    A.   Inside the blue marking?
2    Q.   Well, do you know who made that marking?
3    A.   I don't.
4    Q.   Okay.
5        MR. GELFAND:  Sorry.  Which one is N?
6        MS. ROBERTSON:  Are we all looking at --
7 do we have the same?
8        MR. GELFAND:  I'm not, but that's okay.
9        MS. ROBERTSON:  Is it not?  It should be.
10        MR. GELFAND:  It's okay.  Is it this one?
11        MS. ROBERTSON:  Yeah.
12        MR. GELFAND:  Okay.  There.
13 BY MS. ROBERTSON:
14    Q.   Does that blue marking have any
15 significance to you?
16    A.   Yeah, that's where the motorcycle was
17 parked.
18    Q.   On October 22nd?
19    A.   Yes.
20    Q.   The last time you saw it?
21    A.   Yeah.  The helmet's next to it there, the
22 brown -- that black thing on the ground is the helmet.
23 And the bike was right there next to it.
24    Q.   Which side of the helmet was the bike on?
25        As you're looking at this photograph --

109

```
 1      A.   It was in front of that Jeep top.  See the
 2  hard top for the Jeep?
 3      Q.   Uh-huh.
 4      A.   It was -- the bike was located in front of
 5  that Jeep top.
 6      Q.   Okay.
 7      So is this -- was the trike within this blue
 8  circle?
 9      A.   A little bit -- a little bit to the right
10  of it.
11      Q.   Mr. Thompson, one thing I forgot to
12  mention earlier I wanted to confirm.
13      We've had some other depositions in this case
14  this week.
15      Would you agree?
16      A.   Yeah.
17      Q.   And you sat through all of those
18  depositions.
19      Is that correct?
20      A.   Right.
21      Q.   And so you heard the testimony of all the
22  witnesses that were deposed earlier this week.
23      Is that correct?
24      A.   I think, yeah, parts of them.  Yeah.
25      Q.   Did anyone else have access to your trike
```

110

```
 1  on October 22nd of 23rd -- or 2023 -- 2022?  Sorry.
 2      A.   No.
 3      Q.   Did anyone else have permission to use
 4  your trike on October 22nd, 2022?
 5      A.   No.
 6      Q.   Were you home on the evening of October
 7  22nd, 2022?
 8      A.   I believe I got home after, in the early
 9  morning hours of October 23rd.
10      Q.   What time -- what time did you leave your
11  home?
12      A.   That day?
13      Q.   Did you leave your house on the 22nd, or
14  had you been gone prior to that?
15      A.   I left the house in the morning, went to
16  work, and worked all day, and then I stayed working at
17  my office most of the night.
18      Q.   Do you know what time you left your house
19  on October 22nd?
20      A.   I don't.  I'm going to guess somewhere
21  around 10:00 AM.  9:00 to 10:00 AM.
22      Q.   And you did not return until the 23rd?
23      A.   Yeah.
24      Q.   Was anyone else home, to your knowledge,
25  while you were gone on the 22nd?
```

111

```
 1      A.   No.
 2      Q.   Was anyone else anywhere else on your
 3  property -- and let me back up here.
 4      The photograph we're looking at in Exhibit N and
 5  Plaintiff's Exhibit 8, is that your residence at 1209
 6  Cottagemill?
 7      A.   This?
 8      Q.   Yes.
 9      A.   Exhibit N?  Yes, that's the backyard of my
10  property.
11      Q.   Okay.
12      Was anyone else outside your residence on
13  October 22nd that you knew of?
14      A.   No.
15      Q.   Did you reside with anyone on October 22nd
16  of 2022?
17      A.   I had my daughter.  I shared custody with
18  my daughter, 15-year-old daughter.  And like we
19  established earlier, my cousin stays with me
20  periodically.  I don't know when that is.  He comes and
21  stays when he's in between -- he works around the
22  country, so in between jobs.
23      Q.   Well, we talked about earlier, neither of
24  those two individuals were home?
25      A.   No.
```

112

```
 1      Q.   Okay.
 2      Is it fair to say, then, the only person, to
 3  your knowledge, with your permission that was at your
 4  residence on the 22nd was you?
 5      A.   Correct.
 6      Q.   In your answer in Exhibit M, which I think
 7  you have.
 8      A.   Uh-huh.
 9      Q.   If you turn to Interrogatory Number 4.
10      A.   Page 4?
11      Q.   Page 3.
12      You wrote, Jeremiah Thompson witnessed Defendant
13  Gerholdt telling Plaintiff that he went on his
14  property.
15      And I'll submit that your answer is analogous in
16  your answers to Officer Gerholdt's interrogatories.
17      What are you alleging your brother witnessed?
18      MR. GELFAND:  I would object to the form
19  of the question to the extent that it states that he is
20  alleging anything.
21      MS. ROBERTSON:  I can rephrase it.
22  BY MS. ROBERTSON:
23      Q.   So what are you saying your brother
24  witnessed?
25      MR. GELFAND:  I would just object to the
```

28 (Pages 109 to 112)

RAYMOND THOMPSON

113

1  form of the question.  I'm not trying to be difficult.
2  If you're just asking what he observed, I have no
3  problem with that.  I just don't want to -- I want to
4  know what you're actually asking.
5  BY MS. ROBERTSON:
6      Q.   Well, it says Jeremiah Thompson
7  witnessed -- so let me back up.
8          MR. GELFAND:  If you ask him what he's
9  referring to, I think that gets you there.
10 BY MS. ROBERTSON:
11     Q.   In that statement, what are you referring
12 to?
13     A.   Okay.  Do I tell the whole --
14     Q.   Well, you start where you would like, and
15 we might stop and come back to it later.  But --
16     A.   Okay.  Okay.
17         So I came home.  I noticed my gate was open.
18         I walked in the back.  Normally I enter through
19 the front door, but I noticed the gate was open.
20         I have a puppy, so I normally keep the gate
21 shut.  And I was worried that the puppy was out.
22         And then when I walked back there, I noticed my
23 motorcycle was gone, so I called 911.  They referred me
24 to Manchester Police Department.
25         I noticed the bike was gone, and I was

114

1  hysterical and panicking.  I ran over to my neighbor's
2  house and asked them if their ring camera was
3  functional.  And that's Maria.  And then I -- and I
4  woke them up, her and her fiancé, Christian.
5          And then I -- I called 911, and they referred me
6  to Manchester.
7          I called Manchester.  They dispatched Officer
8  Gerholdt and Officer Cockrell to my house.
9          I was still in my driveway, talking to my
10 neighbors to the left or west of my house.  You can see
11 their house in the photos.  And so to see if they
12 had -- their cameras were functioning, and -- when
13 Officer Gerholdt and Cockrell pulled up in front and
14 met me in the driveway.
15         Then I said I need to report my motorcycle as
16 stolen.
17         And they went to tell me that they let two
18 people -- they let two people onto my property, take
19 the motorcycle, because they had a title.
20         I informed them I was in a title dispute and had
21 other law enforcement agencies involved in this, and I
22 asked them do they want to see the paperwork?
23         You know, I was visibly upset, because I just
24 lost this motorcycle, right, and I had put a lot of
25 work and time into it.  And I was upset that they

115

1  trespassed, violated my every right, every homeowner
2  right imaginable.
3          And I said, how did you know it was the right
4  motorcycle?
5          And Gerholdt said, you know, well, we didn't go
6  in the backyard.
7          Initially Officer Gerholdt told me he did not go
8  in the backyard.  Neither of them would admit to that.
9          And then he said -- I said, well, how did you
10 know it was the right motorcycle?  I own several.
11         And he said, well, we checked the VIN.
12         And I said, well, that would have been hard to
13 do from such a distance, and in the dark.
14         And Officer Gerholdt and Cockrell said this is a
15 civil matter.
16         And then they both decided to leave my property.
17         And I was angry, and I said, you know, I
18 forgot -- you know, I forgot what I said exactly, but I
19 said, where are you going?  Do you want to see my
20 paperwork that I own this bike that you just stole from
21 my property?
22         And they said -- they said this is a civil
23 matter.  We're the police.  We can go anywhere -- I
24 said you trespassed, and they said we're the police.
25 We can go anywhere we want.

116

1          And then they drove -- they just drove away.
2          So then I was panicked and upset that they just
3  basically violated everything, you know, and my
4  property and me, and my personal property.
5          So I called I believe it was 911 back.  And they
6  referred me back to -- it was either 911 or Manchester
7  Police.
8          And I said I need to speak to a supervisor.  And
9  then I need somebody to come out here, because your
10 officers just stole my motorcycle, and they left.
11         And so that's when Officer Waters and Gerholdt
12 and Cockrell returned to my property.
13         And then Officer Waters came up to my door, my
14 front door.  I was sitting out there.
15         I called -- in between the time they came there,
16 I called my brother, and I said basically, you're not
17 going to believe what happened.  The police just
18 totally went on my property and stole my motorcycle.
19 And I go, it's insane, you know.
20         And so my brother goes -- he said, I'll be over
21 there in a few minutes.  He lives over in Kirkwood.
22         So he came over to my house, and he showed up
23 right as -- he showed up right after Cock -- or
24 Cockrell and Waters had left the second -- or left --
25 Cockrell left the second time and Waters left.

RAYMOND THOMPSON

117

1 When Waters came to my door, he asked for my
2 documents proving that the motorcycle is mine.
3 He said Mr. Thompson, can we see your paperwork.
4 And I showed him the title.
5 Then I offered to show Cockrell and Gerholdt
6 this stuff, and they said this is a civil matter. We
7 don't need to see anything, originally.
8 And they left, and then Officer Waters came to
9 my door and said, Mr. Thompson, can I see your
10 paperwork?
11 I showed it to him. They all went out into the
12 street with the original title, all of the paperwork.
13 Viewed it, and Officer Waters instructed Officer
14 Gerholdt to call them and retrieve the bike.
15 And my -- and then my brother -- then Officer
16 Gerholdt stayed in his car, and Officer Waters told me,
17 don't worry, we'll get this taken care of.
18 And Officer Cockrell and Waters left and
19 Gerholdt stayed there.
20 And then my brother came in, came to my house.
21 We were out sitting on my front porch.
22 And Officer Gerholdt gave me a police report --
23 a report, and he handed me a police report and said,
24 well, I'm going to wait here and see if they bring back
25 the bike. But until then -- and then I think Mr. Rench

118

1 told him no, I'm not bringing it back.
2 So he gave me a police report.
3 My brother was there when that happened, and he
4 had conversations with Officer Gerholdt in regards to
5 this.
6 Then they admitted to my brother that they had
7 actually went into the backyard after that as well.
8 Q. Were you present when officers -- well,
9 let's back up.
10 You just said they admitted to my brother that
11 they went into the backyard.
12 A. Yes.
13 Q. Who is they?
14 A. Well, not they. Gerholdt did.
15 Q. Were you present?
16 A. Yes.
17 Q. So did you also hear that?
18 A. Yes.
19 Q. What specifically did Officer Gerholdt
20 say?
21 A. I don't remember all of the details of the
22 conversation, but he was -- he said that he went into
23 the back, because I had asked him how did you know the
24 bike was the right one?
25 And then he admitted -- initially they both told

119

1 me they never went -- Cockrell and Gerholdt said they
2 never went into the backyard.
3 And then they both -- or not both, but Gerholdt
4 admitted to going in the backyard, after.
5 Q. I kind of want to come back and break that
6 down and make sure that I understand it.
7 A. Uh-huh.
8 Q. But I'm going to ask a few different
9 questions first.
10 A. Yeah, it's crazy. Yeah, it's crazy.
11 Yeah.
12 Q. Do you have any security cameras at your
13 residence at 1209 Cottagemill?
14 A. I do now.
15 Q. But did you on October 22nd of 2022?
16 A. No.
17 Q. Did you have a Ring doorbell or any other
18 Ring cameras?
19 A. No. I have many cameras now, though.
20 Q. Did you have any other audio or visual
21 recording devices at the home on October 22nd of 2022?
22 A. No. Just my phone and my brother's phone.
23 Q. You mentioned that you went over to your
24 neighbor's home. That's the Wagner's; correct?
25 A. Maria and Christian, yeah.

120

1 Q. And you mentioned them having a Ring?
2 A. It's on the front of their house.
3 Doorbell.
4 Q. And does the front of their house face
5 your backyard?
6 A. No.
7 Q. Do you know if they have any other audio
8 or visual recording devices at their home?
9 A. I don't.
10 Q. Where did the Wagners live in connection
11 to you?
12 A. To the left -- if you're facing my house,
13 to the left or west of my property.
14 Q. And do they live on the same street as
15 you?
16 A. Their house faces Parkfield. They back
17 up -- it's on a corner, so we're both on the corner.
18 Q. So the left side of their house and --
19 well.
20 The two sides of your houses kind of are near
21 each other?
22 A. My house faces south, and their house
23 faces west.
24 Q. And so then your backyards are near each
25 other? Is that --

RAYMOND THOMPSON

121

1    A.  Yes.
2    Q.  Okay.
3    Did you -- did you speak to Maria on the 23rd?
4    A.  Yes.
5    Q.  What did you say to her?
6    A.  I said -- I asked her if she had cameras.
7    Maria and her fiancé, Christian, came out.
8    And I said, "Do you have cameras on the back of
9    your home?  Because someone stole my motorcycle.  I'm
10   sorry to wake you up so late."
11   And they indicated that they didn't, but that
12   they heard the motorcycle start late at night, and they
13   said that was not -- that was unusual, because normally
14   I drive the motorcycles during the day, and they heard
15   it at 11:00 or 11:30 at night, which was not typical
16   for me.
17   They said it was actually so loud that it woke
18   them up.
19   Q.  Did you go ring their doorbell?
20   A.  Yes.
21   Q.  Is that how you made contact with them?
22   A.  Yes.
23   Q.  And did -- where did you speak with them?
24   A.  On just -- to the west of my driveway,
25   behind their -- behind their house, and in between

122

1    their house and my driveway.
2    Q.  So did they then -- they came out of their
3    house and walked around --
4    A.  Yeah.
5    Q.  -- to you --
6    A.  Yeah, were standing there, talking to me.
7    We were waiting for the police to show up.
8    Q.  Do you know what time this was,
9    approximately?
10   A.  Somewhere around 2:00 AM, I guess.  1:00
11   to 2:00 AM.
12   Q.  And just to confirm, did either Chris or
13   Maria tell you they saw anything?
14   A.  They did not say that.
15   Q.  They did not say that?
16   A.  Yeah, they did not tell me that.
17   Q.  Did they tell you they heard anything
18   other than the motorcycle?
19   A.  No.
20   Q.  Did they tell you they heard voices?
21   A.  I don't recall.
22   Q.  Did they tell you they heard anyone say
23   anything?
24   A.  I don't recall.
25   Q.  When -- prior to today, when was the last

123

1    time you spoke with Maria or Christian?
2    A.  I spoke with them the other day, telling
3    them I was sorry that they were getting dragged into
4    this, and apologizing for not remembering that they
5    were fiancées then, they're now married.  So I didn't
6    remember their wedding.
7    Q.  I'm sorry.  You said what about their --
8    A.  I didn't remember that they got, their
9    wedding day.  I should have -- I apologized for not
10   being a good neighbor and not --
11   Q.  Did you go to their wedding?
12   A.  No.
13   Q.  Are you anything more than neighbors with
14   Maria and Christian?
15   A.  No.  No.
16   Q.  Do you hang out socially?
17   A.  No.
18   Q.  I'll show you what's been marked for
19   identification as Defendant's Exhibit O.
20       [Defendant's Exhibit O
21       marked for identification.]
22   BY MS. ROBERTSON:
23   Q.  Mr. Thompson, do you recognize Defendant's
24   Exhibit O?
25   A.  I do.

124

1    Q.  How do you recognize that?
2    A.  It's a copy of a letter that Maria and her
3    now-husband Christian provided for me, because I asked
4    them what time they heard the motorcycle leave the
5    property, and they were -- they said it woke them up,
6    so they were pretty specific about the time, you know.
7    Q.  I don't -- I don't want to know anything
8    between you and your attorney.
9    When did you first see this letter?
10   A.  I had them print it for me a long time
11   ago.  I mean, it was pretty much right after the
12   incident happened.
13   Q.  Is it dated October 24th of 2022?
14   A.  Probably, yeah.
15   Q.  Okay.
16   And do you believe that that may be close in
17   time to when you first --
18   A.  Yeah.
19   Q.  -- received this?
20   A.  Yeah.  I asked them to provide this even
21   before, you know, anything, because I just wanted a
22   record.
23   Q.  Did -- and so Maria and Christian provided
24   this to you?
25   A.  Yes.

31 (Pages 121 to 124)

125

1    Q.   Did they just walk it over to your house,
2  or how did you receive this?
3    A.   They walked it over to my house.  I asked
4  them if they could make a statement.
5    Q.   Have you discussed this incident any
6  further with Maria and Chris?
7    A.   No.  They don't -- they don't know the
8  specifics or details as much.
9    I mean, I did tell them that the police stole
10 the motorcycle, invaded my privacy, trespassed, and
11 they agreed that they would be willing to help in this
12 regard.  So --
13   Q.   Okay.
14   So now I kind of want to go back with what you
15 explained to me and kind of break this down to make
16 sure I understand.
17   A.   Okay.
18   Q.   So October 22nd of 2022, you left at 10:00
19 AM and returned home on the 23rd around 1:00 AM.
20   Is that correct?
21   A.   Vaguely, yeah.  Somewhere around those
22 times.  I don't know the exact time, but yeah.
23   Q.   Okay.
24   And you have a puppy also?
25   A.   He's no longer a puppy, but yes, I had a

126

1  puppy at the time.
2    Q.   Did anyone come to your house on the 22nd
3  to let the puppy out to go potty?
4    A.   No, he's kenneled.
5    Q.   Does he just do his business in the
6  kennel?
7    A.   He -- when he was that small, he did.
8  Yes.  He's since potty-trained, yes.
9    Q.   And when you left your residence on the
10 22nd, was your gate open or closed or something else?
11   A.   Closed.
12   Q.   How do you normally -- prior to October
13 22nd of 2022, how did you normally keep your gate?
14   A.   I would pull it shut.  It has handles, and
15 I pull, you know, the one side -- there's two separate
16 gates, and so I pulled them shut.
17   Q.   In Defendant's Exhibit N, if you could
18 take a look at that for me.  It's one of them.
19   MR. GELFAND:  This one?
20   MS. ROBERTSON:  Yeah, it's that photo with
21 the blue circle.
22   A.   Okay.  This one?  (Indicating.)
23 BY MS. ROBERTSON:
24   Q.   Yeah.
25   A.   Okay.

127

1    Q.   There's a -- I think it's a Jeep.  Is that
2  a Jeep?
3    A.   Yeah.
4    Q.   Is that where that vehicle is normally
5  parked?
6    A.   No.
7    Q.   Where is that vehicle normally parked?
8    A.   That's parked -- at the time I had that
9  vehicle, the Corvette, and the blue Ford F-150.  So you
10 know, they kind of -- I would move them around.
11   In one of the pictures, the Jeep -- that Jeep is
12 in front of the gate, and then in another vehicle
13 picture, this picture, it's in the yard.
14   Q.   Okay.  Let's --
15   A.   As they get used, I pull -- sometimes I
16 have to move two or three cars.
17   MS. ROBERTSON:  We could mark these, I
18 guess, P through V, I guess.
19   [Defendant's Exhibits P through V
20   marked for identification.]
21   [Discussion off the record.]
22 BY MS. ROBERTSON:
23   Q.   Mr. Thompson, if you look at Defendant's
24 Exhibit P, there appears to be one or two vehicles in
25 your driveway.  Let's see.

128

1    Defendant's Exhibit S might have a better visual
2  of the rear vehicle.
3    A.   Uh-huh.
4    Q.   Do you know whose vehicles those are?
5    A.   Those are mine.
6    Q.   Okay.
7    Is the vehicle in -- it looks like there's a
8  Jeep Rubicon there?
9    A.   Right.
10   Q.   Is that Jeep the same -- is that Jeep the
11 same as the Jeep that's in Exhibit N?
12   A.   No.
13   Q.   What's the vehicle behind the Rubicon?
14   A.   That's a Ford F-150.
15   Q.   Okay.
16   And Exhibit N, is that a Renegade?
17   A.   It's a -- yeah.  Wrangler.
18   Q.   Exhibit N is a Wrangler?
19   A.   N?  Wait a minute.
20   Q.   Well, to be fair, I guess a Rubicon is a
21 Wrangler also.  They're just different trim levels.
22   A.   Yeah.  Right.  Right.
23   Q.   Are you also a Jeep enthusiast, Mr.
24 Thompson?
25   A.   Also, yeah.  Also.

RAYMOND THOMPSON

129

1     Q.   Okay.
2     A.   Yeah, that's a Wrangler.
3     Q.   Okay.
4         Now, you also have -- okay, that -- that's an
5    F-150 behind the Rubicon in Exhibit S?
6     A.   Yes.
7     Q.   You also have a Corvette?
8     A.   Yes.
9     Q.   Where do you park the Corvette?
10    A.   It's in storage.  Sometimes -- sometimes
11   it's at the house in the summer.  Sometimes I put -- I
12   have a storage unit.
13        MR. GELFAND:  Are you asking him about the
14   date at issue, or generally?
15        MS. ROBERTSON:  Just generally.
16    A.   Oh.
17   BY MS. ROBERTSON:
18    Q.   So prior to October 22nd, did you have a
19   usual parking spot for each of those vehicles?
20    A.   No, just random.  Just whatever I felt
21   like driving.
22    Q.   Okay.
23        Was there a vehicle that was usually parked in
24   the garage?
25    A.   The trike motorcycle.

130

1     Q.   The trike's home was in the garage?
2     A.   Right.
3     Q.   Okay.
4     A.   I had another bike in the garage as well.
5     Q.   And the Corvette was at the storage unit,
6    you said?
7     A.   Uh-huh.
8     Q.   And so then there's two Jeeps and a F-150?
9     A.   Correct.
10    Q.   And is it fair to say, then, the two Jeeps
11   and the F-150 kind of had moving places that they might
12   be parked, different places they might be parked?
13    A.   Right, depending on which one I was
14   driving, and -- right.
15    Q.   Okay.
16        In Exhibit -- Defendant's Exhibit P, we talked
17   about a puppy.
18        Is that the puppy?
19    A.   Yeah, that's him.  Chewy.  Yeah.
20    Q.   What's his name?
21    A.   Chewy.
22        MR. GELFAND:  We'll stipulate that that's
23   Chewy.
24   BY MS. ROBERTSON:
25    Q.   There are two circles in Exhibit P.

131

1     A.   Yeah.
2     Q.   Blue circles.
3         Did you make those circles?
4     A.   Yeah.  Because when the -- you know, the
5    fairing on the trike is wide, so whoever tried to
6    squeeze it through, I mean, I'm surprised that they
7    were supposed to squeeze it through there.
8     Q.   You said the fairing?
9     A.   The fairing.  So you know, the normal
10   motorcycles are narrow, two wheels.
11        This is a wide fairing.
12        So when they tried to squeeze it through there,
13   they hit both of these -- so there's scratches on --
14   and broken fiberglass on both corners of -- when I got
15   the trike back, there was damage to both fairings, or
16   both sides of the --
17    Q.   On the trike?
18    A.   Yeah, the rear wheel fairings.
19    Q.   Is there any damage depicted in this
20   photograph?
21    A.   Yeah.  There's scratches on the Jeep, the
22   front of the Jeep, and then there's damage to the
23   fence, too, as well.
24    Q.   Have you obtained any repair estimates as
25   to the damage to the Jeep?

132

1     A.   No.
2     Q.   Have you obtained any repair estimates as
3    to the damage to the fence?
4     A.   No.
5     Q.   Do you intend to get those items repaired?
6     A.   I don't know.  Maybe.
7     Q.   Do you -- do you have any estimate,
8    yourself, of the damage to the fence or the Jeep?
9     A.   I don't.  I don't know what it would cost
10   to fix them.
11        The damage was worse to the bike, trying to
12   squeeze it through there.
13    Q.   Defendant's Exhibit Q.  If you would turn
14   to that, please.
15    A.   Okay.
16    Q.   There's what kind of looks to me like an X
17   and an O?
18    A.   Uh-huh.
19    Q.   Do you see what I'm referring to?
20    A.   I do.
21    Q.   Did you make those markings?
22    A.   I don't remember making them, but that's
23   the helmet for the bike and that's where the bike was
24   parked.
25    Q.   And I haven't been out to your property.

RAYMOND THOMPSON

133

1      A.   Uh-huh.
2      Q.   Is that some sort of handwriting on the
3  photo, or is that spray paint on the pavement?
4      A.   That's handwriting on the photo.
5      Q.   Okay.
6      And in Exhibit Q.  If you look, there is a Jeep
7  in the right hand -- upper right corner of Exhibit Q;
8  correct?
9      A.   Uh-huh.
10     Q.   And then if you go to the left of -- the
11  left --
12     A.   Behind the Jeep?
13     Q.   Behind the Jeep.
14     Is that your gate?
15     A.   Yes.
16     Q.   And is that where you -- your driveway
17  extends to go out to the street?
18     A.   Correct.
19     Q.   And if you go to Exhibit R.
20     Is that the gate that is -- that we just
21  discussed?
22     A.   Yes.
23     Q.   And then the driveway we just discussed?
24     A.   Yes.
25     Q.   And then continuing to the right off the

134

1  page would be how you would back out into the street?
2      A.   Yeah, to the right.  Yes.
3      Q.   And then if you turn to Exhibit S, we can
4  see the Jeep and backing out into the street; correct?
5      A.   That -- well, that's the Rubicon.  And
6  then the F-150 there.  But yeah.
7      Q.   A different Jeep.
8      A.   Yeah.
9      Q.   And I'm not trying to suggest vehicles are
10  doing anything.
11     A.   Right.
12     Q.   I'm just talking about that's the
13  driveway --
14     A.   That's how you would get out to the
15  street, yes.
16     Q.   Thank you.
17     Is Defendant's Exhibit T another photograph of
18  your property?
19     A.   Yes.
20     Q.   Is Defendant's Exhibit U another
21  photograph of your property?
22     A.   Yes.
23     Q.   Is Defendant's Exhibit K another
24  photograph of your property?
25     A.   I don't have K.

135

1      Q.   I'm sorry.  I can't read my own
2  handwriting.
3      Exhibit V?
4      A.   Yes.
5      Q.   Somewhere, I believe it's in your
6  interrogatory answers, but you state these photographs
7  were taken on November 8th of 2022.
8      Does that sound right?
9      A.   I don't remember, but it could.
10     Q.   Did you take these photographs?
11     A.   I did.
12     Q.   In your interrogatory answers, I believe
13  you referenced some damage to the grass or that you --
14  something of that fashion.
15     Do any of these photographs depict what you were
16  referring to?
17     A.   Well, when they pulled through the grass,
18  like they drove through the grass, because they
19  couldn't get around the vehicles -- there were two
20  vehicles in the driveway, so they drove -- they
21  squeezed through the Jeep and the gate, damaged the
22  bike, and then they drove through the grass.
23     Q.   Are you able to -- so --
24     A.   They not only trespassed my yard, but my
25  neighbor's yard as well.

