UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RAYMOND THOMPSON,                     )
                                      )
         Plaintiff,                   )
                                      )
    vs.                               )        Case No. 4:23-CV-133 SRW
                                      )
JOSHUA COCKRELL, et al.,              )
                                      )
         Defendants.                  )

**<u>MEMORANDUM AND ORDER</u>**

This matter comes before the Court on Defendants' Motion for Summary Judgment (ECF No. 32), Plaintiff's Motion for Sanctions for Failure to Preserve Evidence (ECF No. 36), and Plaintiff's Motion for Partial Summary Judgment (ECF No. 38). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c). At Plaintiff's request, the Court held an evidentiary hearing on Plaintiff's Motion for Sanctions on March 15, 2024. The Court received the transcript of that hearing on April 12 (ECF No. 58). For the following reasons, the Court will grant Defendants' Motion for Summary Judgment and deny Plaintiff's Motion for Partial Summary Judgment and Motion for Sanctions.

## I.     BACKGROUND

In February 2023, Plaintiff Raymond Thomson filed a complaint in this Court alleging Defendants Joshua Cockrell and Robert Gerholdt violated 42 U.S.C. § 1983 and his civil rights when they assisted third-parties in the theft of his motorcycle. Plaintiff asserts three counts under § 1983 against Defendants: (1) unlawful search in violation of the Fourth Amendment; (2) unlawful seizure in violation of the Fourth Amendment; and (3) deprivation of property without due process of law in violation of the Fourteenth Amendment. The parties have filed competing

1

motions for summary judgment, each asserting the material facts are undisputed and that the Court may decide the issues as a matter of law. Plaintiff has also filed a motion for sanctions alleging Defendants failed to preserve Officer Gerholdt's body and dash camera recordings from the night in question.

## II.     STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden of demonstrating there are no genuine issues of material fact rests on the moving party, and the Court considers the evidence and reasonable inferences in the light most favorable to the nonmoving party. *Allard v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015). To avoid summary judgment, the non-movant must demonstrate the existence of specific facts supported by sufficient probative evidence that would permit a finding in his favor on more than speculation. *Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 739 (8th Cir. 2017). Where the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Combs v. Cordish Cos.*, 862 F.3d 671, 680 (8th Cir. 2017).

## III.    UNDISPUTED MATERIAL FACTS

On March 30, 2020, Plaintiff purchased a 2003 Harley Davidson, 100-year anniversary, custom, three-wheel motorcycle. He kept the motorcycle at his residence at 1209 Cottagemill Drive, in Manchester, Missouri. The property includes a single-family home with a paved driveway that extends into the backyard which is fenced in with a gate separating the front and back of the driveway. At approximately 10:00 a.m. on the morning of October 22, 2022, Plaintiff left his house. Plaintiff testified that when he left that morning, the driveway gate was closed. Later that night, an individual named Amara Elmore requested police respond to Plaintiff's address and standby to keep the peace while she, and her husband, Steven Mackenzie, retrieved a motorcycle.[1] At approximately 11:16 p.m., Defendants, acting in their capacity as officers of the Manchester Police Department, were dispatched to Plaintiff's address in response to this request.

Officer Gerholdt arrived at the residence first and began speaking with Ms. Elmore and Mr. Mackenzie. Officer Cockrell arrived a few minutes later. Ms. Elmore told Defendants that Nathan Rench, her father, had loaned the motorcycle to Plaintiff, who had failed to return it.[2] Ms. Elmore stated that her father was not present because he had recently been in a motorcycle accident and had a stroke requiring him to use a motorized scooter. Ms. Elmore and Mr. Mackenzie showed Defendants a picture of a purported title to a Harley Davidson motorcycle. The title listed Nathan Rench as the owner of the motorcycle. They also showed Defendants a

---

[1] Plaintiff disputes this fact asserting that it is inadmissible because it includes hearsay. What Ms. Elmore told dispatch is not hearsay because it is not introduced for the truth of the matter asserted but rather to show why Officers Cockrell and Gerholdt responded to Plaintiff's residence.

[2] Plaintiff disputes this fact asserting that it is inadmissible because it includes hearsay. What Ms. Elmore told Defendants is not hearsay because it is not introduced for the truth of the matter asserted. In fact, Defendants now know that Ms. Elmore was not truthful with them.

photograph of the motorcycle. Ms. Elmore told Officer Gerholdt the motorcycle was visible in the backyard of the residence.[3]

Defendants attempted to contact Plaintiff by knocking on the front door of the residence and announcing their presence. There were lights on in the house and a rear upper window was open. After knocking on the door multiple times, no one answered. As Defendants returned from knocking on the door, Mr. Mackenzie told them the motorcycle could be seen through the open gate to the backyard. Without entering the backyard, the officers could see the motorcycle through the open gate.[4] A jeep was parked in the driveway, and Officer Gerholdt ran the license plate of the Jeep to see who lived at the residence. The license plate was registered to Plaintiff.