136

1      Q.   I'll show what's been marked for
2  identification as Defendant's Exhibit W.
3      [Defendant's Exhibit W
4      marked for identification.]
5  BY MS. ROBERTSON:
6      Q.   Mr. Thompson, can you turn to Page 3 of
7  Defendant's Exhibit W?
8      A.   Yes.
9      Q.   And I would direct your attention to your
10  answer to Interrogatory Number 4, specifically the
11  fourth bullet point.
12     You state, "Plaintiff took a photo of tracks in
13  his lawn that were made when his motorcycle was removed
14  from his property at 1209 Cottagemill Drive on October
15  22nd-23rd, 2022.  He took the photo on November 8th,
16  2022."
17     Can you tell me which of the photos, which of
18  the exhibits we've just looked at, depicts what you've
19  answered there?
20     A.   I'm not sure.  I did take a picture of the
21  tracks.  Maybe it's -- it's hard to tell from the
22  photos.  But there were clearly tracks going out on the
23  grass.
24     Q.   Did you have to conduct repairs to your
25  grass or yard?

RAYMOND THOMPSON

137

1    A.  No.  No.  I just mowed it.
2    Q.  Did you incur any costs in connection with
3  the tracks?
4    A.  No.
5    Q.  After you returned home on October 23rd of
6  2022 and realized your motorcycle was gone -- strike
7  that.
8        On October 22nd, 2022, when your left your
9  residence, was your gate closed?
10    A.  When I left?
11    Q.  When you left.
12    A.  Are you referring -- in the morning, yes.
13    Q.  On the 22nd?
14    A.  Correct.
15    Q.  And did you return home at all on the
16  22nd?
17    A.  I don't believe so.
18    Q.  So is the next time that you were at your
19  residence on October 23rd of 2022?
20    A.  Yes.
21    Q.  And when you returned home, I believe you
22  told me the gate was open.
23        Is that correct?
24    A.  Yes.
25    Q.  Do you know how far the gate was open?

138

1    A.  It was -- the left side -- there are two
2  gates.  The left side was completely open.
3    Q.  Does your gate have any locking mechanism?
4    A.  It has got a hasp on it.  There is a hasp.
5  You know -- you know what a hasp --
6    Q.  I don't.
7    A.  Okay.  So a hasp is like -- closes, and
8  then there's a hole that you could drop a pin or a lock
9  on.
10      I don't lock it, because I never thought I had
11  to.  But I usually just put a pin in it, like there's a
12  pin that hangs through the hole, and it keeps it from
13  opening so the dog can't get out.
14    Q.  So is it fair to say, then, any
15  able-bodied person could lift the pin and open the
16  gate?
17    A.  Yes.
18    Q.  They didn't need a key?
19    A.  They did not need a key.
20    Q.  Didn't need a code?
21    A.  No.
22    Q.  And then you said you called 911?
23    A.  Called 911.
24    Q.  And they directed you to Manchester?
25    A.  Yeah.  I think originally I got connected

139

1  with St. Louis County Police, and they directed me --
2  when I gave them my address, they said you need to call
3  Manchester Police.
4    Q.  Did you -- did they just transfer you, or
5  did you look up the phone number?
6    A.  I think they gave me the phone number.
7    Q.  And did you then call Manchester?
8    A.  I called Manchester.
9    Q.  Excuse me.
10      Do you recall what you said to whoever answered
11  the phone?
12    A.  I said, I need to report a stolen vehicle.
13  My motorcycle has been stolen off my property.
14    Q.  And then is the next thing you did to go
15  to your neighbor Maria and Christian's?
16    A.  Yes.
17    Q.  Did you do anything between calling
18  Manchester and going to your neighbors?
19    A.  No.
20    Q.  After you spoke with Maria or --
21    A.  Maria and Christian.
22    Q.  Maria and Christian -- strike that.
23      At some point did a law enforcement officer
24  respond?
25    A.  At some point?

140

1    Q.  At some point.
2    A.  Yes.
3    Q.  When did an officer respond?
4    A.  I'm guessing approximately 15, 20 minutes
5  later, after calling Manchester.
6    Q.  Were you still speaking with Maria and
7  Christian?
8    A.  Yes.
9    Q.  Was Christian still outside?
10    A.  Both of them were still there when the
11  police pulled up.
12      And then I left talking to them and went over to
13  talk to the police in my driveway.
14      We were in between our properties, and I walked
15  closer to the police to greet them.
16    Q.  Do you know what Maria and Christian did?
17    A.  I think they went back inside at some
18  point, once the police arrived.
19    Q.  Do you know who the police officer was
20  that arrived first?
21    A.  I think they both arrived about the same
22  time, but I'm guessing Gerholdt arrived first, and then
23  Cockrell arrived shortly after.
24    Q.  Did you -- did you make contact with one
25  of -- with the officers?

141

1      A.   I approached them.  They got out of their
2   cars and were approaching me, and I approached them,
3   and then we kind of met in my driveway.
4      Q.   Do you know who spoke first?
5      A.   I think it was -- I think I spoke first.
6   I said I want to report my motorcycle as stolen.
7      Q.   Is that verbatim what you said?
8      A.   I'm -- I'm fairly confident, yes.
9      Q.   Were you upset at that point in time?
10     A.   Yes.  Extremely.  I was panicked.
11     Q.   Did you know what had happened at that
12  point in time?
13     A.   No.  I just assumed somebody had broken
14  into my yard and stolen my bike, though I had no reason
15  to believe the police stole it at that time.
16     Q.   Did you have any thoughts about who might
17  have taken your motorcycle?
18     A.   No.  I thought -- no.  I mean, it was -- I
19  was just -- I was assuming it was just a random, you
20  know.
21     Q.   So what did -- did the officers reply to
22  you?
23     A.   Yes.
24     Q.   What did they say?
25     A.   Officer Gerholdt said, "Mr. Thompson, we

142

1   were here earlier."
2      I can't remember word for word what was said.
3   Should be on his body cam.  But I can't remember word
4   for word what was said.
5      But he said, "We -- we were here earlier, Mr.
6   Thompson, and Nathan Rench's daughter provided a title
7   or showed us a title, and we let them take the
8   motorcycle."
9      Q.   What was Officer Gerholdt's demeanor like
10  at that time?
11     A.   He seemed calm.
12     Q.   Did Officer Cockrell say anything?
13     A.   Not originally.  I think he was just
14  standing there next to Gerholdt.
15     Q.   Do you recall where on your property this
16  conversation --
17     A.   This was in the driveway, like maybe
18  behind the truck, the F-150.
19     Q.   Do you recall which vehicle you were
20  driving the 22nd and 23rd?
21     A.   I believe it was the F-150.
22     Q.   Okay.
23  So while you were away from the residence, the
24  F-150 would not have been in the driveway.
25     Is that fair?

143

1      A.   That's fair.
2      Q.   And what vehicles were still at your
3   residence when you left on the 22nd?
4      A.   The Jeep Gladiator, the Jeep Wrangler, and
5   the -- the Harley-Davidson trike, and the motorcycle --
6   the custom motorcycle, Hardtail, in my garage.
7      Q.   The Hardtail was in the garage?
8      A.   Inside my garage.
9      Q.   Where was the Gladiator?
10     A.   It was up close to the gate.
11     Q.   Inside the gate, or outside?
12     A.   Outside the gate, up close to the gate.
13     Q.   And then by process of elimination, the
14  Wrangler was inside?
15     A.   Correct.  Inside the backyard.
16     Q.   What will did you -- what, if anything,
17  did you say to Officer Gerholdt when he told you that
18  Nathan Rench's daughter provided a title?
19     A.   I -- I was upset.  I was -- I said a lot
20  of things.  I mean, I said, you did what?  You know,
21  and then I said, it's an ongoing -- ongoing issue with
22  this title.  I have already had law enforcement
23  involved in this.  They're obtaining a fraud -- you
24  know, the fraudulent title.
25     And I said, can -- and I offered to show him and

144

1   Cockrell the documents, my documents.
2      And they said, this is a civil matter.
3      I think I might have called them both idiots at
4   one time.
5      And they said this is -- they said this is a
6   civil matter.  We -- and they --
7      I said do you want to see my documents?
8      And they said no.
9      And then Gerholdt walked to his car, and
10  Cockrell walked to his car.  Cockrell's car was parked
11  in front of my home, directly in front of my front
12  door.  And with his driver side -- so he was parked on
13  the opposite side of the driveway.
14     And Gerholdt was parked on the right side of the
15  driveway.
16     And I said -- they got into their cars to leave.
17  They said, this is a civil matter.
18     And I said, you guys just trespassed and
19  facilitated stealing my bike.  You guys came on my
20  property without a warrant.
21     And Cockrell -- or Cockrell responded, in his
22  car, with the window down, we're the police, we can go
23  anywhere we want.
24     Q.   Cockrell said that?
25     A.   Cockrell said that.

36 (Pages 141 to 144)

RAYMOND THOMPSON

145

1    And then they drove off.
2        Then I called my brother Jeremiah, because I
3    didn't know who else to call at 2:00 in the morning to
4    tell him -- I was just like -- I'm dumbfounded at what
5    just happened here. The cops just basically violated
6    me, and the police, Cockrell and Gerholdt, just
7    violated me. And, you know, they let people on my
8    property, steal and break into my property.
9        And then I didn't know who else to call at 2:00
10   in the morning, so I called my brother. And I go,
11   you're not going to believe what just happened here.
12       And so he is like, you know, are you serious?
13   I'll be over there in a few minutes.
14       So he drove over, and while he was on his way
15   over, that's when I called -- I called Manchester back,
16   and I said, I need some solutions here. The police
17   officers left my residence, and they just let -- your
18   officers let someone steal my motorcycle, and I need to
19   speak to a supervisor.
20       And so there should be a response call. I
21   called there numerous times to Manchester that night.
22       And so anyway, they -- I said, I need a
23   supervisor out here. And that's when Waters, Cockrell,
24   and Gerholdt came back to my house.
25       And then that's when Waters -- I was sitting on

146

1    the front porch with my puppy, Chewy, on a leash. And
2    that's when Waters -- Officer Waters came up.
3        By that time, I had went inside, and I had
4    gotten all of the paperwork, my title and everything.
5        And Officer Waters said, can I see your
6    paperwork?
7        And I said yes, and I provided it to him.
8        He met me at the front door. He walked out to
9    the street with Cockrell and Gerholdt.
10       And they -- it was dark, so they all had
11   flashlights, and they were looking at my paperwork.
12       And then Officer Waters instructed Officer
13   Gerholdt to call Nathan and get the motorcycle back.
14   Q.   Did it make you mad when the officers said
15   this was a civil matter?
16   A.   After the fact, yeah, I was furious. I
17   was -- I mean, they just -- they just violated my
18   rights. I felt violated. Yeah, of course. They
19   were -- I mean, they broke into my property and stole,
20   you know, the -- I mean, the two people wouldn't have
21   come onto my property if Officer Cockrell and Gerholdt
22   didn't allow them to come steal.
23       You know, they facilitated the whole thing. I
24   thought I was at least safe from the police, you know.
25   I mean --

147

1    Q.   Did you -- did you know Officers Cockrell
2    or Gerholdt prior to this incident?
3    A.   Never. Never saw them before.
4    Q.   Had you ever met Amara Elmore (ph)?
5    A.   No.
6    Q.   Had you ever met Stephen Mackenzie?
7    A.   No.
8    Q.   Had you ever heard of them --
9    A.   No.
10   Q.   -- through the course of any of your
11   dealings with Nathan Rench?
12   A.   Never.
13   Q.   And you testified in the preliminary
14   hearing in the criminal case against Nathan Rench
15   regarding your trike.
16       That's right?
17   A.   Right.
18   Q.   And --
19   A.   Their names were never mentioned in that.
20   Q.   Are you mad at Nathan Rench?
21   A.   Is that rhetorical?
22   Q.   No, I mean -- no, it's an honest question.
23   A.   Okay. Yes, of course.
24   Q.   Do you have any knowledge as to whether
25   Officers Gerholdt or Cockrell knew Nathan Rench prior

148

1    to this incident?
2    A.   I assume they did at first, because why
3    would they -- why would they have done this?
4        Like I assume they knew them, because they
5    allowed the theft, or they were participants in the
6    theft of the motorcycle.
7        So I don't know that they know them, but for a
8    while I was assuming that they were somehow in
9    collusion with this, or maybe they were -- I had no
10   idea what was going on.
11   Q.   As we sit here today, you have not
12   registered the trike in your name?
13   A.   I still don't have the title.
14   Q.   And so do you know whose name the trike is
15   still registered in?
16   A.   Probably Nathan Rench's, because I still
17   have not -- don't have the title. I've applied, and
18   it's --
19   Q.   Would it be -- would it be fair to say,
20   then, as of October 22nd of 2022, the trike would have
21   been, according to Department of Revenue records, then
22   registered to Nathan Rench?
23       MR. GELFAND: Objection to the form of the
24   question, and calls for speculation.
25   A.   I don't know -- I don't know how -- what

37 (Pages 145 to 148)

RAYMOND THOMPSON

149

1  their guidelines are.  I don't know that.
2      I paid for it.  You know, obviously I paid for
3  it and restored it.  You know, did everything.  You
4  know, but -- so I don't know why he has any entitlement
5  to that whatsoever.
6  BY MS. ROBERTSON:
7      Q.  Have you filed any civil lawsuits or
8  claims against Nathan Rench with respect to the trike?
9      A.  No.
10      Q.  Have you received a response from the
11  Missouri Department of Revenue regarding Exhibit I,
12  this complaint form you submitted?
13      A.  I did.
14      Q.  What did they say?
15      A.  They said I need to -- that they could not
16  help with that matter.  That's what they said.
17      Q.  Do you have a -- was that a written
18  response?
19      A.  I believe so.
20      Q.  Do you have a copy of that?
21      A.  Somewhere, yeah.  I have it with -- I have
22  another folder with -- pertaining to all of this with
23  Nathan and the title information.
24          MR. GELFAND:  If he is able to locate
25  that, we're happy to provide it.

150

1  BY MS. ROBERTSON:
2      Q.  Do you know now the Officers Gerholdt and
3  Cockrell didn't know Amara Elmore or Stephen Mackenzie
4  or Nathan Rench prior to this incident?
5          MR. GELFAND:  Object to the form of the
6  question.  Calls for the state -- I'm sorry.  Calls for
7  state of mind of a third party, and calls for
8  speculation.
9      You can answer.
10      A.  Sorry.  I don't know that.
11  BY MS. ROBERTSON:
12      Q.  Did you ever call Officer Gerholdt on the
13  on the telephone?
14      A.  No.
15      Q.  Did you ever call Officer Cockrell on the
16  telephone?
17      A.  Never.
18      Q.  Did you ever call Sergeant Waters on the
19  telephone?
20      A.  Never.
21      Q.  After your initial reports on the 23rd --
22      A.  Uh-huh.
23      Q.  -- to Manchester, have you ever called
24  Manchester Police by phone?
25      A.  No.  I -- I had -- Officer Gerholdt came

151

1  by the following day.  I guess he had been up.
2      I went to bed on the 22nd, and then he came by
3  at 3:00 the following day and wanted the original title
4  and information.
5      And I said I would not provide that, but I'll
6  provide copies.
7      So he came by, knocked on the door, and I said
8  I'll provide you copies.  I'm not going to give you the
9  original of that.
10      So I made folders with Officer Gerholdt, Officer
11  Cockrell, and Officer Waters, and dropped them off at
12  Manchester the following day.
13      Q.  With copies of the --
14      A.  Copies of my -- all my information.  But I
15  was suspect, because they took photos, and -- or they
16  had -- I provided them to them the night of the theft,
17  and then they came by the next day and wanted the
18  originals to take with him to make copies.
19      And I said I'm not -- I'm not giving my
20  originals to anyone.  So I'll make you copies, and
21  provide them to you.
22      And so that's what I did.  I dropped them off at
23  Manchester.
24      Q.  Did he object to that?
25      A.  No.  He was -- he was shocked.  He thought

152

1  I would just hand him the originals.
2      But he was like, oh, okay.  He was like -- you
3  know.
4      Q.  Was he pleasant with you during that
5  interaction?
6      A.  Yeah, I think so.  Yeah.
7      Q.  Was he polite?
8      A.  Yeah.
9      Q.  Do you recall anything else that was --
10  that he said to you during that interaction?
11      A.  I don't.  I think he was polite.
12      Q.  Aside from what we have already talked
13  about on October 23rd of 2022, have you had any other
14  contact with Officer Cockrell?
15      A.  I have not.
16      Q.  Aside from the contact that -- that we've
17  just discussed and that you had with Officer Gerholdt,
18  have you had any other contact with Officer Gerholdt?
19      A.  No.
20      Q.  Did -- was your motorcycle ultimately
21  recovered?
22      A.  Yeah.  Almost a year later, yeah.
23      Q.  And I'll ask you about that in just a
24  second.
25      A.  Yeah.

38 (Pages 149 to 152)

153

1    Q.   But how did you find out the motorcycle
2  had been recovered?
3    A.   Owensville Police called me, told me they
4  had it.
5    Q.   Did Officer Gerholdt also go to your door
6  and let you know?
7    A.   He did after Owensville called me and let
8  me know.
9    Q.   What did he say to you?
10    A.   He said they recovered your motorcycle.
11  Owensville Police has it.
12    Q.   Did he say anything else?
13    A.   I don't think so.
14    Q.   Was he polite?
15    A.   Yes.
16    Q.   Do you know if your brother had any phone
17  conversations with any law enforcement officers
18  connected to this case?
19    A.   I don't think so, no.
20    Q.   When -- you mentioned that Officer
21  Gerholdt admitted to going in the backyard of your
22  residence --
23    A.   Uh-huh.
24    Q.    -- did you hear him say that?
25    A.   Uh-huh.

154

1    Q.   What did he -- is that a yes?
2    A.   Yes.  I'm sorry.  Yes.
3    Q.   Sorry.
4  You heard him say that?
5    A.   Yes.
6    Q.   Do you recall verbatim what he said?
7    A.   No.  But originally both he and Cockrell
8  denied going past the fence, and then later admitted to
9  going -- because I questioned them on how they verified
10  the VIN on the motorcycle at night.
11    And then they admitted to going into the
12  backyard.
13    Q.   Who was present for that conversation?
14    A.   Me and the two officers, and later
15  Gerholdt admitted it to me and my brother Jeremiah on
16  my front porch.
17    Q.   Okay.
18  Let's go back to the first conversation.
19    A.   Okay.
20    MR. GELFAND:  I'm sorry.  Can we just go
21  off the record for one second?
22    MS. ROBERTSON:  Sure.
23    [Discussion off the record.]
24    MR. GELFAND:  Just by agreement of the
25  parties as a scheduling courtesy, for lack of a better

155

1  way of putting it, Mr. Bailey, who also represents Mr.
2  Thompson, is going to take my place.  So obviously
3  there was always only one lawyer for our side at any
4  given time participating in the deposition.
5    But he'll bring this to conclusion, and I'll
6  step out.
7    MS. ROBERTSON:  No objection.
8    MR. GELFAND:  Thank you.
9    [Discussion off the record.]
10    MS. ROBERTSON:  Mr. Bailey, you can hear
11  me?
12    MR. BAILEY:  I can.  Thank you.
13    MS. ROBERTSON:  Okay.
14  BY MS. ROBERTSON:
15    Q.   Mr. Thompson, we were talking about the
16  first time that you stated that Officer Gerholdt
17  admitted to you that he was in your backyard.
18    What was the -- did Officer Gerholdt ever state
19  to you where in your backyard he went?
20    A.   Initially they told me they never crossed
21  the gate.  He said, we didn't go into the gate, because
22  I accused them of trespassing, you know, of going
23  on my property without a search warrant.
24    And then he said, we didn't.
25    And then I said -- I said, well, how did you

156

1  check the VIN -- I said, how did you know it was the
2  right motorcycle?
3    And he goes, we checked the VIN.
4    So he didn't admit going into the backyard at
5  that time.  He admitted later to going into the
6  backyard, with me and my brother.
7    But I said, how did you -- how did you --
8  without going into the backyard, how did you check the
9  VIN?
10    And so he said -- I can't remember how I
11  responded.  But he --
12    Q.   You said the officers initially denied
13  going into the backyard?
14    A.   They did.
15    Q.   Did both officers deny that?
16    A.   Yes.
17    Q.   Okay.
18  How --
19    A.   They said they -- they said that only --
20  that the other two people, Amara, whatever their names
21  are -- "McKinney" and Amara -- only them two went in
22  the backyard.
23    Q.   Let me ask you this.
24    When you first made contact with the officers,
25  how did they explain to you what happened?

39 (Pages 153 to 156)

RAYMOND THOMPSON

157

1    A.   They said they provided -- they said
2  Nathan's daughter provided a title, and we let them
3  take the bike.  She said that you were borrowing the
4  bike, and -- you were borrowing the bike, and they came
5  to get it back.  You were just borrowing the bike, and,
6  they came to get it back.
7        Q.   Did they say anything else?
8    A.   No.  That's --
9        Q.   Is the next thing that happened that you
10  asked some questions?
11    A.   Right.  And I was upset, and asked some
12  questions and told them this was an ongoing title issue
13  with other law enforcement agencies.
14        Q.   Mr. Thompson, have you ever worked in law
15  enforcement?
16    A.   No.
17        Q.   Do you have any training and experience in
18  law enforcement?
19    A.   No.
20        Q.   Does your brother?
21    A.   No.
22        Q.   Do your parents?
23    A.   No.
24        Q.   Any siblings have --
25    A.   No.  I mean, I probably have cousins.  My

158

1  ex-wife's husband was a detective for Sunset Hills.
2  But --
3        Q.   The second time that you spoke with the
4  officers, was your brother present for the entirety of
5  that conversation?
6    A.   Yeah, but by that time, Officer Waters and
7  Officer Cockrell had left.
8        So my brother was present for the entirety of
9  the conversation with Gerholdt, because they had left,
10  and Officer Waters instructed Officer Gerholdt to
11  call --
12        Q.   Mr. Rench?
13    A.   Mr. Rench and his daughter to bring back
14  the motorcycle.
15        And so she agreed to bring it back.  And so
16  Officer Waters, I assume, felt comfortable enough to
17  leave, and he told Officer Cockrell to leave, and then
18  Officer Gerholdt stayed and waited for the motorcycle
19  to come back.
20        And then he got a call -- I assume he got a call
21  from Nathan, who said, I'm not bringing the motorcycle
22  back.
23        So that's when he came up, and my brother asked
24  Officer Gerholdt some questions when he came up to the
25  porch and, you know, basically like, this is crazy,

159

1  what did you guys do here?  You know, stuff like that.
2        And then Gerholdt tried to explain himself.  I
3  don't remember every word.  My brother would probably
4  remember more of that, but -- and then --
5        Q.   Do you remember what Officer Gerholdt said
6  in response to your brother's questions?
7    A.   We're going to get it fixed.  We're going
8  to get it taken care of.  We're going to get the bike
9  back.
10        Q.   After -- is there any other contact you
11  had with Officers Gerholdt or Cockrell or Waters that
12  we have not discussed today?
13    A.   I don't believe so.
14        Q.   What was the -- after the 23rd, did you
15  have contact with other law enforcement agencies?
16    A.   Yes, with Owensville Police Department.
17        Q.   And what contact did you have with
18  Owensville?
19    A.   Just trying to see if they were able to
20  locate Nathan and the motorcycle.  I called them
21  periodically, to see, every couple days, if they were
22  able to locate the motorcycle and Nathan Rench.
23        Q.   When did you learn the motorcycle had been
24  recovered?
25    A.   It was in late -- early spring.  It was

160

1  March or -- March of -- March this past year.  March
2  or -- March of 2024 (sic).
3        Q.   What did you do once you learned the
4  motorcycle had been recovered?
5    A.   My -- it was at an impound yard out near
6  Owensville, Missouri, and me -- myself and Justin and
7  Joe Lambson (ph) met out at the impound yard to pick up
8  the motorcycle.
9        Q.   And again, I don't want to know what you
10  did or discussed with your attorneys.
11    A.   Uh-huh.
12        Q.   But was the motorcycle immediately
13  released from the impound yard to you?
14    A.   Yeah.  I had to pay -- I think I paid $300
15  and some dollars -- 25 or something -- and then they
16  released it.
17        My mechanic, Derick Compton, met us out there
18  with a trailer to tow it back.
19        MS. ROBERTSON:  Greg, I'm going to mark as
20  an exhibit, and it's this -- some sort of a tow receipt
21  dated February -- there's a couple different dates.
22  But I don't know if you can see this.
23        MR. BAILEY:  I can't really -- is he still
24  in the room there?
25        MS. ROBERTSON:  No.