Officers Gerholdt and Cockrell went into the backyard to verify the VIN number on the motorcycle. Before entering the backyard, Officer Gerholdt told Ms. Elmore and Mr. Mackenzie to wait and not come into the backyard. However, they did not listen and followed the officers. Officer Gerholdt walked to the motorcycle and verified that it matched the photograph Ms. Elmore and Mr. Mackenzie showed him. He then located the VIN number on the right front fork assembly and confirmed that it matched the VIN number listed on the picture of the purported title that Ms. Elmore and Mr. Mackenzie provided. While Officer Gerholdt checked the VIN number, Officer Cockrell stood nearby where he could see the open rear window of the house to make sure Officer Gerholdt was safe.

Officer Gerholdt ran the VIN number through radio/computer dispatch. This initiates a search through the Missouri Department of Revenue records for the current registered owner of

---

[3] For the same reasons as the previous statements from Ms. Elmore, these statements are not hearsay because they are not introduced for the truth of the matter asserted.
[4] Plaintiff disputes this fact arguing that when he left home, the gate was closed. However, both of the facts can be true. The gate could have been closed when he left home that morning and open when the officers arrived late that evening. Both officers testified the gate was open when they arrived at the residence. Plaintiff elected not to depose Ms. Elmore and Mr. Mackenzie.

the vehicle, whether it has been reported lost or stolen, and any other available information on the vehicle. Dispatch notified Officer Gerholdt that the search showed the motorcycle was registered to Mr. Rench. Officer Gerholdt then relayed the information obtained and circumstances of the call to his supervisor, Sgt. Evan Waters, who indicated that Mackenzie and Elmore could be allowed to take the motorcycle.[5] After receiving this information, Mr. Mackenzie, using the key in his hand, started the motorcycle, and he and Ms. Elmore drove away without interference from Defendants. At this time, Defendants considered the call complete and left.

Defendants did not have a warrant to enter Plaintiff's backyard or to seize the motorcycle. While in the backyard, Defendants went straight to the motorcycle and did not touch the motorcycle or anything else. The motorcycle was not covered or stored in a garage or outbuilding. It was parked at the rear of the driveway and was not parked close to the house. During this time, Defendants were not conducting a criminal investigation.

Plaintiff did not return to his residence until the early morning hours of October 23. When he returned, he found the gate to his backyard open and his motorcycle missing. He called 911 to report his motorcycle had been stolen. Defendants returned to Plaintiff's residence and explained what had happened earlier that night. After Plaintiff showed Defendants the legal title to the motorcycle, as well as other paperwork showing he had purchased the motorcycle, Officer Gerholdt spoke to Ms. Elmore and Mr. Rench on the phone. When Plaintiff complained to Defendants about their conduct, Defendants told Plaintiff that the incident was a "civil matter." Shortly thereafter, Defendants left Plaintiff's residence.

---

[5] Plaintiff disputes this fact asserting that it is inadmissible because it includes hearsay. What Sgt. Evan Waters told dispatch is not hearsay because it is not introduced for the truth of the matter asserted but rather to demonstrate Officers Cockrell and Gerholdt subsequent conduct.

On the police report, Officer Gerholdt characterized the incident as "Stealing of a Motor Vehicle." In the report, when describing the taking of the motorcycle, Officer Gerholdt wrote, "Elmore and Mackenzie were then allowed to leave." The Manchester Police Department opened an investigation into Ms. Elmore, Mr. Mackenzie, and Mr. Rench for the theft of Plaintiff's motorcycle. The motorcycle has been recovered from Mr. Rench and returned to Plaintiff. Mr. Rench is being prosecuted in the Circuit Court of Gasconade County for receiving stolen property in connection with the motorcycle. As of December 6, 2023, the date of Plaintiff's deposition, Plaintiff had not registered with the Missouri Department of Revenue the motorcycle he purchased in March of 2020.

## IV.    DISCUSSION

The parties have filed three pretrial motions. In their motions for summary judgment, each party asks the Court to decide the case as a matter of law. Plaintiff asserts the facts and the law clearly show Defendants violated his civil rights under the Fourth and Fourteenth Amendments. Defendants argue the Court should find they are entitled to qualified immunity on all of Plaintiff's claims. Defendants also ask the Court to grant summary judgment in their favor as to Plaintiff's official capacity claims because Plaintiff has not pleaded or produced evidence of a municipal policy or custom. In addition to his motion for summary judgment, Plaintiff filed a motion for sanctions for Defendants' failure to preserve Officer Gerholdt's body and dash camera recordings from the night in question.

### A.    Dueling Summary Judgments

Plaintiff brings his claims under 42 U.S.C. § 1983. To state a claim under § 1983, Plaintiff must show "he was deprived of a right secured by the Constitution and the laws of the United States and that the deprivation was committed by a person acting under color of state

law." *Alexander v. Hedback*, 718 F.3d 762, 765 (8th Cir. 2013). Defendants assert that their actions were protected by the defense of qualified immunity. Therefore, the Court must determine if qualified immunity applies to Plaintiff's three claims for alleged violations of Plaintiff's constitutional rights.