RAYMOND THOMPSON

161

```
1        MR. BAILEY:  Okay.  That's fine.  I'll
2   pull it up digitally.
3        MS. ROBERTSON:  Okay.  I believe it was
4   something that -- or that plaintiffs produced.
5        MR. BAILEY:  Okay.  Great.
6   BY MS. ROBERTSON:
7        Q.  Mr. Thompson, I'm going to show you what's
8   been marked for identification as Defendant's Exhibit
9   X.
10           [Defendant's Exhibit X
11           marked for identification.]
12  BY MS. ROBERTSON:
13       Q.  Mr. Thompson, do you recognize Defendant's
14  Exhibit X?
15       A.  Yes.
16       Q.  How do you recognize that?
17       A.  That's the receipt for the tow, for the
18  impound yard -- that I paid the impound yard, and tow
19  bill.
20       Q.  Does that reflect how much you paid?
21       A.  Yeah, $325.
22       Q.  Does refresh your recollection as to the
23  date?
24       A.  Yeah.  It was cold outside.  Yeah, it
25  does.
```

162

```
1        Q.  If you see in the middle there, it says
2   storage from.
3            Do you see that?
4        A.  Storage from.
5        Q.  And then it says February 12th, 2023, to
6   February 16th, 2023, five days at $40?
7        A.  Yeah.
8        Q.  So is February 16th, 2023, the day you
9   picked up the motorcycle?
10       A.  Yes.
11       Q.  And Mr. Thompson, I forgot to ask you.
12       MS. ROBERTSON:  Greg, this is the
13  photograph of -- actually, you know what, let me make
14  it easier on you.  I'll use the one that has already
15  been marked as an exhibit by plaintiffs.
16       MR. BAILEY:  Okay.
17       MS. ROBERTSON:  Well, I thought it had
18  been marked.  I -- Greg, I don't want to go through
19  this.  I don't see exhibit stickers on --
20       MR. BAILEY:  That's fine.  You can mark --
21  I know that picture.
22       MS. ROBERTSON:  This one?
23       MR. BAILEY:  Yeah, I have that one.  Yeah.
24  BY MS. ROBERTSON:
25       Q.  Mr. Thompson, I'm going to show you what's
```

163

```
1   been marked as Defendant's Exhibit Y.
2            [Defendant's Exhibit Y
3            marked for identification.]
4   BY MS. ROBERTSON:
5        Q.  Do you recognize Defendant's Exhibit Y?
6        A.  I do.
7        Q.  How do you recognize that?
8        A.  I took that picture on my front porch.
9        Q.  With what did you take that photo?
10       A.  My phone.
11       Q.  Your cell phone?
12       A.  Yes.
13       Q.  When did you take that photo?
14       A.  The night of -- the night that Officer
15  Gerholdt and Officer Cockrell stole the motorcycle.
16       Q.  Did you take that the first time you spoke
17  with the officers or the second time?
18       A.  The second time.
19       Q.  I'm going to show you what's been marked
20  for identification as Defendant's Exhibit Z.
21           [Defendant's Exhibit Z
22           marked for identification.]
23       MS. ROBERTSON:  Greg, this is a picture of
24  an individual on the --
25       MR. BAILEY:  Okay.  Thank you.
```

164

```
1        MS. ROBERTSON:  -- bike.
2   BY MS. ROBERTSON:
3        Q.  Mr. Thompson, do you recognize Defendant's
4   Exhibit Z?
5        A.  I do.
6        Q.  How do you recognize that?
7        A.  That's a picture I pulled off of Facebook
8   the day after the motorcycle was stolen by Manchester
9   Police.
10       Q.  Who is -- do you know the individual
11  depicted in the photo?
12       A.  That's Nathan Rench.
13       Q.  Do you know the -- do you recognize the
14  motorcycle depicted in the photograph?
15       A.  Yeah, that's the 2003 Harley-Davidson
16  trike.
17       Q.  You stated that you pulled this off
18  Facebook?
19       A.  Uh-huh.
20       Q.  Would it be fair to say on October 23rd?
21       A.  It was either the same day or the day
22  after.
23       Q.  So the 23rd or the 24th?
24       A.  Correct.
25       Q.  Was there -- when -- do you know when the
```

Golkow Litigation Services

RAYMOND THOMPSON

165

1  photo was posted?
2     A.  Yeah, it was posted the next day of -- it
3  was posted on I think the 23rd or 24th.
4     Q.  And who --
5     A.  I took -- or I pulled -- screenshotted
6  this picture, and I provided it to the Owensville
7  Police.
8     Q.  Are you Facebook friends with Nathan
9  Rench?
10    A.  No.
11    Q.  Were you at the time?
12    A.  No.  I just stalked his page, because I
13  assumed he would do something like that.
14    Q.  Did he -- is he who posted the photo?
15    A.  Uh-huh.
16    Q.  Were there any comments with it?
17    A.  Yeah.  Burn Ray's ass album.
18    Q.  I couldn't hear that.
19    A.  Yeah.  Burn Ray's ass album.
20    Q.  Does that have any meaning to you?
21    A.  Just that he wanted to be derogatory.
22    Q.  When you -- when you got your motorcycle
23  back, was there any damage to it?
24    A.  Yeah.
25    Q.  What was damaged?

166

1     A.  There were parts missing, custom parts
2  missing.  There was lots of damage to the fiberglass,
3  the new paint was scratched and completely damaged.
4  And it's not operational.  It wouldn't start at the
5  impound yard.
6     I had to -- me and Derick had to -- Derick
7  Compton, my mechanic, had to push it onto the trailer
8  because it wouldn't start.
9     There was a substantial amount of damage to it.
10    Q.  What custom parts were missing?
11    A.  He put new handlebars on it, and there is
12  the air cleaner that I had engraved, this air cleaner
13  here.  Air -- it's a custom chrome air cleaner that I
14  had engraved with a snake head on it.  That's missing.
15    Q.  In Exhibit C, is the air clean -- is the
16  air cleaner depicted?  Can you see it?
17    A.  Yeah, it's by his shin.
18    Q.  Is that -- is what's depicted in Exhibit Z
19  your -- the custom air cleaner you put on it?
20    A.  Right.
21    And then when I got the back -- when I got the
22  bike back, that is no longer on there.  The handlebars
23  are different-sized.  And there's lots of exterior
24  damage to the paint, fiberglass, chrome.
25    Q.  Mr. Thompson, I'll show what's been marked

167

1  for identification as Defendant's Exhibits AA and BB.
2     [Defendant's Exhibits AA and BB
3     marked for identification.]
4     A.  Thank you.
5     MS. ROBERTSON:  Greg, these are two
6  photographs that plaintiff -- I feel like the screen
7  has moved so you can't see me now.
8     MR. HENDRICKSON:  In theory, it's motion
9  activated.  So maybe --
10    MS. ROBERTSON:  If I wave my hands around?
11  Okay.
12    I don't know if you can see this, but it's
13  photos I think that were recently produced of the
14  motorcycle.
15    MR. BAILEY:  Okay.  All right.  Thank you.
16  BY MS. ROBERTSON:
17    Q.  Mr. Thompson, do you recognize Defendant's
18  Exhibits AA and BB.
19    A.  Yeah.  I do.  Yes.
20    Q.  How do you recognize those?
21    A.  I took pictures of some of the damage.
22    Q.  Why did you take pictures of this damage?
23    A.  They were -- my attorneys requested it.
24    Q.  Oh.  I don't want to know what your
25  attorneys did.

168

1     A.  Oh.
2     Q.  But maybe let me ask that question a
3  better way.
4     Can you tell me in Defendant's Exhibit AA what
5  damage is depicted?
6     A.  AA?  There's lots of scratching on the
7  chrome.  There's broken fiberglass to the right of the
8  picture, like something was hit.  It's --
9     Q.  What part of the motorcycle is depicted in
10  Defendant's Exhibit AA?
11    A.  That's -- that's the fairing and the right
12  side.  If you're sitting on it, this would be on the
13  right side, near the forward controls.
14    Q.  Is there any other damage depicted?
15    A.  On this picture?
16    Q.  Yes.
17    A.  Just what you can see from the picture.
18    Q.  Do you -- I'm sorry.  Let me ask you.
19    Do you know the cause of the damage depicted in
20  this picture?
21    A.  I do not.
22    Q.  Do you know who caused the damage depicted
23  in this picture?
24    A.  I assume Nathan Rench.
25    Q.  Prior to October 22nd of 2022, did your --

42 (Pages 165 to 168)

RAYMOND THOMPSON

169

1  did these scratches exist on the trike?
2      A.   No.  I'd just had it painted.
3      Q.   Did the fiber -- the damage to the
4  fiberglass exist?
5      A.   It did not.  I had just had it painted.
6      Q.   Looking at Defendant's Exhibit BB.
7  Did you take this photo?
8      A.   Either me or my mechanic, Derick.  We took
9  a bunch of them.  These are just two.  And I don't know
10  why you don't have many more.  So --
11     Q.   I might have some more, but --
12     A.   Okay.
13     Q.   What does this depict?
14     A.   That's the rear wheel fender.
15     Q.   Is there any damage depicted in this
16  photograph?
17     A.   Yeah.
18     Q.   What is depicted?
19     A.   There's damage to the fiberglass and
20  paint.
21     Q.   Where is the damage to the fiberglass?
22     A.   On the left side.  On the left side, by
23  the -- by the rear foot pegs.
24     Q.   Can you see the damage to the fiberglass
25  on this photo?

170

1      A.   Yeah, you can in here.  It's dented in.
2  (Indicating.)
3      Q.   Okay.
4      Do you know what the cause of this damage was?
5      A.   I have no idea.
6      Q.   Do you know who caused this damage?
7      A.   I assume either Amara or Nathan Rench.
8  Amara or whoever drove the bike.
9      Q.   Do you know -- did this damage exist prior
10  to October 22nd, 2022?
11     A.   No.
12     Q.   I'm going to mark for identification
13  Defendant's Exhibit CC, DD, EE, FF, and GG.
14          [Defendant's Exhibits CC through GG
15          marked for identification.]
16     MS. ROBERTSON:  And Greg, these are more
17  photos of damage I think that was recently sent.
18     MR. BAILEY:  Okay.  Thank you.
19  BY MS. ROBERTSON:
20     Q.   Mr. Thompson, do you recognize Defendant's
21  Exhibits CC through GG?
22     A.   Yes.
23     Q.   How do you recognize those?
24     A.   Those are pictures Derick Compton, my
25  employed mechanic, took of the damage -- some of the

171

1  damage to the motorcycle.
2      Q.   Is that Mr. Compton depicted in the
3  reflection --
4      A.   Yes.
5      Q.   -- in Defendant's CC?
6      A.   Yes.
7      Q.   What damage is depicted in Exhibit CC?
8      A.   There's damage to the paint, the
9  fiberglass.  The paint and fiberglass.
10     Q.   When were these photographs taken?
11     A.   Probably a couple weeks ago.
12     Q.   Where were these photographs taken?
13     A.   At my shop in Valley Park, Missouri.
14     Q.   When you say shop --
15     A.   It's my office and -- where my trucks and
16  my office are.
17     Q.   For your tree service?
18     A.   Correct.
19     Q.   Is any other damage depicted in
20  Defendant's Exhibit CC?
21     A.   Just fiberglass, paint, and chrome.
22     Q.   What part of the motorcycle is depicted in
23  Exhibit CC?
24     A.   It is -- I believe that's the left -- left
25  fender, rear fender.

172

1      Q.   In Exhibit DD, what part of the motorcycle
2  is depicted?
3      A.   I believe that's the right rear fender.
4      Q.   What damage, if any, is depicted in
5  Exhibit --
6      A.   Paint, fiberglass --
7      Q.   -- DD?
8      A.   Decals.
9      Q.   When you say decals, can you explain that
10  more?
11     A.   So earlier remember I told you we had to
12  search for those custom 100-year-old -- 100-year
13  anniversary decals?
14     So see how they're scratched and --
15     Q.   Is the decal the pinstripe?
16     A.   Yes.  So those are specific to the
17  100-year anniversary, those decals.
18     Q.   Any other damage depicted in Exhibit DD?
19     A.   Just fiberglass and paint decals.
20     Q.   Turning to Exhibit EE.
21     A.   Yeah.
22     Q.   What part of the motorcycle is depicted in
23  this photograph?
24     A.   That's the right side engine and tank.
25  It's the gas tank.  Looking --

43 (Pages 169 to 172)

RAYMOND THOMPSON

173

1    Q.   What, if any, damage is depicted in this
2  photograph?
3    A.   There's damage to the tank, paint, chrome.
4  And then the custom air cleaner that I had made --
5  custom-made and put on there is replaced with this
6  factory air cleaner.  I don't know why --
7    Q.   Do you know --
8    A.   A generic one.
9    Q.   -- how this damage occurred?
10   A.   I don't.
11   Q.   Do you know who caused this damage?
12   A.   I do not.
13   Q.   Is there any other damage depicted in this
14 photograph that we haven't discussed?
15   A.   No, just there again, chrome, paint,
16 decals.
17   Q.   Did that damage exist prior to October
18 22nd, 2022?
19   A.   No.
20   Q.   And then I don't think I asked you those
21 questions for Defendant's Exhibit AA, BB, CC, and DD.
22   Do you know who caused the damage on any of
23 these photographs?
24   A.   I don't.
25   Q.   Do you know what caused the damage in any

174

1  of those photographs?
2    A.   I don't.
3    Q.   Do you -- did that damage exist prior to
4  October 22nd, 2022?
5    A.   No.
6    Q.   Okay.
7    Turning to Exhibit FF.
8    What part of the motorcycle is depicted in this
9  photograph?
10   A.   That's the V-twin engine and tank, gas
11 tank.  And the foot pegs, the right forward controls.
12   Q.   Is any damage depicted in this photograph?
13   A.   Yeah.  There's damage to the paint on the
14 tank, and there's -- someone replaced the custom air
15 cleaner that I had made for this bike with some
16 generic, whatever this is, air cleaner.
17   Q.   Do you know what caused this damage?
18   A.   I don't.
19   Q.   Do you know who caused this damage?
20   A.   I don't.
21   Q.   Do you know who replaced the air filter?
22   A.   I don't.
23   Q.   Is this the condition the motorcycle was
24 in on October 22nd of 2022?
25   A.   No.

175

1    Q.   Turning to Exhibit GG.
2    Do you recognize what's depicted in Exhibit GG?
3    A.   That's the rear -- rear fairing.
4    Q.   Is there any damage depicted in this
5  photograph?
6    A.   Yeah, there's cracks in the fiberglass,
7  scratches in the paint.
8    Q.   Any other damage?
9    A.   It's a small portion of the bike, but --
10 no, just every part of that is damaged right there.
11 So --
12   Q.   Do you know who caused this damage?
13   A.   I don't.
14   Q.   Do you know how this damage occurred?
15   A.   No.
16   Q.   Did this damage exist on October 22nd of
17 2022?
18   A.   No.
19   Q.   We talked a little bit that the -- I think
20 you mentioned the bike was not operational.
21   Do you know what caused the bike to be
22 unoperational?
23   A.   I don't.  I haven't taken it to a shop yet
24 or had it restored.
25   Q.   Do you know why it wouldn't start?

176

1    A.   I have no idea.
2    Q.   Have you been able to get it started?
3    A.   No, I haven't -- I haven't taken it to a
4  shop yet.
5    Q.   Do you have an estimate of the cost to
6  make the repairs or replacements to the damage we just
7  discussed in these photographs?
8    A.   No.
9    Q.   Do you have an estimate of the value of
10 the motorcycle on October 22nd of 2022 at the time you
11 left your house?
12   A.   To me, or to -- I mean, it depends.  It's
13 extremely valuable to me.  It's personal.  I've
14 custom-made -- custom-made to fit like a custom suit.
15 So to me, it's extremely valuable.
16   So I don't know what the market value is.  I
17 know for a 2003 anniversary trike, they're not -- it's
18 not something you can just go rent or, you know, easily
19 find.  You may have to drive to California or New
20 Jersey to find one.  So --
21   Q.   Do you have an estimate of the loss of
22 value to the motorcycle?
23   A.   I don't.  I mean, to me, it's extremely,
24 you know, troubling.  So --
25   Q.   Do you -- is there a number that you place

44 (Pages 173 to 176)

RAYMOND THOMPSON

177

1  on the loss of use of the motorcycle, between October
2  22nd and February of 2023, when you regained possession
3  of the motorcycle?
4      A.   I don't -- I don't know that.  It's a huge
5  loss, but I don't know what the number is.  I mean,
6  it's a huge loss to me.
7      Q.   Have you made any social media posts
8  regarding this incident?
9      A.   No.
10     Q.   Have you made any social media posts
11 regarding the trike?
12     A.   No.
13     I mean, after this incident?  Are you referring
14 to after this incident?  I mean, I have a picture prior
15 to all this of my nephew sitting on the trike, on my
16 Facebook page, once I had it restored.
17     But there's no -- after this happened, I have
18 not -- I have not.
19     Q.   Do you have other photos of the trike on
20 your Facebook page?
21     A.   Just the one.
22     Q.   Do you have any photographs of the process
23 of restoring it?
24     A.   No.
25     Q.   In your request -- your response to

178

1  Request for Production Number 30, the request stated,
2  "Please produce all documents evidencing or relating to
3  the registration of the motorcycle described in
4  plaintiff's complaint with the State of Missouri."
5      And your response was, "Responsive documents are
6  attached."
7      I just want to clarify.  We've discussed today
8  that you never were able to actually register the
9  motorcycle in your name; correct?
10     A.   Correct.
11     Q.   And so any documents you are referring to
12 that have been produced would be the title in Nathan
13 Rench's name, the title that has the signature -- your
14 signature on the back.
15     A.   Right.
16     Q.   But you don't have any documents where
17 you -- that -- evidence that you went and registered
18 the motorcycle; correct?
19     A.   Correct.  I tried.  I have evidence where
20 I tried to multiple times.
21     Q.   Did you take any cell phone videos or
22 recordings on October 22nd or 23rd?
23     A.   Just the photo of Officer Gerholdt.
24     Q.   How would you characterize your interest
25 in motorcycles?  Is it a hobby, an obsession, a minor

179

1  interest, something else?
2      A.   It's a -- it's a very enjoyable hobby to
3  me.  I mean, I -- it's something I've done since I was
4  a child.  I've collected particularly Harley-Davidsons
5  and custom Harleys.
6      So yeah, avid hobby.
7      Q.   What about motorcycles -- why do you enjoy
8  them?
9      A.   I just -- I just always have.  I like the
10 freedom on the road, you know.  Yeah.
11     Q.   When did you first become interested in
12 motorcycles?
13     A.   As a child.  I think I was probably 10
14 years old when my dad bought me my first one.
15     Q.   10 years old?
16     A.   Yeah.  Yeah.
17     Q.   Did your father have motorcycles?
18     A.   He did.
19     Q.   Did -- could you ride a motorcycle at 10?
20     A.   Yeah.  Little dirt bikes, the 50CC dirt
21 bikes.
22     Q.   Well, so my next question was how did you
23 learn to ride motorcycles?
24     A.   My dad.
25     Q.   Did you ever take a class?

180

1      A.   Just -- no.  Just learned as a kid.
2      Q.   Do you have a motorcycle endorsement on
3  your driver's license?
4      A.   Yeah.
5      Q.   When did you obtain that, if you recall?
6      A.   I got a permit.  It was I think in 2002,
7  when I bought the Softail.
8      Q.   When was -- is that -- when was the first
9  motorcycle that you purchased?
10     A.   I purchased -- I mean, street bike, Harley
11 street bike, I've had them -- I don't know, I purchased
12 lots of them.
13     The first new bike I bought was in 2002, the
14 Softail.
15     Q.   Do you recall when as an adult, though,
16 you purchased your first?
17     A.   Well, I probably had bikes from when I was
18 a teenager to adulthood.  So --
19     Q.   Do you make any -- excuse me -- repairs
20 yourself?
21     A.   Sometimes.  What I'm capable of.
22     Q.   What kinds of repairs are you comfortable
23 making on your own?
24     A.   Oil changes, you know, some things.  You
25 know, very limited.

45 (Pages 177 to 180)

RAYMOND THOMPSON

181

1    Q.   Do you have -- you don't have any training
2  as a mechanic?
3    A.   No.
4    Q.   Do you have other hobbies?
5    A.   Some.  Yeah.
6    Q.   What other hobbies do you have?
7    A.   Hunting, you know.  Some -- do a little
8  bit of that.  But mostly motorcycles.
9    Q.   Do you belong to any motorcycle-related
10 clubs or groups?
11        MR. BAILEY:  I'm sorry.  Could you repeat
12 that?  I just couldn't hear.
13        MS. ROBERTSON:  I'm sorry.
14 BY MS. ROBERTSON:
15   Q.   Do you belong to any motorcycle-related
16 clubs or groups?
17        MR. BAILEY:  We object to the form and
18 relevance.
19 BY MS. ROBERTSON:
20   Q.   You can answer.
21        MR. BAILEY:  You can answer.
22   A.   Okay.
23   No.
24 BY MS. ROBERTSON:
25   Q.   When do you usually ride your motorcycles?

182

1    A.   Daylight hours, like my neighbor said.
2    Q.   Are there -- weekdays, weekends?
3    A.   Weekends mostly.  Yeah.
4    Q.   Are there specific times of the year?
5    A.   Not really.  I mean, sometimes, you know.
6  I have cold weather gear, so I ride in the summer, and
7  I have a bike in Florida, too.  So when I'm down in
8  Florida in the south, I ride.
9    Q.   Do you ride in the winter?
10   A.   Yeah.
11   Q.   Do -- where do you usually ride?
12   A.   Out, you know, out in Franklin County a
13 lot.  My parents have a farm in Robertsville.  Out to
14 Beaufort.
15   Q.   Do you have anyone you regularly ride
16 with?
17   A.   I have several friends, yeah, that I ride
18 with.
19   Q.   What are their names?
20   A.   Tom Weaver, Jack Setzer (ph).
21   Q.   Anybody else?
22   A.   Garrett Gist.  Sometimes -- there's lots
23 more, but yeah.
24   Q.   Please tell me all of the reasons that you
25 believe that my client, Officer Robert Gerholdt,

183

1  violated your rights.
2        MR. BAILEY:  I'm sorry.  You got to speak
3  up a bit.
4        MS. ROBERTSON:  I'm so sorry, Greg.
5  BY MS. ROBERTSON:
6    Q.   Please tell me all of the reasons you
7  believe my client Gerholdt -- or Robert Gerholdt
8  violated your rights.
9        MR. BAILEY:  Objection.  Asked and
10 answered.
11 BY MS. ROBERTSON:
12   Q.   You can answer.
13        MR. BAILEY:  You can answer.
14   A.   Okay.  He could have called me.  He could
15 have -- they could have not come to my house, 11:30 at
16 night, broke into my property.  Not let someone steal
17 from two counties away, steal -- I've been a resident
18 of Manchester for 20-something years.
19        They could have contacted me any time and said,
20 we have this title dispute.  Do you want to come talk
21 to us?
22        You know, at 11:30 at night, let people come
23 onto my property and let other people onto my property,
24 and -- you know, it's a total violation.  I mean, I
25 feel raped, you know.

184

1  BY MS. ROBERTSON:
2    Q.   Is your answer the same for both officers?
3    A.   Yes.  They were both extremely rude and
4  tried to cover up their actions.  They were dishonest
5  the night of.  When I was trying to get honest answers
6  out of them, they lied.
7    Q.   Your --
8    A.   I have -- you know, I have a
9  now-15-year-old daughter.  And she could have been home
10 that night, if I would have ran up to Schnucks and
11 grabbed food while all this went on, and they brought
12 criminals onto my property.
13        You know, that's -- I mean, where does it end?
14 They violated me in every way possible.
15   Q.   How were the officers rude?
16   A.   They were rude when they left, when I was
17 trying to have a discussion with them to find out where
18 is my motorcycle?
19        They were like, civil matter, after they had
20 already committed the act of theft.
21        I said, how do we resolve this?
22        And they said, civil matter, and they just left.
23   Q.   Did you --
24   A.   And then I asked Cockrell, what do you
25 mean you're leaving?  You just trespassed, and you

RAYMOND THOMPSON

185

1  stole my motorcycle.
2      And they said, we're the police, we can go
3  anywhere we want, and they drove off.
4      Q.  I want to separate -- so Cockrell said
5  that?
6      A.  Cockrell said that.
7      Q.  Did Gerholdt say, we're the police, we can
8  go anywhere we want?
9      A.  No.  Gerholdt said, civil matter, we're
10  leaving.  Both of them said that.
11      And I said, what do you mean you're leaving?  I
12  know it's a -- it was a civil matter until you broke
13  into my property and stole my bike.
14      Q.  You referenced that the officers lied.
15      Is there anything additional that we haven't
16  already discussed with respect to what you believe the
17  officers lied about?
18      A.  They lied about coming onto the property,
19  and then they lied about how many times they came to my
20  house, which would be easy to verify through phone
21  records with Manchester, you know, or their --
22      Q.  What do you mean, about how many times
23  they came --
24      A.  Well, in their depositions, they're saying
25  they only came to my house twice.

186

1      Q.  How many times did they come to your
2  house?
3      A.  They went to my house three times, because
4  they went there, stole the motor -- Officer Cockrell
5  and Gerholdt went there originally, responded to Amara
6  and McKenzie, stole the motorcycle.  I called them.
7  Then they -- I called them.  They responded to do my
8  home.
9      Then they left and said this is -- once I
10  started questioning them, they said, this is a civil
11  matter.  I was just trying to get a bearing of what was
12  happening, and they said, this is a civil matter, we're
13  leaving, and they just left me hanging without any
14  explanation.
15      And then, you know -- and then I had to call
16  Manchester and request a supervisor, and that's when
17  Officer Waters came out, again, with Cockrell and
18  Gerholdt.
19      And they totally just forgot that whole part,
20  coincidentally, you know.
21      Q.  Mr. Thompson, please tell me all the
22  reasons you believe Officer Gerholdt acted
23  intentionally.
24      MR. BAILEY:  I'm sorry.  Can you repeat it
25  again?

187

1      MS. ROBERTSON:  I'm sorry, Greg.  I'm
2  asking questions regarding punitive damages and your
3  allegations that the officers acted intentionally,
4  outrageously, demonstrated evil motive, demonstrated
5  reckless indifference, and I was just going to go
6  through those one by one.
7  BY MS. ROBERTSON:
8      Q.  So Mr. Thompson, can you please tell me
9  all the reasons you believe Officer Gerholdt acted
10  intentionally?
11      MR. GELFAND:  I'm going to object.  Calls
12  for a legal conclusion.
13      A.  Yeah.
14      Because he could have just called me.  It was as
15  simple as a phone call.  He could have -- when I
16  offered to show him the property documentation, they
17  refused to see it, initially.  And they said, civil
18  matter, and they just left.
19      I mean, it was intentional from -- obviously it
20  was intentional.  You know, I mean -- and then the next
21  day, I had suspect of motives on his behalf when he
22  tried to get the original title from me and the
23  original paperwork.
24      I mean, why he else would he want that when he
25  had it the night before, you know, I handed it to him

188

1  and his supervisor Waters the night before?
2  BY MS. ROBERTSON:
3      Q.  What did you believe Officer Gerholdt
4  wanted to do with the title?
5      A.  I think he wanted to make it all go away.
6      Q.  How so?
7      A.  I mean, wouldn't that change the whole
8  dynamic of everything?
9      Q.  No, I really don't understand what you're
10  saying, Mr. Thompson.  How would --
11      A.  Oh, okay.
12      I believe he wanted the title -- I mean, to make
13  it go away.  Why would he need the original when he had
14  it the night before, he had all of the information on
15  that title the night before?
16      Gerholdt, Waters, and Cockrell had -- they had
17  it all.  Why would they need all my originals the next
18  day?  It's just --
19      Q.  So on the 20 -- evening of the 23rd, --
20      A.  Uh-huh.
21      Q.  -- did the officers make copies of your
22  title at that time?
23      A.  I believe they were taking pictures of
24  them.  They had it out in the street and they were --
25  had camera -- or not cameras, but flashlights, the

RAYMOND THOMPSON

189

1  originals of everything.
2      I don't know why they needed them again the
3  second day.
4      Q.   Do you know if they took pictures?
5      A.   I -- I don't know that for a fact, but I
6  thought I saw them taking pictures.
7      Q.   Is it possible they just wanted to have a
8  copy in evidence, based on what you had --
9          MR. BAILEY:  Objection.  Calls for
10  speculation.
11  BY MS. ROBERTSON:
12      Q.   You can answer, if you know.
13      A.   I don't know.  I was already -- after
14  they -- after they broke onto my property without my
15  consent, I was already suspect of them by then.
16      They had already stolen from me, broken onto my
17  property, let people, potentially dangerous people, on
18  my property when I have a teenage daughter, you know.
19      And then, you know, didn't -- didn't call,
20  didn't get a search warrant, anything.  They just took
21  it upon themselves.
22      Q.   Let me ask you.
23      You have used the term broke onto or something
24  similar a few times --
25      A.   Yeah.