Qualified immunity "shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation omitted). Officials are entitled to qualified immunity under § 1983 unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at that time." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (internal quotation omitted). When deciding whether a defendant is entitled to qualified immunity, a court may address either prong of the qualified immunity inquiry first. *See Robbins v. City of Des Moines*, 984 F.3d 673, 678 (8th Cir. 2021).

In *Wesby* the Supreme Court discussed the "clearly established" prong in great detail:

"Clearly established" means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate. This demanding standard protects all but the plainly incompetent or those who knowingly violate the law.

To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority. It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that every reasonable official would know.

The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted. This requires a high degree of specificity. We have repeatedly stressed that courts must not define clearly

established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced. A rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that the rule was firmly established.

*Id. at* 63–64 (internal quotations and citations omitted).

### i.    Unlawful Search

Plaintiff asserts Defendants violated his clearly established Fourth Amendment right to be free from unreasonable searches when Defendants entered his backyard to inspect the motorcycle without a warrant. Defendants argue they did not need a search warrant to enter Plaintiff's backyard because the community caretaking exception to the Fourth Amendment's warrant requirement applies. Furthermore, they argue the law does not clearly establish that their conduct was unlawful. The Court finds Defendants are entitled to qualified immunity because the unlawfulness of Defendants' conduct was not clearly established when they entered Plaintiff's backyard without a warrant.

The Fourth Amendment protects individuals from "unreasonable searches and seizures" by the government. U.S. Const. amend. IV. For a search to be reasonable, generally, the government must obtain a warrant supported by probable cause before "physically intruding on constitutionally protected areas" or otherwise searching areas or items in which an individual has a reasonable expectation of privacy. *Florida v. Jardines*, 569 U.S. 1, 8-10 (2013). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley v. California*, 573 U.S. 373, 382 (2014).

Plaintiff argues that *Caniglia v. Strom*, 593 U.S. 194, 197 (2021) and *United States v. Sanders*, 4 F.4th 672, 677 (8th Cir. 2021) clearly establish Defendants violated the Fourth Amendment. In *Caniglia*, the Supreme Court addressed whether a police officer's "community

caretaking functions . . . creates a standalone doctrine that justifies warrantless searches and seizures in the home." 593 U.S. at 196. Petitioner Edward Caniglia's wife spent the night at a hotel after he expressed suicidal thoughts. *Id*. The next morning when she could not reach him, she called the police to request a welfare check. *Id*. When police arrived at the home, petitioner spoke with them on the porch and stated he was not suicidal, but he agreed to go to the hospital for a psychiatric evaluation if the police promised not to confiscate his firearms. *Id*. at 196-97. Once petitioner left, the officers entered his home and took two handguns. *Id*. at 197. Petitioner sued claiming the officers violated the Fourth Amendment when they entered his home and seized him and his firearms without a warrant. *Id*.

The Supreme Court vacated the judgment and remanded the case. In the opinion, the Court declined to extend the holding of *Cady v. Dombrowski*, 413 U.S. 433 (1973), which established the community caretaking doctrine, to searches in a home finding that there is a constitutional difference between a search of an impounded vehicle and a home. *Id*. at 199. In its analysis, the Supreme Court stated, "this recognition that police officers perform many civic tasks in modern society was just that – a recognition that these tasks exist, and not an open-ended license to perform them anywhere." *Id*.

On remand, the district court again found the officers were protected by qualified immunity because it was "not clearly established that the community caretaking exception [did] not apply to police activity in the home intended to preserve and protect the public." *Caniglia v. Strom*, 569 F. Supp. 3d 87, 91 (D.R.I. 2021). In reaching this conclusion, the district court noted, "'neither the general dimensions of the community caretaking exception nor the case law addressing the application of that exception provides the sort of red flag that would have

semaphored to reasonable police officers that their entry into the plaintiff's home was illegal.'" *Id.* (quoting *MacDonald v. Town of Eastham*, 745 F.3d 8, 15 (1st Cir. 2014)).[6]

In *Sanders*, the Eighth Circuit originally determined that the officers warrantless entry into the defendant's home was permissible under the community caretaking exception. 956 F.3d 534, 539–40 (8th Cir. 2020), *cert. granted, judgment vacated,* 141 S. Ct. 1646, 210 L. Ed. 2d 867 (2021), and *opinion vacated and superseded,* 4 F.4th 672 (8th Cir. 2021). After granting a writ of certiorari, the Supreme Court remanded the case back to the Eighth Circuit for further consideration in light of *Caniglia.* 141 S. Ct. 1646 (2021).