190

1      Q.   -- in the last few minutes.
2      Was anything broken to get onto your property?
3      A.   Well, I mean -- I don't -- they --
4  somebody opened up my gate.  It was either them --
5  somebody opened it up to get -- to steal the
6  motorcycle.  So --
7      Q.   Were any windows broken?
8      A.   No.
9      Q.   Were any doors kicked in?
10      A.   No.
11      Q.   Was the gate forcibly opened?
12      A.   I don't know.  The gate was opened.  I
13  don't --
14      Q.   Was the gate still functional when you
15  returned home?
16      A.   It's not as functional, but yeah -- if
17  somebody pushed it, you know.
18      Q.   In what way is it not functional?
19      A.   It's on a wheel, and the two-by-four
20  holding the wheel is broke now.  I have to lift it when
21  I close it.
22      Q.   There wasn't a lock your gate, though.  We
23  discussed that.
24      Correct?
25      A.   Right.  There was a hasp, and a bolt in

191

1  the hasp.
2      Q.   Would you please tell me all of the
3  reasons you believe Officer Gerholdt acted
4  outrageously?
5          MR. BAILEY:  Objection.  Calls for a legal
6  conclusion.
7      Go ahead.  Sorry.
8      A.   Because he -- when I asked him what
9  happened, he said, this is -- I asked him and Cockrell
10  what happened, they said, this is a civil matter.
11      I said, do you want to see my paperwork?
12      And they said, civil matter.  We don't need to
13  see anything.  We're the police, we go anywhere we
14  want.  And they left.
15      I've repeated that.
16  BY MS. ROBERTSON:
17      Q.   Is your answer any different for --
18      A.   No.
19      Q.   -- Officer Gerholdt or Cockrell?
20      A.   I mean, they both say the civil matter,
21  we're leaving.
22      Q.   I just --
23      A.   The only difference is Cockrell was the
24  one that said, we're the police, we can go anywhere we
25  want.  That's the only difference.

192

1      Q.   Okay.  That's for -- when I asked
2  you about --
3      A.   Gerholdt and Cockrell both said, this is a
4  civil matter, we're leaving, when I was saying, can you
5  help me figure this out?  I want to know what happened
6  here.
7      And they said, civil matter.
8      And I said, do you want to see my paperwork,
9  my -- showing I have ownership of this vehicle that you
10  let them come in and steal?
11      Q.   Is there -- and that's as to your -- your
12  allegation that they acted outrageously.
13      With respect to your allegation that they acted
14  intentionally, is your answer any different for Officer
15  Gerholdt than Cockrell?
16      A.   No.  They both acted similarly.
17      Q.   Please tell me all the reasons you believe
18  any officer acted with evil motive?
19          MR. BAILEY:  Objection.  Calls for a legal
20  conclusion.
21      A.   Because they could have -- I've been a
22  resident of Manchester for 20-something years.  They
23  could have contacted me.  They could have come by my
24  house at a normal business hour, and we could have
25  spoke about it.  I could have offered up all the

RAYMOND THOMPSON

193

1  information they wanted.
2      But they break into my house on my property --
3  break into my property at 11:30 at night.  That is evil
4  motive.
5  BY MS. ROBERTSON:
6      Q.   And I just want to -- they did not break
7  into your home?
8      A.   They broke onto my property.
9      Q.   Okay.
10      Any other reason you believe they acted with
11  evil motive?
12      A.   I just explained that, I feel.
13      Q.   Please tell me all the reasons you believe
14  either officer acted with reckless indifference?
15          MR. BAILEY:  Objection.  Calls for a legal
16  conclusion.
17      A.   Because when I tried to ask them for an
18  explanation, they said, we're no longer want any part
19  of this, basically, by saying this is a civil matter,
20  and just left me hanging there.
21      And then I had to call back their superior and
22  request a superior out there to give me some sort of
23  explanation of what happened and why this happened.
24  BY MS. ROBERTSON:
25      Q.   When Officers Cockrell and Gerholdt were

194

1  at your residence the first time, do you have any
2  reason to believe -- and this would be on October 22nd,
3  when you were not there.
4      A.   Right.
5      Q.   Do you have any reason to believe either
6  of them had your phone number?
7      A.   They had -- I don't know that they -- I
8  mean, I'm easy to find.
9      And they had -- they ran -- in Officer
10  Cockrell's -- or Officer Gerholdt's testimony, they
11  looked up my license plate.  They could have easily
12  accessed my phone number.  There's a million ways to do
13  that.  If they can look up license plates, they can get
14  my phone number.
15      They could have asked my neighbor.  They could
16  have done -- there's a million ways they could have
17  gotten my phone number.
18      Q.   Please tell me every reason you believe
19  either officer was negligent.
20          MR. BAILEY:  I -- you trailed off again.
21  I --
22          MS. ROBERTSON:  I'll give you your
23  objection on this one, Greg.
24  BY MS. ROBERTSON:
25      Q.   Please tell me all the reasons you believe

195

1  either officer was negligent.
2          MR. BAILEY:  Objection.  Calls for a legal
3  conclusion.  Thank you.
4      A.   I mean, they broke onto my property.  They
5  stole from me.  They offered no help when I tried to
6  request help from them to understand what was
7  happening.  They just left.
8      And they let strangers who I don't know anything
9  about onto my property.  I don't know even know that
10  they're people -- you know, they could be serial
11  killers.  I don't know who they let on the property.  I
12  have a child.
13      I have since put up cameras all over my house,
14  inside and out, because of this situation.
15  BY MS. ROBERTSON:
16      Q.   Mr. Thompson, do you wish to add anything
17  or change any answer you've given me today?
18      A.   I don't think so.
19      Q.   Have all of your answers been truthful?
20      A.   Yes.
21      Q.   I don't think I have any further
22  questions.
23          MR. BAILEY:  Thank you.
24      I have no questions for you, Mr. Thompson.
25      A.   Okay.  Thank you.

196

1          MS. ROBERTSON:  Off the record -- oh, do
2  you want to waive or read and sign?
3          MR. BAILEY:  We'd like to read and sign,
4  please.
5          [2:43 p.m.]
6
7          [SIGNATURE RESERVED.]
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

49 (Pages 193 to 196)

Golkow Litigation Services

197

```
 1         C E R T I F I C A T E
 2
 3      I, Jude Arndt, a Certified Shorthand
 4  Reporter and Certified Court Reporter, do hereby
 5  certify that RAYMOND THOMPSON, prior to the
 6  commencement of the examination, was sworn by me to
 7  testify the truth, the whole truth and nothing but the
 8  truth.
 9      I DO FURTHER CERTIFY that the foregoing is a
10  true and accurate transcript of the proceedings as
11  taken stenographically by and before me at the time,
12  place and on the date hereinbefore set forth.
13      I DO FURTHER CERTIFY that I am neither a
14  relative nor employee nor attorney nor counsel of any
15  of the parties to this action, and that I am neither a
16  relative nor employee of such attorney or counsel, and
17  that I am not financially interested in this action.
18
19
20      _____
21      JUDE ARNDT, CSR, CCR, RPR
22      CSR NO. 084-004847
23      CCR NO. 1450
24
25
```

198

```
 1
 2
 3      I, RAYMOND THOMPSON, the witness herein,
 4  having read the foregoing testimony of the pages of
 5  this deposition, do hereby certify it to be a true and
 6  correct transcript, subject to the corrections, if any,
 7  shown on the attached page.
 8
 9
10
11      _____
12          Raymond Thompson
13
14
15
16
17  Sworn and subscribed to before me,
18  This _____ day of _____, 202_.
19
20
21  _____
22      Notary Public
23
24
25
```

199

```
 1         DEPOSITION ERRATA SHEET
 2
 3  Page No._____ Line No._____ Change to:_____
 4  _____
 5  Reason for change:_____
 6  Page No._____ Line No._____ Change to:_____
 7  _____
 8  Reason for change:_____
 9  Page No._____ Line No._____ Change to:_____
10  _____
11  Reason for change:_____
12  Page No._____ Line No._____ Change to:_____
13  _____
14  Reason for change:_____
15  Page No._____ Line No._____ Change to:_____
16  _____
17  Reason for change:_____
18  Page No._____ Line No._____ Change to:_____
19  _____
20  Reason for change:_____
21
22  SIGNATURE:_____DATE:_____
23      Raymond Thompson
24
25
```

RAYMOND THOMPSON

Page 200

**A**

**a.m** 4:1
**AA** 3:16 167:1,2
  167:18 168:4,6
  168:10 173:21
**Aaron** 37:16
  38:22 40:3
  42:24 44:4
  45:22 46:4 49:6
  49:24 52:3 99:8
  99:9 100:6
**Abigail** 7:18 9:23
**ability** 5:25
**able** 36:23 43:5,7
  43:9,10,23 57:5
  75:4 135:23
  149:24 159:19
  159:22 176:2
  178:8
**able-bodied**
  138:15
**ACC** 71:22
**access** 74:7 95:4
  109:25
**accessed** 194:12
**accessory** 72:19
**accountant's**
  83:14 87:20,23
  87:24
**accurate** 27:24
  40:14 59:14
  60:1 61:11 83:3
  83:15 96:24
  100:13 197:10
**accusation** 90:21
**accused** 155:22
**accuses** 92:18
**acquainted** 78:23
**acquired** 17:21
**acres** 84:4
**act** 54:15 184:20
**acted** 186:22
  187:3,9 191:3
  192:12,13,16
  192:18 193:10
  193:14
**action** 197:15,17

**actions** 184:4
**activated** 167:9
**acts** 75:7
**actual** 68:16
  87:11
**Adam** 99:8,10
**add** 21:1 195:16
**added** 34:20
  68:20,21,22
  73:13 74:4
**addition** 41:23
  42:3 45:9
**additional** 42:4
  75:7 185:15
**address** 7:4 8:23
  41:9 139:2
**admit** 115:8
  156:4
**admitted** 118:6
  118:10,25
  119:4 153:21
  154:8,11,15
  155:17 156:5
**adult** 91:21
  180:15
**adulthood**
  180:18
**after-market**
  67:22
**age** 21:5
**agencies** 52:14
  53:16,18 58:22
  61:7 114:21
  157:13 159:15
**ago** 50:20,21
  124:11 171:11
**agree** 6:2,18
  74:23 98:20
  106:4,7 109:15
**agreed** 63:5 85:9
  125:11 158:15
**agreed-upon**
  85:15
**agreement** 87:11
  103:19 104:20
  154:24
**ahead** 191:7

**air** 45:7 166:12
  166:12,13,13
  166:15,16,19
  173:4,6 174:14
  174:16,21
**album** 165:17,19
**allegation** 192:12
  192:13
**allegations** 187:3
**alleging** 112:17
  112:20
**allow** 146:22
**allowed** 95:4
  148:5
**Amara** 147:4
  150:3 156:20
  156:21 170:7,8
  186:5
**amount** 29:18,22
  42:12 84:18,19
  84:20 85:9
  88:21 104:1
  166:9
**analogous** 112:15
**and/or** 16:1
**Android** 101:4
**Anglers** 86:3
**angry** 115:17
**anniversary**
  15:23 17:7,24
  20:22,23 21:16
  22:1,4,11,14,17
  22:21 23:15,17
  30:6 41:15,22
  44:17 76:6 79:2
  172:13,17
  176:17
**answer** 5:8 13:2
  51:19 64:15
  65:19 76:14
  88:16,19 92:25
  93:22 112:6,15
  136:10 150:9
  181:20,21
  183:12,13
  184:2 189:12
  191:17 192:14

195:17
**answered** 51:19
  136:19 139:10
  183:10
**answers** 102:22
  112:16 135:6
  135:12 184:5
  195:19
**Anthony** 4:20
**anti-theft** 72:21
  72:24 73:7,13
  75:8 77:23
**anybody** 64:13
  81:7 182:21
**anymore** 74:19
**anyway** 145:22
**apologize** 36:17
  77:13 78:5
**apologized** 123:9
**apologizing**
  123:4
**apparently** 92:4
**appear** 31:20
**APPEARANC...**
  2:4
**appeared** 65:14
  65:16
**appears** 127:24
**Apple** 101:5,6
**applied** 50:12
  148:17
**appraisal** 14:2
**appraiser** 14:7
**approached**
  141:1,2
**approaching**
  141:2
**approximately**
  122:9 140:4
**area** 86:2
**Arizona** 8:21
**Arndt** 1:15 2:2
  197:3,21
**Arnold** 40:19,23
  41:7,11 42:23
**arranged** 104:3
**arrived** 140:18

140:20,21,22
  140:23
**Ashley** 10:4,5,7
  10:14
**aside** 19:16 97:3
  152:12,16
**asked** 6:3 13:1
  36:16 51:19
  54:9 66:17
  77:13 78:5 89:1
  114:2,22 117:1
  118:23 121:6
  124:3,20 125:3
  157:10,11
  158:23 173:20
  183:9 184:24
  191:8,9 192:1
  194:15
**asking** 53:4,11
  83:13 102:25
  113:2,4 129:13
  187:2
**ass** 165:17,19
**assessments** 37:2
**assignment** 27:9
  27:15
**associated** 40:15
**assume** 25:10
  87:24 148:2,4
  158:16,20
  168:24 170:7
**assumed** 141:13
  165:13
**assuming** 141:19
  148:8
**attached** 43:21
  178:6 198:7
**attempted** 52:16
**attention** 136:9
**attest** 22:19
**attorney** 4:22
  54:24 55:20
  56:4,10 65:14
  66:20,21 82:9
  98:12 124:8
  197:14,16
**attorneys** 6:22,24

RAYMOND THOMPSON

160:10 167:23
167:25
**auctions** 17:22
17:23
**audio** 119:20
120:7
**August** 97:13
**aunt** 99:20
**automatically**
101:7
**available** 22:23
23:4
**Avenue** 2:2,7
83:21
**avid** 179:6
**aware** 57:11
63:19 64:11,17
65:1

**B**

**B-L-U-M-H-O...**
37:22
**back** 8:5 26:17
34:4 45:22 46:1
47:23 50:22
54:24 56:13
58:17 70:17
74:10 95:5,16
96:15 99:5
106:18 111:3
113:7,15,18,22
116:5,6 117:24
118:1,9,23
119:5 120:16
121:8 125:14
131:15 134:1
140:17 145:15
145:24 146:13
154:18 157:5,6
158:13,15,19
158:22 159:9
160:18 165:23
166:21,22
178:14 193:21
**backed** 86:2
**background**
12:19

**backing** 134:4
**backyard** 107:1
107:21 111:9
115:6,8 118:7
118:11 119:2,4
120:5 143:15
153:21 154:12
155:17,19
156:4,6,8,13,22
**backyards**
120:24
**Bailey** 2:13 155:1
155:10,12
160:23 161:1,5
162:16,20,23
163:25 167:15
170:18 181:11
181:17,21
183:2,9,13
186:24 189:9
191:5 192:19
193:15 194:20
195:2,23 196:3
**balance** 28:18
30:24 32:18
**ballpark** 71:3
85:6,18
**bank** 28:8 33:7
**barn** 79:2 95:6
**barns** 16:13
**based** 189:8
**basic** 43:1
**basically** 7:19
116:3,16 145:5
158:25 193:19
**basis** 20:15 87:4
101:16
**battery** 36:3
70:12 72:20
**BB** 3:17 167:1,2
167:18 169:6
173:21
**Bear** 101:22
**bearing** 186:11
**Beaufort** 8:20,23
25:25 26:7 79:3
82:18,21,22

83:21 98:19
100:5 182:14
**bed** 151:2
**beginning** 40:12
100:12
**behalf** 2:6,14
187:21
**believe** 5:15 8:1
9:2,6,7,11 22:3
22:18 24:21
28:7 32:1,24
35:21 36:3
41:17,17,20
47:16 51:20
55:24 56:15,20
58:10 64:7
67:21 79:11
80:7 82:1 84:5
84:16 91:15
99:17,20
102:13 110:8
116:5,17
124:16 135:5
135:12 137:17
137:21 141:15
142:21 145:11
149:19 159:13
161:3 171:24
172:3 182:25
183:7 185:16
186:22 187:9
188:3,12,23
191:3 192:17
193:10,13
194:2,5,18,25
**belong** 181:9,15
**belongs** 89:3
**best** 8:7
**better** 75:22
128:1 154:25
168:3
**big** 20:6 39:11
41:5
**bike** 21:6 23:12
28:17,22,23
30:17 42:25
43:4,17 46:14

46:20,25 49:24
58:1,3 68:13
73:9,11 80:13
87:17 88:9,12
91:24 92:5,6,13
92:14 108:23
108:24 109:4
113:25 115:20
117:14,25
118:24 130:4
132:11,23,23
135:22 141:14
144:19 157:3,4
157:4,5 159:8
164:1 166:22
170:8 174:15
175:9,20,21
180:10,11,13
182:7 185:13
**bikes** 16:21 18:10
42:23,24 46:25
78:3 179:20,21
180:17
**bill** 161:19
**Biology** 13:17
**bit** 15:14 43:2
44:20 78:11
96:13 109:9,9
175:19 181:8
183:3
**black** 22:10,11
22:12,18 83:10
98:24 100:21
108:22
**blank** 56:23
**Bless** 47:18
**blue** 22:11,12
107:22 108:1
108:14 109:7
126:21 127:9
131:2
**Blumhorst** 37:20
37:20 38:4,7,12
38:13,15 39:6
39:14,19 42:24
49:6
**body** 47:25 142:3

**bolt** 190:25
**Bonhomme** 2:2,7
**boom** 88:6
**borrowing** 157:3
157:4,5
**bottom** 32:3 34:2
60:21 61:6
100:20
**bought** 17:16,18
17:22 19:1
30:18 94:16
97:8,11 179:14
180:7,13
**box** 26:23,25
27:9 59:17,20
59:24,24 60:7,9
60:9 61:7 99:7
**boxes** 33:15
**break** 12:24 13:3
64:24 119:5
125:15 145:8
193:2,3,6
**bring** 42:15 95:5
95:16 117:24
155:5 158:13
158:15
**bringing** 118:1
158:21
**brings** 42:10,11
**broke** 146:19
183:16 185:12
189:14,23
190:20 193:8
195:4
**broken** 131:14
141:13 168:7
189:16 190:2,7
**brother** 12:7
32:12 50:11
53:7 59:9
112:17,23
116:16,20
117:15,20
118:3,6,10
145:2,10
153:16 154:15
156:6 157:20

RAYMOND THOMPSON

158:4,8,23
159:3
**brother's** 119:22
159:6
**brought** 33:14,15
37:6 56:13
58:17 184:11
**brown** 108:22
**builder** 90:3
**building** 35:10
93:9
**buildings** 84:13
86:8,8 92:10
**builds** 38:1 40:20
**bullet** 103:3
136:11
**bunch** 84:11
169:9
**bureau** 35:10
54:8
**Burn** 165:17,19
**burned** 90:21
**burnt** 91:10
**Bushmaster** 45:8
**business** 12:6,8
12:17 20:1,2,8
20:9 28:10 33:5
90:7 126:5
192:24
**button** 67:15
68:17 69:13
72:6
**buy** 73:19
**buyer** 32:9 60:14
60:16,17 61:2
62:13,14
**buyer's** 60:18

———————

**C**

**C** 3:4 23:21,25
24:9,17 47:23
103:3 166:15
197:1,1
**C-O-M-P-T-O-N**
33:20
**cabin** 94:15
**cabins** 84:2 86:5

93:8,14,16,17
93:18,23 94:2,3
94:5,12,17
95:13,13,19,23
96:6
**calculator** 34:20
**California**
176:19
**call** 54:15 117:14
139:2,7 145:3,9
145:20 146:13
150:12,15,18
158:11,20,20
186:15 187:15
189:19 193:21
**called** 21:2 49:11
54:6,14,17,19
55:11,14 57:2
88:23,24 89:1,8
94:9 113:23
114:5,7 116:5
116:15,16
138:22,23
139:8 144:3
145:2,10,15,15
145:21 150:23
153:3,7 159:20
183:14 186:6,7
187:14
**calling** 54:12
139:17 140:5
**calls** 52:13 90:9
90:25 92:2,2,23
93:20,20
148:24 150:6,6
150:7 187:11
189:9 191:5
192:19 193:15
195:2
**calm** 142:11
**cam** 142:3
**camera** 114:2
188:25
**cameras** 97:19
97:21,24
114:12 119:12
119:18,19

121:6,8 188:25
195:13
**camp** 84:2,3
**camper** 95:2
**campground**
84:2 86:5
**canoe** 86:3
**Canyon** 8:21
**capable** 180:21
**car** 18:23 21:14
97:19,22,25
117:16 144:9
144:10,10,22
**card** 35:8,9,11
38:25 42:19
55:19
**care** 81:14
117:17 159:8
**carpentry** 90:3
**Carrie** 9:17
**cars** 74:20
127:16 141:2
144:16
**case** 36:5 65:6
66:4,5,8 67:1
109:13 147:14
153:18
**CaseNet** 64:23
**cash** 33:8 35:8
38:14
**Catawissa** 41:8
**Cate** 4:11
**Catherine** 2:17
**cause** 168:19
170:4
**caused** 168:22
170:6 173:11
173:22,25
174:17,19
175:12,21
**CC** 3:17 170:13
170:14,21
171:5,7,20,23
173:21
**CCR** 1:15,16
197:21,23
**cell** 163:11

178:21
**certain** 21:11
88:20 104:15
**certainly** 53:9
**certificate** 47:24
**certificates** 13:7
13:11,13
**certifications**
14:4,7
**Certified** 2:2,2
197:3,4
**certify** 197:5,9,13
198:5
**chair** 70:23
**change** 188:7
195:17 199:3,5
199:6,8,9,11,12
199:14,15,17
199:18,20
**changes** 101:8
180:24
**changing** 67:4
107:6,7
**characterize**
178:24
**charge** 56:4
96:14
**chassis** 35:24
36:15 41:18
**check** 24:21 29:1
30:5,8,20,23
32:17,19,20,23
33:8 35:7 42:18
80:8,19 156:1,8
**checked** 115:11
156:3
**checks** 18:17
79:5
**Chewy** 130:19,21
130:23 146:1
**child** 179:4,13
195:12
**children** 9:25
**Chris** 122:12
125:6
**Christian** 114:4
119:25 121:7

123:1,14 124:3
124:23 139:21
139:22 140:7,9
140:16
**Christian's**
139:15
**chrome** 166:13
166:24 168:7
171:21 173:3
173:15
**circle** 109:8
126:21
**circled** 32:5
**circles** 130:25
131:2,3
**City** 31:13,18
49:10 53:16,19
54:1,4,5,13
55:10 61:12
**civil** 115:15,22
117:6 144:2,6
144:17 146:15
149:7 184:19
184:22 185:9
185:12 186:10
186:12 187:17
191:10,12,20
192:4,7 193:19
**claims** 149:8
**clarify** 54:2
178:7
**class** 179:25
**clean** 166:15
**cleaner** 45:7
166:12,12,13
166:16,19
173:4,6 174:15
174:16
**clear** 5:5,11
11:16
**clearly** 136:22
**client** 87:7
182:25 183:7
**close** 46:4,8
104:3,4 124:16
143:10,12
190:21

RAYMOND THOMPSON

**closed** 9:10 86:14
  89:12 126:10
  126:11 137:9
**closer** 140:15
**closes** 138:7
**closing** 84:16
  86:10,17,17
  89:15 91:20
  104:3,11,14,18
  104:19,20,21
  104:22,25
  105:4
**Club** 86:3
**clubs** 181:10,16
**cmr@reichard...**
  2:17
**Co-owner** 12:5
**Cock** 116:23
**Cockrell** 1:6 4:12
  114:8,13
  115:14 116:12
  116:24,25
  117:5,18 119:1
  140:23 142:12
  144:1,10,21,21
  144:24,25
  145:6,23 146:9
  146:21 147:1
  147:25 150:3
  150:15 151:11
  152:14 154:7
  158:7,17
  159:11 163:15
  184:24 185:4,6
  186:4,17
  188:16 191:9
  191:19,23
  192:3,15
  193:25
**Cockrell's**
  102:23 144:10
  194:10
**code** 138:20
**coincidentally**
  186:20
**cold** 79:16,17
  80:16 161:24

  182:6
**collected** 86:7
  179:4
**collector** 15:2,3
**collector's** 23:18
**college** 12:21
  13:16,18
**collusion** 148:9
**color** 22:7
**colors** 22:6,16
**come** 5:11 25:19
  36:13 68:3
  69:15 74:3
  83:14 89:20
  93:6,12 95:8,11
  96:4 105:7
  113:15 116:9
  119:5 126:2
  146:21,22
  158:19 183:15
  183:20,22
  186:1 192:10
  192:23
**comes** 43:4 73:20
  74:25 111:20
**comfortable**
  158:16 180:22
**coming** 185:18
**commencement**
  197:6
**comments**
  165:16
**Commercial**
  12:10
**committed**
  184:20
**commonly** 25:15
**communicate**
  79:18 81:22
**communicated**
  62:19 79:20
**communication**
  82:15
**communications**
  31:10 87:1 91:3
  98:21 102:25
  104:24

**commute** 18:22
  19:19
**company** 19:12
  79:22 85:1,2
  86:18 87:13,25
  88:24,24 89:12
  93:4 100:2
**company-owned**
  19:13
**compared** 18:10
**complaint** 59:13
  59:25 60:8,10
  61:6,15 62:13
  63:20 149:12
  178:4
**complaints** 64:11
**complete** 52:3
**completed** 45:23
  51:12 52:6
**completely** 138:2
  166:3
**components**
  43:25 44:2,8
**composite** 95:12
  95:14
**Compton** 33:18
  33:21 37:2
  160:17 166:7
  170:24 171:2
**conclusion** 155:5
  187:12 191:6
  192:20 193:16
  195:3
**condition** 174:23
**conduct** 136:24
**confident** 141:8
**confirm** 109:12
  122:12
**confused** 54:10
  93:24,24 103:8
**connected** 138:25
  153:18
**connection** 65:3
  66:23 120:10
  137:2
**consent** 189:15
**conservation**

  86:2
**consider** 14:15
  14:18,25
**construction**
  7:22
**contact** 57:1,12
  58:18 63:7
  105:3 121:21
  140:24 152:14
  152:16,18
  156:24 159:10
  159:15,17
**contacted** 61:7
  103:10 183:19
  192:23
**continued** 65:16
  65:17
**continuing**
  133:25
**contract** 87:13
**controls** 168:13
  174:11
**conversation**
  118:22 142:16
  154:13,18
  158:5,9
**conversations**
  31:9 55:19
  81:12,16 118:4
  153:17
**copies** 56:13
  58:17 151:6,8
  151:13,14,18
  151:20 188:21
**cops** 145:5
**copy** 50:24
  102:18 124:2
  149:20 189:8
**corner** 120:17,17
  133:7
**corners** 131:14
**correct** 8:14
  35:17 37:11
  42:13,14 46:21
  56:2 59:19
  60:21 66:2
  68:11 69:3

  71:25 72:8,16
  75:6,6,8,16
  80:7 82:24
  83:12 84:19
  103:16 104:12
  109:19,23
  112:5 119:24
  125:20 130:9
  133:8,18 134:4
  137:14,23
  143:15 164:24
  171:18 178:9
  178:10,18,19
  190:24 198:6
**corrections** 198:6
**corresponds** 25:7
**Corvette** 15:22
  19:25 127:9
  129:7,9 130:5
**cost** 42:4 84:16
  132:9 176:5
**costs** 40:15 41:24
  137:2
**Cottagemill** 7:6
  111:6 119:13
  136:14
**counsel** 2:4 3:20
  197:14,16
**counties** 183:17
**country** 23:5
  111:22
**counts** 81:2
**County** 7:8 50:7
  53:18 54:18,20
  54:24 55:2,17
  55:23 56:3,9,23
  57:2,3 61:9
  62:10 64:3 65:2
  66:5,8,14,17,20
  67:1 81:1,5
  88:24 89:8
  139:1 182:12
**couple** 4:9,13,24
  8:5 23:11 31:8
  31:23 39:9
  49:25 102:15
  159:21 160:21