On remand, the Eight Circuit reconsidered the warrantless search of the home in consideration of the Supreme Court's decision in *Caniglia*. 4 F.4th at 675. Officers were dispatched to Defendant Kenneth Sanders' home on the report of a domestic disturbance that involved children. *Id*. Officers entered the home, without permission, when they heard crying inside. *Id*. After speaking with a minor child about the possibility of a gun in the home, the officers searched the home and eventually found a gun in the couch where Defendant Sanders had been sitting. *Id*. at 676. Defendant Sanders was charged, and conditionally pled guilty, to being a felon in possession of a firearm. *Id*.

The Eighth Circuit ultimately upheld the warrantless entry and search of the home, stating that although the Supreme Court held in *Caniglia* that there is no standalone community caretaker doctrine justifying warrantless searches and seizures in the home, "the *Caniglia* Court did not abrogate the Supreme Court's longstanding precedents that allow a warrantless entry into

---

[6] The district court granted summary judgment in favor of the officers and denied summary judgment on the *Monell* claim against the Cranston Police Department which alleged it had a policy of constitutional violations which violated plaintiff's rights, as genuine issues of material facts needed to be decided by the jury on that claim. 569 F. Supp. 3d at 91-92 (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)).

a home under some circumstances." *Id*. at 677. "[T]he ultimate touchstone of the Fourth Amendment is reasonableness, the Supreme Court has recognized certain exceptions to the warrant requirement." *Id.* (citing *Luer v. Clinton,* 987 F.3d 1160, 1165 (8th Cir. 2021)). The Eighth Circuit noted that "the scope of the encounter was carefully tailored to satisfy the officers' purpose for entry," and found that under all of these circumstances, the officers had an objectively reasonable basis to enter the home without a warrant. *Id*. at 678.

As *Sanders*, and the concurring opinions in *Caniglia*, make clear, the scope and application of *Caniglia* is not yet apparent. In their concurring opinions in *Caniglia*, Justices Alito and Kavanaugh explained that although there is no overarching "community caretaking" doctrine, there are still instances when law enforcement may enter a home without a warrant. *Id*. at 200-02, 205-208. As Justice Alito stated, "the many police tasks that go beyond criminal law enforcement . . . vary widely, and there is no clear limit on how far they might extend in the future." *Id*. at 200. Furthermore, Justice Alito wrote, searches and seizures conducted for non-law-enforcement purposes are not necessarily analyzed under "precisely the same Fourth Amendment rules developed in criminal cases." *Id*. at 200-01. The limits of law enforcement conduct when responding to non-law-enforcement incidents occurring outside of a home remain not well-defined after *Caniglia*.

In the case at bar, Defendants did not enter Plaintiff's home, only his backyard. "[W]hat constitutes curtilage for purposes of the Fourth Amendment generally, and in the present case in particular, are harder questions." *United States v. May-Shaw*, 955 F.3d 563, 569 (6th Cir. 2020) (citation omitted). In *United States v. Dunn*, the Supreme Court listed four factors for courts to consider when determining if an area is curtilage: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home,

11

the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." 480 U.S. 294, 301 (1987).

Here, the motorcycle was in the backyard at the rear of the driveway and was not parked close to the house.[7] The backyard was enclosed with a privacy fence with a large gate separating the part of the driveway visible to the street from the remainder of the driveway within the backyard. The area where the motorcycle was parked was in the rear of the driveway where one would park vehicles driven between the backyard and the street. While the motorcycle was within the fenced area, it was not in a garage or outbuilding, nor was it covered in any manner or concealed in any other way. With the gate closed, it would be difficult to see the motorcycle from the street. However, Defendants could observe the motorcycle from outside the fence through the open gate. Defendants were able to walk through the open gate and see the VIN on the fork of the motorcycle without touching the motorcycle or anything else in the yard. The Court has considered all of the factors from *Dunn* and finds the motorcycle was within the curtilage of the home.

In *Luer*, a case decided before *Caniglia,* but cited with authority in *Sanders*, the Eighth Circuit considered whether law enforcement's entry into the plaintiffs' backyard, and eventually their garage and house, was reasonable under the Fourth Amendment. 987 F.3d at 1163. The defendants in *Luer* where assigned to search for an intoxicated cab rider who failed to pay his fare in the middle of the night. *Id.* at 1164. The driver told one of the officers the direction where the passenger went after leaving the cab. *Id.* Following that lead, the officer walked between the plaintiffs' home and their neighbors, searched both backyards with a flashlight, including the neighbor's porch. He then crossed back into and entered the plaintiffs' backyard and proceeded

---

[7] The Court estimates the motorcycle was approximately 20 feet from the home. The estimate is based on the Court's review the photographic exhibits submitted in summary judgment pleadings.

down a private garden pathway on the side of the plaintiffs' house, and observed that a side door which was not visible from the street was not fully secured. *Id.*

The officers then went to the front door and knocked on the door and windows and rang the bell, all without success. *Id.* They returned to the backyard and knocked on the rear patio door, again without success. *Id.* The officers returned to the side garage entrance, which had an open door, and entered the garage. *Id.* They then entered the plaintiffs' home through the garage and began searching the home with their guns drawn. *Id.* A short time later the plaintiffs emerged from their bedroom and encountered the officers. *Id.* No drunken cab rider was found in their home. *Id.*