171:11
**course** 6:23 11:9
20:12 31:14
80:23 97:23
146:18 147:10
147:23
**court** 1:1 2:2
50:23 65:11,12
65:18 81:1,2,4
197:4
**courtesy** 154:25
**cousin** 7:20 99:20
111:19
**cousins** 157:25
**cover** 36:5 184:4
**covered** 77:4
**COVID** 56:11
**CPR** 13:12
**cracks** 175:6
**crazy** 119:10,10
158:25
**credit** 12:21 35:7
38:24 42:19
**Creek** 8:25 83:21
97:4
**crews** 12:14,15
**criminal** 49:12
54:15 64:21
65:9 66:4,8
147:14
**criminals** 184:12
**crossed** 155:20
**CSR** 1:15,16
197:21,22
**cubic** 21:19
36:19 48:18
**currently** 9:12
15:15 16:23
50:7
**cushion** 70:16
71:10
**custody** 7:17
111:17
**custom** 16:5 17:6
19:24 20:23,23
22:21 45:4,5,7
46:6 52:4 143:6

166:1,10,13,19
172:12 173:4
174:14 176:14
179:5
**custom-built**
15:24
**custom-made**
48:6,7 173:5
176:14,14

---

**D**

**D** 3:5 26:10,14
34:11
**D-E-R-I-C-K**
33:20
**D.C** 2:12
**dad** 179:14,24
**daily** 19:19 20:6
**Dallas** 64:9
**damage** 131:15
131:19,22,25
132:3,8,11
135:13 165:23
166:2,9,24
167:21,22
168:5,14,19,22
169:3,15,19,21
169:24 170:4,6
170:9,17,25
171:1,7,8,19
172:4,18 173:1
173:3,9,11,13
173:17,22,25
174:3,12,13,17
174:19 175:4,8
175:12,14,16
176:6
**damaged** 135:21
165:25 166:3
175:10
**damages** 187:2
**dangerous**
189:17
**Danny** 40:19,23
42:23
**dark** 115:13
146:10

**date** 27:1,19,22
30:8,14 32:19
32:22 33:12
35:12 40:9 46:4
49:14 61:15
76:9 79:5 80:17
94:22 104:3,4
105:11 129:14
161:23 197:12
199:22
**dated** 80:8 83:1
124:13 160:21
**dates** 57:8 103:8
160:21
**daughter** 7:18
9:22 111:17,18
111:18 142:6
143:18 157:2
158:13 184:9
189:18
**daughter's** 90:22
91:13
**daughters** 91:15
**day** 34:15 78:14
107:5,7 110:12
110:16 121:14
123:2,9 151:1,3
151:12,17
162:8 164:8,21
164:21 165:2
187:21 188:18
189:3 198:18
**Daylight** 182:1
**days** 4:9,13,24
8:5 49:25 61:24
80:18 84:14
104:1,20
159:21 162:6
**DD** 3:18 170:13
172:1,7,18
173:21
**dealer** 48:12
**dealing** 55:3 56:9
**dealings** 96:16
147:11
**dealt** 54:10
**debit** 35:9,11

38:25
**debris** 84:11 86:8
86:13 103:17
**decal** 172:15
**decals** 22:13
39:20 41:16,21
41:22,25 42:6
42:12 172:8,9
172:13,17,19
173:16
**deceived** 30:17
**deceiving** 77:5,12
**December** 1:13
2:3
**decided** 115:16
**declaration** 50:6
**defendant** 14:10
112:12
**Defendant's** 3:4
3:5,5,6,6,7,7,8
3:8,9,9,10,10
3:11,11,12,12
3:13,13,14,14
3:15,15,16,16
3:17,17,18,18
3:19,19 23:21
23:25 26:10,13
29:12 59:1,3,6
59:8 69:20,22
69:25 82:2,3
98:3,4,8,18,20
102:17,19
107:10,14,17
123:19,20,23
126:17 127:19
127:23 128:1
130:16 132:13
134:17,20,23
136:2,3,7 161:8
161:10,13
163:1,2,5,20,21
164:3 167:1,2
167:17 168:4
168:10 169:6
170:13,14,20
171:5,20
173:21

**Defendants** 1:7
2:14
**definitely** 97:25
**degree** 14:20
**deliver** 40:6
**delivered** 40:4
45:23,24,25
46:12 49:6,24
67:20 69:4,11
**demeanor** 142:9
**demonstrated**
187:4,4
**denied** 154:8
156:12
**dented** 170:1
**deny** 156:15
**department**
49:16 50:12,14
50:17 54:4
59:12 60:19
61:8,8,9,18
62:5,9 89:10
113:24 148:21
149:11 159:16
**depending**
130:13
**depends** 176:12
**depict** 135:15
169:13
**depicted** 106:5
131:19 164:11
164:14 166:16
166:18 168:5,9
168:14,19,22
169:15,18
171:2,7,19,22
172:2,4,18,22
173:1,13 174:8
174:12 175:2,4
**depicts** 136:18
**deposed** 66:7
109:22
**deposition** 1:12
2:1,1 5:13 6:21
18:8 25:6 65:10
155:4 198:5
199:1

RAYMOND THOMPSON

Page 205

depositions 4:24
109:13,18
185:24
Derick 33:18
37:2 160:17
166:6,6 169:8
170:24
derogatory
165:21
Des 49:18,20
53:22 54:7,7
61:10
described 90:5
178:3
detached 41:5
details 118:21
125:8
detective 158:1
deteriorating
21:4
device 74:4 75:8
devices 72:21
119:21 120:8
difference 191:23
191:25
different 17:22
22:2,3,6 24:23
38:5 39:3,3
45:11 56:18
58:14 94:4,19
119:8 128:21
130:12 134:7
160:21 191:17
192:14
different-sized
166:23
differently 5:1
difficult 45:16
113:1
digitally 161:2
dip 13:11
diplomas 13:6
direct 136:9
directed 138:24
139:1
directly 62:23
144:11

dirt 16:21 179:20
179:20
discount 39:10
discovery 70:5
discuss 52:17,22
53:3,7
discussed 40:17
44:1,2,9 53:8,9
53:14,15,16,17
63:18 125:5
133:21,23
152:17 159:12
160:10 173:14
176:7 178:7
185:16 190:23
discussion 25:1
105:19 127:21
154:23 155:9
184:17
dishonest 184:4
dispatch 12:14
dispatched 114:7
dispose 89:17
dispute 114:20
183:20
distance 115:13
DISTRICT 1:1,1
DIVISION 1:2
divorce 9:18
divorced 7:21
9:13,14
DMV 49:5,7,10
52:7,7,12,16,19
53:4,9,13,16
54:13 55:10
59:10 61:9,12
document 24:1,3
26:20 27:2
53:20 56:14
61:17,20 62:4
documentation
53:23 58:14
187:16
documents 7:2
29:8 31:20
66:17,19 117:2
144:1,1,7 178:2

178:5,11,16
dog 138:13
doing 134:10
dollars 96:22
160:15
door 106:16,16
113:19 116:13
116:14 117:1,9
144:12 146:8
151:7 153:5
doorbell 119:17
120:3 121:19
doors 190:9
DOR 50:16,19,25
dragged 123:3
drain 72:20
draining 107:7
drive 2:15 7:6
23:3 37:4 46:14
121:14 136:14
176:19
driven 72:10
107:5
driver 144:12
driver's 180:3
drivers 20:7
driveway 97:22
106:4,8,25
114:9,14
121:24 122:1
127:25 133:16
133:23 134:13
135:20 140:13
141:3 142:17
142:24 144:15
driving 129:21
130:14 142:20
drop 138:8
dropped 151:11
151:22
drove 45:23 46:1
54:20 55:4
116:1,1 135:18
135:20,22
145:1,14 170:8
185:3
drug 5:22,24

duly 4:3
dumbfounded
145:4
dump 90:11
duties 12:13
dynamic 188:8

_____ E _____

E 3:5 29:11,12,17
30:1 34:4,6
35:2,3 197:1,1
e-mail 79:19
earlier 12:23
41:13 42:1
51:24 61:13
109:12,22
111:19,23
142:1,5 172:11
159:25
early 79:6 110:8
159:25
easier 162:14
easily 176:18
194:11
EASTERN 1:1,2
easy 185:20
194:8
eBay 16:18 17:23
39:4
education 13:8
educational
12:19
EE 3:18 170:13
172:20
eight 40:3
either 10:22 17:1
62:3 116:6
122:12 164:21
169:8 170:7
190:4 193:14
194:5,19 195:1
electronic 44:8
elimination
143:13
Elmore 147:4
150:3
embodiment
24:20

empathetically
104:6
employed 11:24
12:1 33:24
170:25
employee 197:14
197:16
employees 52:20
53:5
enclosed 92:9
encompass 48:20
encompasses
48:18
endorsement
180:2
Enduro 16:19
Enduros 16:2,9
16:18
enforcement
57:13 63:25
114:21 139:23
143:22 153:17
157:13,15,18
159:15
engine 36:1,18,24
43:5 172:24
174:10
engraved 45:8
166:12,14
enjoy 179:7
enjoyable 179:2
enter 113:18
entered 97:5
enthusiast 25:22
128:23
entire 81:5
entirety 82:7
158:4,8
entitlement
149:4
entity 94:8
errands 18:22
ERRATA 199:1
escrow 86:11,12
establish 69:5
established
111:19

RAYMOND THOMPSON

estate 104:20
estimate 97:1
　132:7 176:5,9
　176:21
estimates 131:24
　132:2
evening 110:6
　188:19
eventually 86:5
everybody 11:11
evidence 178:17
　178:19 189:8
evidencing 178:2
evil 187:4 192:18
　193:3,11
ex-wife's 158:1
exact 33:12 46:4
　84:18 96:19
　125:22
exactly 17:11
　29:9 47:3 76:14
　115:18
examination 3:2
　4:4 197:6
example 21:14
exchanged 79:6
　102:11
exclusively 41:6
excuse 30:15
　47:17 48:22,22
　67:25 100:11
　139:9 180:19
exhibit 3:4,5,5,6
　3:6,7,7,8,8,9,9
　3:10,10,11,11
　3:12,12,13,13
　3:14,14,15,15
　3:16,16,17,17
　3:18,18,19,19
　3:20 23:21,25
　24:17 26:10,14
　29:12,24 30:1,4
　32:2,14,14,16
　34:4,6,8,11
　35:2,3 47:23
　59:1,3,6,8
　61:17 69:20,22

69:25 71:7,9
　76:25 82:2,3,7
　82:12,14 83:1
　98:3,3,4,8,18
　98:20 100:11
　102:18,19
　105:22 107:10
　107:14,18
　111:4,5,9 112:6
　123:19,20,24
　126:17 127:24
　128:1,11,16,18
　129:5 130:16
　130:16,25
　132:13 133:6,7
　133:19 134:3
　134:17,20,23
　135:3 136:2,3,7
　149:11 160:20
　161:8,10,14
　162:15,19
　163:1,2,5,20,21
　164:4 166:15
　166:18 168:4
　168:10 169:6
　170:13 171:7
　171:20,23
　172:1,5,18,20
　173:21 174:7
　175:1,2
exhibits 3:3 29:2
　29:17 102:10
　127:19 136:18
　167:1,2,18
　170:14,21
exist 169:1,4
　170:9 173:17
　174:3 175:16
experience
　157:17
expert 14:15,18
　14:25 15:7
explain 4:23
　156:25 159:2
　172:9
explained 125:15
　193:12

explanation
　186:14 193:18
　193:23
extends 133:17
extension 86:9
extensive 14:22
extent 112:19
exterior 166:23
extra 74:4
extremely 141:10
　176:13,15,23
　184:3

## F

F 3:6 29:11,12,17
　29:24 30:1,2,2
　30:4 32:2 197:1
F-150 19:2,8,21
　19:21 127:9
　128:14 129:5
　130:8,11 134:6
　142:18,21,24
F-450 19:7
F-O-R-M-E-R
　68:5
face 120:4
Facebook 164:7
　164:18 165:8
　177:16,20
faces 120:16,22
　120:23
facilitated
　144:19 146:23
facing 120:12
fact 103:20
　146:16 189:5
factory 48:5
　67:20 68:22
　69:15 73:3,9,17
　73:19 74:3 75:1
　173:6
failed 104:2,3
fair 13:4 36:20
　37:3 40:10 87:2
　112:2 128:20
　130:10 138:14
　142:25 143:1

148:19 164:20
fairing 131:5,8,9
　131:11 168:11
　175:3
fairings 131:15
　131:18
fairly 141:8
familiar 48:15
　65:23 94:10,13
family 93:12 95:8
far 137:25
farm 16:12 45:25
　182:13
fashion 135:14
father 99:13
　179:17
feature 68:20
　73:13
February 79:13
　160:21 162:5,6
　162:8 177:2
feel 70:17 82:6
　167:6 183:25
　193:12
felony 14:12 65:2
felt 129:20
　146:18 158:16
fence 131:23
　132:3,8 154:8
fender 169:14
　171:25,25
　172:3
FF 3:19 170:13
　174:7
fiancé 114:4
　121:7
fiancées 123:5
fiber 169:3
fiberglass 131:14
　166:2,24 168:7
　169:4,19,21,24
　171:9,9,21
　172:6,19 175:6
figure 192:5
filed 45:16 46:10
　49:3,3,9 53:10
　60:15 93:10

95:15 97:2
　149:7
fill 12:18
filled 59:9
filter 174:21
final 30:23
financially
　197:17
find 77:9 96:19
　101:25 153:1
　176:19,20
　184:17 194:8
fine 161:1 162:20
finished 40:3
finishing 95:13
first 4:2 17:17
　45:20,20 46:19
　49:19 51:7,16
　52:16 57:12
　58:4 78:23
　79:25 80:1,9
　82:25 83:7 86:1
　99:4 101:11
　119:9 124:9,17
　140:20,22
　141:4,5 148:2
　154:18 155:16
　156:24 163:16
　179:11,14
　180:8,13,16
　194:1
fish 84:2
fit 45:5,5 176:14
five 17:21 23:10
　80:25 81:2
　100:18 162:6
fix 50:15 132:10
fixed 159:7
flashlights
　146:11 188:25
flip 67:11,14
　68:17 71:18,19
　71:23,24 72:2
　75:14
flipped 72:9
flooring 95:12,14
　95:17,23 96:21

**Florida** 8:19,20 10:7 19:4,4 182:7,8
**fob** 67:16 78:7,9
**focus** 69:8
**folder** 149:22
**folders** 151:10
**foliage** 47:14
**folks** 22:6
**follow** 57:3
**followed** 57:8
**following** 151:1,3 151:12
**follows** 4:3
**food** 184:11
**foot** 169:23 174:11
**forcibly** 190:11
**Ford** 19:2,7 127:9 128:14
**foregoing** 197:9 198:4
**forgot** 12:22 41:20,22 109:11 115:18 115:18 162:11 186:19
**fork** 36:8,13 77:25
**forks** 36:15
**form** 51:18 59:9 59:12 62:8 64:14 88:15,18 90:8,24 92:1,22 93:19 112:18 113:1 148:23 149:12 150:5 181:17
**formally** 4:8
**former** 68:3,4 102:14
**forms** 20:15 67:13 101:15
**forth** 197:12
**forward** 168:13 174:11
**four** 9:3 74:16

93:14 100:18
**fourth** 136:11
**Fox** 8:25 83:21 97:4
**frame** 35:23,24 36:8 41:19 43:12 62:7
**Franklin** 53:18 54:18,20,24 55:2,17,23 56:3 56:9,23 57:2,3 61:9 62:10 64:2 88:24 89:8 182:12
**fraud** 58:22 101:21 143:23
**fraudulent** 45:17 46:10 49:9 55:6 56:1 58:5 143:24
**fraudulently** 60:15
**free** 82:6
**freedom** 179:10
**Fresh** 74:11
**friend** 25:21 26:3 37:13 39:10 42:23,24
**friends** 15:5 42:22 165:8 182:17
**front** 40:19,21 47:24 56:19 58:14 105:16 109:1,4 113:19 114:13 116:14 117:21 120:2,4 127:12 131:22 144:11,11,11 146:1,8 154:16 163:8
**fuel** 107:8
**fulfill** 104:7
**full** 86:8
**function** 72:24
**functional** 114:3 190:14,16,18

**functioning** 23:15 114:12
**fund** 86:11,12,12
**furious** 146:16
**further** 125:6 195:21 197:9 197:13
**FX** 48:24
**FXD** 48:15,17,23

---

**G**

**G** 2:11 3:6 29:11 29:12,17 32:14 32:14,16
**garage** 25:25 37:23,25 41:1,2 41:5 79:2 105:13,14,16 106:15,17,20 129:24 130:1,4 143:6,7,8
**garbage** 86:6 95:3
**Garrett** 26:4,8 78:18,25 79:20 79:20,23,23 80:13 89:5,23 89:25 91:9 92:8 92:12 96:14,17 104:8 182:22
**Garrett's** 90:6
**gas** 43:17,19,23 172:25 174:10
**Gasconade** 65:2 65:13 66:5,7,14 66:16,20 67:1 81:1,4
**gate** 95:1,3 113:17,19,20 126:10,13 127:12 133:14 133:20 135:21 137:9,22,25 138:3,16 143:10,11,12 143:12 155:21 155:21 190:4

190:11,12,14 190:22
**gates** 126:16 138:2
**gear** 182:6
**gears** 67:4 78:11 78:14 105:9
**Gelfand** 2:6,8,11 24:7,12 27:6 35:2 47:18 51:18 64:14 68:4,7,14 78:13 86:19,25 87:3,8 88:15,18 90:8 90:24 91:5 92:1 92:22 93:19 108:5,8,10,12 112:18,25 113:8 126:19 129:13 130:22 148:23 149:24 150:5 154:20 154:24 155:8 187:11
**generally** 69:7 86:19 129:14 129:15
**generic** 173:8 174:16
**gentleman** 5:3
**Gerholdt** 1:6 4:12 112:13 114:8,13 115:5 115:7,14 116:11 117:5 117:14,16,19 117:22 118:4 118:14,19 119:1,3 140:22 141:25 142:14 143:17 144:9 144:14 145:6 145:24 146:9 146:13,21 147:2,25 150:2 150:12,25 151:10 152:17

152:18 153:5 153:21 154:15 155:16,18 158:9,10,18,24 159:2,5,11 163:15 178:23 182:25 183:7,7 185:7,9 186:5 186:18,22 187:9 188:3,16 191:3,19 192:3 192:15 193:25
**Gerholdt's** 112:16 142:9 194:10
**getting** 86:12 123:3
**GG** 3:19 170:13 170:14,21 175:1,2
**Gist** 26:4 78:18 78:19 79:20 89:5,23 90:17 182:22
**Gist's** 89:25
**give** 28:18 38:9 53:22 56:18 60:16 62:13,20 73:22,23,24 85:6 104:5,6 151:8 193:22 194:22
**given** 31:4 76:1 82:9 88:20 89:14,15 155:4 195:17
**gives** 74:14
**giving** 30:23 39:8 98:1 151:19
**Gladiator** 15:20 15:21 19:1 143:4,9
**go** 22:25 47:23 49:17 50:23 51:10 54:3,4,6 68:24 83:5 97:24 102:14

103:3 115:5,7
115:23,25
116:19 121:19
123:11 125:14
126:3 133:10
133:17,19
139:14 144:22
145:10 153:5
154:18,20
155:21 162:18
176:18 185:2,8
187:5 188:5,13
191:7,13,24
**goes** 11:21
116:20 156:3
**going** 17:11,12
20:25 21:21
34:4 54:21
58:25 69:16,19
72:7 76:16 81:1
81:25 86:19
87:25 88:11
89:13 95:1
102:17 104:25
105:21 107:9
110:20 115:19
116:17 117:24
119:4,8 136:22
139:18 145:11
148:10 151:8
153:21 154:8,9
154:11 155:2
155:22 156:4,5
156:8,13 159:7
159:7,8 160:19
161:7 162:25
163:19 170:12
187:5,11
**good** 4:6,7 96:8
123:10
**Gotcha** 24:12
**gotten** 102:1
146:4 194:17
**government**
35:10 89:9,11
**grabbed** 184:11
**Graceland** 94:9

**gradually** 23:12
**grass** 135:13,17
135:18,22
136:23,25
**great** 44:25 47:2
47:4 161:5
**green** 83:11 99:1
100:20
**greet** 140:15
**Greg** 2:13 160:19
162:12,18
163:23 167:5
170:16 183:4
187:1 194:23
**greg@marguli...**
2:13
**ground** 4:24
12:22 108:22
**groups** 181:10,16
**guess** 12:20
17:12 54:2
65:17 85:11
96:8 110:20
122:10 127:18
127:18 128:20
151:1
**guessing** 140:4
140:22
**guesstimate**
22:22
**guidelines** 149:1
**guilty** 14:12
**gun** 88:10
**guys** 144:18,19
159:1

---
**H**

**H** 3:7 29:11,12
29:17 34:8
**hammering**
92:18
**hand** 71:1 74:1
133:7 152:1
**handed** 82:8
117:23 187:25
**handlebar** 72:7
72:18 75:15

**handlebars** 35:20
43:14 45:5
67:15 68:18
69:14 72:3,13
75:5,21 166:11
166:22
**handles** 126:14
**hands** 167:10
**handwriting** 32:2
32:8,11 34:1,5
34:9 133:2,4
135:2
**handwriting's**
50:13
**hang** 123:16
**hanging** 186:13
193:20
**hangs** 138:12
**happen** 6:3
**happened** 54:17
54:25 55:2
65:21 93:15
116:17 118:3
124:12 141:11
145:5,11
156:25 157:9
177:17 191:9
191:10 192:5
193:23,23
**happening**
186:12 195:7
**happens** 11:11
72:17
**happy** 12:2,3,8
33:21 149:25
**hard** 20:13 23:1
109:2 115:12
136:21
**Hardtail** 15:25
16:5 17:6,10
22:2 143:6,7
**Harley** 17:24
19:16,24 48:12
63:11,17,21
70:11,24 73:22
74:11,14,25
75:2 76:5 77:21

79:1 180:10
**Harley's** 48:15
**Harley-Davids...**
15:23,24,25
16:1,8 20:20
21:24 22:21
36:19 48:9
143:5 164:15
**Harley-Davids...**
40:20 41:6
179:4
**Harleys** 69:6
179:5
**harness** 35:20
44:10
**hasp** 138:4,4,5,7
190:25 191:1
**haul** 104:8
**hauling** 100:1,3,4
**he'll** 7:22 155:5
**head** 166:14
**heads** 5:10
**hear** 6:9 31:16
68:7,14 118:17
153:24 155:10
165:18 181:12
**heard** 4:22
109:21 121:12
121:14 122:17
122:20,22
124:4 147:8
154:4
**hearing** 65:8,23
81:5 147:14
**height** 45:6
**held** 29:19
104:11
**helmet** 108:22,24
132:23
**helmet's** 108:21
**help** 13:23 29:7
54:8 86:11,12
125:11 149:16
192:5 195:5,6
**Hendrickson** 2:9
167:8
**hereinbefore**

197:12
**Hi** 94:25
**hidden** 68:21
70:15,15
**high** 12:20 13:10
41:21 46:24
**Highway** 28:7
47:8,8 49:11
53:17 54:15
55:13
**Hills** 158:1
**hip** 71:2
**hired** 104:8
**history** 64:21
80:23
**hit** 67:14 72:2,6,9
72:14,15,18
131:13 168:8
**hitting** 69:13
**hobbies** 181:4,6
**hobby** 178:25
179:2,6
**holding** 190:20
**hole** 138:8,12
**home** 41:5 46:13
47:10 86:16
106:3,18 110:6
110:8,11,24
111:24 113:17
119:21,24
120:8 121:9
125:19 130:1
137:5,15,21
144:11 184:9
186:8 190:15
193:7
**home-type** 94:3
**homeowner**
115:1
**honest** 147:22
184:5
**Honestly** 98:16
**hour** 192:24
**hours** 12:21
110:9 182:1
**house** 19:5
105:15,17

110:13,15,18
114:2,8,10,11
116:22 117:20
120:2,4,12,16
120:18,22,22
121:25 122:1,3
125:1,3 126:2
129:11 145:24
176:11 183:15
185:20,25
186:2,3 192:24
193:2 195:13
**houses** 8:17,19
120:20
**huge** 177:4,6
**huh** 88:17
**huh-uhs** 5:10
**hundred** 39:9
**hunt** 84:2
**Hunting** 181:7
**hurry** 39:11
**husband** 158:1
**hysterical** 114:1

**I**

**idea** 90:19 99:11
148:10 170:5
176:1
**identification**
23:22 26:11
29:13 59:1,4
69:20,23 82:4
98:5 102:20
105:22 107:10
107:15 123:19
123:21 127:20
136:2,4 161:8
161:11 163:3
163:20,22
167:1,3 170:12
170:15
**identified** 59:12
**idiots** 144:3
**ignition** 44:6
67:7,7,14 68:3
68:13,17,19
69:13 70:3

71:22 72:3,10
73:3,3,10,17,24
73:25 74:1,21
75:1,12,17,21
76:10,20 92:18
93:11
**Illinois** 8:4
**imaginable** 115:2
**immediately**
33:8 160:12
**impact** 66:10
**important** 5:4
**impound** 160:5,7
160:13 161:18
161:18 166:5
**in-person** 33:1,2
80:12
**inaccurate** 101:1
**inch** 21:19 36:19
48:19
**incident** 8:6 63:8
83:19 124:12
125:5 147:2
148:1 150:4
177:8,13,14
**include** 85:7
**included** 36:1
41:12,25
103:18
**including** 81:1
**incomplete** 30:19
**incur** 137:2
**INDEX** 3:1,3
**Indian** 16:2,8
**indicated** 22:13
68:2 121:11
**Indicating** 27:6
53:21 66:21
126:22 170:2
**indifference**
187:5 193:14
**individual** 26:6
40:22 64:8 99:9
163:24 164:10
**individuals**
111:24
**influence** 5:21

**information**
56:12 57:10
59:16 149:23
151:4,14
188:14 193:1
**informed** 85:2
114:20
**initial** 4:19 86:11
150:21
**initially** 30:17
115:7 118:25
155:20 156:12
187:17
**inoperable** 36:21
36:22
**insane** 116:19
**inside** 92:11 96:6
108:1 140:17
143:8,11,14,15
146:3 195:14
**inspections** 36:23
**install** 67:23
**installed** 73:15
77:16
**instructed**
117:13 146:12
158:10
**intact** 35:23,24
**intend** 132:5
**intended** 78:13
**intentional**
187:19,20
**intentionally**
186:23 187:3
187:10 192:14
**intentions** 101:19
**interaction** 152:5
152:10
**interest** 178:24
179:1
**interested** 85:21
85:24 86:1
179:11 197:17
**INTERROGA...**
3:1
**interrogatories**
102:23 112:16