*Luer* noted that the area "'immediately surrounding and associated with the home – what our cases call the curtilage – is part of the home itself for Fourth Amendment purposes.'" *Id*. at 1165 (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (citations omitted)). The Eighth Circuit found that "a limited warrantless intrusion into the curtilage is not unreasonable when there is a legitimate law enforcement objective 'unconnected with a search against the accused.'" *Id*. (quoting *United States v. Robbins*, 682 F.3d 1111, 1115 (8th Cir. 2012)). The court noted the parties and the district court failed to "defined the parameters of this curtilage." *Id.* at 1166. The court did not dispute that the attached garage was part of the curtilage; however, the parties assumed the backyard, the sliding glass door on the backyard patio, and the pathway and driveway leading from the backyard to the street alongside the neighboring residence were also part of the curtilage. However, the court found each of these areas "present[ed] different Fourth Amendment issues than the subsequent entry into the [plaintiffs'] home[.]" *Id.*

The Eighth Circuit considered the initial conduct of the officer in checking the curtilage of the sides of the homes and the backyards while looking for the fare-skipper. *Id.* at 1166. *Luer*

questioned whether checking the neighbor's backyard and porch with a flashlight violated the neighbor's Fourth Amendment expectation of privacy in the curtilage. *Id.* at 1166–67. The court observed the officer did not enter their home, only the curtilage, to conduct a limited search of where the thief may be hiding, and found this was "arguably a reasonable exercise of [the officer's] community caretaker function 'to preserve and protect community safety.'" *Id.* at 1167 (quoting *Castagna v. Jean*, 955 F.3d 211, 221 (1st Cir. 2020)).

The court further queried, if a passenger had paid his fare and wandered between the homes in a drunken condition, and the cab driver called the officers to make sure everyone was safe, would not the officers have taken the same actions "to preserve and protect community peace and quiet, the surrounding residential properties, and the passenger's safety." *Id.* The court also questioned if the officer's actions would have been any different if someone reported a prowler near the home who may be trying to burgle the premises. *Id.* "Given the dearth of precedent addressing this curtilage issue," the court believed the officer would be entitled to qualified immunity if the neighbor had brought a § 1983 action. *Id.* (citing *MacDonald*, 745 F.3d at 14 ("Given the profusion of cases pointing in different directions, it is apparent that the scope and boundaries of the community caretaking exception are nebulous.")).

Citizens expect law enforcement "efforts to assure that they and their property are safe from unlawful, injurious acts by others." *Id.* at 1167 (quoting *United States v. Struckman*, 603 F.3d 731, 741 (9th Cir. 2010), and citing 3 Wayne R. LaFave, Search and Seizure § 6.6(c) (6th ed. 2020)). Citizens expect law enforcement "to enter curtilage under limited circumstances to protect persons or property." *Id.* The court noted the officers were not seeking evidence that the homeowner had committed a crime; "the entry into their curtilage was entirely noninvestigative." *Id.* at 1168.

14

Although *Luer* cited the community caretaker exception and held the officers' brief entry into the plaintiffs' backyard, path, driveway, and garage was permissible, the officers' entry into and search of the plaintiffs' home with their weapons drawn was not permissible. *Id*. at 1167-68. *Luer* applied a more deferential standard to the officers' conduct in the curtilage and a demanding standard once they entered the plaintiffs' home. Just as the Supreme Court decided in *Caniglia*, 593 U.S. at 199, that "[w]hat is reasonable for vehicles is different from what is reasonable for homes," the Eighth Circuit held what is reasonable for curtilage is different from what is reasonable for homes.

The ultimate question before the Court is whether the law is so "clearly established" that every reasonable officer in Defendants' particular circumstances would find the law sufficiently clear such that every reasonable officer would know they were doing something unlawful. As the undisputed facts in this case show, Defendants received a routine call to "keep the peace."[8] Defendants arrived and spoke with a woman, accompanied by her husband, who stated her father owned the motorcycle visible in Plaintiff's backyard. She advised that her father, Mr. Rench, had provided the motorcycle to Plaintiff, but he failed to return it. She showed Defendants a photograph of the motorcycle, as well as a photograph of a title of a motorcycle listing Mr. Rench as the owner. She explained her father could not drive a motorcycle at this time. They had a key to the motorcycle. Defendants could see the motorcycle in the rear of the driveway without first entering the backyard. No one accused Plaintiff of doing anything illegal.

Defendants knocked on the door of the home multiple times and no one answered; however, lights were on and a window was open in late October. Defendants checked the license plate of another vehicle in the driveway and learned it was registered to Plaintiff. Defendants

---

[8] Missouri law allows certain parties to recover property without judicial process, "if it proceeds without breach of the peace." Mo. Rev. Stat. § 400.9-609.

entered the backyard and checked the VIN on the fork of the motorcycle. The VIN on the fork matched the VIN on the title the woman showed them in the photograph. Defendants ran the VIN through dispatch and learned it was registered to Mr. Rench. Defendants discussed this situation with their sergeant. The couple were then allowed to leave with the motorcycle.