**interrogatory**
102:18,24
112:9 135:6,12
136:10
**interrupt** 24:7,13
**Interruption**
11:10 51:22
**Interstate** 47:9
47:10
**introduced** 78:17
78:20,25 79:13
79:24
**invaded** 125:10
**investigations**
63:17
**involved** 114:21
143:23
**involving** 63:13
63:14
**iPhone** 101:6
**irrelevant** 91:1
**issue** 59:15 62:6
129:14 143:21
157:12
**item** 23:18
**items** 90:18 95:9
104:15 105:4,7
132:5

**J**

**J** 3:8 69:21,22,25
71:7,9 77:1,1
**Jack** 182:20
**jack-of-all-tra...**
90:4,11
**January** 79:15
**Jeep** 15:20,20,21
15:22,22 19:1,3
19:3 109:1,2,5
127:1,2,11,11
128:8,10,10,11
128:23 131:21
131:22,25
132:8 133:6,12
133:13 134:4,7
135:21 143:4,4
**Jeeps** 18:25

130:8,10
**Jeff** 49:10 53:16
53:19 54:1,13
55:10 61:12
**Jefferson** 54:3,5
**Jeremiah** 10:3,6
12:7 32:12 34:1
34:5,8 50:12,21
112:12 113:6
145:2 154:15
**Jersey** 176:20
**Jimmy** 28:21
**job** 8:3 12:13
40:25
**jobs** 111:22
**Joe** 160:7
**joke** 78:14
**JOSHUA** 1:6
**Jude** 1:15 2:1
197:3,21
**July** 88:4 94:23
**June** 83:1 100:12
100:15 101:10
**junior** 12:20
13:16,18
**jurisdiction** 56:6
57:6
**jury** 65:15
**Justin** 2:8 77:6
160:6
**justin@margul...**
2:9

**K**

**K** 2:8 3:8 82:2,3
82:7,12,14 83:1
102:10 134:23
134:25
**keep** 11:2 16:11
19:4 113:20
126:13
**keeps** 138:12
**Kelly** 7:20,24 8:7
**kennel** 126:6
**kennelled** 126:4
**kept** 55:15 58:18
**Kevin** 7:20

**key** 67:15 69:15
73:22,23,24
74:6,14,18,20
74:20 75:1,19
76:1,3,7,9,18
78:1,7 138:18
138:19
**Keye** 28:21 29:19
30:5,15,21,25
31:2,6,10,22,25
**Keye's** 28:24
29:22
**keyhole** 75:23
**keyless** 67:11
**keys** 74:19
**kicked** 54:24
190:9
**kid** 20:14 180:1
**killers** 195:11
**Kimberly** 10:4,5
10:6,8,8
**kind** 12:8 15:13
27:12 39:10
60:4 67:3 70:15
70:18,21 71:1
82:13 92:21
93:13 95:10
119:5 120:20
125:14,15
127:10 130:11
132:16 141:3
**kinds** 180:22
**Kirkwood**
116:21
**knees** 21:4,4
23:11 47:1
**knew** 39:11
57:10 79:20,23
82:21 111:13
147:25 148:4
**knocked** 151:7
**know** 6:6,10,13
6:24 11:3,7,14
11:18,19 12:17
12:18,24 13:12
15:4,6 16:17,18
17:22 18:12

20:6 21:4,6,11
21:24 22:7,16
22:20 23:4,6
25:24 26:1
28:10 29:3,8,9
30:18 31:19
32:11 38:8,19
38:19 39:1,13
39:18,21 40:24
41:3,3,9 42:22
43:2 44:4,6,9
44:22,23 45:1,2
46:8,9,23 47:12
47:14 48:4
50:16 51:7,20
55:6,22 56:14
56:21 58:9
61:23 62:1,20
62:22,25 63:2,6
63:10,15,16
64:8,22 65:8,18
65:21 67:19
69:6 70:17,18
73:1,3,8,9 74:2
74:5,7,16 77:10
78:3,16,25 79:9
79:12,12,14,15
80:15,18 81:18
86:7,14,16 87:5
87:6,19,22 88:2
88:14,22 90:2
90:13,17,23
91:4,7,8,10,13
91:17,25 92:8
92:10,13,21
93:11 94:13
95:24 96:9,16
97:17,23,25
98:9,9,14,16
99:8,9,12,15,18
99:18,22,25
100:6 103:9
107:11,25
108:2 110:18
111:20 113:4
114:23 115:3,5
115:10,17,18

116:3,19
118:23 120:7
122:8 124:6,7
124:21 125:7
125:22 126:15
127:10 128:4
131:4,9 132:6,9
137:25 138:5,5
140:16,19
141:4,11,20
143:20,24
145:3,7,9,12
146:20,23,24
147:1 148:7,7
148:14,25,25
149:1,2,3,4,4
150:2,3,10
152:3 153:6,8
153:16 155:22
156:1 158:25
159:1 160:9,22
162:13,21
164:10,13,25
167:12,24
168:19,22
169:9 170:4,6,9
173:6,7,11,22
173:25 174:17
174:19,21
175:12,14,21
175:25 176:16
176:17,18,24
177:4,5 179:10
180:11,24,25
181:7 182:5,12
183:22,24,25
184:8,13
185:12,21
186:15,20
187:20,25
189:2,4,5,12,13
189:18,19
190:12,17
192:5 194:7
195:8,9,9,10,11
**knowledge** 8:7
14:22 92:7

110:24 112:3
147:24

---

## L

**L** 3:9 60:2 98:3,4
98:8,18,20
100:11 102:10
**labor** 39:6,14
42:10
**lack** 75:22
154:25
**ladders** 95:20
**Lake** 8:22
**Lambson** 160:7
**largest** 59:24
**laser** 45:8
**late** 121:10,12
159:25
**law** 57:13 63:24
114:21 139:23
143:22 153:17
157:13,14,18
159:15
**lawn** 136:13
**lawsuit** 14:10
18:3 20:16 51:2
63:10,15 70:5
87:4 91:2,4,6
94:8 101:16
**lawsuits** 149:7
**lawyer** 155:3
**lawyers** 6:4
**learn** 26:6 159:23
179:23
**learned** 60:15
160:3 180:1
**leash** 146:1
**leave** 95:1 110:10
110:13 115:16
124:4 144:16
158:17,17
**leaving** 184:25
185:10,11
186:13 191:21
192:4
**left** 27:10 59:11
71:13 95:3

98:23 110:15
110:18 114:10
116:10,24,24
116:25,25
117:8,18
120:12,13,18
125:18 126:9
133:10,11
137:8,10,11
138:1,2 140:12
143:3 145:17
158:7,9 169:22
169:22 171:24
171:24 176:11
184:16,22
186:9,13
187:18 191:14
193:20 195:7
**left-hand** 60:4
**legal** 16:21,22,23
17:2,4,7 45:17
63:12 187:12
191:5 192:19
193:15 195:2
**let's** 29:11 70:23
78:16 87:9
118:9 127:14
127:25 154:18
**letter** 50:22,24
124:2,9
**letters** 66:14
104:24
**letting** 97:23
**level** 21:8,10,25
**levels** 128:21
**lever** 71:19
**liable** 93:15
**license** 35:10
47:20 49:16
53:22 54:1,3,7
180:3 194:11
194:13
**licensed** 17:2
51:13 52:8
**licensing** 54:7
**lied** 184:6 185:14
185:17,18,19

RAYMOND THOMPSON

**lien** 28:21,22,24
 29:4,22 30:6
 32:10 34:22
 94:15
**lienholders** 28:20
**liens** 28:17,17,18
 29:18 30:16,24
 84:22 85:1,2,4
 85:5,5,7,9,13
**life** 20:12 80:24
**lift** 70:16 71:4
 138:15 190:20
**limited** 21:15
 180:25
**Line** 199:3,6,9,12
 199:15,18
**lines** 27:4,7
**literally** 87:4
 91:6
**little** 15:13 43:2
 44:20 78:11
 96:13 109:9,9
 175:19 179:20
 181:7
**live** 10:5,9,20
 41:7 120:10,14
**lived** 7:12,16
 55:1
**lives** 10:6,7,7
 45:24 116:21
**living** 10:16
**LLC** 2:15
**load** 89:21
**loaded** 33:15
**loaders** 90:11
**locally** 22:23
**locate** 22:14,15
 23:3,13,14
 41:21 46:5 52:4
 149:24 159:20
 159:22
**located** 8:18
 26:22 70:10,18
 70:19 71:5 73:1
 81:21 105:14
 109:4
**locating** 23:1

44:24 46:5,5
**location** 77:19,22
**lock** 73:2,2 76:10
 95:3 138:8,10
 190:22
**locked** 73:10
 75:20
**locking** 75:18
 76:20 138:3
**locks** 78:1
**lofts** 95:20,21
**long** 7:12 9:1
 17:9,9,19 23:6
 23:8 33:24
 44:23 64:21
 124:10
**longer** 97:24
 125:25 166:22
 193:18
**look** 27:4 37:19
 59:2 60:4 73:2
 77:9,10,11
 80:13 82:11
 105:24 126:18
 127:23 133:6
 139:5 194:13
**looked** 23:6,8
 136:18 194:11
**looking** 25:9,22
 25:23 44:24
 76:25 82:25
 108:6,25 111:4
 146:11 169:6
 172:25
**looks** 59:11 83:1
 83:6,13 94:23
 95:25 96:9
 97:13 99:5
 100:11 128:7
 132:16
**loss** 176:21 177:1
 177:5,6
**lost** 49:4 53:10
 114:24
**lot** 4:25 7:22
 22:11 28:10,12
 33:7 44:4 56:12

114:24 143:19
 182:13
**lots** 15:4,5 35:17
 44:5 45:10,10
 86:6 90:4 166:2
 166:23 168:6
 180:12 182:22
**loud** 5:9 121:17
**Louis** 2:3,7,16
 7:8 46:1 50:6
 139:1
**low** 15:24 21:2,3
 21:16 41:21
 46:24 77:10
**lumber** 95:5,18
 95:19,19,22
 96:21

———————

**M**

**M** 3:9 102:18,19
 112:6
**Mackenzie** 147:6
 150:3
**mad** 146:14
 147:20
**Madeline** 91:16
 91:20
**mail** 33:1
**maintenance**
 12:11
**making** 40:16
 90:21 132:22
 180:23
**manage** 12:14
**Manchester** 7:6
 31:14,18 46:1
 57:24 60:19
 64:23 113:24
 114:6,7 116:6
 138:24 139:3,7
 139:8,18 140:5
 145:15,21
 150:23,24
 151:12,23
 164:8 183:18
 185:21 186:16
 192:22

**March** 18:19
 19:6,15,19
 27:16,19 30:9,9
 30:14 31:6
 32:21 34:12,14
 35:12 51:24
 79:5,6 80:8,9
 81:11 160:1,1,1
 160:1,2
**Margulis** 2:6,11
**Maria** 114:3
 119:25 121:3,7
 122:13 123:1
 123:14 124:2
 124:23 125:6
 139:15,20,21
 139:22 140:6
 140:16
**Marie** 7:18
**mark** 29:10,11
 81:25 98:2
 102:17 127:17
 160:19 162:20
 170:12
**marked** 23:22,25
 26:11 29:13
 58:25 59:4
 69:20,23 82:4
 98:5 102:20
 105:22 107:9
 107:15 123:18
 123:21 127:20
 136:1,4 161:8
 161:11 162:15
 162:18 163:1,3
 163:19,22
 166:25 167:3
 170:15
**market** 176:16
**marking** 82:1
 107:22 108:1,2
 108:14
**markings** 132:21
**married** 9:12
 123:5
**Mary** 10:19
**material** 33:16

**materials** 93:9
**matter** 115:15,23
 117:6 144:2,6
 144:17 146:15
 149:16 184:19
 184:22 185:9
 185:12 186:11
 186:12 187:18
 191:10,12,20
 192:4,7 193:19
**McKenzie** 186:6
**McKinney**
 156:21
**mean** 11:7 12:17
 13:23 16:19
 18:20 19:11
 22:24,25 23:11
 45:15 48:17
 50:16 51:9 53:8
 65:9 67:10
 68:24 73:2 84:1
 87:21 89:9 94:2
 95:17 101:3
 121:11 125:9
 131:6 141:18
 143:20 146:17
 146:19,20,25
 147:22 157:25
 176:12,23
 177:5,13,14
 179:3 180:10
 182:5 183:24
 184:13,25
 185:11,22
 187:19,20,24
 188:7,12 190:3
 191:20 194:8
 195:4
**meaning** 165:20
**means** 67:11
 83:14 101:3
**meant** 11:15
**mechanic** 13:22
 13:24,25 14:5
 33:14,14,17
 37:1,6 42:25
 160:17 166:7

RAYMOND THOMPSON

169:8 170:25
181:2
**mechanical**
43:25 44:2
**mechanism**
72:25 75:18
76:20 138:3
**mechanisms**
72:22 77:24
**media** 177:7,10
**medication** 5:24
**medicine** 5:21
**meet** 33:3
**meeting** 86:18
**memory** 5:22
**mention** 12:23
109:12
**mentioned** 9:22
15:13 16:7
17:20,24 18:2
35:15 37:6
41:24 43:3 44:9
44:16 61:13
69:5 119:23
120:1 147:19
153:20 175:20
**message** 79:19
81:23 82:25
83:7 90:20
92:17 94:25
96:19 98:14,21
100:15,20,21
101:10
**messages** 83:10
83:11 86:22
90:6 96:20
98:12,17,24
99:1,2,23
100:12 102:11
102:15 103:5,5
103:6,13,18
**met** 4:8,12 30:22
30:25 56:11
57:9 79:10 80:1
80:12,23,25
87:24 91:19,20
114:14 141:3

146:8 147:4,6
160:7,17
**middle** 4:19,20
162:1
**million** 194:12,16
**mind** 92:3 93:21
101:23 150:7
**mine** 23:7 25:21
37:13 58:17
96:9 117:2
128:5
**minor** 178:25
**minute** 128:19
**minutes** 116:21
140:4 145:13
190:1
**misdemeanor**
14:13
**missing** 30:19
35:18,19 36:2,5
43:18 166:1,2
166:10,14
**Missouri** 1:1 2:3
7:7 8:21,24
10:5,6,7,10,21
13:17 26:1 28:5
28:21,22 29:19
35:11 37:23
41:8 50:7 53:17
54:15 55:13
59:12 61:18
83:22 86:3
149:11 160:6
171:13 178:4
**Missouri's** 29:4
**misunderstand**
103:22
**MO** 2:7,16
**mobile** 94:3
**model** 21:1,3,17
22:2 23:15
44:23 48:15,19
48:24
**models** 16:2 22:3
48:20
**modern** 78:6
**modified** 21:3

**moment** 101:22
**money** 31:4
60:17 62:14,20
84:19,20
**months** 40:4
80:19,20 86:10
89:15,16
**morning** 4:6,7
110:9,15
137:12 145:3
145:10
**motion** 167:8
**motive** 187:4
192:18 193:4
193:11
**motives** 187:21
**motor** 21:20,22
41:14 42:8,21
49:16 51:8,10
51:16 53:1 54:4
186:4
**motorcycle** 14:16
14:19,25 15:8
15:10,25 17:17
18:2 20:23 24:5
25:12,14,20,22
26:7,18 31:15
31:19 32:9 33:9
36:6,13,20 37:8
39:3,24 40:10
40:16 41:15
42:16 50:1,4
60:14,18 64:25
67:12 70:13
74:8 79:1,22
83:19 85:24
87:18 108:16
113:23 114:15
114:19,24
115:4,10
116:10,18
117:2 121:9,12
122:18 124:4
125:10 129:25
136:13 137:6
139:13 141:6
141:17 142:8

143:5,6 145:18
146:13 148:6
152:20 153:1
153:10 154:10
156:2 158:14
158:18,21
159:20,22,23
160:4,8,12
162:9 163:15
164:8,14
165:22 167:14
168:9 171:1,22
172:1,22 174:8
174:23 176:10
176:22 177:1,3
178:3,9,18
179:19 180:2,9
184:18 185:1
186:6 190:6
**motorcycle-rel...**
181:9,15
**motorcycles**
14:21 15:3,4,5
15:6,14 16:2,8
17:8,20 20:8,11
21:12 37:14,24
38:1 40:25
48:19 79:23
121:14 131:10
178:25 179:7
179:12,17,23
181:8,25
**mouth** 9:4
**move** 77:18 87:9
93:14 94:3
127:10,16
**moved** 94:6
167:7
**moving** 36:24
130:11
**mowed** 137:1
**Mullins** 99:25
100:1,1
**multiple** 178:20

————————
**N**
————————
**N** 3:10 47:8 82:17

107:12,13,14
107:18 108:5
111:4,9 126:17
128:11,16,18
128:19
**N.W** 2:11
**name** 4:11,15,20
9:16 26:3,5,6,8
33:17 37:15,16
37:25 40:22
41:2,3 64:8
82:20 87:15
91:14,16,17
99:7,9,12
130:20 148:12
148:14 178:9
178:13
**names** 10:18 53:4
99:22 147:19
156:20 182:19
**narrow** 131:10
**Nathan** 24:4 26:8
26:17 28:1,10
30:6,17,23,23
30:24 31:14,18
32:17 35:9
45:16 46:10
49:3,3,6,24
53:10 55:1,6
56:4 57:10,24
57:25 60:2 61:1
62:21 63:2,7,25
64:6,12 65:1
66:8,23 68:1
78:12,17,20,23
80:23 82:15,17
82:22,22 83:18
90:21 91:5,13
91:20,23 92:18
93:2,6,13,24
94:25 96:13
97:6,20,23
98:18 99:12,21
102:4,12 103:1
103:4,10,25
142:6 143:18
146:13 147:11

RAYMOND THOMPSON

147:14,20,25
148:16,22
149:8,23 150:4
158:21 159:20
159:22 164:12
165:8 168:24
170:7 178:12
**Nathan's** 99:20
157:2
**Nathans** 82:19
**nature** 11:21
31:9 55:25
60:10 62:12
**near** 28:8 61:20
86:3 120:20,24
160:5 168:13
**neat** 86:4
**need** 12:24 43:11
54:15 71:21
74:5,7 76:23
78:6,7 82:7,11
114:15 116:8,9
117:7 138:18
138:19,20
139:2,12
145:16,18,22
149:15 188:13
188:17 191:12
**needed** 38:9,9,21
43:13,13,14,15
44:3,6 46:6
76:11,13 189:2
**negligent** 194:19
195:1
**negotiating** 80:20
**neighbor** 123:10
139:15 182:1
194:15
**neighbor's** 114:1
119:24 135:25
**neighbors** 114:10
123:13 139:18
**neither** 111:23
115:8 197:13
197:15
**nephew** 177:15
**never** 75:19,19

76:1,3,9,11,13
76:18,23 79:24
86:13 92:11,20
101:23 119:1,2
138:10 147:3,3
147:12,19
150:17,20
155:20 178:8
**new** 17:17 60:15
60:16 62:13
104:4 166:3,11
176:19 180:13
**night** 8:2 11:3
110:17 121:12
121:15 145:21
151:16 154:10
163:14,14
183:16,22
184:5,10
187:25 188:1
188:14,15
193:3
**Noce** 2:15
**normal** 74:15
90:6 131:9
192:24
**normally** 105:11
113:18,20
121:13 126:12
126:13 127:4,7
**Notary** 198:22
**Notice** 2:1
**noticed** 86:2
113:17,19,22
113:25
**notices** 104:25
**November** 135:7
136:15
**now-15-year-old**
184:9
**now-husband**
124:3
**number** 24:16,19
35:1 60:19 76:6
102:24 105:23
112:9 136:10
139:5,6 176:25

177:5 178:1
194:6,12,14,17
**numerous** 16:1,7
19:12 22:1 39:7
43:14 45:4
53:15 54:19
145:21

___

**O**

**O** 3:10 47:8
123:19,20,24
132:17
**oath** 6:15 66:1
**object** 64:14
86:20 90:24
92:1 112:18,25
150:5 151:24
181:17 187:11
**objection** 51:18
88:15,18 90:8
92:22 93:19
148:23 155:7
183:9 189:9
191:5 192:19
193:15 194:23
195:2
**observed** 113:2
**obsession** 178:25
**obtain** 180:5
**obtained** 131:24
132:2
**obtaining** 143:23
**obviously** 149:2
155:2 187:19
**occasionally**
13:23 45:19
**occupation** 89:25
**occur** 58:7
**occurred** 8:6
58:9,10 173:9
175:14
**October** 7:25
8:10,12 10:11
10:23 11:5
18:18,18 19:6
19:15,19 57:16
57:21,22 61:21

61:24 62:2 63:8
75:17 103:3,11
103:14 105:10
106:23 108:18
110:1,4,6,9,19
111:13,15
119:15,21
124:13 125:18
126:12 129:18
136:14 137:5,8
137:19 148:20
152:13 164:20
168:25 170:10
173:17 174:4
174:24 175:16
176:10 177:1
178:22 194:2
**off-road** 16:20
17:3
**offensive** 11:16
**offered** 65:5
90:12 117:5
143:25 187:16
192:25 195:5
**offhand** 42:7
63:1 85:17
**office** 49:17
53:22 54:1,3
55:17,23 56:10
66:11 83:14
87:20,21,23,24
89:11 110:17
171:15,16
**officer** 53:20,20
56:14,15 57:9
57:13 102:23
112:16 114:7,8
114:13 115:7
115:14 116:11
116:13 117:8
117:13,13,15
117:16,18,22
118:4,19
139:23 140:3
140:19 141:25
142:9,12
143:17 146:2,5

146:12,12,21
150:12,15,25
151:10,10,11
152:14,17,18
153:5,20
155:16,18
158:6,7,10,10
158:16,17,18
158:24 159:5
163:14,15
178:23 182:25
186:4,17,22
187:9 188:3
191:3,19
192:14,18
193:14 194:9
194:10,19
195:1
**officers** 4:12 55:8
56:11 81:8
116:10 118:8
140:25 141:21
145:17,18
146:14 147:1
147:25 150:2
153:17 154:14
156:12,15,24
158:4 159:11
163:17 184:2
184:15 185:14
185:17 187:3
188:21 193:25
**offices** 89:9
**oh** 13:10 27:7,16
60:6 129:16
152:2 167:24
168:1 188:11
196:1
**oil** 107:6,7
180:24
**okay** 5:2 6:25 7:1
9:8 11:3,11,13
11:19,22,23
18:5 19:18
21:13,18,23
22:16 24:12,14
27:18 30:3

RAYMOND THOMPSON

32:13 35:6
46:16 49:21
67:5 69:1,9
70:20,25 71:12
74:9 75:9 76:15
76:17,22 78:22
80:6,14 85:4,10
86:25 93:1 94:1
94:7 97:1
100:22 103:24
104:10,23
106:19 108:4,8
108:10,12
109:6 111:11
112:1 113:13
113:16,16
121:2 124:15
125:13,17,23
126:22,25
127:14 128:6
128:15 129:1,3
129:4,22 130:3
130:15 132:15
133:5 138:7
142:22 147:23
152:2 154:17
154:19 155:13
156:17 161:1,3
161:5 162:16
163:25 167:11
167:15 169:12
170:3,18 174:6
181:22 183:14
188:11 192:1
193:9 195:25
**old** 21:5 47:8,9
86:8 93:2
179:14,15
**on-road** 17:3
**once** 28:18 43:24
45:22,22,22,23
52:6 65:17 93:4
140:18 160:3
177:16 186:9
**one's** 91:17
107:12
**ones** 17:4

**ongoing** 143:21
143:21 157:12
**oops** 29:10
**open** 95:1 113:17
113:19 126:10
137:22,25
138:2,15
**opened** 190:4,5
190:11,12
**opening** 138:13
**operational**
18:21 39:25
40:11,16 42:16
43:16 45:13
166:4 175:20
**opportunity**
45:14 87:6 98:7
**opposed** 25:18
**opposite** 144:13
**order** 73:4
**original** 17:13,16
22:10 73:9
117:12 151:3,9
187:22,23
188:13
**originally** 84:25
117:7 138:25
142:13 154:7
186:5
**originals** 56:21
58:16 151:18
151:20 152:1
188:17 189:1
**out-of-state** 7:22
**outrageously**
187:4 191:4
192:12
**outright** 94:18
**outside** 49:25
80:16 106:25
111:12 140:9
143:11,12
161:24
**Owensville** 49:12
53:18 54:25
55:1,3 56:7,17
57:1,7,9,13

58:4,13 61:8
62:10 153:3,7
153:11 159:16
159:18 160:6
165:6
**owned** 8:15 9:1
17:9,19 20:12
95:10
**owner** 12:17
16:14 17:13,16
25:12
**ownership** 47:21
192:9
**owning** 15:14
**owns** 90:2

---

**P**

**P** 3:11 127:18,19
127:24 130:16
130:25
**p.m** 196:5
**packet** 81:25
98:2
**page** 3:2,4,5,5,6,6
3:7,7,8,8,9,9,10
3:10,11,11,12
3:12,13,13,14
3:14,15,15,16
3:16,17,17,18
3:18,19,19 24:9
24:9,11 47:24
59:25 82:1 88:7
91:23 93:13
97:15 99:4
100:18 102:24
103:2 112:10
112:11 134:1
136:6 165:12
177:16,20
198:7 199:3,6,9
199:12,15,18
**pages** 24:11
94:24 95:24,24
198:4
**paid** 30:5,15,24
32:10 34:22
35:11 38:8 39:6

39:13,18 41:11
41:14 50:1,3
51:4 62:14 85:7
85:8,16 89:5,20
91:9 92:7,12
101:14 149:2,2
160:14 161:18
161:20
**paint** 39:20,20
40:18 41:15,17
41:18,23,25
42:5,11,20
133:3 166:3,24
169:20 171:8,9
171:21 172:6
172:19 173:3
173:15 174:13
175:7
**painted** 40:18
52:5 96:5 169:2
169:5
**panicked** 116:2
141:10
**panicking** 114:1
**paper** 56:23
**paperwork** 18:16
52:8 54:21
55:11,14,18
86:17 114:22
115:20 117:3
117:10,12
146:4,6,11
187:23 191:11
192:8
**parents** 10:16,22
16:12 157:22
182:13
**parents'** 45:25
46:13
**park** 72:11 129:9
171:13
**parked** 108:17
127:5,7,8
129:23 130:12
130:12 132:24
144:10,12,14
**Parker** 8:21

**Parkfield** 120:16
**parking** 28:10,12
33:7 56:12
129:19
**part** 36:8 87:18
90:6 168:9
171:22 172:1
172:22 174:8
175:10 186:19
193:18
**participants**
148:5
**participating**
155:4
**particular** 26:23
69:7,8,10
**particularly**
179:4
**parties** 154:25
197:15
**parts** 15:4 22:15
33:16 36:25
38:9,17,21,24
39:1,19,20
41:12 42:10
43:14,18 45:4
45:11 46:6,8
52:4 109:24
166:1,1,10
**party** 92:3 93:21
150:7
**passed** 99:14,15
**passenger** 74:15
**Patrol** 49:11
53:17 54:16
55:13
**pavement** 133:3
**pay** 28:16,17
35:7 38:4,7,12
63:3 85:13
87:15 90:15
100:17 101:13
101:18 103:20
160:14
**paying** 84:22
101:20
**payment** 32:9