The Court does not find the law to be so clearly established that every reasonable officer in Defendants' particular circumstances would find the law sufficiently clear to know that what they were doing was unlawful. The touchstone of the Fourth Amendment is reasonableness, and the Supreme Court has recognized certain exceptions to the warrant requirement. As Justice Alito stated in *Caniglia,* many police tasks go beyond criminal law enforcement, and searches and seizures conducted for non-law-enforcement purposes are not necessarily analyzed under the same precise rules developed in criminal cases. 593 U.S. at 200-01.

The Court recognizes that after *Luer* was decided, the Supreme Court in *Caniglia* held that the community caretaking function no longer creates a standalone doctrine justifying warrantless searches and seizures in the home. However, this limitation did not bar the Eighth Circuit in *Sanders* from justifying the warrantless entry of the home based on the particular facts of that case. For the law to be "clearly established," the law must be settled by "controlling authority or a robust consensus of cases of persuasive authority." *Wesby*, 583 U.S. at 63–64. Even if *Caniglia* suggests calls into question the community care taking exception and potentially adds limitations on the exception with respect to curtilage, that does not clearly establish that Defendants actions in this case were unlawful because "it is "not enough that the rule is *suggested* by then-existing precedent." *Id.* (emphasis added). It must be beyond debate and the Court does not find, beyond debate, that the Supreme Court would apply the holding in *Caniglia* to the particular circumstances Defendants encountered in this case.

16

The Court finds the law was not so "clearly established" that every reasonable officer in Defendants' particular circumstances would find the law sufficiently clear and beyond debate to understand that checking the VIN on the fork of a motorcycle, in Plaintiff's backyard for the limited non-investigative purpose of identifying whether Plaintiff or Mr. Rench was the registered owner was doing something unlawful. Defendant are entitled to qualified immunity in this § 1983 action with respect to Plaintiff's unlawful search claim. The Court will grant summary judgment in Defendants' favor on this claim.

### ii.    Unlawful Seizure

In addition to his claim for an unlawful search, Plaintiff asserts Defendants violated his Fourth Amendment right against unlawful seizure when they allowed Ms. Elmore and Mr. Mackenzie to take his motorcycle. Defendants argue they did not unlawfully seize or deprive Plaintiff of his property and it is not clearly established that allowing a private party to confiscate property is a violation of the Fourth Amendment.

The Court finds it was not clearly established that Defendants' actions in this instance constituted an unlawful seizure. In support of his argument that his right to be free from unreasonable seizures was clearly established on October 22, 2022, Plaintiff cites to *Soldal v. Cook County, Illinois*, 506 U.S. 56 (1992), and *Dixon v. Lowery*, 302 F.3d 857 (8th Cir. 2002). Neither of these cases clearly establish Defendants' actions in this case violated Plaintiff's right to be free from unreasonable seizure.

In *Soldal*, Plaintiff and his family resided in a trailer home. 506 U.S. at 57. The owner of the mobile home park where Plaintiff rented a lot filed an eviction proceeding against Plaintiff in state court. *Id*. at 58. Before the court had ruled on the eviction proceeding, the owner chose to forcibly evict Plaintiff. *Id*. The manager of the park contacted the sheriff's department and asked

for the presence of deputy sheriffs to prevent any resistance from Plaintiff. *Id*. Two employees of

the mobile home park owner disconnected the sewer, water, and phone connections, and hooked

the home to a tractor while accompanied by a deputy sheriff. *Id*. The deputy sheriff told Plaintiff,

"he was there to see that [Plaintiff] did not interfere." *Id*.

After two more deputy sheriffs arrived, Plaintiff stated he wanted to file a complaint for

criminal trespass. *Id*. After conferring with the mobile home park owner and employees, and the

district attorney, a deputy sheriff told Plaintiff he would not accept a complaint because, "it was

between the landlord and the tenant . . . [and] they were going to go ahead and continue to move

out the trailer." *Id*. at 58-59. Eventually, in the presence of several deputy sheriffs, the trailer was

towed away. *Id*. at 59. Plaintiff brought an action under § 1983 alleging a violation of his Fourth

and Fourteenth Amendment rights. *Id*. The Supreme Court held Plaintiff's mobile home was

"seized" within the meaning of the Fourth Amendment. *Id*. at 72.

Unlike in this case, the deputy sheriffs in *Soldal* actively participated in the removal of

the plaintiff's mobile home by preventing the plaintiff from stopping the removal. Here,

Defendants confirmed the motorcycle was the same motorcycle listed on the picture of the title

and was registered to Mr. Rench, but otherwise did not aid in the removal of the motorcycle. Nor

was Plaintiff present and interacting with Defendants at the time Ms. Elmore and Mr. Mackenzie

took the motorcycle, as was the case in *Soldal.* Thus, the Court does not believe *Soldal* clearly

establishes that the minimum actions Defendants took in the present case constitute a seizure.