RAYMOND THOMPSON

86:12
**payments** 38:5
  39:7 66:22
**pays** 60:17
**pedals** 45:5
**pegs** 169:23
  174:11
**pending** 13:2
**people** 53:9,14,15
  57:25 114:18
  114:18 145:7
  146:20 156:20
  183:22,23
  189:17,17
  195:10
**percent** 7:19
**Peres** 49:18,20
  53:22 54:7,7
  61:10
**period** 104:15
**periodically** 7:23
  38:8 111:20
  159:21
**permission** 110:3
  112:3
**permit** 180:6
**person** 80:1
  89:23 112:2
  138:15
**person's** 37:15
  78:18
**personal** 50:3
  51:4 85:5 87:15
  116:4 176:13
**pertaining** 14:1
  31:13 98:10
  149:22
**pertains** 87:17
**Pesticide** 13:13
**ph** 147:4 160:7
  182:20
**Phillips** 37:18
  99:8,10 100:6
**phone** 37:19
  52:13 54:6 77:6
  82:20 101:4,7
  102:15 119:22

119:22 139:5,6
  139:11 150:24
  153:16 163:10
  163:11 178:21
  185:20 187:15
  194:6,12,14,17
**phones** 102:14
**photo** 77:5,12
  97:17 126:20
  133:3,4 136:12
  136:15 163:9
  163:13 164:11
  165:1,14 169:7
  169:25 178:23
**photograph**
  95:25 96:2
  97:14 99:4
  106:5,8 107:23
  108:25 111:4
  131:20 134:17
  134:21,24
  162:13 164:14
  169:16 172:23
  173:2,14 174:9
  174:12 175:5
**photographs**
  135:6,10,15
  167:6 171:10
  171:12 173:23
  174:1 176:7
  177:22
**photos** 114:11
  136:17,22
  151:15 167:13
  170:17 177:19
**physical** 24:19
  78:7
**physically** 46:14
**piano** 90:22 91:7
  91:10
**pick** 160:7
**picked** 33:13
  99:23 162:9
**picture** 77:6
  96:11 98:1
  127:13,13
  136:20 162:21

163:8,23 164:7
  165:6 168:8,15
  168:17,20,23
  177:14
**pictures** 127:11
  167:21,22
  170:24 188:23
  189:4,6
**piece** 36:10,11
  56:23 68:12
**pieces** 23:14
  25:25 26:7
  30:18,19,19
  33:12,13 35:16
  35:17,21 36:2
  36:12 43:4 45:1
  68:2
**pin** 138:8,11,12
  138:15
**pinstripe** 172:15
**place** 28:4,9
  94:19 155:2
  176:25 197:12
**places** 39:4 86:3
  94:4 130:11,12
**plaintiff** 1:4 2:6
  14:9 112:13
  136:12 167:6
**plaintiff's** 105:22
  111:5 178:4
**plaintiffs** 161:4
  162:15
**plate** 194:11
**plates** 45:17
  47:20 49:7
  194:13
**pleasant** 152:4
**please** 13:2 60:18
  95:5 132:14
  178:2 182:24
  183:6 186:21
  187:8 191:2
  192:17 193:13
  194:18,25
  196:4
**pleasure** 19:23
**pled** 14:12

**plus** 42:11
**PNC** 33:7
**pocket** 67:17
**point** 6:4 12:24
  39:8,24 52:15
  89:18 103:3
  136:11 139:23
  139:25 140:1
  140:18 141:9
  141:12
**police** 49:13
  53:18 55:3,22
  57:24 60:19
  61:8,8 62:11
  64:24 81:8 93:5
  93:10 95:15
  96:4 97:2 98:1
  113:24 115:23
  115:24 116:7
  116:17 117:22
  117:23 118:2
  122:7 125:9
  139:1,3 140:11
  140:13,15,18
  140:19 141:15
  144:22 145:6
  145:16 146:24
  150:24 153:3
  153:11 159:16
  164:9 165:7
  185:2,7 191:13
  191:24
**polite** 152:7,11
  153:14
**porch** 117:21
  146:1 154:16
  158:25 163:8
**portion** 175:9
**position** 12:3
  25:3,11
**possess** 13:6
**possessed** 76:18
**possession** 33:9
  34:13 51:16
  77:15,20 177:2
**possible** 184:14
  189:7

**Possibly** 53:8
**posted** 165:1,2,3
  165:14
**posts** 177:7,10
**potentially**
  189:17
**potty** 126:3
**potty-trained**
  126:8
**Powerscourt**
  2:15
**prefab** 94:5
  95:23
**preliminary**
  65:23 147:13
**prepare** 6:20
**present** 8:8 118:8
  118:15 154:13
  158:4,8
**pretend** 70:24
**pretty** 14:22
  44:25 124:6,11
**previously** 68:13
**price** 28:13 34:16
  80:21 85:15
**primary** 7:4,10
  36:4
**print** 124:10
**prior** 30:22 81:11
  81:18 89:15
  94:21 104:18
  104:19,21,22
  110:14 122:25
  126:12 129:18
  147:2,25 150:4
  168:25 170:9
  173:17 174:3
  177:14 197:5
**privacy** 125:10
**privately** 38:1
**probably** 4:23
  6:3 12:20 16:3
  16:9 19:11,21
  23:11 39:17,23
  41:14 42:20
  65:24 80:20
  85:11,17

RAYMOND THOMPSON

124:14 148:16
157:25 159:3
171:11 179:13
180:17
**problem** 113:3
**proceeding** 63:12
**proceedings**
197:10
**process** 30:11,13
143:13 177:22
**produce** 178:2
**produced** 21:25
22:1,5,8,21
51:2 70:4 86:21
86:23 103:7
161:4 167:13
178:12
**Production** 178:1
**projects** 38:11
39:12
**Proof** 32:9
**proper** 75:23
**properties** 94:9
140:14
**property** 8:16,20
8:20,21,24 9:1
50:3 51:4 64:3
64:5,24 81:20
81:20 83:18,20
83:23,24 84:6
84:12,13,15,17
85:1,3,8,22,25
86:6,15 87:14
87:15,15 88:20
88:22 89:6,19
91:8 92:5,6
93:3,5,9 94:6
95:5,14 97:4,11
97:20,24 104:9
104:16 105:1,4
105:6 111:3,10
112:14 114:18
115:16,21
116:4,4,12,18
120:13 124:5
132:25 134:18
134:21,24

136:14 139:13
142:15 144:20
145:8,8 146:19
146:21 155:23
183:16,23,23
184:12 185:13
185:18 187:16
189:14,17,18
190:2 193:2,3,8
195:4,9,11
**prosecuted** 65:2
**prosecuting**
54:23 55:20
56:3,10 65:14
66:20,21
**prosecution** 57:3
**prosecutor** 57:4
65:20 66:14,17
**prosecutor's**
66:11
**provide** 31:20
32:25 38:15
42:20 55:18
58:13 61:17,20
62:5,8 124:20
149:25 151:5,6
151:8,21
**provided** 24:5
26:18 32:22
58:16 62:1 66:1
66:3,10,16,19
66:25 98:12
124:3,23 142:6
143:18 146:7
151:16 157:1,2
165:6
**providing** 62:4
**proving** 117:2
**Public** 198:22
**pull** 126:14,15
127:15 161:2
**pulled** 97:22
102:1 114:13
126:16 135:17
140:11 164:7
164:17 165:5
**pun** 78:13

**punitive** 187:2
**puppy** 113:20,21
125:24,25
126:1,3 130:17
130:18 146:1
**purchase** 16:18
18:14 28:1
34:16 35:16
40:4,9 60:16
79:4,6 83:18,20
84:10 85:23
97:4
**purchased** 18:17
24:5 26:18
27:22 30:18
36:14 38:21
39:1 43:16,18
64:3 67:3,6
68:1 84:6 92:15
94:6,18 180:9
180:10,11,16
**purchaser** 26:24
**purchaser's** 99:7
**purchasing** 30:11
81:19,19 85:22
**purpose** 88:1
**purposes** 20:9
**pursuant** 2:1
**push** 166:7
**pushed** 190:17
**put** 9:4 40:18,19
40:20 41:15
45:4,7,11,18
46:6 65:19,25
84:1 93:8 95:5
97:19,21
114:24 129:11
138:11 166:11
166:19 173:5
195:13
**putting** 155:1

---
**Q**
---

**quali** 14:24
**qualifications**
14:24
**question** 6:3,7

11:17,18 13:2,2
51:19 64:15
88:16,19 90:9
90:25 92:2,23
93:20 103:22
112:19 113:1
147:22 148:24
150:6 168:2
179:22
**questioned** 154:9
**questioning**
186:10
**questions** 52:23
65:20 119:9
157:10,12
158:24 159:6
173:21 187:2
195:22,24
**quite** 31:16

---
**R**
---

**R** 3:12 133:19
197:1
**R-A-Y-M-O-N...**
4:17
**ran** 114:1 184:10
194:9
**random** 129:20
141:19
**ransacked** 88:5
**raped** 183:25
**Ray** 10:19 61:3
93:13 95:6
**Ray's** 165:17,19
**Raymond** 1:3,12
2:1 4:2,17
197:5 198:3,12
199:23
**reach** 71:5
**read** 25:7 35:3
60:13,23
101:10,11
135:1 196:2,3
198:4
**real** 8:16 97:11
104:19
**realized** 137:6

**really** 160:23
182:5 188:9
**realtor** 89:1
**rear** 128:2
131:18 169:14
169:23 171:25
172:3 175:3,3
**reason** 5:16 21:5
24:22 46:24
88:3 100:25
141:14 193:10
194:2,5,18
199:5,8,11,14
199:17,20
**reasons** 182:24
183:6 186:22
187:9 191:3
192:17 193:13
194:25
**recall** 28:13,24
49:14 122:21
122:24 139:10
142:15,19
152:9 154:6
180:5,15
**receipt** 38:15
42:20 160:20
161:17
**receipts** 38:18
42:18
**receive** 125:2
**received** 35:13
66:22 75:19
102:2,4,7
124:19 149:10
**recess** 58:19
**reckless** 187:5
193:14
**recognize** 24:1,3
26:13,16,19
32:14 59:6
82:12 105:25
106:2 107:17
107:20 123:23
124:1 161:13
161:16 163:5,7
164:3,6,13

RAYMOND THOMPSON

167:17,20
170:20,23
175:2
**recollection**
27:21 29:18
39:5 52:11 80:7
161:22
**record** 4:16 5:5
5:11 24:25 25:1
52:12 105:19
124:22 127:21
154:21,23
155:9 196:1
**recording** 119:21
120:8
**recordings**
178:22
**records** 42:19
148:21 185:21
**recovered** 152:21
153:2,10
159:24 160:4
**redundant** 11:19
**refer** 60:18
**reference** 18:16
83:17 101:24
**referenced** 96:20
135:13 185:14
**referred** 25:15
25:17 49:10,11
49:12 54:12
55:15 57:7 62:4
113:23 114:5
116:6
**referring** 25:5
29:24 30:1
55:16 60:3
91:25 92:14
94:20 95:7
113:9,11
132:19 135:16
137:12 177:13
178:11
**refers** 59:20
**refinery** 8:3
**reflect** 161:20
**reflected** 27:1

**reflection** 171:3
**refresh** 27:21
29:18 52:10
161:22
**refuse** 91:9 100:1
**refused** 187:17
**regained** 177:2
**regard** 31:5
125:12
**regarding** 57:13
57:23,24 63:17
63:25 147:15
149:11 177:8
177:11 187:2
**regards** 57:19
65:21 118:4
**register** 49:5,19
51:8,10,17
52:16,25 53:24
178:8
**registered** 16:14
16:17 48:12,25
49:7 51:13
148:12,15,22
178:17
**registration**
49:17 178:3
**regularly** 182:15
**Reichardt** 2:15
**reimbursed**
38:22
**relating** 178:2
**relation** 99:21
**relationship**
86:23
**relative** 197:14
197:16
**relay** 62:24
**released** 160:13
160:16
**relevance** 181:18
**remainder** 34:24
95:2
**remember** 9:9
16:3 17:11
31:24 33:12
35:21 37:16

39:8 40:8,13
42:7 44:15 46:4
47:5,7,11,13
49:23,25 50:20
51:9 52:1,9
53:6 57:8 58:8
61:22,25 62:3,3
62:7,18 63:1
77:3 78:18
79:16 80:16
82:20 84:18
85:17 118:21
123:6,8 132:22
135:9 142:2,3
156:10 159:3,4
159:5 172:11
**remembering**
123:4
**removal** 86:10
103:17 105:4
**removals** 12:11
**remove** 84:14
88:21 89:5
92:12 104:15
104:25 105:7
**removed** 73:17
75:18 90:18
136:13
**removing** 90:5
**Rench** 24:4 26:9
28:2 31:3 32:23
33:10 35:9,13
37:10 49:3 56:4
57:10,25 58:1
60:2 61:1 62:21
63:2,7,25 64:6
64:12 65:1 66:5
66:8,23 68:2
76:3 77:16,21
78:12,17,20,24
79:10,18,21,22
79:25 80:8,10
80:19,23 81:9
81:12,22 82:15
82:22 83:6,10
83:13 84:7,10
85:24 86:24

87:12,20 88:5
88:14 91:5 94:8
96:17 97:6,9
98:21,24 99:14
100:16 102:12
103:1,4,10,25
104:14 117:25
147:11,14,20
147:25 148:22
149:8 150:4
158:12,13
159:22 164:12
165:9 168:24
170:7
**Rench's** 91:13
99:12 142:6
143:18 148:16
178:13
**Renegade** 128:16
**rent** 7:14 86:5
176:18
**rental** 86:3
**rented** 8:16
**rents** 90:3
**repair** 14:16
79:22 131:24
132:2
**repaired** 43:6,7,9
43:10,24 44:3
132:5
**repairs** 42:19
43:11 45:2
77:19 136:24
176:6 180:19
180:22
**repeat** 31:16
181:11 186:24
**repeated** 191:15
**rephrase** 6:12
112:21
**replace** 43:5
**replaced** 43:9
44:3,5,7 173:5
174:14,21
**replacements**
176:6
**reply** 141:21

**repoed** 94:20
**report** 55:22,25
58:22 60:19
64:2 88:11
93:10 95:15
97:2 114:15
117:22,23,23
118:2 139:12
141:6
**reporter** 1:15 2:2
2:2 11:10 51:22
107:12 197:4,4
**reports** 58:23
63:24 64:6
150:21
**represent** 4:11
**representing**
57:25
**represents** 155:1
**request** 177:25
178:1,1 186:16
193:22 195:6
**requested** 58:24
88:2 167:23
**requesting** 63:3
**required** 45:2
104:5
**requiring** 63:3
**RESERVED**
196:7
**reside** 111:15
**residence** 7:5,10
8:8 10:11,23
28:9 33:5 38:2
60:18 83:25
106:14 111:5
111:12 112:4
119:13 126:9
137:9,19
142:23 143:3
145:17 153:22
194:1
**resident** 183:17
192:22
**residential** 12:11
**resolve** 59:15
62:5 184:21

RAYMOND THOMPSON

**respect** 15:8 20:1
  63:21 103:17
  149:8 185:16
  192:13
**respond** 139:24
  140:3
**responded** 103:5
  144:21 156:11
  186:5,7
**response** 145:20
  149:10,18
  159:6 177:25
  178:5
**Responsive** 178:5
**rest** 35:3 42:22
**restitution** 66:18
  66:22
**restored** 149:3
  175:24 177:16
**restoring** 177:23
**retained** 3:20
**retrieve** 54:22
  95:9 117:14
**return** 110:22
  137:15
**returned** 116:12
  125:19 137:5
  137:21 190:15
**Revenue** 50:13
  50:15,17 59:13
  61:18 62:5,9
  148:21 149:11
**review** 7:2 82:6
  98:8
**rhetorical** 147:21
**rid** 86:13,13 89:3
  91:9 92:8
**ride** 15:5 45:14
  45:19,21 47:5
  179:19,23
  181:25 182:6,8
  182:9,11,15,17
**rider** 21:2,3,16
**ridiculous** 63:6
**riding** 20:13
**right** 4:14 5:12
  6:5 7:1 8:11 9:5

11:4,6,9,22
  27:12 34:25
  39:17 42:10
  50:18 52:24
  56:19 58:15
  59:18,22 70:13
  71:1,2,13,15,20
  73:21 75:10
  76:21 77:1 78:8
  78:12 82:10,19
  83:8 98:13 99:2
  106:10 108:23
  109:9,20
  114:24 115:1,2
  115:3,10
  116:23,23
  118:24 124:11
  128:9,22,22
  130:2,13,14
  133:7,7,25
  134:2,11 135:8
  144:14 147:16
  147:17 156:2
  157:11 166:20
  167:15 168:7
  168:11,13
  172:3,24
  174:11 175:10
  178:15 190:25
  194:4
**right-hand** 99:5
**rights** 146:18
  183:1,8
**ring** 114:2
  119:17,18
  120:1 121:19
**road** 8:25 144:13
  179:10
**Robert** 1:6
  182:25 183:7
**Robertson** 2:17
  3:2 4:5,11
  11:20 23:23
  24:10,14,15,25
  25:2 26:12 27:8
  29:14 35:5
  47:19 51:23

58:20 59:5
  64:19 68:6,8,23
  69:16,18,24
  78:15 82:5
  86:21 87:1,5,10
  89:7 90:14 91:3
  91:12 92:16,24
  93:25 98:6
  102:21 105:20
  107:11,13,16
  108:6,9,11,13
  112:21,22
  113:5,10
  123:22 126:20
  126:23 127:17
  127:22 129:15
  129:17 130:24
  136:5 149:6
  150:1,11
  154:22 155:7
  155:10,13,14
  160:19,25
  161:3,6,12
  162:12,17,22
  162:24 163:4
  163:23 164:1,2
  167:5,10,16
  170:16,19
  181:13,14,19
  181:24 183:4,5
  183:11 184:1
  187:1,7 188:2
  189:11 191:16
  193:5,24
  194:22,24
  195:15 196:1
**Robertsville**
  10:10,21 16:12
  45:25 46:13
  182:13
**rode** 46:19 47:9,9
**room** 106:13
  160:24
**route** 47:7
**RPR** 1:15 197:21
**Rubicon** 128:8
  128:13,20

129:5 134:5
**rude** 184:3,15,16
**rule** 12:22
**rules** 4:24
**run** 35:25
**running** 74:22
**rural** 83:24

———————
**S**

**S** 3:12 128:1
  129:5 134:3
**safe** 88:10 146:24
**safety** 74:4
**sale** 27:1,19 28:4
  28:9,13,15
**sales** 12:15 50:1
  84:9 87:11
  103:19
**sat** 109:17
**satisfied** 28:19
**satisfy** 30:6,24
**saw** 81:2 107:2
  108:20 122:13
  147:3 189:6
**saying** 5:4 87:20
  112:23 185:24
  188:10 192:4
  193:19
**says** 27:9,19
  47:25 48:4
  59:25 60:10,13
  61:7 62:13
  71:21 82:17
  88:5,11 91:23
  93:13 94:12,25
  96:10 99:7,8
  100:14 113:6
  162:1,5
**scheduling**
  154:25
**Schnucks** 184:10
**school** 12:20
  13:10
**scratched** 166:3
  172:14
**scratches** 131:13
  131:21 169:1

175:7
**scratching** 168:6
**screen** 167:6
**screenshotted**
  165:5
**search** 41:21
  155:23 172:12
  189:20
**searched** 44:22
  46:24
**season** 47:11
**seat** 35:20,21
  68:21 70:12,16
  70:24 71:5,5,10
  71:11 77:7,10
**seating** 70:23
**second** 21:22
  24:8,9 62:12
  76:16 116:24
  116:25 152:24
  154:21 158:3
  163:17,18
  189:3
**second-to-last**
  97:15
**seconds** 77:9
**security** 119:12
**see** 27:9,16 32:4
  47:25 60:7,11
  69:25 78:16
  100:23,23
  103:6 106:10
  109:1 114:10
  114:11,22
  115:19 117:3,7
  117:9,24 124:9
  127:25 132:19
  134:4 144:7
  146:5 159:19
  159:21 160:22
  162:1,3,19
  166:16 167:7
  167:12 168:17
  169:24 172:14
  187:17 191:11
  191:13 192:8
**seek** 22:25

RAYMOND THOMPSON

Page 219

| | | | | |
|---|---|---|---|---|
| **seen** 92:11 | 40:8 49:5,23 | **simple** 11:2 | **sought** 21:5,7 | **spouses** 9:20 |
| **sell** 26:2 | 57:7 101:21 | 187:15 | **sound** 9:5 65:23 | **spray** 96:5 133:3 |
| **seller** 60:2,15,16 | 140:23 | **single** 24:10 | 135:8 | **spraying** 12:12 |
| 60:17,25 62:13 | **show** 58:25 69:19 | **sit** 148:11 | **sounds** 40:14,14 | 13:14 |
| **selling** 85:25 | 105:21 107:9 | **sitting** 116:14 | 42:14 | **sprays** 13:13 |
| **send** 50:19 55:10 | 117:5 122:7 | 117:21 145:25 | **south** 120:22 | **spring** 159:25 |
| 55:13 104:24 | 123:18 136:1 | 168:12 177:15 | 182:8 | **squeeze** 131:6,7 |
| **sends** 96:13 | 143:25 161:7 | **situation** 50:15 | **space** 90:3 | 131:12 132:12 |
| **sent** 50:14 59:10 | 162:25 163:19 | 195:14 | **speak** 116:8 | **squeezed** 135:21 |
| 94:25 95:25 | 166:25 187:16 | **six** 80:25 81:3 | 121:3,23 | **SRW** 1:5 |
| 96:4 97:14 | **showed** 116:22 | **sixth** 100:18 | 145:19 183:2 | **St** 2:2,7,16 7:8 |
| 100:15 103:4 | 116:23 117:4 | **skills** 13:21 14:1 | **speaking** 140:6 | 46:1 50:6 139:1 |
| 103:13 170:17 | 117:11 142:7 | **skull** 45:8 | **special** 13:21 | **stalked** 165:12 |
| **sentence** 62:12 | **showing** 23:24 | **small** 81:15 | 14:1 21:6 44:18 | **stand** 65:19,25 |
| 101:12 | 192:9 | 126:7 175:9 | 44:19,21 | **standing** 122:6 |
| **sentencing** 65:18 | **shown** 198:7 | **Smith** 64:9 | 104:19 | 142:14 |
| **separate** 19:13 | **shut** 113:21 | **snake** 166:14 | **specific** 20:25 | **start** 68:16 69:11 |
| 36:11,12 68:12 | 126:14,16 | **social** 177:7,10 | 22:13 46:6 56:7 | 69:12 70:19 |
| 126:15 185:4 | **shutters** 106:11 | **socially** 123:16 | 64:18 124:6 | 71:16 72:7 73:4 |
| **Sergeant** 150:18 | **siblings** 10:2,3 | **Softail** 16:1 17:6 | 172:16 182:4 | 73:10 74:7 75:5 |
| **serial** 195:10 | 157:24 | 17:15 22:2 | **specifically** 22:12 | 75:11,15 |
| **serious** 145:12 | **sic** 106:23 160:2 | 180:7,14 | 44:15 54:25 | 113:14 121:12 |
| **served** 15:7 | **side** 60:4 70:13 | **sold** 19:2 | 57:23 118:19 | 166:4,8 175:25 |
| **service** 12:2,4,9 | 71:13,15 98:23 | **solutions** 145:16 | 136:10 | **started** 55:3 |
| 33:22 171:17 | 99:2,5 106:18 | **solve** 52:14 | **specifics** 20:16 | 75:20 176:2 |
| **set** 197:12 | 108:24 120:18 | **somebody** 88:5 | 125:8 | 186:10 |
| **settled** 94:15 | 126:15 138:1,2 | 116:9 141:13 | **speculation** 90:9 | **starter** 74:2 |
| **Setzer** 182:20 | 144:12,13,14 | 190:4,5,17 | 90:25 92:2,23 | **starting** 75:2 |
| **shakes** 5:9 | 155:3 168:12 | **sorry** 11:22 | 93:20 148:24 | **state** 4:15 13:17 |
| **shared** 7:17 | 168:13 169:22 | 13:19 24:7,12 | 150:8 189:10 | 23:3 28:22 29:3 |
| 111:17 | 169:22 172:24 | 27:16,17 37:21 | **spell** 4:15 33:19 | 29:19 34:22 |
| **SHEET** 199:1 | **sides** 120:20 | 52:18 68:4 | 37:21 | 35:7 50:7 55:13 |
| **shell** 95:2 | 131:16 | 76:12 77:3 80:5 | **spelling** 96:9 | 92:2 93:20 |
| **sheriff's** 55:17,23 | **sign** 34:11 196:2 | 100:8,10,17 | **spent** 4:9 39:19 | 103:3 135:6 |
| 56:10 61:9 | 196:3 | 103:23 108:5 | **spoke** 6:22 25:21 | 136:12 150:6,7 |
| 89:10 | **signature** 26:19 | 110:1 121:10 | 31:21 79:24,25 | 155:18 178:4 |
| **sheriffs** 54:20 | 26:22,24 27:5,7 | 123:3,7 135:1 | 80:10,11 123:1 | **stated** 155:16 |
| 55:21 58:18 | 60:20 178:13 | 150:6,10 154:2 | 123:2 139:20 | 164:17 178:1 |
| **shift** 78:11,13 | 178:14 196:7 | 154:3,20 | 141:4,5 158:3 | **statement** 60:20 |
| **shin** 166:17 | 199:22 | 168:18 181:11 | 163:16 192:25 | 113:11 125:4 |
| **shocked** 151:25 | **signed** 59:10 | 181:13 183:2,4 | **spoken** 31:6,25 | **statements** 56:8 |
| **shop** 15:3 23:2 | 60:23 | 186:24 187:1 | **sport** 21:15 | 66:11,25 |
| 171:13,14 | **significance** | 191:7 | **Sports** 41:15 | **states** 1:1 112:19 |
| 175:23 176:4 | 108:15 | **sort** 12:12 14:20 | 42:8,21 | **stay** 7:22,24 81:5 |
| **Shorthand** 2:2 | **similar** 99:5 | 67:16 99:5 | **Sportster** 22:3 | **stayed** 110:16 |
| 197:3 | 189:24 | 133:2 160:20 | **spot** 129:19 | 117:16,19 |
| **shortly** 8:2 33:13 | **similarly** 192:16 | 193:22 | **spouse** 9:16 | 158:18 |