Similarly, the actions taken by the officers in *Dixon* rise to a level not seen in this case. In

*Dixon*, Kurt Dixon operated a restaurant and agreed to a deal with Aaron Omar to open a new

establishment in the restaurant's space. 302 F.3d at 860. After the relationship between Dixon

and Omar broke down, Omar contacted the police and hired two off-duty officers to stand by

18

while he changed the locks on the restaurant. *Id*. The officers arrived at the restaurant in city

police cars, wearing their uniforms, badges, and side arms. *Id*. at 861. Officers stood watch while

a locksmith changed the locks, and the officers told an employee attempting to telephone Dixon

that the employees needed to leave the restaurant. *Id*. They escorted the employees out and

locked the door behind them. *Id*. Officers stayed inside the restaurant and took possession of the

keys when Omar left. *Id*. When Dixon arrived at the restaurant, the officers allowed Dixon into

the restaurant for ten minutes and watched as fixtures and personal property were removed. *Id*.

Dixon filed suit, and the Eighth Circuit held that "seizure of property without a warrant, in

circumstances such as those present in this case, is unreasonable." *Id*. at 864.

The officers in *Dixon* were significantly more involved in the seizure of the restaurant

than Defendants were involved in the taking of the motorcycle in this case. The officers in *Dixon*

removed employees from the premises, took possession of the keys to the building, and locked

the doors. There is a meaningful difference from the actions Defendants took in this case, in

which Defendants simply checked the VIN on the motorcycle in Plaintiff's backyard.

Consequently, *Dixon* does not clearly establish that Defendants seized Plaintiff's motorcycle and

violated his Fourth Amendment rights.

Because Plaintiff has not clearly established his right to be free from unreasonable seizure

under the Fourth Amendment was violated, Defendants are entitled to qualified immunity. The

Court will grant summary judgment in Defendants' favor on this claim.

### iii.    Procedural Due Process Violation

In his last claim, Plaintiff asserts Defendants deprived him of his motorcycle without due

process of law in violation of the Fourteenth Amendment. Defendants argue they are entitled to

qualified immunity because there was no deprivation of property, and the law was not clearly established finding otherwise.

The Fourteenth Amendment provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." *Town of Castle Rock, Co. v. Gonzales*, 545 U.S. 748, 755 (2005) (quoting U.S. Const. amend. XIV, § 1). Procedural due process requires the right to notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Fuentes v. Shevin*, 407 U.S. 67, 86 (1972). "Any significant taking of property by the State is within the purview of the Due Process Clause." *Id*. at 80. However, the Fourteenth Amendment "does not protect against the conduct of private persons." *Moore v. Carpenter*, 404 F.3d 1043, 1046 (8th Cir. 2005). "States are responsible for private conduct only when the state has exercised coercion or significantly encouraged the conduct, not when the state has merely acquiesced in a private party's initiatives." *Id*. "Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." *Blum v. Yaretsky*, 457 U.S. 991, 1004-05 (1982).

In this case, Defendants did not coerce or significantly encourage Ms. Elmore and Mr. Mackenzie to take Plaintiff's motorcycle. The Court believes Defendants' actions are closer to mere approval or acquiescence. Although Defendants did verify the VIN number on the motorcycle, they did not in any way aid Ms. Elmore and Mr. Mackenzie in its removal. The Court finds Defendants did not take Plaintiff's motorcycle within the meaning of the Fourteenth Amendment. Furthermore, this area of the law is particularly fact sensitive and complicated. *Moore*, 404 F.3d at 1046. The Court finds a reasonable officer would not clearly understand that his conduct was unlawful in the situation Defendants confronted. Thus, it was not clearly

20

established that Defendants' conduct was unlawful. For these reasons, the Court finds Defendants are entitled to qualified immunity on Plaintiff's claim Defendants violated his Fourteenth Amendment right to due process. The Court will grant summary judgment in Defendants' favor on this claim.

### iv.     Official Capacity Claims

Plaintiff filed suit against Defendants in their individual and official capacities. Defendants ask the Court to grant summary judgment against Plaintiff on his official capacity claims because Plaintiff has not pleaded or produced evidence of a municipal policy or custom that caused Plaintiff's alleged injury. Plaintiff did not respond to this argument. Plaintiff's failure to oppose a basis for summary judgment constitutes waiver of that argument. *Satcher v. University of Ark. at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009). The Court will also grant summary judgment in Defendants' favor on Plaintiff's official capacity claims.