RAYMOND THOMPSON

Page 220

staying 8:4
stays 7:21 111:19
  111:21
steal 64:24 145:8
  145:18 146:22
  183:16,17
  190:5 192:10
stealing 31:14
  144:19
stenographically
  197:11
step 155:6
Stephen 147:6
  150:3
steps 58:21 95:22
  95:23
Steve 99:14
stick 74:18,20
stickers 162:19
Stingray 15:23
stipulate 130:22
stole 31:19 60:17
  64:4 88:6 93:9
  95:12,13,14
  97:20 105:6
  115:20 116:10
  116:18 121:9
  125:9 141:15
  146:19 163:15
  185:1,13 186:4
  186:6 195:5
stolen 18:4 58:3
  88:12 114:16
  139:12,13
  141:6,14 164:8
  189:16
Stone 2:9
stone@margul...
  2:10
stop 113:15
stopped 31:12
storage 16:13,13
  129:10,12
  130:5 162:2,4
store 105:11
stored 106:21
story 56:24

straight 71:19
strangers 195:8
street 2:11 16:21
  16:21,23 17:1,2
  17:4,7 117:12
  120:14 133:17
  134:1,4,15
  146:9 180:10
  180:11 188:24
strike 25:4 36:6
  45:12 49:14
  137:6 139:22
stubs 42:18
stuck 77:6
study 13:15
stuff 12:12 21:5
  43:1 86:7,10
  88:6,21 89:14
  95:14 96:14
  117:6 159:1
style 47:25
subject 63:12
  198:6
submit 34:19
  82:7 98:11
  112:15
submitted 149:12
subpoena 66:12
subpoenaed 65:7
  65:13,20
subscribed
  198:17
substantial 166:9
substantive
  81:16
suggest 134:9
suit 176:14
Suite 2:2,7,11,15
summer 129:11
  182:6
Sunset 158:1
superior 193:21
  193:22
supervisor 116:8
  145:19,23
  186:16 188:1
supply 39:3

supporting 66:17
supposed 93:3
  131:7
sure 13:5 20:18
  22:9 30:13 46:3
  48:8,14,24 58:8
  58:12 64:16,17
  64:20 68:25
  75:12 78:2
  94:22 96:8
  101:2 119:6
  125:16 136:20
  154:22
surprised 131:6
suspect 151:15
  187:21 189:15
switch 67:9,11,14
  67:19,23 68:10
  68:21 69:13
  70:3,7,10 72:5
  72:13 73:5,15
  75:14 76:24
  77:16,18,20
  105:9
sworn 4:3 197:6
  198:17

———————
         T
———————

T 2:9 3:13 27:12
  27:15 134:17
  197:1,1
T-H-O-M-P-S-...
  4:18
take 13:3 28:4,9
  37:12 38:10
  48:12 59:2
  73:20 77:8 85:6
  105:24 114:18
  126:18 135:10
  136:20 142:7
  151:18 155:2
  157:3 163:9,13
  163:16 167:22
  169:7 178:21
  179:25
taken 2:1 5:13
  58:19 117:17

135:7 141:17
  159:8 171:10
  171:12 175:23
  176:3 197:11
talk 5:4 11:12
  15:6 31:12
  78:12 81:15
  140:13 183:20
talked 20:4 31:11
  31:12 43:2
  53:15 54:19
  57:18,21,22
  58:4,21 79:4
  81:14,19
  111:23 130:16
  152:12 175:19
talking 11:3
  18:11 21:19
  24:20 25:15
  57:18 59:21
  63:11,18,22
  66:4 69:6 70:8
  88:8,14 93:16
  93:16 94:14
  96:21 97:3
  101:15 114:9
  122:6 134:12
  140:12 155:15
talks 88:10
tank 43:17,19,23
  68:17 73:24
  172:24,25
  173:3 174:10
  174:11,14
tax 50:1,3 85:4,5
  87:16
taxes 51:4 101:13
  101:18
tedious 83:5
teenage 189:18
teenager 180:18
telephone 79:19
  150:13,16,19
tell 5:16,25 6:18
  31:2 44:20
  62:16,21 84:25
  96:2 102:4,7

105:24 113:13
  114:17 122:13
  122:16,17,20
  122:22 125:9
  136:17,21
  145:4 168:4
  182:24 183:6
  186:21 187:8
  191:2 192:17
  193:13 194:18
  194:25
telling 31:13
  95:16 112:13
  123:2
term 75:23
  189:23
terms 28:15 84:9
  84:21
test 37:3
testified 4:3
  147:13
testify 81:7,9
  197:7
testimony 65:5,7
  66:1,4 109:21
  194:10 198:4
text 79:19 81:23
  86:22 87:17
  88:4,8 90:6,20
  96:13 98:11,14
  98:17,20 99:1
  99:23 100:11
  102:11,15
  103:4,13,18
texts 98:23
Thank 134:16
  155:8,12
  163:25 167:4
  167:15 170:18
  195:3,23,25
Thanks 95:6
theft 57:24 65:2
  148:5,6 151:16
  184:20
them's 91:16
theory 167:8
thing 13:1 56:17

RAYMOND THOMPSON

108:22 109:11
139:14 146:23
157:9
**things** 13:11,14
13:24 14:22
17:23 18:22
43:3 44:6,13
84:12,13 90:5
93:7 95:2,11
96:5 143:20
180:24
**think** 4:22 7:13
8:5 18:15,15
23:8 24:22 31:8
31:11 33:7
34:15 36:4
37:17 42:2,2
44:18 53:6
56:15 78:4 79:5
80:22 83:14
85:16 87:2,8
89:13 90:9
91:15 94:8,20
96:20 97:22
99:14 101:2
102:15 103:22
106:20 109:24
112:6 113:9
117:25 127:1
138:25 139:6
140:17,21
141:5,5 142:13
144:3 152:6,11
153:13,19
160:14 165:3
167:13 170:17
173:20 175:19
179:13 180:6
188:5 195:18
195:21
**third** 92:3 93:21
150:7
**Thompson** 1:3
1:12 2:1 4:2,6
4:17 7:18 9:17
10:4,4,4,19
12:7 23:24

24:16 25:3
26:13 29:15
58:21 61:3
69:19 82:6
86:24 98:7
105:21 107:17
109:11 112:12
113:6 117:3,9
123:23 127:23
128:24 136:6
141:25 142:6
155:2,15
157:14 161:7
161:13 162:11
162:25 164:3
166:25 167:17
170:20 186:21
187:8 188:10
195:16,24
197:5 198:3,12
199:23
**Thompson's**
32:12 34:1,5,9
**thought** 86:4
101:24 103:25
138:10 141:18
146:24 151:25
162:17 189:6
**thoughts** 141:16
**thousand** 30:9
39:21 96:22
**three** 9:2,2,2 10:3
25:18 86:10
89:15 100:18
127:16 186:3
**three-wheel**
20:23 22:4
23:12 48:6,7,10
48:20
**ticket** 102:2
**tickets** 102:5,8
**time** 7:19 23:1,6
31:12,13,21
35:16 36:21
38:6,10 44:23
46:9,19 51:7,13
51:14 52:5,15

52:23,25 53:23
56:9 57:12 58:4
61:20 62:7 64:2
67:3,6,25 68:1
73:15 77:20
79:11,25 80:1,9
82:11,17 88:21
101:8 104:1,5,6
104:15 107:2
108:20 110:10
110:10,18
114:25 116:15
116:25 122:8
123:1 124:4,6
124:10,17
125:22 126:1
127:8 137:18
140:22 141:9
141:12,15
142:10 144:4
146:3 155:4,16
156:5 158:3,6
163:16,17,18
165:11 176:10
183:19 188:22
194:1 197:11
**times** 31:8 39:9
80:22,25 81:3
125:22 145:21
178:20 182:4
185:19,22
186:1,3 189:24
**timestamp**
100:23
**timestamps**
100:25
**Tina** 99:18
**tire** 40:19,20
43:13
**title** 24:4 26:17
35:13 45:17
46:10 47:24
49:4,9 50:15
53:10 54:22
55:5,6 56:1
57:19,23 58:5
58:22 59:15

60:14,15,16
62:6,13,20 63:4
85:1,2 86:18,18
87:13,21,25
88:23,24 89:12
93:4 99:6
101:21 114:19
114:20 117:4
117:12 142:6,7
143:18,22,24
146:4 148:13
148:17 149:23
151:3 157:2,12
178:12,13
183:20 187:22
188:4,12,15,22
**titled** 87:15 91:24
**today** 5:17 6:16
6:23 59:21
63:18 78:6 95:1
122:25 148:11
159:12 178:7
195:17
**toggle** 67:9,14,19
67:23 68:10,21
69:13 70:3,7,10
73:5,15 75:14
76:24 77:16,18
77:19
**told** 25:22 30:16
31:11 38:10
39:10 41:12
42:1,9 53:13,23
56:5 62:8,22,23
78:16 95:9
115:7 117:16
118:1,25
137:22 143:17
153:3 155:20
157:12 158:17
172:11
**Tom** 182:20
**tomorrow** 88:12
95:4
**toolbox** 88:12
**top** 24:9,11 59:11
59:16 71:9

84:24 85:19
98:14,19
100:21 103:2
109:1,2,5
**topics** 81:13
**total** 34:16,21
35:4 39:13
80:22 183:24
**totally** 91:1
116:18 186:19
**totals** 34:25
**touched** 92:20
**tough** 22:15
**tow** 46:17 160:18
160:20 161:17
161:18
**town** 28:8
**tracks** 136:12,21
136:22 137:3
**tractors** 89:21
**traffic** 102:2
**trailed** 194:20
**trailer** 33:14,15
37:7 88:8,12
91:23 160:18
166:7
**trailers** 92:9,9
95:2
**training** 13:12
15:10 157:17
181:1
**transaction** 55:2
**transactions** 97:5
**transcript** 197:10
198:6
**transfer** 30:20
139:4
**transferred**
33:10
**transmission**
36:4,24 43:8
**transported** 37:8
**tree** 12:2,3,8,10
12:10,11,11,11
33:21 171:17
**trees** 47:15
**trespassed** 115:1

RAYMOND THOMPSON

Page 222

115:24 125:10 135:24 144:18 184:25

**trespassing** 155:22

**tried** 31:11 52:8 60:14 101:19 101:20 131:5 131:12 159:2 178:19,20 184:4 187:22 193:17 195:5

**trike** 15:24 17:6 17:7,25 18:7,12 18:14 19:17,24 19:24 20:15,17 20:19,24 21:25 22:4,17 24:20 24:23 25:5,8,10 25:15,19 27:22 28:1 29:20 30:7 30:12 34:14,17 35:15 36:18 44:16,21 45:13 46:12 47:20 48:22,23,25 51:5,11,16 53:24 57:14 59:20 63:11,17 63:21 64:1,4 65:3 67:6,7,20 68:1,3 69:2,7,8 69:10 70:11,24 71:16 72:7,10 72:22 73:19 75:11,18 76:6 76:10 77:15,23 78:9 79:1,2 81:13,20 92:5 97:3 101:13,15 101:18 102:2,5 105:12 106:21 106:24 109:7 109:25 110:4 129:25 131:5 131:15,17 143:5 147:15

148:12,14,20 149:8 164:16 169:1 176:17 177:11,15,19

**trike's** 130:1

**trikes** 18:5 22:12 22:21 23:19

**trim** 21:8,10 128:21

**Triumph** 16:2

**troubling** 176:24

**truck** 73:20 74:11 88:5 92:19,20,21 93:2,7,11,12 96:5 142:18

**trucks** 13:24 20:6 89:21 90:11 171:15

**true** 14:21 197:10 198:5

**truth** 5:17,25 6:18 197:7,7,8

**truthful** 195:19

**try** 50:15 54:12 54:22 55:5 59:15

**trying** 52:14 113:1 132:11 134:9 159:19 184:5,17 186:11

**turn** 67:12,13 72:1,11,12,12 72:12,17 74:21 75:1 78:1 86:4 102:24 103:2 112:9 132:13 134:3 136:6

**Turning** 172:20 174:7 175:1

**turns** 74:21

**twice** 185:25

**two** 8:19 25:18 27:4,7 28:16 30:9 57:25 67:13 84:5,5

89:16 91:4,15 99:16 100:18 111:24 114:17 114:18 120:20 126:15 127:16 127:24 130:8 130:10,25 131:10 135:19 138:1 146:20 154:14 156:20 156:21 167:5 169:9 183:17

**two-by-four** 190:19

**two-by-fours** 95:20

**two-wheel** 46:25 48:3,4,5

**type** 36:18 65:8 67:7 83:23 101:4

**typical** 121:15

_____
**U**

**U** 3:13 134:20

**U.S** 23:5

**Uh-huh** 15:17 18:1 44:11 48:1 52:21 53:2 57:15 58:6 70:22 71:8 73:16 74:13,17 75:13 79:8 80:3 83:4,9 106:12 107:24 109:3 112:8 119:7 128:3 130:7 132:18 133:1,9 150:22 153:23 153:25 160:11 164:19 165:15 188:20

**uh-huhs** 5:10

**ultimately** 26:5 152:20

**Umm** 6:22

**unable** 37:3 49:1

49:8 50:2,5,23

**understand** 5:6,8 6:2,7,15 18:9 43:4 68:25 86:22 104:11 119:6 125:16 188:9 195:6

**understanding** 25:6

**Union** 28:5,6,21 30:22 33:4 35:10 61:7 79:2 87:13 88:25 90:2 100:5

**unique** 18:9,10 18:13 23:19,20 45:9,11 84:11

**unit** 129:12 130:5

**UNITED** 1:1

**unknown** 42:12

**unlock** 76:10

**unlocked** 75:12 75:20

**unlocking** 75:4

**unoperational** 175:22

**unusual** 121:13

**update** 38:10 101:7

**upper** 133:7

**upset** 114:23,25 116:2 141:9 143:19 157:11

**usage** 17:3

**use** 18:21 19:18 19:22 20:8 38:25 69:16 70:21 73:4 101:4 110:3 162:14 177:1

**usual** 129:19

**usually** 74:18 129:23 138:11 181:25 182:11

**utility** 20:6

_____
**V**

**v** 1:5 3:14 127:18 127:19 135:3

**V-twin** 174:10

**Vaguely** 125:21

**Valley** 171:13

**valuable** 176:13 176:15

**valuation** 14:19 15:1,8,11

**value** 176:9,16,22

**values** 14:22

**van** 96:11

**vandalism** 96:3 96:12

**vandalized** 64:4 93:8 105:6

**variety** 12:18

**various** 13:10,12 15:4 35:21 38:5 53:17 58:22 85:5 90:1,2 95:22

**vehicle** 14:2,7 19:16,18 49:16 51:8,11 52:17 53:1 74:15,16 79:7 106:7,10 106:16 127:4,7 127:9,12 128:2 128:7,13 129:23 139:12 142:19 192:9

**vehicles** 15:15,16 18:19,20 19:12 19:14,22 20:2,5 54:4 78:6 97:8 127:24 128:4 129:19 134:9 135:19,20 143:2

**Velocity** 41:14 42:8,21

**verbatim** 141:7 154:6

**verified** 154:9

**verify** 185:20

**victim** 66:10

RAYMOND THOMPSON

**videos** 178:21
**Viewed** 117:13
**VIN** 24:16,19,23
  25:6,7,9 76:6
  115:11 154:10
  156:1,3,9
**vintage** 15:4
  16:17
**violated** 115:1
  116:3 145:5,7
  146:17,18
  183:1,8 184:14
**violation** 183:24
**visible** 105:16
**visibly** 114:23
**visual** 119:20
  120:8 128:1
**voices** 122:20

------

**W**

**W** 3:14 136:2,3,7
**Wagner's** 119:24
**Wagners** 120:10
**wait** 102:14
  117:24 128:19
**waited** 158:18
**waiting** 122:7
**waive** 196:2
**wake** 121:10
**walk** 125:1
**walked** 113:18
  113:22 122:3
  125:3 140:14
  144:9,10 146:8
**want** 6:24 9:4
  23:16 68:25
  69:8 72:11 83:5
  86:22 89:18
  90:13 105:9
  113:3,3 114:22
  115:19,25
  119:5 124:7
  125:14 141:6
  144:7,23 160:9
  162:18 167:24
  178:7 183:20
  185:3,4,8

187:24 191:11
  191:14,25
  192:5,8 193:6
  193:18 196:2
**wanted** 23:12
  33:8 47:3 62:17
  71:16 84:13
  86:9 93:6 105:8
  109:12 124:21
  151:3,17
  165:21 188:4,5
  188:12 189:7
  193:1
**wants** 96:14
**warehouse** 90:2
**warm** 47:12,13
  49:25
**warrant** 144:20
  155:23 189:20
**Washington** 2:12
  37:22 45:24
**wasn't** 39:11
  76:14 86:1 91:5
  104:5 190:22
**waste** 100:4
**Waters** 116:11
  116:13,24,25
  117:1,8,13,16
  117:18 145:23
  145:25 146:2,2
  146:5,12
  150:18 151:11
  158:6,10,16
  159:11 186:17
  188:1,16
**wave** 167:10
**way** 25:17 57:21
  62:17,19 69:12
  145:14 155:1
  168:3 184:14
  190:18
**ways** 68:16 69:5
  69:11 194:12
  194:16
**we'll** 29:7 55:5
  117:17 130:22
**we're** 5:4 11:3

12:23 25:5 66:4
  107:11 111:4
  115:23,24
  120:17 144:22
  149:25 159:7,7
  159:8 185:2,7,9
  186:12 191:13
  191:21,24
  192:4 193:18
**we've** 4:8 24:20
  43:2 59:20
  63:11,17,21
  79:4 97:3
  109:13 136:18
  152:16 178:7
**weather** 81:15
  182:6
**Weaver** 182:20
**wedding** 123:6,9
  123:11
**week** 109:14,22
**weekdays** 182:2
**weekends** 182:2
  182:3
**weeks** 80:18
  171:11
**weight** 45:6
**well-rested** 5:19
**went** 33:13 35:9
  49:5,7 51:7,12
  51:17 52:7,16
  52:25 54:23
  65:12 78:9 81:4
  85:1,23 110:15
  112:13 114:17
  116:18 117:11
  118:7,11,22
  119:1,2,23
  140:12,17
  146:3 151:2
  155:19 156:21
  178:17 184:11
  186:3,4,5
**west** 114:10
  120:13,23
  121:24
**whatsoever**

149:5
**wheel** 131:18
  169:14 190:19
  190:20
**wheeled** 74:16
**wheels** 25:18
  131:10
**whereabouts**
  10:8
**wide** 131:5,11
**willing** 26:1 45:3
  125:11
**winch** 88:6
**window** 106:11
  144:22
**windows** 190:7
**winter** 182:9
**wiring** 35:20
  43:15 44:9
**wish** 195:16
**witness** 4:2 31:20
  91:6 198:3
**witnessed** 112:12
  112:17,24
  113:7
**witnesses** 4:23
  91:4 109:22
**woke** 114:4
  121:17 124:5
**wonderful** 46:23
**word** 27:15 142:2
  142:2,3,4 159:3
**words** 9:4
**wordy** 6:4 52:23
**work** 12:10 13:24
  20:5 33:14,21
  38:16 42:25,25
  46:6 47:1 52:4
  110:16 114:25
**Work-related**
  13:8
**work-related-t...**
  13:13
**work-type** 13:11
**worked** 55:7,8
  110:16 157:14
**working** 8:3,3

18:19 38:11
  40:25 64:23
  110:16
**works** 7:21 37:13
  37:23 41:4,5
  42:23,24
  111:21
**worried** 113:21
**worry** 117:17
**worse** 23:12
  132:11
**worth** 96:22
**wouldn't** 38:19
  146:20 166:4,8
  175:25 188:7
**Wrangler** 15:21
  15:22 19:3,3
  128:17,18,21
  129:2 143:4,14
**write** 56:22,23
  76:5
**writing** 58:23
**written** 56:8
  66:13,14,25
  87:12 149:17
**wrong** 75:9
**wrote** 32:17
  112:12

------

**X**

**X** 3:15 132:16
  161:9,10,14

------

**Y**

**Y** 3:15 163:1,2,5
**yard** 8:8 100:4
  127:13 135:24
  135:25 136:25
  141:14 160:5,7
  160:13 161:18
  161:18 166:5
**yeah** 4:20,21 5:20
  8:17 9:15,24
  11:13 13:5,20
  13:25 14:20
  16:9,16 18:12
  18:13,25 19:17

RAYMOND THOMPSON

Page 224

19:21 20:3
25:10 26:8
27:23,23,25
28:16 29:8 31:8
32:5 38:5,6
42:17 43:22,24
44:4 47:2,4,12
47:16 48:16
53:12,15 60:6
61:5 62:15
63:15 65:7,13
68:6,14,15
71:20 74:24
75:24 77:2
85:20 87:13
88:17 91:22
93:23 96:1,9
97:16 98:10
99:24 100:4,9
100:24 108:11
108:16,21
109:16,24,24
110:23 119:10
119:10,11,25
122:4,6,16
124:14,18,20
125:21,22
126:20,24
127:3 128:17
128:22,25
129:2 130:19
130:19 131:1,4
131:18,21
134:2,6,8
138:25 146:16
146:18 149:21
152:6,6,8,22,22
152:25 158:6
160:14 161:21
161:24,24
162:7,23,23
164:15 165:2
165:17,19,24
166:17 167:19
169:17 170:1
172:21 174:13
175:6 179:6,10

179:16,16,20
180:4 181:5
182:3,10,17,23
187:13 189:25
190:16
**year** 16:5 20:21
31:23 40:4 46:9
51:15,21 52:3
86:16 152:22
160:1 182:4
**years** 7:13 9:2,3
17:12,12,21
23:9,10,13
31:23 33:25
35:25 44:24
86:7 94:21
99:16 179:14
179:15 183:18
192:22
**Young** 2:15

**Z**

**Z** 3:16 163:20,21
164:4 166:18
**Zoom** 2:13

**0**

**084-004847** 1:16
197:22

**1**

**1,000** 39:16,17
42:10
**1,100** 41:18,25
42:5,11
**1:00** 122:10
125:19
**10** 16:3,9,9,14
17:12,12,19
33:25 179:13
179:15,19
**10-22-22** 60:17
**10-25-22** 61:16
**10,000** 85:18
**10:00** 110:21,21
125:18
**10:05** 4:1

**100** 76:6
**100-anniversary**
21:25
**100-year** 20:22
23:17 172:12
172:17
**100-year-old**
172:12
**100th** 22:17,20
44:17
**102** 3:9
**107** 3:10
**11** 102:25
**11:00** 121:15
**11:30** 121:15
183:15,22
193:3
**12** 95:24
**12:33** 101:11
**1209** 7:6 111:5
119:13 136:14
**123** 3:10
**12444** 2:15
**127** 3:11,11,12,12
3:13,13,14
**12th** 162:5
**130-something**
12:21
**1325** 2:11
**136** 3:14
**13th** 83:1 100:15
101:10
**141** 47:10
**1450** 1:16 197:23
**15** 16:4,10,15
17:19 140:4
**15-year-old** 7:18
111:18
**150** 19:9
**160** 2:15
**161** 3:15
**163** 3:15,16
**167** 3:16,17
**16th** 162:6,8
**170** 3:17,18,18,19
3:19
**17th** 94:23

**1965** 15:22 19:25
**1970s** 16:2,8
**1997** 15:21 19:4
**1HD1GDV353...**
24:18

**2**

**2** 91:23
**2,175** 29:23 34:20
**2,366.37** 34:21
**2:00** 122:10,11
145:3,9
**2:43** 196:5
**20** 9:5 140:4
188:19
**20-something**
183:18 192:22
**2000** 15:21
**20004** 2:12
**2002** 15:25 17:6
17:15,17 180:6
180:13
**2003** 15:23 17:6
17:24 20:22
21:16,24 22:16
22:20 23:16
30:6 41:22
63:11,17,21
76:6 79:2
164:15 176:17
**2004** 19:2,7
**2005** 16:6 17:5
**2011** 9:19
**2014** 15:22 19:3
**2019** 8:15
**202** 198:18
**202-975-0895**
2:12
**2020** 9:5 18:15,15
27:16,19 30:10
30:14 31:7
32:21 35:12
40:11 79:13,15
81:11,18 83:2
88:4 94:23
97:13
**2021** 18:15 40:12

**40:**14 51:8,10
51:25 58:7,10
100:12,15
**2022** 7:10,25 8:10
10:12,25 11:8
15:20 18:18
19:1,6,15,19
57:17,21,22
58:9 61:21
75:17 103:4,11
103:15 105:10
110:1,4,7
111:16 119:15
119:21 124:13
125:18 126:13
135:7 136:15
136:16 137:6,8
137:19 148:20
152:13 168:25
170:10 173:18
174:4,24
175:17 176:10
**2023** 1:13 2:3
18:19 19:7,15
19:20 31:25
106:23 110:1
162:5,6,8 177:2
**2024** 160:2
**20th** 30:9
**22** 7:13
**22-12985** 60:19
**22nd** 8:10 10:11
10:23 11:5
57:16 75:17
103:11,14
105:10 106:23
108:18 110:1,4
110:7,13,19,25
111:13,15
112:4 119:15
119:21 125:18
126:2,10,13
129:18 137:8
137:13,16
142:20 143:3
148:20 151:2
168:25 170:10

RAYMOND THOMPSON

173:18 174:4
174:24 175:16
176:10 177:2
178:22 194:2
**22nd-23rd** 63:8
103:4 136:15
**23** 3:4 7:13
**23,000** 84:16,17
85:6,19
**23rd** 8:12 10:12
10:25 110:1,9
110:22 121:3
125:19 137:5
137:19 142:20
150:21 152:13
159:14 164:20
164:23 165:3
178:22 188:19
**24th** 124:13
164:23 165:3
**25** 160:15
**25th** 61:21,24
62:2
**26** 3:5
**26th** 97:13
**29** 3:5,6,6,7

---

**3**

**3** 112:11 136:6
**3-4-20** 27:3
**3:00** 151:3
**30** 178:1
**300** 40:21 41:11
160:14
**30th** 27:16,19
34:12,14 35:12
79:5 81:11
**314-390-0230** 2:8
**314-789-1199**
2:16
**325** 161:21
**3676** 8:25 83:21

---

**4**

**4** 3:2 93:13 112:9
112:10 136:10
**4,541.37** 34:21

**4:23-cv-00133**
1:5
**40** 7:19 162:6
**400** 39:8
**44** 47:9,10
**450** 19:10
**453** 35:3
**453.83** 34:25
**4683** 59:12
**4th** 32:21 80:8,9

---

**5**

**5,000** 28:14,18
32:18 34:18,25
35:4 39:22
41:12 42:1,9
63:5 85:18
86:11 90:16
**50** 7:19 28:7
**500** 2:11
**50CC** 179:20
**59** 3:7
**5th** 30:9,14 31:7

---

**6**

**6** 1:13 2:3 102:24
**6,000** 42:11
**63021** 7:7
**63105** 2:7
**63131** 2:16
**66** 47:8,9
**69** 3:8

---

**7**

**7,000** 96:14
**7,100** 42:11
**750** 2:2,7
**7700** 2:2,7

---

**8**

**8** 105:23 111:5
**8,000** 42:16
**82** 3:8
**88** 48:18
**8th** 135:7 136:15

---

**9**

**9:00** 110:21

**90** 84:14 104:1,20
**911** 113:23 114:5
116:5,6 138:22
138:23
**96** 36:19 48:18
**98** 3:9