### B.     Motion for Sanctions

Plaintiff moves for sanctions against Defendants pursuant to Rule 37(e) for failure to preserve electronically stored information, specifically Officer Gerholdt's dash and body camera recordings from October 22-23, 2022. Plaintiff asks the Court to presume the lost ESI was unfavorable to Defendants when deciding the summary judgment motions and to instruct the jury at trial the lost ESI was unfavorable to Defendants. Plaintiff also asks the Court to issue sanctions necessary to cure the prejudice caused by the loss of ESI and for an award of fees and costs incurred in discovery related to this issue and this motion.

### i.     Facts Related to the Motion

The parties presented the following undisputed facts as it relates to this motion. Officer Gerholdt's body camera and dash camera were active and recording during the entire encounter

involving Defendants, Ms. Elmore, and Mr. Mackenzie at Plaintiff's residence on October 22, 2022. His body camera made both a video and audio recording of Officer Gerholdt's interactions that night. His dash camera made a video recording of his initial interaction with Ms. Elmore and Mr. Mackenzie. Officer Gerholdt's body camera was also activated and recording when he returned to Plaintiff's residence on October 23. Officer Cockrell did not activate his body camera at any point. At the end of a shift, Manchester Police Department ("MPD") officers place their body cameras into a docking station that automatically downloads the recordings onto a server.

At all relevant times, the MPD had a written policy in place governing the use and retention of body camera recordings. Pursuant to MPD General Order 466, body camera recordings "will be retained for a minimum of 30 days per Missouri Secretary of State Records Retention Schedule requirements." The Order also states, "[r]ecordings related to misdemeanor or felony criminal proceedings, litigation or a personnel complaint, shall be preserved until the matter is resolved . . ." MPD policy also requires body and dash camera recordings to be preserved for at least three years if they relate to a felony investigation.

Twenty-two days after Defendants entered Plaintiff's backyard, on November 14, 2022, Plaintiff's counsel emailed a preservation letter to the MPD, as well as Paul Rost and Erin Seele, the city attorneys of the City of Manchester. The letter demanded that relevant electronically stored information including body and dash camera footage be preserved in anticipation of possible litigation. The letter directed the preservation request to the MPD, "all officers, employees, supervisors, attorneys and/or any other individual associated" with the MPD, "who may have access to potentially relevant documents, tangible items, or ESI." This letter was not individually sent to either Defendant.

Manchester Police Chief Scott Will was on vacation from November 13-27, 2022. He then was out of the office from November 30-December 5, 2022, due to complications from a medical procedure. When he received and read the letter, he reviewed the police report of the incident. He knew the statute of limitations for the offense was three years and believed that any body or dash camera footage tagged as a "felony incident" would be retained pursuant to automatic retention settings consistent with the statute of limitations. He did not log onto the evidence management system because he believed it would be retained.

Officer Gerholdt testified in his deposition that he was never asked to preserve his body or dash camera recordings from October 22-23, 2022. He stated he had never seen the preservation letter before his deposition. He did not take any additional steps to preserve the recordings. They were not preserved and are no longer available.

### ii.        Analysis

Under Rule 37(e), if ESI that should have been preserved is lost because a party failed to take reasonable steps to preserve it, the Court "upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice," or if the party acted with the intent to deprive another party of the information's use, may presume the information was unfavorable to the party, instruct the jury that it may or must presume the information was unfavorable to the party, or dismiss the action or enter a default judgment. Fed. R. Civ. P. 37(e)(1), (2). Thus, before imposing sanctions, a court must find that the ESI was lost, the party had a duty to preserve the ESI, the party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery. *Blazer v. Gall*, 2019 WL 3494785 at *3 (D.S.D. Aug. 1, 2019).

Plaintiff asserts that the destruction of the body and dash camera recordings have prejudiced him because the recordings documented the entirety of the events that form the factual basis of each of his claims. He also argues the destruction of the recordings prejudices his ability to seek punitive damages at trial. The Court does not believe the body or dash camera recordings would change the Court's determination that Defendants are entitled to qualified immunity because it was not clearly established that their conduct violated the Constitution. The evidence Plaintiff seeks from the body and dash camera recordings primarily goes to the subjective intent of the officers, which may be relevant to punitive damages but does not alter the Court's analysis of the law and circumstances relevant to qualified immunity in this case. Even if the body camera footage was still available and showed the gate to Plaintiff's backyard was shut when the officers arrived, the Court would still conclude that a constitutional violation in these circumstances is not clearly established. The Court does not need to decide whether the evidence would prejudice Plaintiff in his claim for punitive damages because it has found Defendants are entitled to qualified immunity. For these reasons, the Court will deny Plaintiff's Motion for Sanctions.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 32) is **GRANTED**. The Court finds Defendants are entitled to qualified immunity and grants judgment to Defendants on all counts. Plaintiff's Complaint is **DISMISSED**, with prejudice.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Sanctions for Failure to Preserve Evidence (ECF No. 36) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment (ECF No. 38) is **DENIED**.

So Ordered this 1st day of May, 2024.

_____
**STEPHEN R. WELBY**
**UNITED STATES MAGISTRATE JUDGE**